UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------------x
LEVON ALEKSANIAN, SONAM, LAMA, HARJIT KHATRA,
and, Individually, on Behalf of All Others Similarly Situated, and
as Class Representatives,

                              Plaintiffs,                                    19-cv ### (AKH)

                                                                            COMPLAINT
                              -against-


UBER TECHNOLOGIES, INC., UBER LOGISTIK, LLC, UBER
USA LLC, jointly and severally,

                              Defendants.
------------------------------------------------------------------------------------------x

Plaintiffs Levon Aleksanian, Sonam Lama, and Harjit Khatra ("Named Plaintiffs"), individually, and on behalf of all others similarly situated, and as class representatives, by and through counsel, Mirer, Mazzocchi, & Julien, PLLC, and Zubin Soleimany Esq., hereby allege as follows:

## NATURE OF THE CASE

1.      This is a class action brought against Uber Technologies, Inc., Uber Logistik, LLC, and Uber USA, LLC (collectively "Uber") by Named Plaintiffs, New York City Uber drivers, on behalf of themselves and all other similarly situated persons complaining on a class basis of systematic breaches of contract.

2.      Specifically, this lawsuit seeks to recover amounts that were systematically deducted from drivers' earnings in violation of Uber's driver contracts (known as Uber "Software License and Services Agreement": hereafter "contracts") as a result of Uber's payment practices in New York from at least November 6, 2013 through May 22, 2017. The Named Plaintiffs are present and former drivers who contracted with Uber to drive Black Cars as part of Uber's New York City fleet and who did not opt out of arbitration.

1

3.     The claims raised herein on behalf of those similarly situated seek to provide redress to more than 96,000 New York City Uber drivers (hereafter "drivers")  for breaches of contract affecting every member of the largest private sector workforce in New York City over the relevant period.

4.     From the time Uber entered the New York City market in 2011, until May 22, 2017, Uber illegally deducted from drivers' earnings monies which Uber represented were sales taxes and the surcharge for the Black Car Fund ("BCF") surcharge, which provides Workers' Compensation for Black Car drivers.

5.     Uber's own contract did not allow for such deductions from driver earnings. Rather, Uber's contracts promised drivers a set percentage of each fare paid by the passenger, with only Uber's commission, or "Service Fee" deducted from each fare.

6.     During the relevant time period, Uber deducted its Service Fee, which ranged from 20-28% of the fare.

7.     In the relevant period, the New York City sales tax rate was 8.875% and the BCF surcharge rate was 2.5%.

8.     Such unlawful deductions in violation of the governing contracts occurred only on trips taken within New York State because, under New York sales tax law, only intra-state Black Car trips are considered taxable, and, for example, drivers' trips between New York and Connecticut were not subject to sales tax.[1]

9.     Defendants' practice of deducting amounts represented as the consumer sales tax and the BCF surcharge from driver earnings ended shortly after other Uber driver Plaintiffs in *New York Taxi Workers Alliance et al v. Uber Technologies, Inc. et al*, 16-CV-04098 (AKH), later styled as *Haider et al v. Uber Technologies, Inc. et al.*, cited to specific tax regulations making clear the unlawful nature of Uber's deduction practice.

---

[1] Because interstate trips which originate in New York state are subject to the BCF surcharge, Uber's deductions of BCF surcharge amounts from driver pay occurred on those interstate trips originating in New York State.

10.     In a May 19, 2017 e-mail to its New York City drivers, Uber wrote: "We're moving to a simpler rate structure where service fees & taxes will no longer be included in base, time & distance rates. With these changes, you'll see an earnings increase on trips in New York." The e-mail continued: "Previously, you needed to deduct Uber's service fee, sales tax and Black Car Fund fee from your rates to determine your earnings. Now, no math is required. You'll always know exactly what you'll earn." (Emphasis original).   This email admitted Uber's violation.

11.     Then, effective May 22, 2017, Uber amended its contract to no longer promise drivers the full fare paid by the passenger minus only a static percentage deducted from each fare as Uber's service fee.

12.     Simultaneously, Uber claimed to have just discovered that it was underpaying its New York City drivers, and remitted tens of millions of dollars to the drivers.  *See*, Noam Scheiber, *Uber Says It Just Noticed Error on Pay, but It Was No Secret*. N.Y TIMES (Jun. 1, 2017), available at https://www.nytimes.com/2017/06/01/business/uber-driver-commissions.html (Last Accessed: Oct. 24, 2019). Such payments by Uber, however, amounted to only a fraction of the total deductions Uber made in violation of its contracts.

13.     This lawsuit seeks to recover the full sum wrongfully taken by Uber from more than 96,000 New York City drivers in violation of Uber's contracts, subject to offset by Uber's "May 22, 2017 Payback."

14.     Defendants also engaged in a second systematic contract violation which consisted of keeping a double set of books in a scheme called "Upfront Pricing," introduced in or about April 2016, during which time Uber charged different fares to customers than it reported on drivers' pay statements. This surreptitious use of double definitions of the "Fare," a defined term under the contract, resulted in Uber charging higher fares to passengers than those it reported to drivers. Uber then pocketed the
 difference, depriving drivers of their contractual share of the full fare charged to customers.

15.     This practice was expressly forbidden by the contract until May 22, 2017 when Uber amended its contract to permit it.

16.     Further, the upfront pricing practice amplified the existing tax and BCF unlawful deductions by increasing the size of such unlawful deductions, which were based on the higher consumer price.

17.     Named Plaintiffs seek to represent two classes:  A class of New York City Uber drivers who were subjected to Uber's systematic contract violations since at least November 6, 2013 through May 22, 2017 as a result of Uber's unlawful deduction of amounts represented as tax and BCF surcharge from driver earnings (the "Tax and BCF Class"); and a class of New York City Uber drivers who were subjected to Uber's systematic contract violations from in or about April 2016 through May 22, 2017 due to Uber's unlawful Upfront Pricing practices (the "Upfront Pricing Class").

18.     Named Plaintiffs and the two classes they seek to represent are New York City Uber drivers who did not opt out of Uber's arbitration clause.

19.     Indeed, the claims of a class of New York City Uber drivers who did opt out of arbitration was certified and has been resolved on the issue of unlawful Tax and BCF breaches.

20.      Named Plaintiffs bring this putative class action as they and the class they seek to represent are exempt from having to arbitrate their claims under the provisions of the Federal Arbitration Act, 9 U.S.C. § 1, as they are transportation workers engaged in interstate commerce. *See e.g. Singh v. Uber Techs., Inc.*, 2019 U.S. App LEXIS 27412, 2019 WL 4282185 (3d Cir. Sept. 11, 2019).

21.     As of 2019, any decision as to whether a class of workers is exempt from the FAA is for the Court, not an arbitrator, to decide.  *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019).

**PARTIES**

**Plaintiff Levon Aleksanian**

22.     Plaintiff Levon Aleksanian ("Aleksanian") is a resident of Fresh Meadows, Queens County, New York.

23.     Aleksanian drove for Uber in New York City from August 2014 to September 2015.

24.     Aleksanian is a party to the June 2014, November 10, 2014, and April 3, 2015 contracts with Uber and did not opt out of the arbitration clauses to such contracts.

25.     Aleksanian was expected to and regularly did transport passengers across state lines while working as an Uber driver.

26.     Thus, Aleksanian is a worker engaged in interstate commerce and exempt from the arbitration clauses contained in the Uber contracts to which he is a party.

27.     During his tenure with Uber, 4.36% of the trips Aleksanian performed for Uber involved transporting a passenger across state lines.  These interstate trips accounted for 10.12% of the total sales volume of Uber trips provided by Mr. Aleksanian.

28.     Aleksanian seeks to represent the Tax and BCF Class only.

**Plaintiff Sonam Lama**

29.      Plaintiff Sonam Lama ("Lama") is a resident of Astoria, Queens County, New York.

30.     Lama has been driving for Uber in New York City from April 2015 to the present.

31.     Lama is a party to the April 3, 2015 and December 11, 2015 contracts with Uber and did not opt out of the arbitration clauses to such contracts.

32.     Lama was expected to and regularly did transport passengers across state lines while working as an Uber driver.

33.     Thus, Lama is a worker engaged in interstate commerce and exempt from the arbitration clauses contained in the Uber contracts to which he is a party.

34.     Uber does not currently allow Lama to access his trip records from the relevant time period, however, in 2017, Lama saved payment statements from eight consecutive weeks that provide a representative sampling of the amount of interstate work he performed for Uber.

35.     During this eight-week period from January 4, 2016 to February 22, 2016, 7.55% of the number of trips Lama performed for Uber involved transporting passengers across state lines.

36.     During the same time period, these interstate trips accounted for 19.78% of the total stated cost of rides Lama provided.

37.     Lama seeks to represent both Classes.

**Plaintiff Harjit Khatra**

38.     Plaintiff Harjit Khatra ("Khatra") is a resident of Hicksville, Nassau County, New York.

39.     Khatra has been driving for Uber in New York City from in or about October 2013 to the present.

40.     Khatra is a party to all contracts with Uber in the relevant period— July 2013, June 2014, and on November 10, 2014, April 3, 2015, and December 11, 2015—and he did not opt out of the arbitration clauses to such contracts.

41.     Khatra was expected to and regularly did transport passengers across state lines while working as an Uber driver.

42.     Thus, Khatra is a worker engaged in interstate commerce and exempt from the arbitration clauses contained in the Uber contracts to which he is a party.

43.     Uber does not currently allow Khatra to access his trip records from the relevant time period, but on information and belief, given his long history with Uber, his percentage of interstate trips is similar to other Named Plaintiffs and the putative class as a whole.

44.     Khatra seeks to represent both Classes.

**Defendants**

**Uber Technologies, Inc.**

45.     Uber Technologies, Inc. ("Uber Technologies") is a Delaware corporation.

46.     Uber Technologies maintains its headquarters at 1455 Market Street, 4th Floor, San Francisco, CA 94103.

47.     Uber Technologies operates twenty-eight (28) wholly owned subsidiaries in New York, each of which has held or currently holds a TLC license to operate a For-Hire Vehicle (FHV) Base.

48.     Uber operates its Black Car operations in New York City as a group of Black Car bases and one luxury limousine base, each of which is licensed by the New York City Taxi Limousine Commission (TLC). These bases are subsidiaries of Defendant Uber Technologies, which is the owner of the app.

49.     All Black Cars operating in New York City must be affiliated with a base in order to accept dispatches, but drivers are permitted to accept dispatches from any base under TLC rules.

50.     Most Uber drivers operate vehicles affiliated with these bases, each organized as a separate LLC. Uber, however, effectively operates its bases as a unified company known as "Uber."

51.     All requests for the Uber service are made through the Uber smartphone application (the Uber "app") and are dispatched to Uber drivers through Uber's centralized dispatch network that also operates via the Uber app.

52.     By dispatching in New York City through its Black Car bases, Uber, was the vendor of transportation services under applicable New York Tax Law.

53.     As the vendor, Uber and its subsidiary Black Car bases were responsible to collect and remit the tax.

54.     From December 31, 2011 to on or about November 9, 2014, Uber Technologies was a party to the contracts pursuant to which drivers received dispatches from the Uber "app."

55.     Uber Technologies is the sole owner of Uber USA and Uber Logistik.

**Uber Logistik, LLC**

56.    Uber Logistik is a limited liability company organized under the laws of the state of Delaware on May 6, 2014.

57.    Uber Logistik is a wholly owned subsidiary of Uber Technologies, Inc.

58.    From on or about November 10, 2014 to on or about April 2, 2015, Uber Logistik was a party to the contracts pursuant to which drivers received dispatches from the Uber "app."

**Uber USA, LLC**

59.    Uber USA, LLC ("Uber USA") is a Delaware limited liability company, solely owned by Uber Technologies.

60.    Uber USA, LLC is a wholly owned subsidiary of Uber Technologies, Inc.

61.    Uber USA states in its filings with the TLC that it is the "general member" of many of Uber's FHV bases.

62.    From on or about April 3, 2015 to the present, Uber USA has been a party to the contracts pursuant to which drivers received dispatches from the Uber "app."

63.    All Defendants operate as a single integrated entity (collectively "Uber").

## JURISDICTION AND VENUE

64.    Jurisdiction is proper as this Court has diversity jurisdiction under 28 U.S.C. §1332 as all corporate defendants are citizens of the State of Delaware, and all Named Plaintiffs are citizens of the state of New York and the amount in controversy in this case exceeds $75,000.

65.    Jurisdiction is also proper as this Court under 28 U.S.C. § 1332 (d) based on diversity of citizenship and the Class Action Fairness Act ("CAFA").

66.    The Tax and BCF Class is made up of all Uber drivers who drove in New York City at any time in the period from November 6, 2013 until May 22, 2017.

67.    The Upfront Pricing Class is made up of all Uber drivers who drove in New York City at any time in the period from in or about April 2016 until May 22, 2017.

68.    On information and belief, based on press reports and public records, the potential number of Putative Class members of the Tax and BCF Class is over 96,000 drivers who made

millions of trips each year for Uber. The potential number of Putative Class members of the Upfront Pricing Class is thousands of drivers who made millions of trips each year for Uber.

69.     Given the number of Putative Class members and the fact that more than 10% of each fare was illegally deducted from each of the drivers, the aggregate amount in controversy is over $5,000,000.00.

70.     Plaintiffs allege that the requirements of U.S.C. §1332(d)(2) are met because, for a period of over four years, Defendants impermissibly took more than 10% of most fares owed to the drivers from their pay.

71.     Defendants are subject to personal jurisdiction in the State of New York as they do business in New York.

72.     Venue is proper in this District because Defendants conduct business in this Judicial District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

73.     This case is related to *New York Taxi Workers Alliance, Harjit Khatra et al. v Uber Technologies et. al.*, 16-cv-08299, which was deemed a related case to *Haider v Uber*, 16-cv-04098. *NYTWA, Khatra et al v. Uber et al.* was dismissed without prejudice on February 1, 2017.  One of the plaintiffs originally in the *Haider* and then *Khatra* actions and the theories in the *Haider* litigation are the same as the breach of contract theories presented in this case.

74.     As transportation workers engaged in interstate commerce, Plaintiffs are exempt from the Federal Arbitration Act.

## FACTUAL ALLEGATIONS

### Uber Has Structured Its New York City Business Such That New York City-based Uber Drivers Are Engaged In Interstate Commerce

75.     As noted in the allegations regarding the Named Plaintiffs, New York City-based Uber drivers routinely transport passengers across state lines while performing services for Uber.

76.     Uber's New York City business model is structured to provide not only transportation within New York City and New York State, but interstate transportation as well; Uber's policies contemplate the regular performance of interstate transportation work by its drivers.

77.     Uber has maintained a consistent policy, published in both driver pay documents and consumer-facing advertising, of imposing a "$20 surcharge on all trips between NYC and New Jersey."

78.     At times, Uber advertised flat rates for trips between Manhattan and Newark International Airport.

79.     New York City-based Uber drivers routinely transport passengers between New York and New Jersey or Connecticut.

80.     Uber's policies state that trips originating in New York City may last as long as four hours.

81.     Specifically, in entering ride locations passengers may choose any destination within four hours of their pick-up location, irrespective of the state of the destination.

82.     Thus, New York City-based Uber drivers may be dispatched to locations in New Jersey, Connecticut, Pennsylvania, Rhode Island, Massachusetts, Vermont, Delaware, or Maryland.

83.     Once a driver receives a dispatch, Uber specifies the pick-up location, but withholds the drop-off location until the passenger has entered the vehicle.

84.      Drivers are instructed that they will be penalized should they not accept an Uber dispatch.  If a driver refuses a trip after learning of the destination, Uber considers such a refusal to be a "cancellation."

85.     During the relevant time period, Uber maintained a deactivation policy that stated that drivers' accounts could be permanently deactivated for excessive cancellation rates. Accordingly, no driver had the option to exclude performing interstate trips, without risking further exposure to deactivation.

86.     The Uber app is programmed to anticipate interstate trips and makes pricing adjustments when it recognizes an interstate trip by not indicating any deductions or assessments for sales tax on trips originating in New York but terminating in other states, pursuant to New York Tax law and regulations which require taxation of only intra-state trips.

87.     Thus, acceptance of interstate trips was a term and condition of Named Plaintiffs and all Putative Class members' access to Uber dispatches.

88.     All Named Plaintiffs and Putative Class members were required to perform interstate trips.

89.     All Named Plaintiffs and Putative Class members did in fact perform interstate trips.

**Plaintiffs And Similarly Situated Persons Signed Contracts With Uber In Order To Drive, Providing That Drivers Would Receive The Customer Fare Minus Uber's Service Fee**

90.     In order to receive Uber dispatches, Named Plaintiffs and similarly situated persons were required to either sign a paper copy, or electronically "accept" a contract on their phones to use the Uber App.

91.     Uber published five different contracts that it required its drivers to accept during the relevant time period, from November 6, 2013 to May 22, 2017. These contracts were issued in July 2013, June 2014, and on November 10, 2014, April 3, 2015, and December 11, 2015, respectively.

92.     In order to receive dispatches after a new contract, a driver was required to agree to the new contract, which appeared on his or her phone, before any new dispatch could come in.

93.     During this same time period, Defendants made additional deductions from drivers' pay which they represented were intended to cover the cost of taxes and contributions to a drivers' Workers' Compensation Fund, known as the Black Car Fund or BCF.

94.     All contracts in the relevant period provided that drivers would receive the passenger fare minus a service fee, set at Uber's sole discretion.

95.     Uber's service fee at all times was separately stated on the Uber website and incorporated by reference into the driver contract.

96.     In the relevant period, Uber would deduct as its service fee anywhere from 20% to 28% of each fare depending on the class of service provided, the time period, and when drivers began working for Uber,

## Uber's Tax And BCF Breaches Of Contract

### *November 6, 2013 Through November 10, 2014: Uber's Breaches of the July 2013 and June 2014 Gross Fare Contracts By Unlawful Retention of Drivers' Monies*

97.     Pursuant to Section 1.12 of the July 2013 and June 2014 versions of the driver contracts, which remained in effect through November 10, 2014, Uber defined the word "Fare" as "the amount (including applicable taxes and fees) that the [contracting driver] is entitled to charge the User for the Ride, based on the recommended fares for the City as set out on http://www.uber.com or on the App."

98.     That is, "Fare" meant the total amount Uber charged its passengers for a ride.

99.     The July 2013 and June 2014 contracts state, at Section 5.2.1, that the driver will pay Uber a "Fee" per ride that is "calculated as a percentage of each Fare."

100.     During the relevant period, drivers contracted with Uber to pay Fees of 20%, 25% or 28%, depending on the service offered and the period during which services were offered.

101.     Section 5.2.1 of the July 2013 and June 2014 contracts provides that the driver (referred to as "Transportation Company" or "Customer"), agrees that Uber will "deduct its Fee payable on all Fares earned by the Transportation Company and remit the remainder of the Fare to the Transportation Company."

102.     Quite simply, the July 2013 and June 2014 contracts require Uber to collect the gross fare, and remit the fare to drivers, minus Uber's Fee.

103.     Nothing in the July 2013 and June 2014 contracts empowers Uber or any of its subsidiaries to remove any additional amounts from the fare.

12

104.    Yet, at all times while these agreements were in force, Uber and its subsidiaries collected the entire Fare from passengers, and remitted to drivers the Fare minus Uber's Fee, and additionally, minus amounts represented as sales tax and the BCF surcharge.

105.    By so doing, Uber breached these contracts to Plaintiffs' detriment.

*November 11, 2014 Through May 22, 2017: Uber's Violations of The November 10, 2014, April 3, 2015, and December 11, 2015 Contracts*

106.    Contracts in force since November 11, 2014 likewise defined "Fare" to mean the total amount charged to the customer.

107.    Under the November 10, 2014, April 3, 2015, and December 11, 2015 versions of the contract the term "Fare" is defined in Section 1.9, by reference to Section 4.1 of each contract.

108.    Section 4.1 of the contract defines "Fare" as set forth in the below paragraphs.

109.    Section 4.1 of the November 10, 2014 and April 3, 2015 Contracts states that the Fare would be an amount charged to the "User" or passenger "calculated based upon a base fare amount plus mileage and/or time amounts, as detailed for the applicable Territory."

110.    The December 11, 2015 contract defines Fare in functionally similar terms, stating the Fare would be an amount charged to a User, "calculated based upon a base fare amount plus distance (as determined by Uber using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory."

111.    The November 10, 2014, April 3, 2015, and December 11, 2015 Contracts state, at Section 4.4, that the driver will pay Uber a service fee per ride that is "calculated as a percentage of the Fare."

112.    Further, Section 4.1 of the November 2014 and April 2015 Contracts state "Uber agrees to remit to Customer on at least a weekly basis: (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees."

113.    Section 4.1 of the December 11, 2015 contract contains almost-identical language, stating: "Uber agrees to remit, or cause to be remitted, to Customer on at least a weekly basis: (a)

the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees."

114.    During the relevant period Uber retained its service fee pursuant to Section 4.1.

115.    During the relevant period Uber remitted to drivers tolls collected from passengers (which were paid for by drivers) pursuant to Section 4.1.

116.    At all times relevant Uber did not remit tax to drivers as Section 4.1 is inapplicable in New York City, as New York law requires dispatching Black Car bases to collect and remit tax.

117.    Thus, as with its earlier Contracts, nothing in Uber's 2014 and 2015 Contracts entitled Uber to take any additional amounts from driver earnings aside from Uber's service fee.

118.    Nor did the November 2014, April 2015, and December 11, 2015 contracts permit the taxes to be included in the fare as, section 4.1 conceives of taxes and fees as discrete sums outside of the fare.

119.    However, as before, Uber deducted amounts purported to be Sales Tax and the BCF surcharge from driver earnings, in addition to the service fee, in violation of the contract.

120.    While, in a statement to the New York Times, Uber maintained that some of the Fare included taxes, State law and regulations do not permit a black car base to treat the sales tax or Black Car Fund surcharge as part of the cost of services, but requires such amounts to be charged separately on top of the fare and separately on receipts. N.Y. Tax L. § 1132 (a); 20 N.Y.C.R.R. § 532.1 (b); N.Y. Exec. L. 160-jj(2)); See Plan of Operation of The New York Black Car Operators' Injury Compensation Fund, Inc., at Article VIII, §6. See, Noam Scheiber, *How Uber's Tax Calculations May Have Cost Drivers Hundreds of Millions*. N.Y. TIMES, (July 5, 2017). Available at https://www.nytimes.com/2017/07/05/business/how-uber-may-have-improperly-taxed-its-drivers.html (Last Accessed Oct. 23, 2019), attached as Appendix A.

121.    At all times relevant Uber failed to assess be Sales Tax and BCF in addition to the Fare as required.

122.    That is, at all times relevant, Uber itemized its receipts to show that every part of the Fare charged to the customer represents part of the consumer sales price for transportation services, broken down into separate charges for the base fare, the charge for distance, and the charge for time, respectively: thus, the fare.

123.    Accordingly, at all times relevant, 100% of the monies collected from New York City passengers by Uber (minus tolls and the Split Fare and Safe Ride Fees) was the fare due and owing to drivers, minus solely Uber's service fee.

**Uber's Upfront Pricing Practice Violates Drivers' Rights to Compensation Pursuant to the Contract**

124.    Upon information and belief, in or about April 2016, Uber launched a pricing scheme called "Upfront Pricing" whereby the customer received a fare quote in advance of the trip. Drivers continued to receive a fare based on the base charge, plus time, plus distance formula. *See* https://newsroom.uber.com/upfront-fares-no-math-and-no-surprises/

125.    This scheme remained in effect until on or about May 22, 2017 when Uber amended its contracts to allow for this this type of scheme.

126.    During this period, the governing contract was the December 11, 2015 contract.

127.    Under this scheme, Uber processed the monies to drivers as though the fare was the base charge, time plus distance fare, subjecting only such fare to the contractual split. However, inasmuch as the Upfront Price quoted to customers was often greater than the base charge, plus time, plus distance fare, Uber retained the excess without sharing such monies with drivers. *See* Joel Rubin*, Lawsuit accuses Uber of ripping off drivers, paying them smaller fares than what passengers pay* (Apr. 28, 2017). L.A. Times. Available at, http://www.latimes.com/local/lanow/la-me-uber-drivers-lawsuit-20170429-story.html.

128.    That is, Uber used two definitions of a fare: an oftentimes higher fare which, unbeknownst to drivers, it quoted to customers, and a separate, often-lower fare it showed to drivers, which appeared on drivers' weekly statements.

129.    The contract did not permit multiple definitions of the fare.

130.    Pursuant to Section 4.1 of Uber's contract with drivers, the "Fare" is defined as "the amount charged to the passenger." Section 4.1 states that the driver charges the rider a fare for each ride, based on the Fare as listed at uber.com/cities.

131.    Uber's failure to pass on to the driver the fare charged to the passenger minus its service fee is a violation of the contract.

132.    Plaintiffs Lama and Khatra and all similarly situated persons who drove for Uber in the relevant period when the Upfront Pricing scheme was in force, have been harmed by Defendants' violation of the contract in the amount of 80% to 72% of the difference between the fare reported on Plaintiffs' driver pay statements and the fare actually charged to customers.

133.    That is, through their use of Upfront Pricing, Defendants benefitted by charging the customer a sum in excess of the amount it reported as the fare on drivers' pay statements. Defendants kept the difference between the two fares to its benefit, excluding Plaintiffs from any share in such monies, and thus failing to adequately compensate Plaintiffs therefor.

### Tax And BCF Breach Class Allegations

134.    Plaintiffs commence this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, including Rule 23(b)(3), on behalf of the following class: Uber Drivers who were parties to any of the following contracts—the July 2013, June 2014, November 10, 2014, April 3, 2015, and/or December 11, 2015 Contracts— who did not opt out of the arbitration clause of such contracts, and who provided trips in New York City prior to May 23, 2017 (the "Tax and BCF Class").

135.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial

officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

136.    The Tax and BCF Class claims are brought to recover damages from the violations of the contract by Uber's taking of amounts purported to be sales tax and BCF surcharge from drivers' earnings in violations of the aforementioned contracts.

137.    Named Plaintiffs, as Putative Tax and BCF Class Representatives, seek to represent a class of New York Uber drivers who have been subject to the Tax and BCF Breaches set forth in this complaint for the period of on or about November 6, 2013 to May 22, 2017 (hereafter the "Tax and BCF class action period.")

138.    The class action Plaintiffs are readily ascertainable since the identity, addresses, time records, work schedules, positions, rates of pay, and trip records for each such Putative Class member are determinable from the Defendants' records. Notice can be provided pursuant to Rule 23 of the Fed. R. Civ. P.

139.    **Numerosity:** The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. The precise number of such persons is unknown as the data required to calculate that number is presently within the sole possession, custody, and control of Defendants. Upon information and belief, there are at least ninety-six thousand (96,000) Uber drivers in New York who are within the class definition.

140.    **Commonality:** There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members, including, but not limited to, the following:

    a.   Whether Uber breached its July 2013, June 2014, November 10, 2014, April

3, 2015, and/or December 11, 2015 Contracts by its practice of taking additional amounts purported to be sales tax and Black Car Fund from drivers' earnings.

b. Additional common questions of law and fact as developed during the discovery phase of this litigation.

141.    Typicality: Plaintiffs' claims are typical of the claims of the Class, as such claims could be alleged by any member of the Class, and the relief Plaintiffs seek is typical of the relief that Class members seek. All of the Class members were subject to the same systematic breaches of contracts of Defendants as alleged herein. Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of wrongful acts as to each Class member. Plaintiffs and other Class members sustained similar losses, injuries, and damages arising from the same unlawful breach of contracts by the Defendants' practice of taking purported tax and BCF surcharge amounts from driver earnings.

142.    **Adequacy of Representation:** Plaintiffs are fit to fairly and competently represent and protect the interests of the class action Plaintiffs. For the purposes of this action, the Named Plaintiffs have no interests that conflict with those of the class action Plaintiffs. Representative Plaintiffs' attorneys have considerable experience in the field of employment litigation as well as class action litigation.

143.    **Superiority:** Disposition of the claims as a class action is superior to any other available means of adjudication for the foregoing reasons:

(a) Class members are workers who individually lack the necessary resources to effectively litigate against a corporate defendant;

18

(b)  A class action is in the interests of judicial economy as individual litigation would result in the expenditure of considerable public resources;

(c) Injuries suffered by each Class member individually are small in comparison to the cost of individual litigation, dissuading and precluding redress of their claims;

(d)  The claims shared by Class members involve important public policy interests that would otherwise go unaddressed due to aforesaid barriers to and limitations of individual litigation, and;

(e) A class action will provide anonymity for those Class members whose fear of retaliation would otherwise dissuade them from asserting their rights as many Class members are still employed by Defendants.

(f) Questions of law and fact are common to all Class members and predominate over those of any individual Class member.

### Upfront Pricing Breach Class Allegations

144.    Additionally, Plaintiffs commence this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, including Rule 23(b)(3), on behalf of the following class: Uber drivers who were parties the April 3, 2015, and/or December 11, 2015 Contracts— who did not opt out of the arbitration clause of such contracts, and who provided trips in New York City from in or about April 2016 to May 22, 2017 (hereinafter the "Upfront Pricing Class").

145.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial

officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

146.    The Upfront Pricing claims are brought to recover damages from the violations of the contract by Uber's calculating driver earnings on an amount less than the actual customer fare, according to their Upfront Pricing system, in violations of the aforementioned contracts.

147.    Named Plaintiffs as Upfront Pricing Class Representatives seek to represent a class of New York Uber drivers who have been subject to the Upfront Pricing Breaches set forth in this complaint for the period of in or about April 2016 to May 22, 2017 (hereafter the "Upfront Pricing class action period.")

148.    The class action Plaintiffs are readily ascertainable since the identity, addresses, time records, work schedules, positions, rates of pay, and trip records for each such Putative Class member are determinable from the Defendants' records. Notice can be provided pursuant to Rule 23 of the Fed. R. Civ. P.

149.    **Numerosity:** The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. The precise number of such persons is unknown as the data required to calculate that number is presently within the sole possession, custody, and control of Defendants. Upon information and belief, there are thousands of Uber Drivers in New York who are within the definition of the class

150.    Commonality: There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members, including, but not limited to, the following:

    a.  Whether Uber breached its April 3, 2015, and/or December 11, 2015

Contracts by its practice of calculating and remitting drivers' earnings on a sum less than the actual Fare charged to passengers.

b.  Additional common questions of law and fact as developed during the discovery phase of this litigation.

151.    Typicality: Plaintiffs' claims are typical of the claims of the Class, as such claims could be alleged by any member of the Class, and the relief Plaintiffs seeks is typical of the relief that Class members seek. All of the Class members were subject to the same systematic breaches of contracts of Defendants as alleged herein. Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of wrongful acts as to each Class member. Plaintiffs and other Class members sustained similar losses, injuries, and damages arising from the same unlawful breach of contracts by the Defendants' practice of taking purported tax and BCF surcharge amounts from driver earnings.

152.    Adequacy of Representation: Plaintiffs are fit to fairly and competently represent and protect the interests of the class action Plaintiffs. For the purposes of this action, the Named Plaintiffs have no interests that conflict with those of the class action Plaintiffs. Representative Plaintiffs' attorneys have considerable experience in the field of employment litigation as well as class action litigation.

153.    Superiority: Disposition of the claims as a class action is superior to any other available means of adjudication for the foregoing reasons:

(a) Class members are workers who individually lack the necessary resources to effectively litigate against a corporate defendant;

(b) A class action is in the interests of judicial economy as individual litigation would result in the expenditure of considerable public resources;

(c) Injuries suffered by each Class member individually are small in comparison to the cost of individual litigation, dissuading and precluding redress of their claims;

(d)  The claims shared by Class members involve important public policy interests that would otherwise go unaddressed due to aforesaid barriers to and limitations of individual litigation, and;

(e) A class action will provide anonymity for those Class members whose fear of retaliation would otherwise dissuade them from asserting their rights as many Class members are still employed by Defendants.

(f) Questions of law and fact are common to all Class members and predominate over those of any individual Class member.

**FIRST CLAIM FOR RELIEF**

**Breach of Contract**

**(Brought by All Plaintiffs on Behalf of Themselves and the Tax and BCF Class and the Upfront Pricing Class)**

154.    Plaintiffs, on behalf of themselves and those similarly situated drivers, members of the Tax and BCF Class and the Upfront Pricing Class, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

155.    Plaintiffs are transportation workers who are engaged in interstate "commerce" and whose contracts of employment are therefore exempt from section 1 of the Federal Arbitration Act, 9 U.S.C. § 1.

156.    Plaintiffs and all similarly situated persons are parties to one of the following contracts with Uber: July 2013, June 2014, November 10, 2014, April 3, 2015, and/or December 11, 2015.

157.    Plaintiffs provided driving services pursuant to the contracts as required.

158.    As described above, Uber paid drivers less than they were owed pursuant to the governing contracts with drivers by (i) unlawfully deducting purported sales tax and Black Car Fund surcharge amounts as to the Tax and Black Car Class, and (ii) calculating and remitting drivers' earnings on a sum less than the actual Fare charged to passengers as to the Upfront Pricing Class.

159.    Throughout the period covered by the applicable statute of limitations, Defendants' actions and omissions, as alleged above, constituted independent and separate breaches of the contracts entered into by Plaintiffs and those similarly situated.

160.    As a direct and proximate result of Uber's breaches, Plaintiffs and others similarly situated, have been damaged in an amount as yet to be determined.

## RELIEF SOUGHT

**WHEREFORE**, Plaintiffs on behalf of themselves and the Putative Class Action Members, request relief as follows:

    A.  Certification of the Rule 23 Classes;

    B.  Appointment of undersigned counsel as Class Counsel;

    C.  Notice to the Classes of the action;

    D.  An award of damages for all breach of contract claims;

    E.  All penalties available under the applicable laws;

    F.  Interest as provided by law;

    G.  Such other relief as this Court deems just and proper.

Dated: New York, New York

      November 6, 2019

Respectfully submitted,

MIRER, MAZZOCCHI, & JULIEN &PLLC


By: Jeanne E. Mirer
    Ria Julien
*Attorney for Plaintiffs*
1 Whitehall Street, 16th Floor
New York, NY 10031
(212) 231-2235
Jmirer@mmsjlaw.com
rjulien@mmsjlaw.com


_____

By: Zubin Soleimany
*Attorney for Plaintiffs*
New York Taxi Workers Alliance
31-10 37th Avenue, Suite 300
Long Island City, NY  11101
718-706-9892
zsoleimany@nytwa.org

By: Zubin Soleimany
*Attorney for Plaintiffs*
New York Taxi Workers Alliance
31-10 37th Avenue, Suite 300
Long Island City, NY  11101
718-706-9892
zsoleimany@nytwa.org