UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------------------x

LEVON ALEKSANIAN, SONAM LAMA, HARJIT KHATRA,
and, Individually, on Behalf of All Others Similarly Situated, and
as Class Representatives,

                                 Plaintiffs,

                             -against-

UBER TECHNOLOGIES, INC., UBER LOGISTIK, LLC, UBER
USA LLC, jointly and severally,

                             Defendants.

---------------------------------------------------------------------------------------x

CASE NO.
1:19-cv-10308-ALC

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO COMPEL ARBITRATION OF DEFENDANTS
## <u>UBER TECHNOLOGIES, INC., UBER LOGISTIK, LLC, AND UBER USA LLC</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

ARGUMENT ........................................................................................................................ 4

I.      The Agreement Is Not a "Contract[ ] of Employment." ......................................... 4

II.     Plaintiffs Are Not Part of a "Class of Workers Engaged in Foreign or Interstate
        Commerce." ............................................................................................................. 6

        A.      Plaintiffs fall within the class of "personal transportation providers." ..................... 7

        B.      Personal transportation providers are not "engaged in foreign or interstate
                commerce." ......................................................................................................... 10

                1.      Text ............................................................................................................ 10

                2.      Structure .................................................................................................... 15

                3.      Purpose ...................................................................................................... 19

III.    Plaintiffs' Agreement to Arbitrate Is Enforceable under New York State Law. ............... 21

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

CASES

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ...............................................1, 4, 21, 23

*Bacashihua v. United States Postal Service*, 859 F.2d 402 (6th Cir. 1988) ...................................7

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ...................................................... *passim*

*Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003) ....................................................................19

*Cunningham v. Lyft, Inc.*, No. 1:19-cv-11974, 2020 WL 1503220 (D. Mass. Mar. 27, 2020), *appeal docketed*, No. 20-1379 (1st Cir. Apr. 6, 2020).......................................................14, 15

*Diaz v. Michigan Logistics Inc.*, 167 F. Supp. 3d 375 (E.D.N.Y. 2016) ......................................23

*Douglas v. United States District Court for Central District of California*, 495 F.3d 1062 (9th Cir. 2007)...........................................................................................................................24

*Gray v. Uber, Inc.*, No. 8:18-cv-3093-T-30SPF, 2019 WL 1785094 (M.D. Fla. Apr. 10, 2019) ...............................................................................................................................17

*Green Tree Financial Corp. Alabama v. Randolph*, 531 U.S. 79 (2000).......................................4

*Grice v. Uber Technologies, Inc.*, No. CV 18-2995 PSG, 2020 WL 497487 (C.D. Cal. Jan. 7, 2020) ............................................................................................................................17, 20

*Harris v. Shearson Hayden Stone, Inc.*, 56 N.Y.2d 627 (1982) ....................................................24

*Harris v. Shearson Hayden Stone, Inc.*, 82 A.D.2d 87 (1st Dep't 1981), *aff'd*, 56 N.Y.2d 627 (1982).......................................................................................................................23

*Hayes v. County Bank*, 26 A.D.3d 465 (2d Dep't 2006) ...............................................................24

*Heller v. Rasier, LLC*, No. CV 17-8545 PSG, 2020 WL 413243 (C.D. Cal. Jan. 7, 2020) .....................................................................................................13, 17, 20

*Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286 (11th Cir. 2005) ........................................................11

*Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078 (9th Cir. 2008) ..................................24

*Jetblue Airways Corp. v. Stephenson*, 31 Misc. 3d 1241(A), 2010 WL 6781684 (N.Y. Sup. Ct., N.Y. Cty. 2010) (unpublished table decision), *aff'd*, 88 A.D.3d 567 (1st Dep't 2011) ................................................................................................................................18

*Kowalewski v. Samandarov*, 590 F. Supp. 2d 477 (S.D.N.Y. 2008) ...........................14, 18, 20, 21

*Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891 (N.D. Cal. 2018), *appeal docketed*, No. 18-17232 (9th Cir. Nov. 20, 2018) ........................................................................................14

*Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201 (9th Cir. 2016) ..........................................24

*New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019) ...........................................................4, 5, 19

*New York v. Mountain Tobacco Co.*, 942 F.3d 536 (2d Cir. 2019) ...............................................21

*Rogers v. Lyft, Inc.*, No. 20-cv-01938-VC, 2020 WL 1684151 (N.D. Cal. Apr. 7, 2020), *appeal docketed*, No. 20-15689 (9th Cir. Apr. 16, 2020) ................................................ *passim*

*Rosen v. Transx Ltd.*, 816 F. Supp. 1364 (D. Minn. 1993) ............................................................7

*Scaccia v. Uber Technologies, Inc.*, No. 3:18-cv-00418, 2019 WL 2476811 (S.D. Ohio June 13, 2019), *report and recommendation adopted by* 2019 WL 4674333 (S.D. Ohio Sept. 25, 2019), *appeal docketed*, No. 19-4062 (6th Cir. Oct. 29, 2019) ................................17

*Shaw Group Inc. v. Triplefine International Corp.*, 322 F.3d 115 (2d Cir. 2003) .......................21

*Singh v. Uber Technologies, Inc.*, 939 F.3d 210 (3d Cir. 2019) ...............................................7, 18

*Tsadilas v. Providian National Bank*, 13 A.D.3d 190 (1st Dep't 2004) ........................................23

*United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), *overruled by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) .....................................................................14

*Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524 (S.D.N.Y. 2003) ........................................22, 23

STATUTES

9 U.S.C. § 1 ...............................................................................................................................1, 6, 7

9 U.S.C. § 2 .......................................................................................................................................4

ICC Termination Act of 1995, Pub. L. No. 104-88, § 103, 109 Stat. 803, 861 ...........................20

2 Information Law § 11:3 ...................................................................................................................5

2 Information Law § 11:14 .................................................................................................................5

Motor Carrier Act of 1935, Pub. L. No. 74-255, § 203(b), 49 Stat. 543, 545 ..............................19

Uniform Computer Information Transactions Act § 102 ...................................................................5

OTHER AUTHORITIES

Harold Barger, *The Transportation Industries, 1889-1946: A Study of Output, Employment and Productivity* (1951) ..........................................................................................................16

Regina R. Clewlow & Gouri Shankar Mishra, *Disruptive Transportation: The Adoption, Utilization, and Impacts of Ride-Hailing in the United States* (Inst. of Transp. Studies, Univ. of Cal., Davis, Research Report UCD-ITS-RR-17-07, 2017), https://itspubs. ucdavis.edu/wp-content/themes/ucdavis/pubs/download_pdf.php?id=2752 ...........................12

Sharon Feigon & Colin Murphy, *Broadening Understanding of the Interplay Among Public Transit, Shared Mobility, and Personal Automobiles* (TCRP Research Report, No. 195, 2018) ......................................................................................................................................12

Steven R. Gehrke, Alison Felix, & Timothy G. Reardon, *Substitution of Ride-Hailing Services for More Sustainable Travel Options in the Greater Boston Region*. Transportation (Research Record, 2019), https://doi.org/10.1177/0361198118821903 .........12

John W. Hazard, Jr., 1 *Copyright Law in Business & Practice* § 6:17, Westlaw (rev. ed. database updated Dec. 2019) .....................................................................................................6

Metropolitan Area Planning Commission, *Fare Choices: A Survey of Ride-Hailing Passengers in Metro Boston* (Feb. 2018), https://www.mapc.org/farechoices/ ......................12

New York City, For-Hire Vehicle Owners: Taxi & Limousine Rules § 59A-11, www1.nyc.gov/assets/tlc/downloads/pdf/rule_book_current_chapter_59.pdf ........................20

Order, *Reese v. Uber Technologies, Inc.*, No. 2:18-cv-03300 (E.D. Pa. Mar. 4, 2020), ECF No. 41 ........................................................................................................................................23

L.E. Peabody, *Forecasting Future Volume of Railway Traffic*, in 66 Railway Age 899, 900 (Samuel O. Dunn, Roy V. Wright & H.F. Lane eds., 1924)...................................... 15-16

*Rail Profile*, Bureau of Transportation Services, https://www.bts.gov/content/rail-profile (last visited Apr. 29, 2020) ............................................................................................................16

*Thirty-Third Annual Report on the Statistics of Railways in the United States* (Interstate Commerce Comm., Bureau of Statistics 1933) .....................................................................16

*The U.S. Waterway System: 2018 Transportation Facts & Information* (Army Corps of Engineers 2018) ........................................................................................................................16

## PRELIMINARY STATEMENT

Plaintiffs Levon Aleksanian, Sonam Lama, and Harjit Khatra agreed to individually arbitrate their disputes with Defendants Uber Technologies, Inc. and Uber USA LLC (collectively, "Uber").[1] They could easily have opted out of the arbitration provisions in their license agreements with Uber, but they did not. Plaintiffs now seek to renege on their agreements by filing a class-action lawsuit. They may not do so. The Supreme Court has held that arbitration agreements with class-action waivers are enforceable under the Federal Arbitration Act ("FAA"). *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011). In this case, too, the arbitration agreements must be enforced.

In an effort to avoid being bound by the arbitration agreements they signed, Plaintiffs invoke the FAA's exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Plaintiffs' argument is both wrong and irrelevant—wrong because the Section 1 exemption does not apply, and irrelevant because the arbitration agreements are also enforceable under state law.

Plaintiffs' agreements with Uber do not fall within Section 1 for two reasons. First, Plaintiffs did not enter into a "contract of employment." As the Supreme Court has recently held, a "contract of employment" under Section 1 is a contract where a worker promises to do work, either as an employee or as an independent contractor. Plaintiffs' license agreement with Uber, however, does not *require* them to work, but instead *permits* them to access Uber's software. Second, Plaintiffs do not fall within a "class of workers engaged in interstate commerce."

---

[1] Uber Logistik, LLC has been dissolved since 2015. Defendants' counsel waived service for Uber Technologies, Inc. and Uber USA LLC, but notified Plaintiffs' counsel of Uber Logistik, LLC's dissolution and requested that the entity be dismissed as a defendant. On May 1, 2020, Plaintiffs' counsel consented to dismissal of Uber Logistik, LLC.

Although some such workers may sporadically cross state lines, the *class* of workers—personal transportation providers—engage in local transportation of passengers, not interstate commerce. The Court should follow recent federal case law involving Uber and Lyft that reaches the same conclusion.

Even if Plaintiffs could show that they fall within Section 1, their effort to avoid arbitration would still fail. If the FAA does not apply, then state law applies. And under state law, Plaintiffs' arbitration agreements are enforceable irrespective of whether the FAA applies.

Accordingly, the Court should compel Plaintiffs to arbitrate their individual claims.

## FACTUAL BACKGROUND

Uber is a technology company. Ex. 1 (Declaration of Brad Rosenthal) ¶ 3. It develops proprietary software to create digital marketplaces that are operated through app-based platforms. *Id.* The company's first and most widely known marketplace, the Rides marketplace, connects independent transportation providers ("drivers") with individuals seeking transportation services ("riders"). *Id.* ¶¶ 3-4. Uber provides lead generation services to drivers through the Rides marketplace using the driver version of the Uber app (the "Driver App"). *Id.* ¶ 4.

To use the Driver App, a driver must first accept Uber's license agreement ("the Agreement").[2] *Id.* ¶¶ 9-10, 12-14; Ex. 2 ¶ 4. All three named plaintiffs did so. Compl. ¶¶ 24, 31, 40; Ex. 2 ¶¶ 5, 8. The Agreement allows drivers to access and use Uber Services, defined as "on-demand lead generation" services, which provide access to the Driver App and Uber's software,

---

[2] Aleksanian accepted Uber's June 21, 2014 Software License Agreement ("SLA") and June 21, 2014 Driver Addenda, while Lama and Khatra last accepted Uber's December 11, 2015 UBER USA Technology Services Agreement ("TSA") and December 11, 2015 UBER USA Driver Addendum. Ex. 2 (Declaration of Allison Gordon) ¶¶ 5, 8. For ease, both sets of agreements are referred to collectively as the "Agreement." The SLA is attached to Exhibit 2 as Exhibit A; the TSA is attached to Exhibit 2 as Exhibit D.

websites, payment services, and related support services systems. TSA § 1.17; SLA § 1.18. The Agreement does not impose any obligations on drivers; instead, it is a license that permits drivers to use Uber's platform. *See* TSA § 5.1 ("Subject to the terms and conditions of this Agreement, Uber hereby grants . . . a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use (and allow[ ] its Drivers to use) the Uber Services (including the Driver App on a Device) solely for the purpose of providing Transportation Services to Users and tracking resulting Fares and Fees."); SLA § 2.1 ("Uber hereby grants Transportation Company a non-exclusive, non-transferable, right to use the Software and Uber Service."). Drivers pay Uber a service fee. TSA § 4.4; SLA § 5.2.

The first page of the Agreement advises drivers, in bold, capitalized text, that it contains an Arbitration Provision, which drivers may "**CHOOSE TO OPT OUT OF . . . BY FOLLOWING THE INSTRUCTIONS PROVIDED IN [the Arbitration Provision] BELOW**." TSA at 1; SLA at 1. These instructions allow a driver to opt out of arbitration by notifying Uber in writing within 30 days of executing the Agreement. TSA § 15.3; SLA § 14.3.

Plaintiffs executed the Agreement with Uber, and did not opt out of the Agreement's Arbitration Provision. Compl. ¶¶ 24, 31, 40; *see also* Ex. 2 ¶¶ 5, 8, 12. Thus, they agreed to arbitrate "any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services," and to do so "on an individual basis," rather than through a "class, collective, or representative action." TSA §§ 15.2, 15.3; SLA §§ 14.2, 14.3. They have filed this putative class action, alleging that they and other similarly-situated drivers are entitled to damages for Uber's alleged breach of contract, on the theory that the FAA exempts their claims from arbitration. Compl. ¶¶ 17, 18, 20.

3

## ARGUMENT

The FAA provides that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction. . ., shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "The principal purpose of the FAA is to ensur[e] that private arbitration agreements are enforced according to their terms." *Concepcion*, 563 U.S. at 344 (internal quotation marks omitted, alteration in original).

Here, Plaintiffs entered into arbitration agreements yet seek to avoid arbitration.  Plaintiffs claim that the FAA does not apply because Uber's Agreement is a "contract[] of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," and thus exempt from the FAA.  9 U.S.C. § 1.  Plaintiffs "bear[] the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. Ala. v. Randolph*, 531 U.S. 79, 91 (2000).  Plaintiffs cannot meet that burden for three independent reasons.  First, Uber's Agreement is not a "contract[] of employment" under Section 1 of the FAA.  Second, even if the Agreement is a "contract[] of employment," drivers who use Uber's platform are not in a "class of workers engaged in foreign or interstate commerce."  Third, even if the FAA does not apply, New York law would require enforcement of the Agreement.

## I.  The Agreement Is Not a "Contract[ ] of Employment."

Uber's Agreement does not fall within the FAA's Section 1 exemption because it is not a "contract[] of employment."  9 U.S.C. § 1.

As the Supreme Court has recently explained, Section 1 exempts "contract[s] for the performance of *work* by *workers*" from the FAA's coverage. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 541 (2019) (emphasis in original).  In that case, the Supreme Court held that the scope of

Section 1 does not turn on the classification of the worker; a "contract of employment" can be with either an employee or an independent contractor.  *Id.*  Instead, whether a contract qualifies as a "contract of employment" depends on the nature of the agreement: a "contract of employment" must include a promise to perform work.  *Id.* at 543-44 ("When Congress enacted the Arbitration Act in 1925, the term 'contracts of employment' referred to agreements to perform work.").

License agreements are different.  A license agreement is a "contract that authorizes access to . . . information or informational rights, but expressly limits the access or uses authorized or expressly grants fewer than all rights in the information."  Uniform Computer Information Transactions Act § 102(a)(41); *see* 2 Information Law § 11:3 ("A license consists of a conditional or limited grant of rights or privileges that are the subject matter of the agreement.").  License agreements do not *bind* a party to work for another, but instead *permit* a party to access a third party's rights.  For instance, a patent license agreement permits the licensee to practice the patent.  Another type of license is an "online license," in which an "information provider gives licensed access to information contained in its online system," comprising "access to the information and to the system itself."  2 Information Law § 11:14.  While the licensee may *use* the online system to facilitate work, the license is not *itself* an "agreement[] to perform work."  *New Prime*, 139 S. Ct. at 543-44.

Uber's Agreement is a license agreement, not a contract of employment.  It "grants" drivers "a non-exclusive, non-transferable" license to use the Uber Services.  TSA § 5.1; SLA § 2.1.  That license gives drivers access to Uber's "on-demand lead generation" services and related Uber App, websites, software, and payment and support services, subject to certain restrictions.  TSA §§ 1.17, 5.1; SLA §§ 1.18, 2.1.  It reserves to drivers "the sole right" to determine when, where, and for how long they will use the Uber App or the Uber Services, as well as "the option" to accept,

decline, ignore a rider's request for transportation services, or cancel an accepted request, through the Uber App.  TSA § 2.4; SLA § 4.2.2.  Unlike employees or independent contractors, who must work according to the terms of their contracts of employment, licensees of Uber's app can use the app to find passengers as much or as little as they want.

The payment provisions in the Agreement also bear the hallmarks of license agreements. In "contracts of employment," workers are paid by the entities that hire them.  In license agreements, the payments typically go the other way—the licensees pay the licensors for the privilege of using the license to generate income.  *See* John W. Hazard, Jr., 1 *Copyright Law in Business & Practice* § 6:17, Westlaw (rev. ed. database updated Dec. 2019) ("Most licensing agreements provide for royalty payments to be made to the licensor.").  The Agreement falls into the latter rubric—drivers are paid by passengers via Uber's platform, and remit a service fee to Uber.  TSA § 4.4; SLA § 5.2.

Because Uber's Agreement with Plaintiffs is a license, not a "contract for employment" subject to the FAA's Section 1 exemption from arbitration, the FAA governs—and requires the arbitration agreement to be enforced.

## II.  Plaintiffs Are Not Part of a "Class of Workers Engaged in Foreign or Interstate Commerce."

Even if the Agreement is a "contract of employment," drivers who use the Uber app are not "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.

Determining whether drivers fall within Section 1 requires answering two questions.  First, what is the "class of workers" at issue?  Second, is that "class of workers" "engaged in foreign or interstate commerce" within the meaning of Section 1?  As shown below, the "class of workers" is "personal transportation providers."   And while some *individual* personal transportation

6

providers may cross state lines on occasion, the *class* of personal transportation providers *as a whole* is not "engaged in foreign or interstate commerce" within the meaning of the FAA.  That conclusion makes sense because the purpose of Section 1 is to exempt workers who are subject to other federal regulatory schemes—which seamen and railroad employees are, but personal transportation providers are not.

A.  Plaintiffs fall within the class of "personal transportation providers."

Under Section 1, a court does not analyze whether an *individual* worker is "engaged in interstate or foreign commerce."  Rather, it determines whether the worker falls within a *"class of workers engaged in interstate or foreign commerce."*  9 U.S.C. § 1; *see Singh v. Uber Techs., Inc.*, 939 F.3d 210, 227 (3d Cir. 2019) ("[T]he inquiry regarding § 1's residual clause asks a court to look to classes of workers rather than particular workers."); *Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988) ("[T]he concern [i]s not whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining party belonged engaged in interstate commerce."); *Rosen v. Transx Ltd.*, 816 F. Supp. 1364, 1371 (D. Minn. 1993) ("The exclusion pertains to classes of workers, not individual workers.").  Thus, to resolve the Section 1 question, the Court must first answer a threshold question: what is the "class of workers" to which Plaintiffs belong?

Here, Plaintiffs, and all other drivers who use the Uber app, are personal passenger-transportation providers—workers who provide transportation services in passenger vehicles to individuals who request those services.  *See* TSA at 1 (describing Uber as providing "lead generation" to drivers who, in turn, provide passenger transportation services to riders); *id.* §§ 1.4, 1.14, 1.20; SLA at 1 (describing driver as being "in the business of providing transportation services," and "accessing and using the Uber Services and Software to increase your transportation

business"); *id.* §§ 1.7, 1.11, 1.21.  Thus, the question under Section 1 is whether the *class* of personal transportation providers is "engaged in interstate or foreign commerce."

Plaintiffs resist this framing on two grounds.  First, Plaintiffs allege that they fall within the Section 1 exemption because *they personally* transported passengers across state lines.  *See, e.g.*, Compl. ¶¶ 25-26 ("Aleksanian was expected to and regularly did transport passengers across state lines while working as an Uber driver.  Thus, Aleksanian is a worker engaged in interstate commerce …").  But Section 1 asks not whether an *individual* worker is engaged in interstate commerce, but whether an individual falls within a *class* of workers that does.  Thus, Section 1's applicability turns on the activities of the class as a whole, not on any one individual's personal driving practices.  *Rogers v. Lyft, Inc.*, No. 20-cv-01938-VC, 2020 WL 1684151, at *5 (N.D. Cal. Apr. 7, 2020) ("The plaintiffs' personal exploits are relevant only to the extent they indicate the activities performed by the overall class."), *appeal docketed*, No. 20-15689 (9th Cir. Apr. 16, 2020).

Second, Plaintiffs attempt to define the relevant "class of workers" more narrowly as *the putative class of drivers they seek to represent*—which is limited to New York City drivers.  Compl. ¶¶ 20, 144.  According to Plaintiffs, because New York City drivers "are expected to and regularly [do]" transport passengers across state lines, *that* "class of workers" is engaged in interstate commerce.  *Id.* ¶¶ 25-26.

The Court should reject this effort to gerrymander the "class of workers."  The relevant "class of workers" for purposes of the FAA is the class of personal transportation providers *as a whole*, not merely the subset of drivers who fall within Plaintiffs' class definition in a particular city and case.

This conclusion follows from Section 1's plain text.  In *Circuit City Stores, Inc. v. Adams*, the Supreme Court held that "[t]he wording of § 1 calls for the application of the maxim *ejusdem generis*, the statutory canon that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  532 U.S. 105, 114-15 (2001) (internal quotation marks and citation omitted).  "Under this rule of construction the residual clause [of Section 1] should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it."  *Id.* at 115.  Here, "seamen" and "railroad employees" are general job categories, rather than narrow categories of workers from a particular geographic area.  Thus, under *Circuit City*'s reasoning, a "class of workers engaged in interstate commerce" must also be a general job category, rather than a narrow category of workers from a particular geographic area.  Here, that job category is "personal transportation provider."

Plaintiffs' contrary approach is unworkable.  Under Plaintiffs' approach, the law governing the enforceability of the Arbitration Provision would turn on geographical location—Honolulu or Los Angeles drivers (who never or rarely cross state lines) would be subject to the FAA, while New York City drivers who do cross state lines would not.  Even more oddly, the class *in this case*—which includes New York City drivers regardless of whether they ever crossed state lines— would be composed of some drivers who fall within Section 1 and some who do not, depending on the happenstance of whether they ever drove someone to New Jersey.  These outcomes would be inconsistent with the FAA's core purpose of establishing a national rule of enforceability of arbitration agreements.  The Court should hold that drivers using the Uber app, no matter where

they are located or what their individual driving practices are, fall within the same "class of workers"—personal transportation providers.

B.  Personal transportation providers are not "engaged in foreign or interstate commerce."

The text, structure, and purpose of Section 1 further support the conclusion that Plaintiffs do not fall within its exemption because the class of personal transportation providers is not "engaged in foreign or interstate commerce."

1.  Text

Under Section 1, a court must determine whether a "class of workers is engaged in foreign or interstate commerce."  As the Supreme Court held in *Circuit City*, "[t]he plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'"  *Circuit City*, 532 U.S. at 118.  "Rather, the term describes 'only persons or activities within the flow of interstate commerce,' meaning 'the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer.'"  *Rogers*, 2020 WL 1684151, at *5 (quoting *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974)).  Thus, Plaintiffs bear the burden of showing that the class of personal transportation workers is *engaged in*—not merely affecting or influencing—interstate commerce.

This, in turn, requires a showing that engaging in foreign or interstate commerce is a characteristic that is *common to the class*—not merely that some people within the class happen to engage in it.  For instance, one would not say that the class of personal transportation providers drives red cars.  Some personal transportation providers drive red cars, but many do not, and driving red cars is not a characteristic common to the class of personal transportation providers.

Likewise, the fact that some workers sometimes cross state lines does not mean that the class, as a whole, "is engaged in interstate commerce."  As *Rogers* recently held with respect to

10

drivers on Lyft's app, the work of drivers on Uber's app "predominantly entails intrastate trips, an activity that undoubtedly affects interstate commerce but is not interstate commerce itself."  2020 WL 1684151, at *6.  "Although we can safely assume that some drivers (especially those who live near state borders) regularly transport passengers across state lines, the company is in the general business of giving people rides, not the particular business of offering interstate transportation to passengers."  *Id.*  "Interstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers."  *Id.*; *accord Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1289–90 (11th Cir. 2005) (Section 1 does not cover "incidental" interstate transportation, such as "the interstate 'transportation' activities of . . . a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town").

That persuasive analysis is backed up by the data.  In 2019, the average Uber trip in the U.S. was 6.3 miles.  Ex. 3 (Declaration of Juan Manuel Contreras) ¶ 5.  In New York, the average Uber trip was shorter: 4.7 miles.  *Id.* ¶ 9.   Not surprisingly in light of the short distances, the overwhelming majority of Uber trips are intrastate.  In 2019, 97.64% of Uber trips nationally were intrastate.  *Id.* ¶ 4.  In New York, that percentage was 98.33%.[3]  *Id.* ¶ 8.  In states where major cities are not near the state line, the percentages are even higher.  In California and Massachusetts, the 2019 percentages of intrastate rides were 99.99% and 99.63%, respectfully.  *Id.* ¶ 12.

Public research studies about personal transportation providers have reached the same conclusion: such providers facilitate local transportation, not interstate commerce.  A 2018 National Academy of Sciences report on five major cities (Chicago, Los Angeles, Washington

---

[3] For trips taken during the putative class period—*i.e.*, 2013 to 2017—the data is similar.  During this period, the average Uber ride nationwide covered a distance of 6 miles and lasted for 16.6 minutes, while the average Uber ride in New York covered a distance of 5 miles and lasted 20.5 minutes.  Ex. 3 ¶¶ 5, 9.  97.28% of all trips taken in this period, and 96.91% of all trips that began in New York, were intrastate.  *Id.* ¶¶ 4, 8.

D.C., Nashville, and Seattle) found that "most [ride-sharing] trips in the study regions are short and concentrated in downtown core neighborhoods." Sharon Feigon & Colin Murphy, *Broadening Understanding of the Interplay Among Public Transit, Shared Mobility, and Personal Automobiles* 3 (TCRP Research Report, No. 195, 2018). Likewise, another national study found that patrons of ride-sharing services connect with drivers regularly to engage in daily activities such as traveling to, "1) restaurants and cafes, 2) shops and services, 3) family and community activities, and 4) bars and parties." Regina R. Clewlow & Gouri Shankar Mishra, *Disruptive Transportation: The Adoption, Utilization, and Impacts of Ride-Hailing in the United States* 11 (Inst. of Transp. Studies, Univ. of Cal., Davis, Research Report UCD-ITS-RR-17-07, 2017), https://itspubs.ucdavis.edu/wp-content/themes/ucdavis/pubs/download_pdf.php?id=2752. Other recent work from the Metropolitan Area Planning Commission (MAPC) in the Boston region confirms that a large component of ride-sharing trips are commute-related. Steven R. Gehrke, Alison Felix, & Timothy G. Reardon, *Substitution of Ride-Hailing Services for More Sustainable Travel Options in the Greater Boston Region.* Transportation (Research Record, 2019), https://doi.org/10.1177/0361198118821903; Metro. Area Planning Comm'n, *Fare Choices: A Survey of Ride-Hailing Passengers in Metro Boston* (Feb. 2018), https://www.mapc.org/farechoices/ .

    This does not mean that the residual clause requires that *all* workers within a class *always* "engage in interstate commerce." As long as a class *generally* engages in interstate commerce, it is natural to say that the "class" does so, even if some individual class members do not. For instance, long-haul truckers generally transport goods long distances, and so it is natural to say that the class of long-haul truckers engages in interstate commerce, even if individual truckers occasionally might transport goods within a particular state. *Rogers*, 2020 WL 1684151, at *5 ("If

a class of workers (say, truckers) transports goods or people between states, a trucker who only occasionally drives across state lines is still exempt from the FAA. . . .  Indeed, that remains true even if the trucker has never left his home state.").  Here, however, personal transportation drivers *generally* engage in local intrastate transportation of passengers, rather than interstate commerce.

The Complaint alleges that the *named plaintiffs* crossed state lines a higher percentage of the time—between 4 and 8 percent.  Compl. ¶¶ 27, 34-35, 43.  It would hardly be surprising if all of the named plaintiffs have driven people across state lines—they all live in New York City, near a state line.  But this does not mean that the *class* of personal transportation providers—which includes many drivers who never cross state lines, and many others who do so much more rarely— is "engaged in" interstate commerce.  Moreover, it is telling that even the named Plaintiffs themselves allege that they transport passengers across state lines less than ten percent of the time.  Thus, even for them, the norm is to transport passengers locally and intrastate; any interstate transport takes places on a sporadic and incidental basis.

Nor are the class of workers to which Plaintiffs belong "engaged in" interstate commerce merely because they might sometimes *facilitate* interstate travel—for instance, by driving someone to La Guardia Airport who then travels to a different state.  First, while drivers who make such trips may *affect* interstate commerce, they are not *engaged in* interstate commerce, as Section 1 requires.  Second, although *individual* drivers drive people to and from the airport, that is not a characteristic of the *class*.  *See Rogers*, 2020 WL 1684151, at *6 ("Nor does the fact that Lyft drivers frequently pick up and drop off people at airports and train stations mean that they are, as a class, 'engaged in' interstate commerce."); *Heller v. Rasier, LLC*, No. CV 17-8545 PSG (GJSx), 2020 WL 413243, at *7 (C.D. Cal. Jan. 7, 2020) ("[N]either Plaintiff … nor Uber is in the business of shipping goods across state lines, even though it delivers luggage and persons that once travelled

13

interstate." (quotation marks omitted)); *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 900 (N.D. Cal. 2018) (rejecting argument "that DoorDash drivers are involved in the flow of interstate commerce because they facilitate the transportation of goods that originated across state lines" because "the FAA is more narrow"), *appeal docketed*, No. 18-17232 (9th Cir. Nov. 20, 2018); *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 485 n.8 (S.D.N.Y. 2008) ("[C]ourts in th[e Second] Circuit have consistently found that workers not involved with the actual, physical movement of goods through interstate commerce do not fall under the residuary exemption, regardless of the workers' ultimate impact on interstate commerce.").

The Supreme Court's decision in *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), supports that conclusion.  The Court held that an alleged conspiracy to limit the number of taxicab companies in Chicago did not involve the "stream of interstate commerce" for Sherman Act purposes.  *Id.* at 228.  It reasoned that "[t]heir relationship to interstate commerce is only casual and incidental . . . [W]hen local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation."  *Id.* at 231, 233.  "It's difficult to see how a different analysis could apply to" Plaintiffs.  *Rogers*, 2020 WL 1684151, at *7.

One recent, non-binding district court decision departed from that consensus.  *Cunningham v. Lyft, Inc.*, No. 1:19-cv-11974, 2020 WL 1503220 (D. Mass. Mar. 27, 2020), *appeal docketed*, No. 20-1379 (1st Cir. Apr. 6, 2020).  In that case, the district court held that the plaintiffs fell within Section 1 because they drove passengers to Logan International Airport in Boston.  It reasoned: "Plaintiffs help facilitate that movement, as the first or last leg of the journey, including into or out of Massachusetts. . . . Therefore, the Lyft drivers are part of the chain of interstate

14

commerce, enabling their passengers to leave or enter Massachusetts." *Id.* at *7.  This Court should not follow *Cunningham* for two reasons.  First, the *Cunningham* court held that the *individual plaintiffs*' allegations established that they were "engaged in interstate commerce."  The court skipped the crucial step of identifying the class and determining whether it is engaged in interstate commerce, and did not address whether the plaintiffs were representative of the class as a whole. Second, the *Cunningham* court held that the plaintiffs were "part of the chain of interstate commerce."  *Id.*  But that merely shows that they *affected* interstate commerce.  *Circuit City* holds that a class of workers must actually *engage in* interstate commerce to fall within Section 1— which local transportation providers do not.  532 U.S. at 118.

2. <u>Structure</u>

As explained above, *Circuit City* holds that Section 1's residual clause must "be controlled and defined by reference to the enumerated categories of workers which are recited just before it," *i.e.*, seamen and railroad employees.  532 U.S. at 115.  In other words, under *Circuit City*'s interpretation of Section 1, "engaging in interstate commerce" means engaging in interstate commerce *in a manner similar to* seamen and railroad employees.

Section 1's references to "seamen" and "railway employees" illuminate what Congress meant by "engaged in interstate commerce"—and confirm that personal transportation providers are not "engaged in interstate commerce."  Seamen and railway employees work in the very channels of interstate and foreign commerce: railroad lines were built for nationwide transport, while the essence of maritime shipping is moving cargo internationally.  The average distances traveled by railroad employees and seamen capture the interstate nature of their occupations. Around the time of the FAA's enactment, one study reported that, in 1920, the average freight haul by railroad was 308 miles.  *See* L.E. Peabody, *Forecasting Future Volume of Railway Traffic*, in

66 RAILWAY AGE 899, 900 (Samuel O. Dunn, Roy V. Wright & H.F. Lane eds., 1924); *see also Thirty-Third Annual Report on the Statistics of Railways in the United States* 37 (Interstate Commerce Comm., Bureau of Statistics 1933) (reporting that, in 1919, the average freight haul of a Class I railroad traveled 178.29 miles and the average passenger trip covered 39.36 miles). The average ship freight haul, shortly after the FAA's enactment, was 660 miles. Harold Barger, *The Transportation Industries, 1889-1946: A Study of Output, Employment and Productivity* 128 (1951).

In the present day, maritime and railroad transportation are no less bound to foreign and interstate commerce. In 2018, the average freight haul of a Class I railroad covered 1,046 miles in 2018, while the average passenger trip on Amtrak covered 200.1 miles. *Rail Profile*, Bureau of Transp. Servs., https://www.bts.gov/content/rail-profile (last visited Apr. 29, 2020). The average haul by ship in the same year was 579.5 miles. *The U.S. Waterway System: 2018 Transportation Facts & Information* 3 (Army Corps of Engineers 2018).

Of course, seamen and railroad employees may *occasionally* engage in intrastate commerce—just as seamen occasionally work on land. But because seamen and railroad employees generally engage in interstate and foreign commerce—indeed, because those occupations *exist* in order to facilitate interstate and foreign commerce—it is natural to say that those classes of workers engage in interstate commerce. By contrast, personal transportation providers are primarily engaged in local transportation, not interstate commerce.

Personal transportation providers differ from railroad employees and seamen in an additional respect. Railroad employees and seamen typically haul *goods* from the place they are manufactured to far-flung locations across the country and the world. By contrast, personal transportation providers typically transport *people* short distances within a neighborhood.

16

In *Circuit City*, the Supreme Court stated in dicta that the residual clause was limited to workers who, like seamen and railway employees, transport goods.  532 U.S. at 112 (agreeing with "[m]ost Courts of Appeals," which limited the Section 1 exemption to "transportation workers . . . 'actually engaged in the movement *of goods* in interstate commerce'" (emphasis added)); *see also id.* at 121 (concluding that the Section 1 exemption reflected "Congress' demonstrated concern with transportation workers and their necessary role *in the free flow of goods*" (emphasis added)). Consistent with *Circuit City*, several courts have held that *ejusdem generis* requires limiting Section 1's residual clause to workers who transport goods.  Indeed, several district courts have so held in cases involving Uber.  *Heller*, 2020 WL 413243, at *7 ("Plaintiff neither transports goods nor is a worker in an industry involving the interstate transportation of goods.  Numerous courts have concluded that the *ejusdem generis* doctrine requires that the residual clause be limited only to those industries and workers dedicated to the movement of goods in interstate commerce, similar to seamen and railroad employees."); *Grice v. Uber Techns., Inc.*, No. CV 18-2995 PSG (GJSx), 2020 WL 497487, at *7 (C.D. Cal. Jan. 7, 2020) (same); *Scaccia v. Uber Techns., Inc.*, No. 3:18-cv-00418, 2019 WL 2476811, at *4 (S.D. Ohio June 13, 2019) ("When driving with Uber, Plaintiff transported passengers to and fro, sometimes in interstate commerce, but he did not transport goods in interstate commerce. Such work places him outside 'any other class of workers engaged in . . . interstate commerce' described in the FAA's § 1 exclusions from mandatory arbitration."), *report and recommendation adopted by* 2019 WL 4674333 (S.D. Ohio Sept. 25, 2019), *appeal docketed*, No. 19-4062 (6th Cir. Oct. 29, 2019); *Gray v. Uber, Inc.*, No. 8:18-cv-3093-T-30SPF, 2019 WL 1785094, at *1-2 (M.D. Fla. Apr. 10, 2019) ("Uber argues Plaintiff did not transport goods in interstate commerce, so the FAA's exception does not apply to him. … The Court agrees with Uber.").

Additionally, a court in this District has reached the same conclusion with respect to black-car drivers. *Kowalewski*, 590 F. Supp. 2d at 484 ("The Court . . . finds the involvement of physical goods to be an indispensable element to being 'engaged in commerce' in the same way that seamen and railroad workers are. So finding, the Court holds that transporting passengers interstate as part of a car service is too far removed from the type of work engaged in by seamen and railroad workers—that is, being a member of an industry that primarily involves the actual, physical movement of goods through interstate commerce." (footnote and citations omitted)). And a state court in New York has followed *Kowalewski* and held that even passenger airline pilots—who routinely transport passengers across state lines—fall outside of Section 1 because they transport passengers rather than goods. *Jetblue Airways Corp. v. Stephenson*, 31 Misc. 3d 1241(A), 2010 WL 6781684, at *3 (N.Y. Sup. Ct., N.Y. Cty. 2010) (unpublished table decision), *aff'd*, 88 A.D.3d 567 (1st Dep't 2011).

Recently, the Third Circuit reached a contrary conclusion, holding that Section 1 is not limited to workers who transport goods, and may also cover workers who engage in interstate commerce by transporting people. *Singh v. Uber Techns. Inc.*, 939 F.3d 210, 226 (3d Cir. 2019). The Court remanded for discovery on the question of whether drivers on the Uber app fall within a class of workers who are engaged in interstate commerce under the FAA. *Id.* at 226-28. Although Uber respectfully disagrees with *Singh*, the Court need not decide in this case whether Section 1 categorically excludes all workers who transport passengers. Rather, the Court can hold more narrowly that, in view of the dramatic differences between workers who haul goods long distances and workers who drive people to nearby destinations, *ejusdem generis* requires holding that the latter class of workers does not "engage in interstate commerce" under Section 1.

3. Purpose

Plaintiffs' contention also conflicts with the purpose of Section 1.

On its face, Section 1's exclusion seems arbitrary.  Aside from Section 1, the FAA governs all contracts falling within Congress's Commerce Clause authority.  *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003).  Why would Congress insist that all arbitration agreements be enforced except contracts of employment with seamen, railway employees, and other workers engaged in interstate commerce?  *Circuit City* answers that question: The FAA carved out seamen and railroad employees from its regulatory purview to accommodate other "federal legislation providing for the arbitration of disputes" involving these types of workers.  *Circuit City*, 532 U.S. at 120-21. Specifically, "Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers."  *Id.* at 121.  And "[w]hen the FAA was adopted, moreover, grievance procedures existed for railroad employees under federal law, and the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes was imminent."  *Id.*  "It is reasonable to assume that Congress excluded 'seamen' and 'railroad employees' from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers."  *Id.*; *see also New Prime*, 139 S. Ct. at 537 ("Why this very particular qualification? By the time it adopted the Arbitration Act in 1925, Congress had already prescribed alternative employment dispute resolution regimes for many transportation workers.").

At the time of the FAA, however, no such scheme existed for personal transportation providers.  Federal statutes that covered motor carriers excluded drivers who engaged in the local transportation of passengers from regulation.  *See*, *e.g.*, Motor Carrier Act of 1935, Pub. L. No. 74-255, § 203(b), 49 Stat. 543, 545 ("Nothing in this part. . . shall be construed to include. . .

taxicabs, or other motor vehicles performing a bona fide taxicab service having a capacity of not more than six passengers and not operated on a regular route or between fixed termini.").  Today, likewise, federal statutes do not generally regulate drivers engaged in local passenger transport. *See, e.g.*, ICC Termination Act of 1995, Pub. L. No. 104-88, § 103, 109 Stat. 803, 861 (exempting "a motor vehicle providing taxicab service").  Instead, such providers are locally regulated. *See* N.Y.C., For-Hire Vehicle Owners: Taxi & Limousine Rules § 59A-11, www1.nyc.gov/ assets/tlc/downloads/pdf/rule_book_current_chapter_59.pdf (allowing only drivers licensed with the New York Taxi and Limousine Commission to pick up passengers within New York City).

As several courts have held, the purpose of Section 1—deferring to remedial schemes in other federal statutes—would not be served by holding that personal transportation providers fall within Section 1.  *See Heller*, 2020 WL 413243, at *8 ("Plaintiff is not in an employment relationship which was already regulated by Congress before the advent of the FAA, like railroad workers and seamen. . . . There was no such pre-existing or developing regime for local car drivers."); *Grice*, 2020 WL 497487, at *8 (same); *Kowalewski*, 590 F. Supp. 2d at 485 ("[T]he exemption in the FAA for railroad employees and seamen was motivated by a desire not to upset pre-existing or developing statutory schemes in those areas. Here, unlike in *Circuit City*, there is no suggestion that applying the FAA to the Black Car industry would upset any pre-existing or developing statutory scheme.").

Plaintiffs' position is particularly implausible in view of the FAA's breadth.  The FAA covers all contracts subject to the federal government's Commerce Clause authority, subject to the exemption in Section 1.  Under Plaintiffs' position, Congress would inexplicably have created an exemption to the FAA that encompasses not only workers subject to other federal arbitration regimes, but also personal transportation providers, who are not covered by *any* federal regime.

Plaintiffs cannot explain why Congress would have arbitrarily decided to exclude one narrow class of arbitration agreements—those appearing in contracts involving personal transportation providers—from an otherwise seamless web of federal coverage. *See New York v. Mountain Tobacco Co.*, 942 F.3d 536, 547 (2d Cir. 2019) ("[A] statute should be interpreted in a way that avoids absurd results." (quotation marks omitted)).

Moreover, Section 1 should be interpreted through the lens of the federal policy favoring arbitration. The Supreme Court has frequently underscored the "liberal federal policy favoring arbitration." *See, e.g.*, *Concepcion*, 563 U.S. at 339. And with particular regard to Section 1 of the FAA, the Supreme Court has emphasized that the exemption must "be afforded a narrow construction" because it "is contained in a statute that 'seeks broadly to overcome judicial hostility to arbitration agreements.'" *Circuit City*, 532 U.S. at 118 (citation omitted). This is a paradigmatic example of a case in which that narrow-construction principle should be given effect. The Court should not hold that the FAA contains an inexplicable gap, untethered from the FAA's purpose, that would confine arbitration agreements involving personal transportation providers to the vagaries of state law. *See Kowalewski*, 590 F. Supp. 2d at 485 ("Expanding the scope of the residuary exemption so broadly would be contrary to the prevailing 21st century judicial attitude toward arbitration. . . . Absent clear authority to the contrary, which is lacking in this case, the Court finds that it should enforce the federal policy favoring arbitration as an alternate dispute resolution method.").

### III.    Plaintiffs' Agreement to Arbitrate Is Enforceable under New York State Law.

Even if the Agreement fell within Section 1 of the FAA, the arbitration agreement would still be enforceable under state law.

If a contract falls within Section 1 of the FAA, that does not mean it is unenforceable; it means that state law, rather than federal law, governs its enforceability. *See Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 528-29 (S.D.N.Y. 2003) (holding, in case involving transportation worker undisputedly exempt from the FAA, that "any inapplicability of the FAA would not preclude enforcing the arbitration agreement under state law," and collecting cases).

New York law controls here.   "[W]here the FAA does not apply, and the arbitration agreement contains no choice of law provision . . . . the law of the jurisdiction having the 'greatest interest in the litigation'" is applied.[4]   *Valdes*, 292 F. Supp. 2d at 528 (quoting *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir. 1992)).   That jurisdiction is New York: Plaintiffs are "New York City Uber drivers" who seek damages arising from "Uber's payment practices in New York" that "occurred only on trips taken within New York State."  Compl. ¶¶ 1, 2, 8.

---

[4] For Plaintiffs Sonam Lama and Harjit Khatra, the TSA contains a choice-of-law clause providing that California law applies, except with respect to the arbitration clause.  TSA § 15.1 ("The foregoing choice of law and forum selection provisions do not apply to the arbitration clause in Section 15.3 or to any arbitrable disputes as defined therein.").  It does not specify the applicable state law with respect to the arbitration clause in the event that the FAA does not apply.

For Plaintiff Levon Aleksanian, the SLA contains a choice-of-law clause providing that the "interpretation of this Agreement shall be governed by California law."  SLA § 14.1.  It further provides: "These provisions are only intended to specify the use of California law to interpret this Agreement . . ., and these provisions shall not be interpreted as generally extending California law to You if You do not otherwise operate Your business in California."  *Id.*  Thus, the SLA provides that California law governs disputes over the *interpretation* of the agreement, but not other types of disputes, such as the dispute over the *enforceability* of the agreement presented here.  *See Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 123 (2d Cir. 2003) (finding that choice-of-law provision that invoked state law "only to assist in construing the agreement and the parties' rights and obligations thereunder," did not provide for state law "to govern the 'enforcement'" of the contract's arbitration provision).  The Agreement does not specify the choice of law for those other types of disputes.

Under New York law, the Arbitration Provision is enforceable.  "New York law favors arbitration, 'interfering as little as possible with the freedom of consenting parties' to submit disputes to arbitration."  *Diaz v. Mich. Logistics Inc.*, 167 F. Supp. 3d 375, 381 (E.D.N.Y. 2016) (quoting *Bd. of Educ. of Bloomfield Cent. Sch. Dist. v. Christa Constr., Inc.*, 80 N.Y.2d 1031, 1032 (1992)).  New York law, moreover, "does not exempt transportation workers from arbitration." *Id.*; *see Valdes*, 292 F. Supp. 2d at 528, 529-30.  Accordingly, "even assuming that" the Plaintiffs here "fall within the § 1 exemption (and the FAA does not apply), [their] claims are subject to mandatory arbitration under New York arbitration law."  *Diaz*, 167 F. Supp. 3d at 380-81; *see* Order at 1 & n.1, *Reese v. Uber Techns., Inc.*, 2:18-cv-03300 (E.D. Pa. Mar. 4, 2020), ECF 41 (finding that "*even if* the FAA does not apply" because of Section 1, Uber's Arbitration Provision was still enforceable under Pennsylvania law (emphasis in original)).

Moreover, under New York law, the Arbitration Provision is enforceable *as written*.  Thus, New York courts would enforce the portions of the Arbitration Provision requiring individualized arbitration, as opposed to class proceedings.  New York law is therefore aligned with the FAA, under which arbitration agreements requiring individualized arbitration must be enforced. *Concepcion*, 563 U.S. at 344-45.

"Under New York law, 'a contractual proscription against class actions . . . is neither unconscionable nor violative of public policy.'"  *Tsadilas v. Providian Nat'l Bank*, 13 A.D.3d 190, 191 (1st Dep't 2004) (quoting *Ranieri v. Bell Atl. Mobile*, 304 A.D.2d 353, 354 (1st Dep't 2003)). In *Harris v. Shearson Hayden Stone, Inc.*, 82 A.D.2d 87 (1st Dep't 1981), the First Department compelled arbitration of a putative class action under New York's arbitration act, even though it assumed that doing so would preclude proceeding as a class action.  82 A.D.2d at 93.  The Court explained that "it is clear . . .  that the interests favoring arbitration should prevail over those

favoring the class action, both in general and in the present instance." *Id.* at 94.   The First Department "[c]onceded[]" that "if no arbitration agreement existed plaintiffs might have a strong case for class action certification, since the institution of an individual lawsuit for the paltry sum at issue would be self-defeating." *Id.* at 95.   But it stressed that "maintenance of a class action here by assertion of a claim for which a forum is provided elsewhere, would defeat the aim of arbitration." *Id.*   The Court of Appeals affirmed "for reasons stated in" the First Department's opinion. *Harris v. Shearson Hayden Stone, Inc.*, 56 N.Y.2d 627, 628 (1982); *accord Hayes v. Cty. Bank*, 26 A.D.3d 465, 467 (2d Dep't 2006); *Douglas v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 495 F.3d 1062, 1068 (9th Cir. 2007) ("class action waiver[s] . . . aren't substantively unconscionable under New York law").

Even if California law were held to apply, the arbitration agreement would be enforceable. All three Plaintiffs' arbitration agreements include opt-out provisions. TSA at 1; *id.* § 15.3; SLA at 1; *id.* § 14.3.   Under California law, arbitration agreements with opt-out provisions are enforceable. *See Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, 1085 (9th Cir. 2008) ("We have held that providing a 'meaningful opportunity to opt out' can preclude a finding of procedural unconscionability and render an arbitration provision enforceable."); *Mohamed v. Uber Techns.*, 848 F.3d 1201, 1210-11 (9th Cir. 2016) (finding that delegation provision in Uber's arbitration agreement with driver was not unconscionable under California law because driver had opportunity to opt out).

Notably, the Complaint does not offer any basis to deny enforcement of the Arbitration Provision under state law.   Rather, it incorrectly assumes that if the FAA does not apply, then the Arbitration Provision is unenforceable. *E.g.*, Compl. ¶ 26 ("Aleksanian is a worker engaged in interstate commerce and exempt from the arbitration clauses contained in the Uber contracts to

which he is a party").  Because Plaintiffs have identified no basis for denying enforcement of the

Arbitration Provision under state law, it should be enforced.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss this action and compel arbitration of

Plaintiffs' claims.


Dated: May 1, 2020                          Respectfully submitted,


                                            s/ Jeremy Creelan
                                            Jeremy M. Creeelan
                                            Elizabeth A. Edmondson
                                            919 Third Avenue
                                            New York, NY 10022-3908
                                            (212) 891-1600
                                            JCreelan@jenner.com
                                            EEdmondson@jenner.com

                                            Adam G. Unikowsky (*pro hac vice forthcoming*)
                                            Tassity S. Johnson (*pro hac vice forthcoming*)
                                            1099 New York Avenue, NW Suite 900
                                            Washington, DC 20001-4412
                                            (202) 639-6000
                                            AUnikowsky@jenner.com
                                            TJohnson@jenner.com

                                            *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2020, the foregoing Memorandum of Law in Support of Motion to Compel Arbitration was filed electronically through the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

s/ Jeremy Creelan
Jeremy M. Creeelan