UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x
LEVON ALEKSANIAN, SONAM LAMA, HARJIT KHATRA,
and, Individually, On Behalf of All Others Similarly Situated, and
as Class Representatives,

                                                      Case No.
                                                      1:19-cv-10308-ALC

                                    Plaintiffs,

     -Against-

UBER TECHNOLOGIES, INC., UBER LOGISTIK, LLC, UBER
USA LLC, jointly and severally,

                                    Defendants.
-----------------------------------------------------------------------------x

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

---

ZUBIN SOLEIMANY, Esq
New York Taxi Workers Alliance
31-10 37th Ave. Ste. 300
Long Island City, NY 11101
(718) 706-9892
Attorney for Plaintiffs

JEANNE E. MIRER, Esq.
RIA JULIEN, Esq.
Mirer, Mazzocchi, & Julien PLLC
1 Whitehall Street, 16th Floor
New York, NY 10031
(212) 231-2235
Attorneys for Plaintiffs

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

PROCEDURAL POSTURE- RELEVANT FACTS ....................................... 2

STANDARD OF REVIEW ............................................................................. 4

ARGUMENT ..................................................................................................... 6

I.   THE ARBITRATION CLAUSE AT ISSUE IS CONTAINED IN A "CONTRACT OF
EMPLOYMENT" FOR THE PURPOSES OF FAA SECTION 1 ...................................... 5

   a.   Uber Admits Drivers Are Independent Contractors, Not Licensees, And *New Prime* Is Thus
   Controlling ..................................................................................................... 5

   b.   Plaintiff Aleksanian Has Been Deemed Not Merely An Independent Contractor of Uber But
   An Employee Of Uber By The State of New York ......................................... 6

   c.   The Face Of Uber Contracts Establish It Is Not A License Agreement But An Agreement For
   Work ................................................................................................................ 7

   d.   The Terms Of The Contract Provide Compensation for Uber Drivers' Work ......................... 9

II. PLAINTIFFS, AS A PUTATIVE CLASS OF NEW YORK CITY DRIVERS, ARE PART OF A
CLASS OF "TRANSPORTATION WORKERS" RECOGNIZED IN CIRCUIT CITY AS
POTENTIALLY SUBJECT TO FAA SECTION 1, AND PLAINTIFFS AND THE PUTATIVE
CLASS ARE IN FACT ENGAGED IN INTERSTATE COMMERCE IN THE FORM OF
INTERSTATE TRIPS AND OTHERWISE OPERATE WITHIN THE FLOW OF INTERSTATE
COMMERCE .....................................................................................................11

   a.   PLAINTIFFS, ACTUALLY, AND AS NYC UBER DRIVERS, ARE IN FACT  ENGAGED
   IN INTERSTATE COMMERCE ...................................................................... 13

      i. Uber Is Structured To Require Interstate Trips Of New York City Drivers As A Term And
      Condition Of Driving For Uber And The Company Touted The Interstate Nature Of The Job . 14

      ii. Ride Data Confirms The Significant Percentage Of Trips Performed By New York City Uber
      Drivers' Which Are Interstate ....................................................................... 16

      iii. Additionally, In Absolute Numbers Uber Drivers Nationally Are Engaged In More Interstate
      Trips That National Bus Lines ....................................................................... 16

      iv. Moreover, In Addition To Trips Crossing State Lines, NYC Uber Drivers Perform Much of
      Their Work In The Flow Of Interstate Commerce ......................................... 17

v. *United States v Yellow Cab* Does Not Weigh Against A Finding Of Flow of Commerce On the Facts Presented ........................................................................................................... 18

vi. Finding that Plaintiffs and the Putative Class Are In The Flow of Interstate Commerce Is Consistent With the Realities of the Gig Economy ..................................................... 20

b.    PLAINTIFFS PERFORM INTERSTATE COMMERCE AS PART OF A "CLASS OF WORKERS" IN INTERSTATE COMMERCE, RECOGNIZED UNDER THE RESIDUAL CLAUSE ........................................................................................................................ 22

i.  Defendant Concedes That Plaintiffs Are "Transportation Workers"—Which Necessarily Satisfies The Class Requirement Under Circuit City ................................................. 23

ii. Plaintiffs Are  Part of a Class of Transportation Workers Engaged  In Interstate Commerce  23

iii. Defendant's Attempt To Assign The Allegations As To Interstate Commerce To Plaintiffs As Individuals Rather Than As Representative Of The Group Of Similarly Situated Workers Has No Basis; Nor Does Defendant's Argument that All  Drivers Must  Be Exempt In Order For Plaintiffs To Be Exempt ..................................................................................................... 25

iv. Nor Does The Fact That Plaintiffs Transport Passengers Rather Than Goods Weigh Against A Finding of FAA Exemption. ....................................................................................... 26

v. Finally, Defendant's Argument That Plaintiffs Cannot Set Forth A Class Of New York City Drivers As The Class Of Transportation Workers Engaged In Interstate Commerce Is Without Merit. ........................................................................................................................ 29

c. FURTHER,  UBER'S RELIANCE ON *ROGERS V LYFT* IS MISPLACED AND DIRECTLY CONTRADICTED BY THE REASONING IN *CUNNINGHAM V LYFT  AND PAPETTI V. COMPANGNIE NATIONALE FR*. ................................................................................ 29

III. ABSENT APPLICATION OF THE FAA, PLAINTIFFS ARE NOT REQUIRED TO SUBMIT THEIR CLAIMS TO ARBITRATION UNDER STATE LAW, GIVEN THE EXPRESS LANGUAGE PRECLUDING THE APPLICATION OF STATE LAW TO THE ARBITRATION CLAUSE ........................................................................................................................ 31

A. Uber's Arbitration Agreements Which Are Expressly and Exclusively Governed By the FAA, Preclude Compelling Arbitration Under State Law if Plaintiffs are Exempt under the FAA. ........ 31

B. Defendant's Current Contract Does Provide For Arbitration Under State Law Should The FAA Not Apply And The Express Language Of The Current Contract Supports  Plaintiffs' Position That State Arbitration Does Not Apply to The Contracts At Bar ............................................. 34

IV. NEW YORK DOES NOT FAVOR MANDATORY ARBITRATION ........................................... 36

V. NEW YORK PUBLIC POLICY OPPOSES FORCED ARBITRATION IN CASES OF INEQUALITY OF BARGAINING POWER. NEW YORK HAS NEVER AGREED THAT IF ARBITRATION AGREEMENTS ARE ENFORCED THAT CLASS WAIVERS MAY BE ALLOWED. ................................................................................................................. 37

CONCLUSION. ................................................................................................................. 41

# TABLE OF AUTHORITIES

## CASES

*Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emples. v. Pa. Greyhound Lines*, 192 F.2d 310 (3d Cir. 1951) ............................................................................................................. 27

*Atwood v. Rent-A-Center E., Inc.*, No. 15-cv-1023-MJR-SCW, 2016 U.S. Dist. LEXIS 63478 (S.D. Ill. May 13, 2016) ........................................................................................... 34

*Bensadoun v. Jobe-Riat*, 316 F.3d 171 (2d Cir. 2003) ................................................... 5

*Bates v. Long Island Railroad*, 997 F.2d 1028 (2nd Cir. 1993) ............................... 24, 25

*Brady v. Williams Capital Group, L.P.*, 14 N.Y.3d 459 (2010) .............................. 37, 39

*Brown Bros. Electrical Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397 (1977) .................... 33

*Brown v. Nabors Offshore Corp,*, 339 F.3d 391 (5th Cir. 2003) ............................ 24, 26

*Circuit City v. Adams*, 532 U.S. 105 (2001) ........................................................ passim

*Cunningham v. Lyft, Inc.*, 2020 U.S. Dist. Lexis 53653 (D. Mass. 2020) ......... 18, 28, 30, 31

*Davis v Cintas Corp.*, 2019 U.S. Dist. LEXIS 87261 (W.D. Pa. 2019) ..................... 35

*Davis v EGL Eagle Global Logistics LP*, 243. Fed. Appx 39, 2007 U.S. App. LEXIS 16324 ............. 35

*Diaz v. Michigan Logistics Inc.*, 167 F. Supp.3d 375 (E.D.N.Y. 2016) ..................... 33

*Gray v. Uber, Inc.*, 2019 U.S. Dist. LEXIS 72060 (M.D. Fla. Apr. 10, 2019) .................. 27

*Grice v. Uber Techs., Inc.*, 2020 U.S. Dist. LEXIS 14803 (C.D. Cal. Jan. 7, 2020) ............ 27

*Guida v. Home Sav. of Am., Inc.*, 793 F. Supp. 2d 611 (E.D.N.Y. 2011) ..................... 5

*Gulf Oil Corp v. Copp Paving Co..*, 419 U.S. 186 (1974) ................................... 12, 28

*Hamrick v. Partsfleet*, 411 F. Supp.3d 1298 (M.D. Fla. 2019) ........................ 26, 27, 32

*Harris v. Shearson Hayden Stone, Inc.*, 82 A.D.2d 87 (App. Div. 1st Dept. 1981) ......... 38, 40

*Heller v. Rasier LLC*, No. cv-17-8545 (C.D. Cal Jan 7, 2020) ................................ 27

*Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286 (11th Cir. 2005) ................................. 29

*Jacobus v. Colgate*, 217 N.Y. 235 (1916) ................................................................. 37

*International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954 (7th Cir. 2012) ................................................................ 21, 25, 29

*Kauffman v U-Haul*, 2018 U.S. Dist. LEXIS 145717 (E.D. Pa. Aug. 27, 2018) .................. 34

*Kowalewski v. Samandarov*, 590 F. Supp. 2d 477 (S.D.N.Y. 2008) ............................ 27

*Lenz v. Yellow Transp. Inc.*, 431 F.3d 348 (8th Cir 2005). .............................. 21, 31

*Marbury v. Madison*, 5 U.S. 137 (1803) ................................................................ 37

*Maross Constr. v Central N.Y. Regional Transp. Auth.*, 66 NY2d 341 (1985) ................ 40

*Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am.*, 37 NY2d 91 (1975) .......... 40

*Matter of Siegel [Lewis]*, 40 NY2d 687 (1976) ........................................................ 40

*Matter of Smith Barney Shearson v Sacharow*, 91 NY2d 39 (1997) ............................. 40

*Matter of Weinrott (Carp)*, 32 NY2d 190 (1973) ...................................................... 40

*New Prime v Oliviera*, 139 S.Ct. 532 (2019) ................................................... 1, 5, 6

*O'Connor v. Uber Technologies*, 82 F.Supp.3d 1133 (N.D. Cal 2015) ......................... 7, 11

*Palcko v. Airborne Express Inc.*, 372 F.2d 588 (3rd Cir. 2004) ............................... 35

*Papetti v. Compagnie Nationale Air Fr.*, 97 CV 2921, 1998 U.S. Dist. LEXIS 14848 (E.D.N.Y. Aug. 14, 1998) ............................................................................................. 19

*Pennsylvania Greyhound Lines v. Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, Division 1063*, 193 F.2d 327 (3d Cir. 1952) .................... 27

*Ragucci v. Prof'l Constr. Servs.*, 803 N.Y.S.2d 139 (2nd Dept.) ............................. 39

*Ranieri v. Bell At. Mobile*, 304 A.D.2d 353 (1st Dep't 2003) ............................... 38

iv

*Reese v. Uber Techns., Inc.*, 2:18-cv-03300 (E.D. Pa. Mar. 4. 2020) ................................. 34

*Rittman v. Amazon.com Inc.*, 383 F. Supp. 3d 1196 (W.D. Wash. 2019) ........................... 32, 33

*Rogers v. Lyft, Inc.*, No. 20-cv-01938-VC, 2020 U.S. Dist. LEXIS 61169 (N.D. Cal. Apr. 7, 2020)
.................................................................................................................................... passim

*Scaccia v. Uber Techs., Inc.*, 2019 U.S. Dist. LEXIS 99161 (S.D. Ohio June 13, 2019)...................... 27

*Sherwood v. Marquette Transp. Co., LLC*, 587 F.3d 841, 2009 U.S. App. LEXIS 25581 ................... 35

*Sienkaniec v. Uber Techs.*, 401 F. Supp 3d 870 (D. Minn, 2019) ............................................ 21

*Singh v. Uber Technologies Inc.*, 939 F.3d 210 (3rd Cir. 2019) ........................................... passim

*Susquehanna Valley Cent. Sch. Dist. v. Susquehanna Valley Teachers' Assoc.*, 37 N.Y.2d 614 (1975)
.................................................................................................................................... 39

*Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers of America, (U.E.) Local 437*,
207 F.2d 450, 452 (3d Cir. 1953) ............................................................................... 27

*United States v. Pielago*, 135 F.3d 703, 710 (11th Cir. 1998) ............................................ 27

*United States v. Yellow Cab. Co.*, 332 U.S 218 (1947) ................................................ 19, 24

*Valdes v. Swift Transp.Co.*,  292 F. Supp. 2d 524 (S.D.N.Y 2003) .......................................... 33

*Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335 (D. Mass. 2019) ..................................... 30

*Walling v. Jackson Paper Co.*, 317 U.S. 564 (1943) ........................................................ 30

*Ward v. Express Messenger Sys.*, 413. F.Supp.3d 1079 (D. Colo. 2019) ................................ 21

## STATUTES

CPLR § 7515.................................................................................................................... 36, 37

Federal Arbitration Act, 9 U.S.C. § 1 ......................................................................... passim

N.Y. Gen. Bus. Law § 399-c ........................................................................................... 30

## OTHER AUTHORITIES

Advocate General of the EU Court of Justice's Opinion, Case C-434/15 (May 11, 2017) .................. 11

Case Nos. 2202550/2015 et al. (U.K. Employment Tribunals Oct. 28, 2016) ........................... 11

New York State Unemployment Insurance Appeal Board Nos. 596722-596727 (July 12, 2018) . 6, 8, 10

New York State Department of Taxation and Finance, TSB-M-09(7)S: *Additional Guidance Relating
to the Sales Tax on Certain Transportation Services,* NYS DTF TSB-M-09(7)S ............................ 10

Unemployment Insurance Appeal Board, Administrative Law Judge Section, ALJ Case No. 016-23858
.................................................................................................................................... 7, 11

## MISC.

1.6x Fare Promotion............................................................................................................ 10

2015 Fare Guarantee, wwww.driveubernyc.com/2015h2guar ............................................... 10

2019 Legis. Bill Hist. NY A.B. 8421 ................................................................................ 39

*About Greyhound*, https://www.greyhound.com/en/about/facts-and-figures ........................... 17

*Amtrak FY 2019 Company Profile,*
https://www.amtrak.com/content/dam/projects/dotcom/english/public/documents/corporate/nationalfact
sheets/Amtrak-Corporate-Profile-FY2019-033120.pdf-- ..................................................... 17

April 2015 Agreement ............................................................................................... 8, 9

"The Arbitration Hack: The Push to Expand the FAA's Exemption to Modern-Day Transportation
Workers in the Gig Economy"  54 U.S.F. L. Rev. 397 (2020) ....................................... 20, 21

December 2015 Agreement ........................................................................................ 7, 8, 9

December 2015 Addendum ............................................................................................. 8

*Get a For-Hire Vehicle License*, N.Y.C Taxi & Limousine Comm'n,
https://www1.nyc.gov/site/tlc/vehicles/get-a-for-hire-vehicle-license.page  (last visited Jun. 25,
2020) ............................................................................................................................................ 14

http://www.mta.info/press-release/lirr/lirr-time-performance-rises-three-year-high-2019-cancellations-
major-delays-short ..................................................................................................................... 24

*James Neutrals*,
https://www.jamsadr.com/neutrals/search?name=&keyword=&location=jams_new_york&homeOffice
=yes&practice=&language=&judicialstate=&judicial= (last visited June 29, 2020). .......................... 38

James A. Parrot & Michael Reich, *An Earnings Standard for New York City's App-based Drivers:
Economic Analysis and Policy Assessment,*............................................................................... 13, 17

January 2017 UberBLACK and UBERSUV Eligibility Addendum ............................................... 8

January 6, 2020 Platform Access Agreement ...................................................................................... 33

July 2013 Agreement ............................................................................................................................. 32

*LaGuardia Uber Rider Center among dining and retail amenties at NY & NJ airports,*
https://www.mcmorrowreports.com/port-authority-airports-offer-new-uber-ride-center-more-food-
retail. ............................................................................................................................................... 15

Memorandum of Law in Support of Unopposed Motion to Preliminarily Approve Settlement, *Ortega v
Uber*, 15-cv-07387 (NGG)-(JO).Dkt 68-5  at p.9)......................................................................... 12

November 2014 Agreement ............................................................................................ 8, 9, 32

Uber 2015 Onboarding Video, available at https://vimeo.com/125046223 .......................................... 10

Uber, *Make $5,000 per Month for the Rest of the Year* (Sep. 30, 2014), https://newsroom.uber.com/us-
new-york/make-5000-per-month-for-the-rest-of-the-year/ .................................................................. 9

Uber NYC 2014 Onboarding Video, available at https://vimeo.com/87769425 (Date Accessed June 30,
2020). ................................................................................................................................................. 9

Uber NYC, *Onboarding (Updated: Feb 26)*, Vimeo, available at https://vimeo.com/87769425 .......... 15

Uber Technologies, Inc., Annual Report (Form 10-K) (Dec. 31, 2019)................................................. 17

Uber Technologies, Inc., Registration Statement (Form S-1) (December 31, 2019) ............................ 31

*UberX: Uber NYC's GM Answers Your Questions*, at 3:00, available at
https://soundcloud.com/ubernyc/uberx-uber-nycs-gm-answers-your-questioins/s-nUiQR (Date
Accessed June 30, 2020)................................................................................................................ 10

www.uber.com/cities/new-york ............................................................................................................. 14

## INTRODUCTION

From the time Uber entered the New York City market in 2011 until May of 2017 Uber illegally deducted from every New York City trip of every Uber driver approximately 11% of every fare, on top of the commission on fares drivers agreed to pay to Uber.  This 11%, represented as the sales tax and Black Car Fund surcharge, was actually the customer's obligation to pay, but Uber was trying to break into the market and had drivers unwittingly subsidize customers in an effort to keep costs down and shift costs from passengers to drivers. This illegal subsidy was a clear violation of Uber's contract with drivers.   Thus far Uber has avoided responsibility for its theft from drivers.

In the last year, however, the Supreme Court in *New Prime v Oliviera*, 139 S.Ct. 532 (2019), recognized that determinations as to arbitrability of claims are the province of the Court not the arbitrator, and further recognized that independent contractors may be exempt under the residual clause of the Federal Arbitration Act (FAA), 9 U.S.C. § 1.  Further, since the Third Circuit's decision in *Singh v Uber Technologies Inc.*, 939 F.3d 210 (3rd Cir. 2019), other courts have affirmed that drivers such as Uber drivers are transportation workers engaged in interstate commerce, exempt from arbitration under the Federal Arbitration Act 9 U.S.C. § 1, based on such drivers' role transporting passengers, rather than good, in interstate commerce. While the Court in *Singh* reaffirmed precedent acknowledging that transportation of passengers interstate qualified as engaging in interstate commerce to find Uber drivers as exempt from the FAA, the Court remanded for further discovery on the issue of the drivers' participation in interstate commerce. *Singh*, 939 F.3d at 228.

Plaintiffs herein on behalf of the class of New York City Uber drivers they seek to represent have pleaded significant facts to support their claim that they meet the tests for engaging in interstate commerce when they regularly transport passengers across state lines and where Uber's own policies were designed to address interstate trips.  Plaintiffs also show that they participate in the flow of interstate

commerce by connecting passengers to and picking passengers up from airports, train stations and bus terminals.[1]

     For the reasons stated herein Plaintiffs request this Court deny Defendant's motion.  Plaintiffs allege that they have a contract of employment with Uber, are transportation workers who are engaged in interstate commerce making them exempt from the Federal Arbitration Act, and at least by virtue of the terms of the contract, they cannot be compelled to submit to arbitration under New York state law. Plaintiff's provide in this brief the law and facts to support all of Plaintiff's positions, which set forth why this motion should be denied.

     Because the issues raised in the motion are primarily legal issues, the factual allegations in the complaint and other supporting documentation will be provided within the arguments and attached to the Affirmation of Zubin Soleimany along with further Declarations of the Plaintiffs.

## PROCEDURAL POSTURE- RELEVANT FACTS

     On May 1, 2020, Defendant filed a motion to compel arbitration of this case. They claim plaintiffs have reneged on their agreements to arbitrate their claims.  Not so.  They are exempt from the agreement to arbitrate.   After the millions of dollars that Uber has taken from a class of approximately 96,000 drivers, Uber does not have the moral high ground as Defendant breached the contracts of all of these workers for four years and are seeking impunity behind its arbitration agreement.

     Plaintiffs Levon Aleksanian, Sonam Lama and Harjit Khatra have been and are drivers for Uber. All Plaintiffs were subject to the deductions from their pay for amounts represented to be sales tax and the Black Car Fund Surcharge during the relevant time periods.  They seek to represent a class of similarly situated Uber drivers.   The facts with respect to each Named Plaintiff taken from the Complaint are set forth below.

---

[1] The allegations regarding the Plaintiffs driving across state lines on a regular basis appear in the complaint and are supported by Uber's own documents.  The allegations regarding Plaintiff's participation in the flow of interstate commerce are also primarily based on Uber documents and/or referred to as URLs.  All documents supporting Plaintiffs positions are attached to the Affirmation of Zubin Soleimany.

Plaintiff Levon Aleksanian ("Aleksanian") is a resident of Fresh Meadows, Queens County, New York. Aleksanian drove for Uber in New York City from August 2014 to September 2015. Aleksanian is a party to the June 2014, November 10, 2014, and April 3, 2015 contracts with Uber and did not opt out of the arbitration clauses to such contracts. Aleksanian was expected to and regularly did transport passengers across state lines while working as an Uber driver. Thus, Aleksanian is a worker engaged in interstate commerce and exempt from the arbitration clauses contained in the Uber contracts to which he is a party. During his tenure with Uber, 4.36% of the trips Aleksanian performed for Uber involved transporting a passenger across state lines. These interstate trips accounted for 10.12% of the total sales volume of Uber trips provided by Mr. Aleksanian. Aleksanian seeks to represent the Tax and BCF Class only. (Compl. paras. 22 to 28). *See also* Ex. A attached to Soleimany Aff.

Plaintiff Sonam Lama ("Lama") is a resident of Astoria, Queens County, New York. Lama has been driving for Uber in New York City from April 2015 to the present. Lama is a party to the April 3, 2015 and December 11, 2015 contracts with Uber and did not opt out of the arbitration clauses to such contracts. Lama was expected to and regularly did transport passengers across state lines while working as an Uber driver. Thus, Lama is a worker engaged in interstate commerce and exempt from the arbitration clauses contained in the Uber contracts to which he is a party. Uber does not currently allow Lama to access his trip records from the relevant time period, however, in 2017, Lama saved payment statements from eight consecutive weeks that provide a representative sampling of the amount of interstate work he performed for Uber. During this eight-week period from January 4, 2016 to February 22, 2016, 7.55% of the number of trips Lama performed for Uber involved transporting passengers across state lines. During the same time period, these interstate trips accounted for 19.78% of the total stated cost of rides Lama provided. Lama seeks to represent both Classes set forth in the Complaint. (Compl. paras. 29 to 37) *See also* Ex. B attached to the Soleimany Aff.

Plaintiff Harjit Khatra ("Khatra") is a resident of Hicksville, Nassau County, New York. Khatra has been driving for Uber in New York City from in or about October 2013 to the present.  Khatra is a party to all contracts with Uber in the relevant period— July 2013, June 2014, and on November 10, 2014, April 3, 2015, and December 11, 2015—and he did not opt out of the arbitration clauses to such contracts. Khatra was expected to and regularly did transport passengers across state lines while working as an Uber driver. Thus, Khatra is a worker engaged in interstate commerce and exempt from the arbitration clauses contained in the Uber contracts to which he is a party. Uber does not currently allow Khatra to access his trip records from the relevant time period, but on information and belief, given his long history with Uber, his percentage of interstate trips is similar to other Named Plaintiffs and the putative class as a whole. Khatra seeks to represent both Classes. (Compl. paras. 38 to 44).

Further, Plaintiff Khatra had been part of a previous class case (*New York Taxi Workers Alliance et. al. v. Uber et. al.  sub. nom Haider et al v Uber et al*, 16-cv-04049 AKH) in which he also claimed that the contract had been breached in the manner alleged herein.  Because Plaintiff Khatra had not opted out of Uber's provision in the agreement regarding arbitration, his case was dismissed from the original case.  After filing a separate case with other drivers who had also not opted out of the arbitration agreement, (16-cv-08299-AKH) the case was dismissed without prejudice while the case continued for a group of Plaintiffs who had opted out.   Plaintiff Khatra and the other Named Plaintiffs now seek to represent a class of drivers whose wages were similarly taken in violation of their contract with Uber, and, as such, this is a continuation of a previously dismissed case.   The issue of whether this case should be assigned to the original judge in the prior action is pending before this Court.   Based on the developments in the law since the dismissal of the prior action the Plaintiffs, including Plaintiff Khatra believe they are properly exempt from submitting their claims to arbitration and may proceed as a class action.

**<u>STANDARD OF REVIEW</u>**

Section 1 of the FAA provides that "nothing" in the FAA "shall apply" to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. As the Court stated in *Singh*, *supra*,  the applicability of the residual clause of § 1 is not merely "presumed to be [a] question[ ] for judicial determination." *Id*. at 773 (citation omitted). Rather, *New Prime* establishes that a court must be satisfied that this clause does not apply before making an order that the parties proceed to arbitration pursuant to §§ 3 and 4 of the FAA. *New Prime*, 139 S.Ct. at 537. Thus, a "restricted inquiry" may be necessary to resolve a motion to compel arbitration that presents an issue regarding the applicability of the residual clause of § 1.

The Second Circuit in *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003), stated that the Court should apply a standard similar to that applicable of a motion for summary judgment to a motion to compel arbitration.  As stated in *Guida v. Home Sav. of Am., Inc*., 793 F. Supp. 2d 611, 613 n.2 (E.D.N.Y. 2011), "[w]hile it is generally improper to consider documents not appended to the initial pleading or incorporated in that pleading by reference in the context of a Rule 12(b)(6) motion to dismiss, it is proper (and in fact necessary) to consider such extrinsic evidence when faced with a motion to compel arbitration."

Plaintiffs, as the party opposing arbitration, present the Court not only with argument but also documentary evidence, primarily Uber documents, which support Plaintiff's contention that this Court should deny Defendant's Motion to Compel Arbitration, as Plaintiffs have raised a viable question of fact regarding the relevant factual questions.

## ARGUMENT

I.      **THE ARBITRATION CLAUSE AT ISSUE IS CONTAINED IN A "CONTRACT OF EMPLOYMENT" FOR THE PURPOSES OF FAA SECTION 1**

   a.   **Uber Admits Drivers Are Independent Contractors, Not Licensees, And *New Prime* Is Thus Controlling**

The controversy in this case arises from Uber's failure to pay drivers the full amount due under its contract for performing work, as promised. Quite plainly, Uber paid Plaintiffs to work for them as drivers, regardless of their employment status under state or federal employment laws.[2] The notion that Uber's agreement is not a contract **of employment** has been dealt with summarily in *Singh,* which held that the Supreme Court's decision in "*New Prime* eliminated Uber's 'contract of employment argument." *Singh v. Uber Techs.*, 939 F.3d 210, 217 (3rd Cir. 2019) (internal citation omitted). Indeed in *New Prime*, the Supreme Court held that the independent contractor agreement pursuant to which truck drivers perform work are contracts of employment for purposes of the exemption from arbitration contained in Section 1 of the FAA. *New Prime*, 139 S.Ct. at 543.

Indeed, *New Prime* is controlling. Uber has repeatedly taken the position in all its labor dispute regarding the issue of employee misclassification that drivers are not employees but rather independent contractors. Such position tacitly admits that *New Prime* is controlling. Indeed, a crucial aspect of the transaction between Uber and drivers is consistent with payment of independent contractors: Uber issues 1099 to drivers for the full amount all fares completed.

Given the controlling nature of *New Prime,* Uber's attempts to obfuscate and style its contracts as license agreements should be rejected out of hand. Indeed, Uber has not pointed to a single case that even implies that a contract styled as a license agreement cannot be a contract of employment because no such cases exist. None of the recent cases Defendant cites regarding the FAA's residual exemption and ride-hail drivers even entertain this argument.

### b. Plaintiff Aleksanian Has Been Deemed Not Merely An Independent Contractor of Uber But An Employee Of Uber By The State of New York

---

[2] Notably, however, the New York State Unemployment Insurance Appeal Board has already found Plaintiff Aleksanian and "all drivers similarly employed by Uber" to be employees under the New York Unemployment Insurance Law. Uber did not appeal this decision. New York State Unemployment Insurance Appeal Board Nos. 596722-596727 (July 12, 2018), attached as Ex. C to the annexed Affirmation of Zubin Soleimany.

Moreover, *a fortiori,* a finding of the existence of an employment contract is warranted here, as the state of New York has determined the lead Named Plaintiff in this action to be not merely an independent contractor but rather an employee.

Specifically, regarding Plaintiff Aleksanian and all other similarly situated drivers, the New York Unemployment Insurance Appeal Board found that, quite plainly:

> "Uber contracted separately with Riders, to provide guaranteed, reliable ride service. … The Riders provide Uber with their credit card for charges associated with the transportation service. The Drivers are not party to the contracts between Uber and the Riders… The fare displayed on the Uber app is charged to the Rider's credit card, by Uber.  Uber then processed the Riders' bills" and then paid the driver. New York Unemployment Insurance Appeal Board, Administrative Law Judge Section, ALJ Case No. 016-23858, *aff'd* Unemployment Insurance Appeal Board Nos. 596722-596727, at page 7. (June 9, 2017), attached as Ex. D to the Soleimany Aff.

Such finding provides separate and independent grounds to find the existence of a contract of employment.

### c. The Face Of Uber Contracts Establish It Is Not A License Agreement But An Agreement For Work

Even if *arguendo,* one must look beyond *New Prime*—which Plaintiffs argue this court need not—the four corners of Uber's contract with drivers establish that it is a contract to perform work for compensation, which grants drivers access to Uber's dispatching software, as it must, in order that drivers may perform their work assignments.   Put simply, it is a contract for employment that necessarily grants drivers access to the Uber dispatch software which is the "critical tool" needed to work as an Uber driver. *O'Connor v. Uber Technologies*, 82 F. Supp.3d 1133, 1153 (N.D. Cal 2015).   To say otherwise misses the point that drivers can only access the Uber app once they are hired by Uber to perform driving work. The structure of the agreements bear this out.  For example, the December 2015 Agreement includes one specific section of a fifteen-section agreement, granting drivers a "license" to use Uber's driver app to receive work assignments. *See* December 2015 Agreement, at Section 5 ("Proprietary Rights: License") and Section 5.1 ("License Grant"), attached as Ex. E to the Soleimany Aff. Indeed the basic economic

structure of the agreement between Uber and drivers is predicated on drivers driving. Indeed no use of

the "license" is possible absent driving, and the fee structure—tied to the particulars of distance, time,

and traffic and demand variables— all refer to the performance of work as drivers.

Thus, Uber's provision of the app to drivers is contractually conditioned upon drivers performing

work, and Uber's contention that drivers could "use the app to find passengers as much or as little as they

want" is plainly false. (Def.'s Mot. to Compel Arbitration at 6.) The contracts at issue here state

unequivocally that drivers must complete a trip at least once a month, or else Uber reserves the right to

deactivate their driver accounts. *See* Dec 11, 2015 Agreement, at §2.1,  Ex. E to the Soleimany Aff. All

other contracts contain similar language.  Nor could drivers merely use the dispatch software as they saw

fit, for a fee; if drivers did not perform enough work while logged into the Uber app, or perform work in

the manner required by Uber, Uber would fire them, or in Uber's terms, deactivate their access to the

software. *See* Ex. C to the Soleimany Aff., at 6.  Uber's Driver Addendum from December 2015 requires

drivers to contractually agree to "accept a substantial portion" of user requests. Ex. F to the Soleimany

Aff.  An addendum to the contract issued in 2016 restricted access to the UberBLACK and UberSUV

service to drivers who failed to complete minimum numbers of trips and gain a satisfactory rating.

January 2017 UberBLACK and UberSUV Eligibility Addendum, attached as Ex. G to the Soleimany Aff.

Various other provisions relate to how drivers perform their labor, indicative of an employment contract

rather than a software license agreement:

- Drivers recommended to "wait at least ten (10) minutes for a User to show up at the requested
  pick-up location."    §§ 2.2 of December 2015, April 2015 and November 2014 Agreements,
  attached as Exs. E, H and I, respectively, to the Soleimany Aff.

- Drivers retain access to the dispatch software only if they provide satisfactory job performance
  based on Uber's star-rating system. *See, e.g.,* December 2015  § 2.6.2., Ex. E to the Soleimany
  Aff.

- Drivers would lose access to the dispatch software if they failed to "maintain standards of appearance and service." July 2013 Agreement, at § 4.3.3 attached as Ex. J to the Soleimany Aff.

- Reserving Uber the right to dock drivers' pay upon complaint that a driver took an inefficient route. § 4.3 of December 2015, April 2015 and November 2014 Agreements, attached as Exs. E, G, and H, respectively, to the Soleimany Aff.

Clearly these are the types of conditions incident to an employment contract.

### d.   <u>The Terms Of The Contract Provide Compensation for Uber Drivers' Work</u>

Uber's payments are plainly compensation for work, the general bargain being: perform these trips, and Uber will pay you a cut of what we get paid, similar to commission workers in any field. In practice, Uber paid drivers a percentage of each trip, with trip costs calculated on an hourly basis, subdivided as per-minute pay, and per-mile for each trip worked. Uber's 2014 "onboarding" video encapsulated the arrangement of compensation for drivers' labor plainly, telling New York City Uber drivers: "What you put into Uber, is what you get out of Uber. You work hard, you get compensated for it." Uber NYC 2014 Onboarding Video, https://vimeo.com/87769425 (last accessed June 30, 2020) at 1:48. Additionally, at times, Uber abandoned its commission practice, and simply paid drivers a set piece rate per mile and minute, regardless of what the customers paid. This occurred on UberPOOL trips where drivers were paid flat mile and minute rates regardless of how much the customer, or multiple customers ride paid. This practice also occurred on all other classes of trips beginning in the fall of 2016, when Uber began its "upfront pricing" scheme. (Compl. paras. 14-15). At various times, Uber supplemented its payment terms with guarantees that drivers would earn a set amount, such as $1,500 per week or $6,000 per month if drivers remained online for 50 hours per week and accepted a minimum percentage of all trips offered, regardless of what the total passenger payments for these trips were. *See*, *e.g.*, Uber, *Make $5,000 per Month for the Rest of the Year* (Sep. 30, 2014), https://newsroom.uber.com/us-new-york/make-5000-per-month-for-the-rest-of-the-year/; attached as Ex. K to the Soleimany Aff; *see also*

2015 Fare Guarantee, wwww.driveubernyc.com/2015h2guar, attached as Ex. L to the Soleimany Aff. See also, New York State Unemployment Insurance Appeal Board Nos. 596722-596727 (July 12, 2018), at 8. At other times, Uber paid drivers bonuses on top of any customer payment for working in a certain place or time, as directed by Uber. *See, e.g., 1.6x Fare Promotion* attached as Ex. M to the Soleimany Aff.

The notion that Uber customers paid drivers for work, and that drivers paid Uber a fee is belied by Uber's own payment practices. At all times, Uber passengers paid Uber for their rides, and Uber paid drivers for their work, by compensating them based on the mile and minutes of each trip, minus their commission. Documents distributed by Uber to drivers described the distribution of the fare between Uber and the driver as a "commission split." *See* Statement of Josh Mohrer, the General Manager of Uber's New York City market, speaking on a podcast emailed to drivers, *UberX: Uber NYC's GM Answers Your Questions*, https://soundcloud.com/ubernyc/uberx-uber-nycs-gm-answers-your-questioins/s-nUiQR (last accessed June 30, 2020) at 3:00.

In any event, Under New York Law, there is no basis for the contention that Uber is selling its app to drivers, rather than selling rides to customers. Accordingly, the law here cannot accommodate a view of drivers as receiving payment and remitting a "fee" to Uber when, under the law, the transaction is only possibly understood as a payment made to the vendor (Uber), who then compensates drivers for performing this service. Uber operates its car service in New York City as a group of subsidiary black car bases, licensed by the New York City Taxi and Limousine Commission to provide for-hire transportation services. *See* Uber 2015 Onboarding Video, https://vimeo.com/125046223 (last accessed July 1, 2020) at 0:20, explaining that "Uber is an established black car base." Explaining drivers' and bases' obligations pursuant to New York sales tax law, the NY Tax Dept.'s bulletin, TSB-M-09(7)S states: "where a base charges a customer for service and receives payment for the service" that base is deemed the vendor for purposes of state tax law." New York State Department of Taxation and Finance, TSB-

M-09(7)S: *Additional Guidance Relating to the Sales Tax on Certain Transportation Services* (May 22, 2009), attached as Ex. N to the Soleimany Aff.   Uber is the party with the registered tax account and remits the tax as the vendor.

Uber's proffered view of itself as not hiring drivers to provide rides rests on a fallacy that it has insisted on perpetuating ever since its entry into the private transportation market: that Uber is not a transportation company, but merely a technology company. The view, as Uber has it, is that Uber sells technology to drivers, who are their customers, who pay them a fee per ride, rather than being paid for their labor in providing Uber's core service.  This is quite a stretch for a company that marketed itself as "Everyone's Private Driver," and has described its business as aiming to "provide transportation as reliable as running water everywhere and for everyone."   Unemployment Insurance Appeal Board, Administrative Law Judge Section, ALJ Case No. 016-23858, Ex. D to the Soleimany Aff., at 5, 15.  This argument been met broadly with skepticism.  The ALJ section of the NYS UIAB found the contention that Uber is a technology company to be a "non sequitur." *Id*. at p. 15.  The District Court for the Northern District of California found such an argument to "strain credulity" and noted that Uber is no more a technology company that Yellow Cab, because that company uses CB radios to dispatch its taxis. *O'Connor v. Uber Techs*., 82 F.Supp.3d 1133, 1144 (N.D. Cal. 2015). The Advocate General of the European Court of Justice issued an advisory opinion holding that Uber is indeed a transportation company, and "cannot be regarded as a mere intermediary" between drivers and passengers. Advocate General of the EU Court of Justice's Opinion in Case C-434/15 (May 11, 2017), attached as Ex. O to the Soleimany Aff.   Employing the British penchant for understatement, the U.K. Employment Tribunal found the notion that Uber's London operation is merely a mosaic of 30,000 independent transportation businesses, connected by Uber's platform to be, "faintly ridiculous." Case Nos. 2202550/2015 et al. (U.K. Employment Tribunals Oct. 28, 2016), attached as Ex. P to the Soleimany Aff., *aff'd* Appeal No. UKEAT/0056/17/DA Employment Appeal Tribunal (Nov. 10, 2017), *aff'd Uber BV v. Aslan* (2018)

11

EWCA Civ. 2748 (Court of Appeal of England and Wales). Thus, Uber's claim that the drivers do not have a contract of employment with Uber must be rejected.

For the reasons provided s*upra,*  the initial requirement of FAA Section 1—the existence of "a contract of employment"— is met by Plaintiffs and the putative class they seek to represent.

## II. **PLAINTIFFS, AS A PUTATIVE CLASS OF NEW YORK CITY DRIVERS, ARE PART OF A CLASS OF "TRANSPORTATION WORKERS" RECOGNIZED IN *CIRCUIT CITY* AS POTENTIALLY EXEMPT UNDER FAA SECTION 1, AND PLAINTIFFS AND THE PUTATIVE CLASS ARE IN FACT ENGAGED IN INTERSTATE COMMERCE IN THE FORM OF INTERSTATE TRIPS AND OTHERWISE OPERATE IN THE FLOW OF INTERSTATE COMMERCE**

Next, Defendant argues, as Uber did in *Singh*, that Plaintiffs are not within the residual clause of Section 1 of the FAA, which exempts from arbitration, "contracts of employment of seamen, railroad employees, *or any other class of workers* [italics added] engaged in foreign or interstate commerce." 9 U.S.C. § 1. The Supreme Court in *Circuit City v. Adams*, 532 U.S. 105, (2001) limited the "class of workers" exempt from Section 1 of the Federal Arbitration Act,  to "transportation workers" engaged in interstate commerce.   In so doing the majority of the Court opined that  "engaged in commerce" is narrower than the more open-ended formulations "affecting commerce" and "involving commerce." *See, e.g.,* *Gulf Oil Corp. v Copp Paving Co.,*  419 U.S. 186, 195 (1974) (the phrase "engaged in commerce" "appears to denote only persons or activities within the flow of interstate commerce").  The Court in *Circuit City* using analogous description from anti-trust law equates engaged in interstate commerce with activities within the flow of interstate commerce.   Uber concedes that Uber drivers are in a class of workers who provide transportation, but disclaims they are workers who engage in the flow of interstate commerce. Uber is incorrect.  Plaintiffs, and the New York City Uber drivers they seek to represent, are engaged in interstate commerce, both directly and through their role in the flow of interstate commerce. Moreover, Plaintiffs and the putative class meet the definition of  the  class of workers  under the residual clause of the FAA as they are transportation workers. Nor does the fact that Plaintiffs and the putative

class transport persons rather than goods render them nonexempt from the FAA. Indeed, as discussed *infra*, Defendant's arguments both regarding interstate commerce and  class definition must fail because they rely on semantic and statistical tricks to mask the clear fact that Plaintiffs  and New York City Uber drivers meet the definition of a class of persons exempt from the FAA,  just as New Jersey Uber drivers were found to be by the Third Circuit in *Singh, supra*.

### a.   Plaintiffs Actually, And As New York City Uber Drivers, Are In Fact Engaged In Interstate Commerce

Uber drivers are the largest private sector workforce in New York City.  *See* James A. Parrott & Michael Reich, *An Earnings Standard for New York City's App-Based Drivers, Report for the New York City Taxi and Limousine Comm'n*, at 69 (July 2018), attached as Ex. Q to Soleimany Aff.  Some 96,000 drivers have driven in the New York City area from the time Uber entered the New York City market in 2013.[3] These drivers perform over 100 million rides per year in New York City, connect New York City residents and visitors from around the world, traverse the tristate area and  provide transportation  to international airports from where passengers  travel to destinations across the globe. Uber drivers are the lifeblood of this international city, and indeed Uber has touted New York City as a major market and a transportation hub precisely due to these qualities.

Nonetheless, Uber in its motion to compel arbitration and brief in support thereof, makes no reference to the factual allegations in Plaintiffs' complaint. From paragraph 75 to paragraph 89 in the Complaint, Plaintiffs described how Uber has structured its New York City business so as to show that these drivers are engaged in interstate commerce and  how in fact Plaintiffs are engaged in interstate commerce. Further, as discussed herein, Plaintiffs work closely in the flow of interstate commerce.

---

[3] This number of Uber drivers comes from the Memorandum of Law in Support of Unopposed Motion to Preliminarily Approve Settlement, *Ortega v Uber*, 15-cv-07381 (NGG)-(JO).Dkt 68-5  at p.9 when a case involving drivers who opted out of the arbitration agreement settled their case which included the tax issue alleged herein.

Defendant does not reference these crucial facts precisely because they make clear that Plaintiffs work in interstate commerce.

        i.    <u>Uber Is Structured To Require Interstate Trips Of New York City Drivers As A Term And Condition Of Driving For Uber And The Company Touted The Interstate Nature Of The Job</u>

As Plaintiffs allege, Named Plaintiffs Aleksanian, Lama, and Khatra routinely transported passengers across state lines while performing services for Uber.  (Compl. paras. 25, 32, and 41)[4] Plaintiffs also allege that Uber's New York City business model was structured to not only provide transportation within New York City and New York State, but also interstate transportation as well. (Compl. paras. 75 - 89).  Further Plaintiffs allege Uber's policies contemplated the regular performance of interstate transportation work by its drivers.   For example, Uber maintained a consistent policy, published in both driver pay documents and consumer-facing advertising, of imposing a "$20 surcharge on all trips between NYC and New Jersey."  (Compl. para. 77). *See also* www.uber.com/cities/new-york, attached as Ex. R to Soleimany Aff.  Also, at times, Uber advertised flat rates for trips between Manhattan and Newark International Airport.  (Compl. para. 78); Ex. R to Soleimany Aff.   Other Uber policies require New York City based drivers, to routinely transport passengers between New York and New Jersey and/ or Connecticut due to the fact that Uber policies state that trips originating in New York City may last as long as four hours. *Id*. That is, passengers may choose any destination within four hours of their pick-up location, irrespective of the state of the destination and thus New York City-based Uber drivers may be dispatched to locations in New Jersey, Connecticut, Pennsylvania. Furthermore, drivers are not aware of the drop-off location until the passenger has entered the vehicle.   Should the driver

---

[4] According to the records kept by Mr. Aleksanian, during his tenure with Uber, 4.36% of the trips Aleksanian performed for Uber involved transporting a passenger across state lines.  These interstate trips accounted for 10.12% of the total sales volume of Uber trips provided by Mr. Aleksanian.  (Compl. para. 27)  For the eight weeks of records preserved by Mr. Lama from January 4, 2016 to February 22, 2016, 7.55% of the number of trips Lama performed for Uber involved transporting passengers across state lines.  During the same time period, these interstate trips accounted for 19.78% of the total stated cost of rides Lama provided.  (Compl. para. 36).   Mr. Khatra could not retrieve his records from that time period. (Compl. para. 43)

refuse to drive for such a long the trip, the refusal would be counted as a "cancellation," and during the relevant time period, Uber's deactivation policy stated that drivers' accounts could be permanently deactivated for excessive cancellation rates. Accordingly, no driver had the option to exclude performing interstate trips without risking further exposure to deactivation.  (Compl. paras. 85 to 87).

In addition, the Uber app is programmed to anticipate interstate trips and makes pricing adjustments when it recognizes an interstate trip by not indicating any deductions or assessments for sales tax on trips originating in New York but terminating in other states, pursuant to New York Tax law and regulations which require taxation of only intra-state trips.  All such facts support a finding that all New York City Uber drivers, including Named Plaintiffs and the class they seek to represent, are required to accept interstate trips as a term and condition of the job at Uber (Compl. paras. 85 to 87).

Indeed, the interstate nature of Plaintiffs' and the putative class' work was touted by Uber. That is, from the outset, Uber communicated to its drivers the interstate nature of their work. In a 2014 driver onboarding orientation video, under a section titled "Uber NYC/NJ" the Company boasts about its expansion "throughout the metropolitan area including a recent an expansion of options into New Jersey." Uber NYC, *Onboarding (Updated: Feb 26)*, VIMEO, https://vimeo.com/87769425 at 2 minute 44 second mark. Thus, Uber itself viewed its New York City operations as part of an interstate metropolitan business.[5]

      ii.    <u>Ride Data Confirms The Significant Percentage Of Trips Performed By New York City Uber Drivers Which Are Interstate</u>

---

[5] New York City Uber Drivers often also under the jurisdiction of the Port Authority of New York and New Jersey. (PANYNJ). The Port Authority of New York and New Jersey is an interstate compact authorized by the United States Congress in 1921. The Port Authority has jurisdiction over and oversees many of the bridges, tunnels, airports, and seaports, within the geographical jurisdiction of the Port of New York.  The PANYNJ operates six bi-state crossings as well as the Port Authority Bus Terminal, the PATH train system, and five airports: LaGuardia Airport; John F. Kennedy Airport; New York Liberty Airport, Teterboro Airport and the Stewart International Airport. Uber Drivers from New York City service these airports and Uber has negotiated with these airports, especially LaGuardia, JFK and Newark to provide a holding area for Uber drivers. Further the PANYNJ has established an Uber rider area on its property.  https://www.mcmorrowreports.com/port-authority-airports-offer-new-uber-ride-center-more-food-retail.   The airport surcharge which Uber Drivers charge is paid to the PANYNJ.

In addition to interstate trips being integral to the job, Plaintiffs in fact performed a significant percentage of their trips in the form of interstate trips, and earned an even greater portion of their pay through interstate trips. Ex. A to Soleimany Aff. Further Plaintiff Aleksanian received more than 10% of his income from interstate trips, and for Plaintiff Lama, he received almost 20% of his income for the eight-week period in early 2016 from interstate trips. (Compl. para. 27).  Based on these facts, and the distance of the interstate trips and the increased earnings they yield to the drivers, it is reasonable to project that Uber drivers would see revenue from interstate trips that is roughly three times the amount of an average trip.  Thus only reporting the number of interstate trips by percentages does not provide an accurate basis for judging the drivers' engagement in interstate commerce.  Named Plaintiffs have no reason to believe that they are not representative of the class as a whole nor has Defendant presented average interstate revenue and trip data regarding New York City drivers within the putative class to suggest that Plaintiffs' high percentages revenue from interstate trips  are outliers.

Instead, Uber has provided the Court with gerrymandered percentages for 2019 of interstate trips in the US and the percentage for interstate trips in New York State.[6]  These data systematically seek to obscure the facts regarding interstate trips taken by New York City drivers in the class period from 2013 through 2017.

   iii.   <u>Additionally, In Absolute Numbers Uber Drivers Nationally Are Engaged In More Interstate Trips That National Bus Lines</u>

In addition to the percentage of trips New York City Uber drivers make interstate and the percentage of New York City Uber driver revenues' derived from such trips, in absolute numbers, nationwide, **<u>Uber driver provide more interstate trips than national bus lines.</u>**

---

[6] Data from New York State in 2019 is misleading because during the relevant time period the only New York Market was New York City.  Uber did not expand into New York State until June 2017 after they stopped taking the sales tax from the drivers.

Uber's dominance in the ground transportation services in New York City and the tristate area cannot be understated. In 2017, Uber's revenue from its New York City operation was $2 billion dollars. James A. Parrot & Michael Reich, *An Earnings Standard for New York City's App-based Drivers: Economic Analysis and Policy Assessment,* Ex. Q at Soleimany Aff. at 44.  The total number of app-dispatched trips in 2017 in New York City was 160 million—almost double the number of taxicab trips—*Id*. at 8.  Uber's market share in 2017 was 66.5%. *Id*. at 42. Put differently, in 2017 Uber drivers completed nearly 106,400,000 trips, more than one hundred million trips in New York City alone. Even accepting Uber's contention that 3.09% of these were interstate trips, at least 3,287,760 of those trips were interstate, thus more than 3 million, in 2017 alone in New York City.  This is a significant number of interstate trips.  Indeed, in 2019 the number of Uber interstate trips nationally was 36,344,000.[7] This number of trips, which are not limited to one passenger, involve the transportation of more than twice the number of passengers Greyhound Bus carried in 2019 in all trips both interstate and intrastate.[8]   In 2019 the number of passengers on all Amtrak trips was less the number of all Uber interstate trips nationally, and this number is even larger as Uber trips often involved more than one passenger.[9] This fact is further indicative of the interstate nature of Plaintiffs' work.

      iv.     <u>Moreover, In Addition To Trips Crossing State Lines, New York City Uber Drivers Perform Much of Their Work In The Flow Of Interstate Commerce</u>

Another basis for a finding that Plaintiffs are engaged in interstate commerce in addition to actual interstate trips, is Plaintiffs' and the putative class' impact on the flow of interstate commerce.  Although

---

[7] **Type**                     **2019**

| Type | 2019 |
|---|---|
| Global trips* | 7,000,000,000 |
| U.S. Share (22%)** | 1,540,000,000 |
| U.S. Interstate trips 2.36%*** | 36,344,000 |

*Uber Technologies, Inc., Annual Report (Form 10-K), at 57 (Dec. 31, 2019), attached as Ex. S to Soleimany Aff.
**Uber Technologies, Inc., Annual Report (Form 10-K), at 18 (Dec. 31, 2019), Ex. S to Soleimany Aff.

[8] *About Greyhound,* https://www.greyhound.com/en/about/facts-and-figures , attached as Ex. T to Soleimany Aff.
[9] *Amtrak FY 2019 Company Profile,*  https://www.amtrak.com/content/dam/projects/dotcom/english/public/documents/corporate/nationalfactsheets/Amtrak-Corporate-Profile-FY2019-033120.pdf-- at 3, Ex. U to Soleimany Aff.

the Supreme Court in *Circuit City* held that Section 1 exemption from the FAA should be limited to "transportation workers," the Court did not define the characteristics of a transportation worker or the degree to which the worker's duties must be involved the transportation of goods or passengers interstate or in the flow of interstate commerce to be considered "engaged in interstate commerce".  District Courts have reached different results based on the facts presented. See e.g. *Cunningham v Lyft*, No. 1:19-cv-11974, 2020 WL 1503220 (D. Mass. Mar. 27, 2020); *Rogers v. Lyft, Inc*., No. 20-cv-01938-VC, 2020 U.S. Dist. LEXIS 61169 (N.D. Cal. Apr. 7, 2020).

Moreover, in the last year several courts with well-reasoned decisions have supported Plaintiffs' claim that Uber drivers are transportation workers engaged in interstate commerce as articulated by the Supreme Court in *Circuit City,* because they transport passengers in interstate commerce *and also* [italics added] in the flow of interstate commerce. Plaintiffs' showing of interstate commerce is thus supportable also on a "flow of interstate commerce" theory.

Specifically,  Named Plaintiffs report a sizable portion of their trips—in addition to out of state trips—to include connecting passengers to other forms of interstate transportation.  (See estimates in the declarations of Aleksanian and Khatra.)

From Uber's own data, a sizable portion of Uber's business involves trips and to from the airports. Indeed, by its own admission, Uber "generated 15% of its Ridesharing Gross Bookings worldwide from trips that either started or were completed at an airport." Uber Technologies, Inc., Registration Statement (Form S-1), at 39 (April 11, 2019) Exhibit V to Soleimany Aff.  Furthermore,  Plaintiffs' declarations indicate their routine trips to and from Grand Central Terminal, and Pennsylvania Station and Port Authority Bus Station, which provide many interstate trips. Thus, Plaintiffs' role in connecting passengers to international and interstate transportation hubs supports a finding of interstate commerce.

v.    <u>*United States v Yellow Cab* Does Not Weigh Against A Finding Of Flow of Commerce On the Facts Presented</u>

Nor does Uber reliance on the 1947 holding in *United States v Yellow Cab. Co*., 332 U.S 218 (1947), weigh against a finding of flow of interstate commerce.  In *United States v Yellow Cab. Co*., the Supreme Court determined that one part of an anti-trust case, involving other aspects of Yellow Cab operations, did not rise to the level of involvement in the stream of interstate commerce.   This part of the case involved a local cab company which transported local residents to the train station or home. Although the characterization of being engaged in interstate commerce in *Circuit City* referred to the test as being one of participating in the "flow of interstate commerce" used in anti-trust law, the Court in *Yellow Cab, supra*, was careful to confine this case to its facts.  In *Yellow Cab* the Court was assessing the role of the local cab company in the context of it being a small part of a conspiracy involving other aspects of the taxi cab industry.  In 1947, at the time when the Court decided *United States v Yellow Cab Co*, *supra* there were no multi-billion dollar ride transportation services such as Uber which transport people interstate,  as well as transport people to and from airports, train or bus stations or ports to catch boats, or use interstate highways, or transport people who have come into a state from another state. Given the narrow holding of *Yellow Cab*, Plaintiffs believe that should there be the type of anti-trust claims between or among other ride share companies, there is no doubt that Uber's business, and thus the drivers who work for them,  would be found to be engaged in the flow of interstate commerce. Indeed, the Court in  *Yellow Cab* expressly contemplated scenarios where interstate commerce sufficient to satisfy the anti-trust statute may be found based on cab pick and drop off to a station:

> Likewise, we are not to be understood in this case as deciding that all conspiracies among local cab drivers are so unrelated to interstate commerce as to fall outside the federal ken. A conspiracy to burden or eliminate transportation of passengers to and from a railroad station where interstate journeys begin and end might have sufficient effect upon interstate commerce to justify the imposition of the Sherman Act or other federal laws resting on the commerce power of Congress. *Yellow Cab, supra*, at 232-233.

Accordingly, *Yellow Cab* does not actually address the argument regarding the flow of interstate commerce and is, rather, limited to its facts.  Nonetheless,  participating in the flow of interstate commerce is a major way  in which workers engage in interstate commerce. See, *Papetti v. Compagnie*

*Nationale Air Fr.,* 97 CV 2921, 1998 U.S. Dist. LEXIS 14848, at *6 (E.D.N.Y. Aug. 14, 1998)  (where the court found a cargo handler exempt from the FAA because the cargo he loaded eventually made its way to various destinations throughout the United States and the world including Chicago, Miami, Houston, Boston, Los Angeles, France, Saudi Arabia, India, and Africa.

vi.     Finding that Plaintiffs and the Putative Class Are In The Flow of Interstate Commerce Is Consistent With the Realities of the Gig Economy

Finally, Plaintiffs' position regarding flow of interstate commerce is  further supported in the legal commentariat.  In the recent Law Review Article: "The Arbitration Hack: The Push to Expand the FAA's Exemption to Modern-Day Transportation Workers in the Gig Economy"  54 U.S.F. L. Rev. 397 (2020) the author highlights the need to develop a more uniform framework for "gig economy" workers given the size and scope of the industry.  The author notes that forty-four (44) percent of the adult population in the United States in 2016 or more than 90 million people either worked for or were customers of one or more of the "platforms" associated with the "gig" economy.  The fact is the "gig economy" relies on workers to bring passengers, meals, packages or other goods and services throughout the country, often connecting people and goods traveling interstate or by delivering passengers or goods to connecting flights, trains, buses trucks or boat in the requires these workers to be seen as in the "flow of interstate commerce".  *Id* at page 1.

This aforementioned Law Review article is instructive as it suggests courts adopt a more uniform definition of a class of workers in the transportation industry engaging in interstate commerce.  The author suggests defining transportation workers in the transportation industry as either (1)  the employer operates a business for the purpose of transporting goods, or passengers from one place to the other by rail, highway, air or water or (2) one the workers' primary job duties are transporting goods or passengers from one place to the other via rail, highway, air or water.  *Id* at pages 29-31.

For the transportation worker then to satisfy the test to be "engaged in interstate commerce" the transportation worker must deliver goods or passengers within the "flow of interstate commerce. **As such**

**the focus is on whether the goods or passengers travel interstate, not whether the worker does**. *Id* at pages 29-31.

Plaintiffs submit that the above tests to determine who is a transportation worker engaged in interstate commerce is consistent, in large measure, with the factors regarding the same issues set out by the Eighth Circuit in *Lenz v Yellow Transp. Inc*. 431 F.3d 348 (8th Cir 2005). In *Lenz, supra* the Court synthesized various factors used by other courts, as a non-exclusive list of factors in determining whether an employee is so closely related to interstate commerce that he or she fits within the § 1 exemption of the FAA. These factors are:

> first, whether the employee works in the transportation industry; second, whether the employee is directly responsible for transporting the goods in interstate commerce; third, whether the employee handles goods that travel interstate; fourth, whether the employee supervises employees who are themselves transportation workers, such as truck drivers; fifth, whether, like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA; sixth, whether the vehicle itself is vital to the commercial enterprise of the employer; seventh, whether a strike by the employee would disrupt interstate commerce; and eighth, the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties. (citations omitted).

In *Lenz* the only issue before the Court was transportation of goods, so the court did not address the issue of passengers. Here Plaintiffs and New York City Uber drivers meet all of the *Lenz* factors except the supervising requirement or whether they were exempt at the time the FAA passed. Furthermore a Court within the 8th Circuit (Minnesota) cited to *Lenz* in a case involving transportation of passengers and specifically Uber, in *Sienkaniec v Uber Techs*. 401 F. Supp 3d 870 (D. Minn. 2019). The Judge in *Seinkaniec* held that all Uber drivers engaged in interstate commerce— even if only small numbers crossed state lines in their work—citing *Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954 (7th Cir. 2012).[10]   See also, *Ward v. Express Messenger Sys*., 413 F. Supp. 3d 1079 (D. Colo. 2019)

---

[10] The Court sent the case to the Magistrate to compile more information from Uber regarding the numbers of trips Uber makes and how many of them are interstate as well as trips and how many trips from Minnesota drivers crossed state lines. The Court also expressed the view that all Uber drivers could be transportation workers engaged in interstate commerce.

Thus whether looking to the terms and conditions of Plaintiffs' work for Uber, the actualities of Plaintiffs' interstate trips and revenues, the statistics regarding New York City Uber drivers extrapolated from Plaintiffs' data and not contradicted by comparative data from Defendant, by considering Plaintiffs' work in a framework of "flow of interstate commerce" or the *Lenz* factors,  a finding that Plaintiffs and New York City drivers generally are engaged in interstate commerce—or have  raised a factual question sufficient to survive motion to compel arbitration on this basis— is warranted.

### b. Plaintiffs Perform Interstate Commerce As Part Of A "Class Of Workers" In Interstate Commerce, Recognized Under The Residual Clause Of Section 1 Of The FAA

Nor does Defendant's argument that Plaintiffs  do not represent a "class of workers" in interstate commerce fare any better than its arguments regarding interstate commerce.  Defendant's arguments must fail for several reasons: Defendant concedes that Plaintiffs are "transportation workers"—which necessarily satisfies the Class requirement under *Circuit City*— and yet Defendant seeks to define Plaintiffs as a class of "personal transportation providers" rather than New York City drivers,  the former whom Defendant argues do not as a group engage in interstate commerce. Further, Defendant's argument that Plaintiffs are not part of a "class" of workers engaged in interstate commerce is unsupportable and Defendant's attempt to assign the allegations as to interstate commerce to Plaintiffs as individuals, rather than as representative of a group of similarly situated workers, has no basis.  Finally, the  argument that a class of transportation workers for purposes of the residual clause of section 1 of the FAA is confined to transportation workers transporting goods rather than persons,  based on dicta in *Circuit City,*  is an argument that most courts since the Third Circuit decided *Singh*, have refused to adopt.  Such argument should also be rejected  here.

As Plaintiffs argue herein, they are "transportation worker" and thus squarely within the residual class recognized by *Circuit City*. Furthermore the subset of transportation workers to which Plaintiffs belong, New York City Uber drivers, is a proper definition,  no less proper for defining the class by

geography than by defining a class of truckers by  employer and determining the question of interstate

commerce in light of the assigned interstate routes unique to such employer. However, just as Defendant

seeks to use inapposite statistical data seek to mislead the court, so too Defendant's attempts to rig or

redefine the class are yet another sleight of hand  intended to lead the court astray.

          i.      <u>Defendant Concedes That Plaintiffs Are "Transportation Workers"—Which Necessarily Satisfies The Class Requirement Under *Circuit City*</u>

As an initial matter, Plaintiffs and the class of workers they seek to represent are transportation workers

as acknowledge by Defendant. Uber admits that Uber drivers are indeed transportation workers by

acknowledging the class they represent are "**transportation providers,**"  albeit  alleged "personal

transportation" providers. This admission, however,  clearly brings Plaintiffs and the putative class

within the ambit of the residual clause as defined in *Circuit City* as  transportation workers. The above

showing that Plaintiffs are engaged in interstate commerce and the uncontested fact they are

transportation workers, should be dispositive to establish them as "transportation workers engaged  in

interstate commerce."  Indeed this court could decide such and end its analysis here. For the avoidance

of doubt however, we address Defendant's other arguments in turn.

          ii.     <u>Plaintiffs Are  Part of a Class of Transportation Workers Engaged  In Interstate Commerce</u>

Uber next argues that the text of the exemption in Section 1 of the FAA and the structure of the FAA

require a finding that Plaintiffs as Uber drivers are not part of a class of workers exempted from the

coverage of the FAA.  This is not the case.

        Plaintiffs' complaint sets forth how they and the class they seek to represent are engaged in

interstate commerce.  As noted *supra*, Uber's reference to the percentage of trips which were intrastate

nationally and in New York in 2019 are misleading given the volume of overall Uber trips and the income

derived from such trips.   See e.g. the comparison of Aleksanian's and Lama's percentage of trips to the

percentage of their income from these trips.   Further the Plaintiffs are likely typical of the class who

routinely picked up and dropped off passengers from rail or bus stations. (See Plaintiffs' declarations). Based on the declarations of Plaintiffs, it is likely that combining interstate with airport bus and rail trips, a third to a half of the Plaintiffs' gross income derives from interstate travel and trips in the flow of interstate travel.

Uber claims that under *Circuit City's* rationale, Uber drivers have to engage in interstate commerce in *a manner similar to* seamen and railroad employees. This statement actually supports Plaintiffs' claim to the exemption. Uber claims that seamen and railroad employees work in the very "channels of interstate and foreign commerce citing to railroad lines built for nationwide transport, while the essence of maritime shipping is moving cargo internationally." (Def Br. p. 15) As noted above, the workers in these industries were presumed to engage in interstate commerce regardless whether the percentage of workers who ever crossed state lines was large or small or if some workers never crossed state lines. See also *Brown v. Nabors Offshore Corp*, 339 F.3d 391 (5th Cir. 2003) (all Seamen exempt from FAA despite no interstate travel); *Bates v Long Island Railroad*, 997 F.2d 1028 (2nd Cir. 1993) (All railroad workers exempt from FAA regardless of interstate travel). In the end, Uber claims states the difference between Uber drivers and seamen and railroad workers is that Uber drivers move passengers short distances whereas railroad employees and seamen haul goods long distances. (Def Brief p 16). This is a distinction without a difference in terms of whether the Uber drivers work in interstate commerce by transporting passengers interstate and in the flow of interstate commerce.

As noted in *Bates v LIRR*, *supra,* none of the Long Island Railroad trips are interstate, however the LIRR carries 91.1 million passengers each year, almost 3 times the passengers per year than Amtrak. http://www.mta.info/press-release/lirr/lirr-time-performance-rises-three-year-high-2019-cancellations-major-delays-short, attached as Ex. W to Soliemany Aff. The average length of a trip does not state how many of the railroads were short lines, which only ran intrastate or what percentage of workers worked on these short lines never traveled interstate. Furthermore all Uber drivers, Plaintiffs submit,

24

at some point drive on highways that either are or connect to interstate freeways.  It is therefore clear that regardless of the length of the trips driven by Uber drivers, they do engage in interstate commerce in *a manner similar to* seamen and railroad employees.

       iii.    <u>Defendant's Attempt To Assign The Allegations As To Interstate Commerce To Plaintiffs As Individuals Rather Than As Representative Of The Group Of Similarly Situated Workers Has No Basis; Nor Does Defendant's Argument that All  Similarly Situated Drivers Must  Be Exempt In Order For Plaintiffs To Be Exempt</u>

Similarly unavailing is Defendant's argument that Plaintiffs' work in interstate commerce is unique to them  as individuals and not a feature of a class of workers.  Defendant claims that Plaintiffs allegedly resist the frame of being part of a class of workers. (Def Br. P 7-8).  Uber cites to the allegations regarding Plaintiff Aleksanian as an example of individual pleading.  Defendant is mistaken.  The pleading with respect to Plaintiff Aleksanian shows him to be typical of and able to represent a class of Uber drivers who are engaged in interstate commerce.  Defendant selectively fails to mention the other class-wide factual allegations of these workers engaging in interstate commerce set forth in the complaint and described above.

Defendant cites to *Rogers v Lyft,* a California District Court decision, for the proposition that "an individual plaintiff's personal "exploits are relevant only to the extent they indicate the activities performed by the overall class."  This argument turns into a claim that that all members of a particular class must cross state lines in their work in order for any of these workers can be considered as engaging in interstate commerce.  But even the section of the *Rogers* decision which Uber cites does not stand for this proposition Defendant states.  In *Rogers* the Court said,

> The plaintiffs' personal exploits are relevant only to the extent they indicate the activities performed by the overall class.  If a class of workers (say, truckers) transports goods or people between states, a trucker who only occasionally drives across state lines is still exempt from the FAA. *See International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC,* 702 F.3d 954, 958 (7th Cir. 2012). Indeed, that remains true even if the trucker has *never* left his home state. *Rogers v. Lyft, Inc.,* No. 20-cv-01938-VC, 2020 U.S. Dist. LEXIS 61169, at *16-17 (N.D. Cal. Apr. 7, 2020)

The above statement is consistent with the reasoning of the Supreme Court in *Circuit City*. That is, in *Circuit City* the Supreme Court presumed by the nature of their jobs that seaman and railroad workers were engaged in interstate commerce. The Court did not limit the railroad workers exempt from the FAA under Section 1 to only those who traveled interstate, or to exempt seaman who traveled interstate waterways. See, *Brown v Nabors Offshore Corp*, *supra*,  *Bates v Long Island Railroad*, *supra*. The Court used the maxim of statutory construction of *ejusdem generis* to hold that in light of the statute's exemption of seaman and railroad workers, the only other workers who would be exempt from section 1 of the FAA would be other transportation workers as opposed to not all workers.  Thus, it is logical that the Court in *Circuit City,* provided the same presumption of interstate commerce to transportation workers engaging in interstate commerce as it did to Seamen and Railroad workers.

Nonetheless, Defendant Uber, without citing any cases, takes the position that Plaintiffs may be exempt from the FAA under Section 1 only if all "personal transportation" drivers are exempt. Defendant cites no authority in support of this proposition. Nonetheless, **Plaintiffs reasonably believe, based on the facts stated *supra*, it is extremely likely that all New York City drivers during the relevant time period have at some point,  crossed state lines in their work.**  Further, the rationale in *Circuit City* regarding these transportation providers being involved in the  "flow of interstate commerce" followed in *Cunningham v Lyft*, supports Plaintiffs' claim that all Uber drivers are part of a class of transportation workers who are engaged in interstate commerce. Thus, while Defendant misstates the standard for a finding that a class  of  workers in engaged in interstate commerce, Plaintiffs meet even Defendant's incorrect  standard.

      iv.    Nor Does The Fact That Plaintiffs Transport Passengers Rather Than Goods Weigh Against A Finding of FAA Exemption.

Defendant's arguments regarding goods in interstate commerce must also fail, in light of the developments in *Singh* and in circuits around the country.

For several years after *Circuit City*, numerous courts found that unless drivers for transportation companies transported "goods" in interstate commerce they could not be exempted from the FAA under Section 1.   These cases include *Heller v Rasier LLC*, No. cv-17-8545 (C.D. Cal Jan 7, 2020), *Grice v. Uber Techs., Inc.*, No. CV, 2020 U.S. Dist. LEXIS 14803 (C.D. Cal. Jan. 7, 2020) *Scaccia v Uber Techs., Inc.*, U.S. Dist. LEXIS 99161 (S.D. Ohio June 13, 2019), *Gray v Uber  Techns Inc.*, , 2019 U.S. Dist. LEXIS (M.D. Fla. Apr. 10, 2019), and *Kowalewski v Samandarov*, 590 F. Supp.2d 477 (S.D.N.Y.2008) to name a few.

In *Singh v Uber  supra*, however, the Third Circuit determined that the goods versus persons dispute had no basis in the law, and was based only on *dicta* in *Circuit City*. Since then most court decisions on this issue subsequent to *Singh* have found that drivers transporting people in the flow of commerce in exchange for money is just as much interstate commerce as transporting goods in exchange for money. As the Court of Appeals held in *Singh*:

> Section 1 of the FAA provides that "nothing" in the FAA "shall apply" to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In our *en banc* decision in *Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers of America, (U.E.) Local 437*, 207 F.2d 450, 452 (3d Cir. 1953), we held that, under the rule of *ejusdem generis* the residual clause of this provision only includes those other classes of workers "who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it." In so holding, we reaffirmed our previous decisions in *Amalgamated Association Street Electric Railway & Motor Coach Employees of America, Local Div. 1210 v. Pennsylvania Greyhound Lines* ("Greyhound I") and *Pennsylvania Greyhound Lines v. Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, Division 1063*, 193 F.2d 327 (3d Cir. 1952) (per curiam) ("Greyhound II"). Those cases held that the collective bargaining agreement between a union and bus line employees qualified as a contract of employment of a class of workers engaged in interstate commerce. See *Greyhound I*, 192 F.2d at 313; 193 F.2d at 328.
>
> In *Tenney*, we had occasion to reconsider our holdings in *Greyhound I and Greyhound II*. Then-Chief Judge Biggs concurred in the judgment, but proposed that we should overturn those decisions on two fronts: first, he argued that a collective bargaining agreement should not be considered a contract of employment, and second, that the residual clause of § 1 should encompass both those engaged in transporting goods in foreign or interstate commerce and those, such as manufacturing  workers, that are engaged in the production of goods for interstate commerce. *Tenney*, 207 F.2d at 454-55 (Biggs, C.J., concurring). We did not adopt either view, but instead affirmed *Greyhound I* and *Greyhound II*, characterizing the bus line employees as

"being directly engaged in the channels of interstate transportation just as are railroad workers." Id. at 453 (emphasis added).

The Greyhound Bus workers clearly are in the business of transporting passengers as are railroad workers and workers on ships.  Similarly, the court in *Rogers v Lyft*, cited *Singh* in holding that "the term "commerce" is "not normally limited to the transportation of only physical goods." *Singh*, 939 F.3d at 229 (Porter, J., concurring in part and concurring in the judgment).  Further in *Singh* the Third Circuit went on to say:

> To the contrary, "it is settled beyond question that the transportation of persons is 'commerce'" for constitutional purposes, an understanding that prevailed well before the enactment of the FAA. (citations omitted) The constitutional meaning is particularly relevant here because the FAA tracks the Commerce Clause by defining "commerce" to include "commerce among the several States or with foreign nations." ... Nor can the goods-passengers distinction be justified by the ordinary meaning of the term "commerce" in 1925. … Contemporary sources often describe the transportation of goods and passengers in the same breath as commerce. (citations omitted) And the longstanding modern definition of "in commerce" continues to be "persons or activities within the flow of interstate commerce."*Gulf Oil Corp. v. Copp Paving Co*., 419 U.S. 186, 195, 95 S. Ct. 392, 42 L. Ed. 2D 378 (1974). Lyft's narrow interpretation still comes up empty "by reference to the enumerated categories of workers which are recited just before" the residual clause. *Circuit City*, 532 U.S. at 115. The ships and trains that transport passengers are staffed by seamen and railroad workers, just like the ones that transport goods. *See Singh*, 939 F.3d at 221-22. In fact, the Supreme Court's lone example of a class of workers engaged in interstate commerce—"air carriers and their employees"—is associated more with the transportation of passengers than goods.

In *Cunningham v Lyft,* the district court agreed with the analysis in *Singh* and in reliance on *Singh* stated:

> The *Singh* court explained that this "seeming contradiction [between the reference to goods in *Circuit City*] simply demonstrates that the *Lenz* court, like all of the courts to paraphrase *Circuit City's* "goods" language in similar circumstances, did not have the question of passengers versus cargo before it, and simply used "goods" as a convenient shorthand to discuss interstate commerce.

Indeed, no circuit court, other than the Third Circuit has ruled on this good versus passenger distinction and the court there reaffirmed its long line of cases recognizing that people are part of commerce among the states.

28

Plaintiffs thus argue that the reasoning in *Singh, Rogers* and *Cunningham* supports their claim that Plaintiffs who carry passengers in the flow of commerce are covered by the exemption in Section 1 of the FAA. As noted above, Uber provides more than double the number of trips, and presumably double the number of passengers than Greyhound Bus carries in a year both inter and intrastate.

<u>v.   Finally, Defendant's Argument That Plaintiffs Cannot Set Forth A  Class Of New York City Drivers As The Class Of Transportation Workers Engaged In Interstate Commerce Is Without Merit</u>

As a final note on the issue of class of workers, Defendant's objection to the geographic limitation of the class  is without merit. Defendant cites no authority for this proposition. As noted, Plaintiffs have provided the court with significant evidence that they have engaged in interstate commerce by traveling with their passengers between states, and they have also engaged in the flow of interstate commerce by providing connections to air, bus and train travel out of the state as well as utilizing interstate highways, given their location in the tristate area.  Plaintiffs assert all Uber drivers are exempt from the residual clause of the FAA, and notwithstanding this, it is proper to consider New York City Uber drivers  as a class of workers in interstate commerce.

**c.  Further,  Uber's Reliance On *Rogers v. Lyft* Is Misplaced And Directly Contradicted By The Reasoning In *Cunningham V Lyft  And Papetti V. Compangnie Nationale Fr.***

Uber's arguments in its brief in support of its motion tracks those made by Lyft in *Rogers supra*. In *Rogers* the Court reviewed the case law on the passenger vs goods distinction and the cases which emphasize that to be exempt the employee must cross state lines while working (*See International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 958 (7th Cir. 2012), as well as other cases where the crossing of state lines was by happenstance.  (*Hill v Rent a Center*, 398 F.3d 1286 (11th Cir. 2005)). The Court ultimately adopted Lyft's argument "that even if workers who transport passengers can qualify for the exemption, the plaintiffs nonetheless don't belong to a class of workers "engaged in foreign or interstate commerce."  The Court cited to *Circuit City's* requirement to

be exempt transportation workers must be engaged in interstate commerce rather than in work "affecting" commerce.   The decision relied on Lyft's claim that its drivers are mainly intrastate, and rejected Plaintiff's claim regarding flow of commerce through frequent trips to the airport or train stations.

In contrast, in *Cunningham v Lyft, supra,* the Court engaged in a more in-depth analysis of the issue of the factors to be considered in determining if Lyft drivers, as Uber drivers, are engaged in interstate commerce.   After determining that the Section 1 exemption for engaging interstate commerce was not restricted to moving goods in interstate commerce, and having found transporting passengers in interstate commerce qualified as part of interstate commerce, and that as transportation workers they qualified under most of the *Lenz supra* factors, the Court found the Lyft drivers engaged in interstate commerce, reasoning:

> Here, in contrast, Plaintiffs' passengers traveling to or from Logan International Airport, see Cunningham Decl. [#37-7] ¶ 6; Mancho Decl. [#37-8] ¶ 4, are in the "continuity of movement" of a longer trip. Plaintiffs help facilitate that movement, as the first or last leg of the journey, including into or out of Massachusetts. See *Walling v. Jackson Paper Co*., 317 U.S. 564, 568, 63 S. Ct. 332, 87 L. Ed. 460 (1943) (holding that goods remain in interstate commerce where there is a practical continuity of movement). Therefore, the Lyft drivers are part of the chain of interstate commerce, enabling their passengers to leave or enter Massachusetts. As such, the Lyft drivers are similar to Amazon's last mile delivery driver engaged in interstate commerce in *Waithaka*, 404 F. Supp. 3d 335, 2019 WL 3938053 at *4, and dissimilar to Doordash's restaurant delivery drivers in *Austin*.
>
> Plaintiffs' participation in transporting passengers who themselves are continuing in the flow of interstate commerce is not incidental, as Defendants argue. Defs' Reply at 6 [#52]. Defendants cite *Hill v. Rent-A-Center,* where the court held that an account manager was not a "transportation worker" despite periodically transporting furniture across state lines to out of state customers. 398 F.3d 1286, 1289-90 (11th Cir. 2005). But in *Hill,* transportation work was incidental to the plaintiff's employment as an account manager; whereas here, Plaintiffs engage solely in transportation work, driving passengers on intrastate and interstate roads, and on the first or last leg of their interstate travel, allowing passengers to begin or finish their trips. Therefore, Plaintiffs' engagement in interstate commerce is not incidental, but essential to their work.
>
> In sum, weighing the *Lenz* factors and considering that some of Plaintiffs' passengers are in continuity of motion in interstate travel, the court finds that Plaintiffs are within a class of transportation workers excluded from coverage by *Section 1 of the FAA.* Accordingly, the FAA does not apply to their agreement with Lyft.

In light of the facts stated in this complaint and provided herein, and based on the well-reasoned

decision in *Cunningham v Lyft*, this court should hold that Plaintiffs are in a class of workers engaged in interstate commerce.[11] In line with *Cunningham*,  the Plaintiffs trips to and from airports are not incidental to their work. See Plaintiffs declarations, and Uber S-1 at p 38 where Uber says: ***"We generate a significant percentage of our Gross Bookings from trips in large metropolitan areas and trips to and from airports. If our operations in large metropolitan areas or ability to provide trips to and from airports are negatively affected, our financial results and future prospects would be adversely impacted."*** See Exhibit V of Soleimany Aff.  Further in *Papetti supra,* the Court in the Eastern District of New York,  used the same reasoning to determine that a cargo handler who loaded planes bound for other states and countries was exempt from the FAA based on the flow of interstate commerce argument.

### III. ABSENT APPLICATION OF THE FAA, PLAINTIFFS ARE NOT REQUIRED TO SUBMIT THEIR CLAIMS TO ARBITRATION UNDER STATE LAW, GIVEN THE EXPRESS LANGUAGE PRECLUDING THE APPLICATION OF STATE LAW TO THE ARBITRATION CLAUSE

#### a. Uber's Arbitration Agreements, Which Are Expressly and Exclusively Governed By the FAA, Preclude Compelling Arbitration Under State Law if Plaintiffs Are Exempt Under the FAA.

Uber claims that should Plaintiffs and the class of New York City Uber Drivers they seek to represent be exempt from arbitration pursuant to the FAA, they are still required to arbitrate their claims under State (New York) Law. Uber is mistaken. It is true that the Second Circuit has not ruled on the issue of how cases should be handled if the FAA is not applicable, but there are cases which find that Uber's argument is undercut by its own agreements which state that the FAA and only the FAA **governs** the arbitration provision, while California law is used to interpret the rest of the agreement.  (See Agreements attached to the Soleimany Affirmation).

---

[11] This quotation from *Cunningham* undercuts Uber's argument as the Court in *Cunningham* failed to identify the class of workers engaged in interstate commerce. (Def Br. 15).  Not only did the Court in *Cunningham* identify the class, the Court referred to the 8th Circuit's decision in *Lenz* to evaluate the various aspects of the class in relation to the work of Lyft drivers.  The *Lenz* factors were also evaluated in the previously mentioned law review article and the paradigm the author relies on and which is stated herein considers and to a large degree incorporated the *Lenz* factors in its tests for transportation worker and "engaging in interstate commerce".

Each of the agreements signed by the named Plaintiffs during the relevant time period states that the provisions are to be interpreted under California law (with other disclaimers against creating additional rights for non-Californians), while the Arbitration provision was expressly and exclusively **governed** by the FAA.  Further, the July 2013 and June 2014 contracts provide at 14.3: "This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq." The November 10, 2014 and the April 3, 2015 agreements provides for the same in section 15.3(i). The December 2015 Agreement, which was the last agreement in the time period at issue in this case, was specific that California law was to be used to *interpret* the agreement, while the arbitration provision which was exclusively *governed* by the FAA. Specifically, the December 2015 agreement provides, at 15.1: "The choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause contained in Section 15.3, such arbitration clause being governed by the Federal Arbitration Act."

Looking to the language of the contracts at issue, the recent case of *Hamrick v Partsfleet,* 411 F. Supp.3d 1298, 1302 (M.D. Fla. 2019) is instructive.  There, the arbitration agreement was governed by the FAA and the rest of the agreement was to be governed by State law.  After the Court found that the plaintiff was an exempt transportation worker under the FAA, the Court addressed whether state law governed.  The court noted:

> However, the Arbitration Provision specifies that, "[t]his Arbitration Provision is ***governed*** by the Federal Arbitration Act." (Doc. 28-1 at 8 (emphasis added)). In interpreting contracts, "[w]hen two contract terms conflict, the specific term controls over the general one." *United States v. Pielago*, 135 F.3d 703, 710 (11th Cir. 1998). Here, the election of governing law generally applies to the Agreements, but the Arbitration Provision itself specifically elects to apply the FAA. Because the more specific provision controls, the Arbitration Provision cannot be interpreted pursuant to applicable state law and must rise or fall on the application of the FAA. As "transportation workers," Plaintiffs are exempt from arbitration under the FAA. Accordingly, this Court cannot compel arbitration pursuant to the parties' Agreements.

Given the similar provisions at bar, the same result is warranted here.

Further, the court in *Hamrick* relied on *Rittman v Amazon.com Inc.,* 383 F. Supp. 3d 1196 (W.D. Wash. 2019), which also found that plaintiffs were exempt from the FAA and where the court refused to

compel arbitration pursuant to state law.  Similar to the present case, the *Rittman* contract stated as to its governing principles as follows:

> These Terms are governed by the law of the state of Washington without regard to its conflict of laws principles. However, the preceding sentence does not apply to [the Arbitration Provision], which is governed by the Federal Arbitration Act and applicable federal law. At 1198.

In rejecting Amazon's argument that Washington state law applied, the Court found inapposite one of the cases Uber relies on herein: *Valdes v Swift Transportation Co.*, 292 F. Supp 2d 524 (S.D.N.Y 2003). The Court in *Rittman* stated the cases Defendants cite (including *Valdes*) are inapposite, in that none of the cases discuss a situation where the FAA is inapplicable *and the contract clearly indicates that state law is also inapplicable.* That is, where, as here, the instant contract separates the arbitration provision from the rest of the agreement, arbitration may not be compelled under state law.  State law may play no role with respect to arbitration, given the separation of the agreement.

In ruling against Amazon, the court specifically held that if the parties had intended Washington State law to apply they could have said so, (or remained silent) however, they did the opposite.[12]   The Court further found that despite federal and state policy favoring arbitration, "courts must place arbitration agreements on an equal footing with other contracts[] and enforce them according to their terms."

None of the cases cited by Uber involve agreements where the choice of law provisions were specifically separated from the arbitration clause as in this case and as found in *Rittman*.  The facts of *Diaz v Michigan Logistics Inc.*, 167 F. Supp.3d 375 (E.D.N.Y. 2016), cited by Uber, demonstrate a similar flaw.  In *Diaz,* despite the contract stating that the FAA would apply to the arbitration agreement, the contract also very clearly stated that all claims would be arbitrated, **and it (as *Valdes*) contained no choice of law provision.**  In the present case not only does the contract restrict state law to all non-

---

12   The Court in *Rittman* stated Washington uses an "objective manifestation" test for contract interpretation based on the words in the contract.  This is the same standard used in New York.  See e.g. *Brown Bros. Electrical Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397 (1977)

arbitration provisions, the case involves only state breach of contract claims. Because *Diaz* involved a federal question claim, the Court used federal common law to decide the choice of law.  Federal common law, to the extent it exists, cannot be applied to these claims.

Plaintiffs have found no case to support Defendant's position that state arbitration applies to agreements like those signed by Plaintiffs. That is, Defendant cites no authority for the proposition, nor have Plaintiffs found any authority which allows for arbitration under state law where the contract expressly states that the FAA governs the arbitration provision and State law only applies to the other parts of the agreement.[13]  Thus, because there is no agreement to arbitrate under any law except the FAA under the contract, once this Court finds that the FAA does not apply to Plaintiffs, it cannot order arbitration under New York Law.

> **b.   Defendant's Current Contract Does Provide For Arbitration Under State Law Should The FAA Not Apply And The Express Language Of The Current Contract Supports  Plaintiffs' Position That State Arbitration Does Not Apply to The Contracts At Bar**

A change to the language of the arbitration clause in Uber's January 6, 2020 Agreement, as compared with the contracts at bar further supports Plaintiffs' position that state arbitration is inapplicable under the relevant contracts. Specifically, the January 6, 2020 contract provides in relevant part:

> This Arbitration Provision is a contract governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce, and you agree that this is not a contract of employment involving any class of workers engaged in foreign or interstate commerce within the meaning of Section 1 of the Federal Arbitration Act. If notwithstanding the foregoing, the Federal Arbitration Act does not apply to this Arbitration Provision, the law pertaining to arbitration agreements of the state where you reside when you entered into this Agreement shall apply. Soleimany Aff., Ex X.

---

13   Uber cites to an unpublished opinion in  *Reese v. Uber Techns., Inc.*, 2:18-cv-03300 (E.D. Pa. Mar. 4. 2020),  However it does not appear that the plaintiff there made the argument advanced herein. Further *Reese*  relies heavily on *Kauffman v U-Haul* 2018 U.S. Dist. LEXIS 145717 (E.D. Pa. Aug. 27, 2018)  and *Atwood v Rent a Center East, Inc.,* 2016 U.S. Dist. LEXIS 63478 where the unlike the present case the agreements had no choice of law provisions.

Indeed, the current contract includes a clear example of language that does provide for arbitration under state law where the FAA does not apply. While Plaintiffs do not concede that they would be subject to arbitration under state law even if the FAA did not apply, just as Defendants have placed such clear language in its current contract consistent with its intent, had Uber intended so all along they would have included the current language in prior agreements. The absence of such language in the July 2013, June 2014, November 10, 2014, April 3, 2015, and December 11, 2015 agreements evinces an intent inconsistent with Defendant's argument in their brief.

Further, the language of the January 6, 2020 contract is consistent with cases where state arbitration agreements have been found to apply in the absence of the FAA. In *Davis v Cintas Corp.* 2019 U.S. Dist. LEXIS 87261 (W.D. Pa. 2019), the court found arbitration could be compelled under Pennsylvania law, even if Davis's contract of employment was exempt from the FAA. There, the agreement stated that the entire agreement was to be interpreted, governed, and enforced according to the FAA and Pennsylvania law, and that the agreement did not specify which sections applied to which provisions. Both parties also agreed Pennsylvania law would apply. The court in *Davis* cited to *Palcko v Airborne Express Inc.*, 372 F.2d 588 (3d Cir. 2004), where the agreement contained a contingency stating that the state law of Washington would apply if the FAA were held to be inapplicable and noted that the agreement in *Palcko* was similar to the agreement at issue, which applied Pennsylvania law to the whole. Indeed, *Palcko* is of a piece with the Uber's January 6, 2020 contract. *See also, Sherwood v. Marquette Transp. Co., LLC,* 587 F.3d 841, 2009 U.S. App. LEXIS 25581 (where the contract also provided state arbitration law would apply), and *Davis v EGL Eagle Global Logistics LP*, 243. Fed. Appx 39, 2007 U.S. App. LEXIS 16324, (which also stated Texas law would apply if the FAA did not). All such cases providing for arbitration under state law are clearly distinguishable in their language from the July 2013, June 2014, November 10, 2014, April 3, 2015, and December 11, 2015 driver agreements.

For all of the above reasons, Defendant's argument that state arbitration law applies in the absence fog the FAA should be rejected.

## IV. NEW YORK DOES NOT FAVOR MANDATORY ARBITRATION IN ALL CIRCUMSTANCES

Uber claims that if Plaintiffs are exempt from the FAA they must arbitrate their cases in New York. Uber bases this on the holding in *Valdes*, *supra*, applying federal common law to give jurisdiction to the state with the greatest interest in the litigation.[14]   Uber asserts New York looks favorably on arbitration.   But, in reality, New York lawmakers have passed laws to rein in the ability of strong employers and others to impose mandatory arbitration in cases where those being required to arbitrate have little bargaining power.  New York has recently expressed its concerns with mandatory arbitration agreements in CPLR 7515.   Assuming, *arguendo,* if the Court were to find Plaintiffs exempt from the FAA, and New York state were to then govern the Arbitration Agreement (which it should not), arbitration of Plaintiffs' claims would still be prohibited under CPLR § 7515.  CPLR § 7515 prohibits

> any clause in any contract which requires as a condition of the enforcement of the contract or obtaining remedies under the contract that the parties submit to mandatory arbitration to resolve any allegation or claim of discrimination, in violation of laws prohibiting discrimination, including but not limited to, article fifteen of the executive law.

The statute defines mandatory arbitration at §7515(a)(3) as:

> a term or provision contained in a written contract which requires the parties to such contract to submit any matter thereafter arising under such contract to arbitration prior to the commencement of any legal action to enforce the provisions of such contract and which also further provides language to the effect that the facts found or determination made by the arbitrator or panel of arbitrators in its application to a party alleging discrimination, in violation of laws prohibiting discrimination, including but not limited to, article fifteen of the executive law shall be final and not subject to independent court review.

In this case, the arbitration agreement is a contract which plainly and repeatedly requires arbitration of all claims, disputes or causes of action arising from the agreement, other than disputes regarding intellectual property rights.  *See*, Dec 11, 2015 Agreement at § 15.3, 15.3.i, and 15.3ii.  Accordingly,

---

14  Uber claims that even if California law were to apply the court would enforce the arbitration agreement as written. Plaintiffs dispute that any state law would govern, but the agreements clearly have separated the arbitration provisions from the rest of the agreement.

these expansive provisions within the arbitration agreement require mandatory arbitration of discrimination claims in violation of laws prohibiting discrimination to be arbitrated.  Further, section 15.3.vii of the arbitration agreement renders all findings of fact final, and does not provide for independent judicial review.  Therefore, the such provisions are considered prohibited under the CPLR. **CPLR 7515(b)(iii) further states that "the provisions" of such prohibited clauses shall be declared null and void.**  In this case, the prohibited provision is a broad arbitration requirement for almost all claims, that encompasses plaintiffs' breach of contract claims; accordingly, this provision is null and void and not enforceable under New York law.

Plaintiffs recognize that some courts have interpreted CPLR 7515 not to apply to employees whose employers are covered by the FAA.  However, when Plaintiffs and the class they represent are exempt from the FAA, the FAA should be out of the picture.   Under New York Law CPLR 7515 makes Uber's arbitration clause "null and void."

## V. NEW YORK PUBLIC POLICY OPPOSES FORCED ARBITRATION IN CASES OF INEQUALITY OF BARGAINING POWER. NEW YORK HAS NEVER AGREED THAT IF ARBITRATION AGREEMENTS ARE ENFORCED THAT CLASS WAIVERS MAY BE ALLOWED.

While Plaintiffs have established that they are exempt from the FAA and that they should not be required to arbitrate at all, Plaintiffs point out that Defendant, in its effort to apply state law, have mischaracterized New York's willingness to allow for arbitration with a class action waiver. It is also a fundamental cornerstone of federal law that where there is a right, there is a remedy. *See, e.g., Marbury v. Madison*, 5 U.S. 137 (1803). This precept is also established New York law. *Jacobus v Colgate*, 217 N.Y. 235 (1916). In certain circumstances, the Court has looked at the individual facts on a case-by-case basis to determine whether compelling arbitration would violate public policy. In *Brady v. Williams Capital Group, L.P.,* 14 N.Y.3d 459, 467 (2010), the New York Court of Appeals held that case-by-case analysis was required to determine whether the costs of arbitration preclude plaintiffs from effective vindication of their statutory rights. Thus, even as New York courts uphold waivers of access to particular

forums or procedures to resolve disputes, they have affirmatively found that these waivers will be restricted when they prevent meaningful access to *all* forums for a party to vindicate their rights. *Id*, finding that arbitration agreements will be limited when they include terms that would "preclude a litigant from vindicating his/her statutory rights in the arbitral forum[.]").

In the instant case, enforcement of the arbitration provision and its class waiver does not merely foreclose judicial resolution of Plaintiffs' complaints or raise questions of arbitration's cost-effectiveness for Plaintiffs, but would make it impossible to for Plaintiffs and the 90,000+ putative class members to have their claims adjudicated at all. JAMS' website currently shows 70 arbitrators serving the New York area.                                                                                                      *See*
https://www.jamsadr.com/neutrals/search?name=&keyword=&location=jams_new_york&homeOffice
=yes&practice=&language=&judicialstate=&judicial= (Date accessed: June 29, 2020).

Although Plaintiffs' claims involve no individual facts, but proceed from the universally applied policy of deducting amounts labeled as tax and BCF surcharge from drivers' pay, enforcement of the arbitration provision and class waiver in this case would require 90,000+ individual arbitrations to be held on an identical issue. Even assuming that JAMS could complete one arbitration arising from these claims every single business day, on top of their current caseload, it would take approximately 357 years to hear 90,000 cases. In these circumstances, enforcement of the arbitration clause does not provide the same remedy as a judicial forum, but serves, beyond any rational doubt, to foreclose the possibility of a remedy for all members of the putative class Plaintiffs seek to represent. Thus, Defendant's arbitration agreement which, as applied in this case, mandates individual arbitration of 90,000+ identical claims, is void under New York law as contrary to public policy.

Defendant's brief also fails to engage meaningfully with New York state's public policy on arbitration, in large part merely summarizing cases in which New York courts analyze the FAA, which do not bear on New York law. While, as noted in *Harris v. Shearson Hayden Stone*, 82 A.D.2d 87 (1st Dept. 1981), and *Ranieri v. Bell Atl. Mobile*, 304 A.D. 2d 353 (1st Dept. 2003), there is no general public policy in

favor of class actions that would, standing alone, void an agreement to arbitrate, New York's presumption in favor of arbitrability is not unlimited. *Brady*, *supra* (recognizing that competing policy interests limit the "strong state policy favoring arbitration"). It is well established that courts will decline to enforce an arbitration agreement if it is contrary to the state's public policy, as expressed in both statutes and decisional law. *Susquehanna Valley Cent. Sch. Dist. v. Susquehanna Valley Teachers' Assoc.*, 37 N.Y.2d 614, 616-17 (1975).

New York statutes and case law do not evince the ironclad commitment to arbitration in all circumstances that Defendant claims. Notably, when not preempted by the FAA, the legislature has decided to exempt certain claims from arbitration altogether. In a clear expression of public policy, the New York state legislature has limited mandatory arbitration in situations of significantly unequal bargaining power for decades: in 1984, the legislature enacted N.Y. Gen. Bus. Law § 399-c, prohibiting mandatory arbitration in contracts for consumer goods. This law was passed in response to the widespread abuse of mandatory arbitration clauses. *Ragucci v. Prof'l Constr. Servs.*, 803 N.Y.S.2d 139, 143-44 (2nd Dept.) (summarizing legislative history). Customers often did not understand the clauses, and it led to customers being forced into inconvenient forums with "one-sided" arbitrators who favored merchants and, ultimately, resulted in consumers forfeiting claims. *Id.* More recently, the legislature has expanded this prohibition to include workplace claims; in recent legislation intended to "increase[…] protections to employees," the legislature banned mandatory arbitration of discrimination and sexual harassment claims. 2019 Legis. Bill Hist. NY A.B. 8421, amending CPLR § 7515**.** These laws plainly indicate that there are situations in which the state views contracts requiring arbitration as against public policy where, unequal bargaining power or the moral harm of the underlying claims renders arbitration an inappropriate forum. In the instant case, given both the similarities between Uber drivers and consumers as non-sophisticated, unrepresented parties, and the fact that requiring mandatory individual arbitration of  90,000+ identical claims would leave New York City Uber drivers without any remedy, ordering arbitration for the putative class members' claims would violate New York's public policy.

New York has never stated a public policy in favor of class waivers. All cases that Defendant cites are inapposite, because they either provide an expression of policy in regards to the FAA, as opposed to New York law, and none address facts in which compelling arbitration would, doubtless, render adjudication of Plaintiffs' claims impossible within a century of filing. While *Harris* does deal with New York law, *Harris* makes it clear that the very same public policy considerations which led the court to favor arbitration decades ago, do not apply in this case. Indeed, *Harris* notes that:

> It has long been settled that New York State public policy favors the enforcement of arbitration agreements (*Matter of Weinrott (Carp)*, 32 NY2d 190, 199, 298 NE2d 42, 344 NYS2d 848 (1973); *Matter of Smith Barney Shearson v Sacharow*, 91 NY2d 39, 49, 689 NE2d 884, 666 NYS2d 990 (1997)), for arbitration serves "as a means of conserving the time and resources of the courts and the contracting parties" (*Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am.*, 37 NY2d 91, 95, 332 NE2d 333, 371 NYS2d 463 (1975), *see also Maross Constr. v Central N.Y. Regional Transp. Auth.*, 66 NY2d 341, 345, 488 NE2d 67, 497 NYS2d 321 (1985)(arbitration "is now well recognized as an effective and expeditious means of resolving disputes between willing parties desirous of avoiding the expense and delay frequently attendant to the judicial process");*Matter of Siegel [Lewis]*, 40 NY2d 687, 689, 358 NE2d 484, 389 NYS2d 800 [1976]("(it) has long been the policy of the law to interfere as little as possible with the freedom of consenting parties to achieve that objective"))

All the stated public policy rationales expressed in *Harris* evaporate under the facts of this case. Conducting 90,000+ individual arbitrations on identical contractual issues will conserve no one's time or resources, not those of the contracting parties, nor the courts called upon to confirm 90,000+ individual arbitration awards. Nothing about arbitrating these claims individually over three centuries would be expeditious or would avoid the "expense and delay frequently attendant to the judicial process." Rather, compelling individual arbitration will simply serve to vitiate any remedy Plaintiffs may have. Under *Brady*, the courts must consider the case-by-case impact, that compelling arbitration would have, and whether this would conflict with the fundamental policy concern that rights, where violated, may be remedied. Because compelling individual arbitration here would frustrate both the policy goals that initially led New York Courts to favor arbitration and the policy goals allowing every right to be remedied, individual arbitration cannot be compelled under New York Law in this case.

## **CONCLUSION**

For the reasons stated herein and based on the evidence and the law, Plaintiffs submit that Defendant's Motion to Compel Arbitration must be denied. In the alternative, Plaintiff requests this court grant Plaintiffs limited discovery on the issue of interstate trips taken by the putative class in the relevant period.

Dated: New York, New York
      July 2, 2020

                         Respectfully submitted,

                         MIRER MAZZOCCHI & JULIEN, PLLC

                         By:/s/_____
                         Jeanne Mirer and Ria Julien
                         1 Whitehall, 16th Floor
                         New York, NY 10004
                         (212) 231-2235
                         jmirer@mmsjlaw.com
                         rjulien@mmsjlaw.com
                         *Attorneys for Plaintiffs*

                         _/s/_____

                         By: Zubin Soleimany
                         *Attorney for Plaintiffs*
                         New York Taxi Workers Alliance
                         31-10 37th Avenue, Suite 300
                         Long Island City, NY  11101
                         718-706-9892
                         zsoleimany@nytwa.org
                         *Attorneys for Plaintiffs*