UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------------x
LEVON ALEKSANIAN, SONAM LAMA, HARJIT KHATRA,
and, Individually, on Behalf of All Others Similarly Situated, and
as Class Representatives,

                                      Plaintiffs,

                                      -against-

UBER TECHNOLOGIES, INC., UBER LOGISTIK, LLC, UBER
USA LLC, jointly and severally,

                                      Defendants.
-------------------------------------------------------------------------------------x

CASE NO.
1:19-cv-10308-ALC

**REPLY BRIEF IN SUPPORT OF**
**MOTION TO COMPEL ARBITRATION OF DEFENDANTS**
**UBER TECHNOLOGIES, INC., UBER LOGISTIK, LLC, AND UBER USA LLC**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

I.      The Agreement Is Not a "Contract[ ] of Employment." ...................................... 1

II.     Plaintiffs Are Not in a "Class of Workers Engaged in … Interstate Commerce." ............. 3

    A.      Plaintiffs fall within the class of "personal transportation providers,"
        not "personal transportation providers in New York City." .................................... 3

    B.      Even "personal transportation providers in New York City" do not
        constitute a "class of workers" "engaged in interstate commerce." ....................... 4

III.    If the FAA Does Not Apply, the Agreement Is Enforceable under New York Law .......... 8

    A.      The Agreement does not bar a court from applying state law ................................ 8

    B.      New York law requires enforcement of the Agreement. ....................................... 10

# TABLE OF AUTHORITIES

**CASES**

*Bissonette v. Lepage Bakeries Park St.*,
  LLC, No. 3:19-cv-00965 (KAD), -- F. Supp. 3d --, 2020 WL 2494763 (D.
  Conn. May 14, 2020) ...................................................................................................5

*Capriole v. Uber Technologies, Inc.*,
  No. 20-cv-02211-EMC, 2020 WL 2563276 (N.D. Cal. May 14, 2020), *appeal
  docketed*, No. 20-16030 (9th Cir. May 28, 2020) ...............................................1, 5

*Circuit City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001) ...................................................................................................8

*Diaz v. Michigan Logistics Inc.*,
  167 F. Supp. 3d 375 (E.D.N.Y. 2016) ......................................................................9

*Espinosa v. SNAP Logistics Corp.*,
  17 Civ. 6383, 2018 WL 9563311 (S.D.N.Y. Apr. 3, 2018) ......................................9

*Hamrick v. Partsfleet*,
  411 F. Supp. 3d 1298 (M.D. Fla. 2019) ..................................................................10

*Kowalewski v. Samandarov*,
  590 F. Supp. 2d 477 (S.D.N.Y. 2008) .......................................................................7

*Lenz v. Yellow Transp. Inc.*,
  431 F.3d 348 (8th Cir. 2005) .....................................................................................6

*New Prime Inc. v. Oliveira*,
  139 S. Ct. 532 (2019) ......................................................................................1, 2, 7, 8

*Papetti v. Compagnie Nationale Air France*, No. 97 Civ 2921, 1998 WL 667932
  (E.D.N.Y. Aug. 14, 1998), *affirmed by Papetti v. Societe Air France*, 225 F.3d
  646 (2d Cir. 2000) ......................................................................................................7

*Ranieri v. Bell Atl. Mobile*,
  304 A.D.2d 353 (1st Dep't 2003) ............................................................................10

*Rittmann v. Amazon.com, Inc.*, 383 F. Supp. 3d 1196 (W.D. Wash. 2019*), appeal
  docketed*, No. 19-35381 (9th Cir. May 3, 2019) ....................................................10

*Rogers v. Lyft, Inc.*, No. 20-cv-01938-VC, 2020 WL 1684151 (N.D. Cal. Apr. 7,
  2020), *appeal docketed*, No. 20-15689 (9th Cir. Apr. 16, 2020) ..........................5, 7

*Sienkaniec v. Uber Techs.*,
  401 F. Supp. 3d 870 (D. Minn. 2019) ...................................................................3, 4

*Singh v. Uber Techs., Inc.*,
    939 F.3d 210 (3d Cir. 2019)........................................................................................8

*United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), *overruled by Copperweld
    Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ....................................6, 7

*Waithaka v. Amazon.com*,
    No. 19-1848, 2020 WL 4034997 (1st Cir. July 17, 2020) ......................................7

**Statutes**

9 U.S.C. § 1 .................................................................................................... *passim*

CPLR § 7515(a)(2) ...........................................................................................10

CPLR § 7515(b)(ii), (b)(iii) ................................................................................10

**Other Authorities**

Fed. R. App. P. 28(j) ...........................................................................................1

Plaintiffs had the opportunity to opt out of their arbitration agreements when they entered into them. They did not opt out, and it is now too late. The FAA requires enforcement of their arbitration agreements. Plaintiffs' argument that Uber's Agreement falls within Section 1 of the FAA fails at every turn. Plaintiffs claim they signed a "contract of employment," but the Agreement contains no promise to do work. Plaintiffs also claim they fall within a "class of workers engaged in foreign and interstate commerce," yet the vast majority of Uber trips are local trips. Most damningly, Plaintiffs cannot articulate any explanation for why Congress would have subjected agreements involving local transportation providers to state law, but all other arbitration agreements—including those involving seamen and railway employees—to federal law. The Court should follow *Capriole v. Uber Technologies, Inc.*, No. 20-cv-02211-EMC, 2020 WL 2563276 (N.D. Cal. May 14, 2020), which recently ruled in Uber's favor on this precise issue. Finally, even if state law rather than federal law applies, the Agreement would still be enforceable.[1]

**I.      The Agreement Is Not a "Contract[ ] of Employment."**

Uber's Agreement does not fall within the FAA's Section 1 exemption because it is not a "contract[] of employment." 9 U.S.C. § 1. Section 1 exempts "contract[s] for the performance of *work* by *workers*" from the FAA's coverage. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 541 (2019) (emphasis in original). Uber's Agreement is a license agreement, not a contract for the performance of work. Drivers who sign the agreement do not promise to do any work, and do not

---

[1] Uber notes that Plaintiffs submitted a 41-page response brief, well over the 25-page limit prescribed by the Court's rules, and did so without obtaining the Court's approval. As if that were not enough, Plaintiffs seek to file a 711-word supplemental brief. Although the Court's rules do not prescribe word limits for such briefs, this is over double the 350-word limit for supplemental appellate briefs under Fed. R. App. 28(j). Nevertheless, Uber will follow the 10-page limit for reply briefs.

breach the agreement if they do no work.  Rather, the agreement is a license that *permits* drivers to use the Uber app to connect with riders.  MTC 4-6.

Contrary to Plaintiffs' contention (Opp. 5), this argument is perfectly consistent with *New Prime*.  *New Prime* holds that a contract requiring the performance of work is a "contract[] of employment," regardless of whether the worker is an employee or independent contractor.  139 S. Ct. at 541.  Plaintiffs are correct that Uber has consistently characterized drivers as independent contractors, and Uber adheres to that position.  But that does not show that Uber's agreement is a "contract of employment."  Plaintiffs enter into a contract with Uber—but that contract is a license agreement, not a contract of employment.  MTC 5.[2]

In an effort to characterize the Agreement as a "contract of employment," Plaintiffs point to the Agreement's provision that Uber may deactivate their accounts if they do not complete a trip at least once per month.  As Plaintiffs frame this provision, "if drivers did not perform enough work," "Uber would fire them."  Opp. 8.  Nowhere does the Agreement impose any obligation on any driver to drive.  Rather, Uber simply has the right to deactivate stale accounts.  A person who does not log into her online bank for sufficient time might have her account deactivated; this does not mean that she works for the bank.  Likewise, the other provisions Plaintiffs identify (Opp. 8-9) are not promises to do work—the *sine qua non* of a contract of employment.

Plaintiffs also contend that the Agreement is a contract of employment because Uber pays drivers for their work.  Opp. 9-12.  Plaintiffs cite press releases, videos, and other sources purporting to establish that Uber pays drivers, but these sources merely make unremarkable

---

[2] Contrary to Plaintiffs' assertion, a decision by the New York Unemployment Insurance Appeal Board classifying drivers as employees does not provide "separate and independent grounds" (Opp. 7) to rule in Plaintiffs' favor.  That state-law administrative ruling says nothing about the classification of Uber's license agreement under federal law.

statements that if a driver drives, then the driver will make money.  The Agreement, by its terms, is unambiguous: Plaintiffs are paid by passengers, and remit a service fee to Uber.  MTC 6.

Plaintiffs cite a bevy of additional authorities, ranging from a New York state tax bulletin to an advisory by the Advocate General of the European Union Court of Justice.  Opp. 10-12. These non-binding sources addressing irrelevant topics cannot overcome the plain text of the Agreement, which states that it is a license and does not require the driver to perform work.

## II.    Plaintiffs Are Not in a "Class of Workers Engaged in … Interstate Commerce."

Even if the Agreement were a "contract of employment," drivers who use the Uber app are not "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  Those drivers are personal transportation providers, which, as a class, is "engaged in" local transportation of passengers, not "foreign or interstate commerce."

### A.    Plaintiffs fall within the class of "personal transportation providers," not "personal transportation providers in New York City."

To decide whether Plaintiffs fall within a "class of workers engaged in foreign or interstate commerce," the Court must first determine the "class of workers" at issue.  For the purposes of the FAA, the relevant class within which Plaintiffs fall is that of personal transportation providers *as a whole*—not a sub-class of New York City-based personal transportation providers.  The enumerated job classes in Section 1—"seamen" and "railroad employees"—are general job classes, rather than groups of workers in particular areas.  Therefore, under the residual clause, a "class of workers" must be defined generally, rather than limited to a particular area.  MTC 8-10; *see Sienkaniec v. Uber Techs.*, 401 F. Supp. 3d 870 (D. Minn. 2019) ("There is a strong argument that the 'class of workers' … is 'all Uber drivers in the United States'").[3]  This distinction is

---

[3] Contrary to Plaintiffs' assertion (Opp. 21), *Sienkaniec* did not come close to holding that "all Uber drivers engaged in interstate commerce."  *Sienkaniec* is an order requesting supplemental

significant because New York City lies next to a state line, but other cities where Uber operates do not—so New York City drivers are not representative of all personal transportation providers.

Plaintiffs make no substantive response to this argument, instead asserting without explanation that it "has no basis" and reflects "sleight of hand." Opp. 22-23. Yet almost all of Plaintiffs' arguments rest on the incorrect premise that the relevant class of workers is the putative class they seek to certify—*i.e.*, a class of personal transportation providers *in New York City*. *E.g.*, Opp. 14-15 (relying on New York City-specific factual allegations), *id.* at 26 ("[I]t is extremely likely that all New York City drivers ... have at some point, crossed state lines"). Plaintiffs barely muster any argument that the relevant class of workers for purposes of Section 1—*i.e.*, personal transportation providers *as a whole*—is "engaged in" interstate commerce. Nor could they: over 97% of nationwide trips during the class period were intrastate. MTC 11 n.3.

B. Even "personal transportation providers in New York City" do not constitute a "class of workers" "engaged in interstate commerce."

Even if the relevant class of workers for the Section 1 determination is New York City drivers, Plaintiffs still cannot show that the class is "engaged in" interstate commerce.

New York City drivers are primarily engaged in local, intrastate transportation. For trips taken during the putative class period, the average Uber ride in New York[4] covered a distance of 5 miles and lasted 20.5 minutes, and 96.91% of all trips that began in New York were intrastate. MTC Ex. 3, ¶¶ 8, 9. Thus, the class of personal transportation providers—whether in New York City or anywhere else—is not comparable to the classes of seamen and railway employees, who typically haul goods long distances. MTC 15-16. Uber's motion relied on *Rogers v. Lyft, Inc.*,

___

briefing as well as additional record evidence on percentages of trips that cross state lines— evidence that Uber has submitted in this case in support of its motion to compel. MTC 11.

[4] As Plaintiffs note, New York drivers during the class period were driving in New York City. Opp. 16 n.6.

4

No. 20-cv-01938-VC, 2020 WL 1684151 (N.D. Cal. Apr. 7, 2020), which explained that the travel of drivers on Lyft's app "predominantly entails intrastate trips, an activity that undoubtedly affects interstate commerce but is not interstate commerce itself." *Id.* at *6. "Although we can safely assume that some drivers (especially those who live near state borders) regularly transport passengers across state lines, the company is in the general business of giving people rides, not the particular business of offering interstate transportation to passengers." *Id.*

After Uber filed its motion, a different district court followed *Rogers* in a case involving Uber. *Capriole v. Uber Technologies, Inc.*, No. 20-cv-02211-EMC, 2020 WL 2563276 (N.D. Cal. May 14, 2020). After thoroughly canvassing the case law on point, the court found "*Rogers* and the line of cases declining to find Section 1 applicable persuasive." *Id.* at *9. It held that "Uber drivers do not perform an integral role in a chain of interstate transportation" and hence "do not fall within the Section 1 exemption." *Id.* This Court should take the same view.

Plaintiffs' contrary arguments lack merit. Plaintiffs allege that Uber imposed surcharges on trips to New Jersey, made pricing adjustments when drivers drove out of state, and advertised flat rates to Newark Airport. Opp. 14, 15. Plaintiffs also cite an orientation video in which drivers learn about driving passengers to New Jersey. Opp. 15.[5] Obviously, New York City drivers *sometimes* go to Newark and other out-of-state locations, so Uber has policies contemplating that such trips will occur. But those trips are a miniscule portion of the total number of trips, Ex. 3, ¶¶ 8, 11, and do not transform the nature of drivers' work into "engaging in interstate commerce."

---

[5] Plaintiffs rely on the allegations in the complaint, but overlook that they bear the burden of *proving* that they fall within FAA Section 1. *See, e.g.*, *Bissonette v. Lepage Bakeries Park St., LLC*, No. 3:19-cv-00965 (KAD), -- F. Supp. 3d --, 2020 WL 2494763, at *3 (D. Conn. May 14, 2020). Here, Plaintiffs provide virtually no evidence—they refer repeatedly to purported plaintiff declarations (Opp. 2, 18, 23-24, 31), but did not actually file any such declarations.

Plaintiffs further allege that if they cancel too many trips, they risk deactivation.  Opp. 15.

But Plaintiffs cite no evidence in the Agreement or elsewhere requiring them to accept interstate

trips or imposing any consequences for refusing out-of-state trips that do not apply equally to

refusing in-state trips.  Plaintiffs' statistical evidence is equally unavailing.  Plaintiffs assert that

one plaintiff received over 10% of his income from interstate trips, and another plaintiff received

almost 20% of his income during one eight-week period from interstate trips.  Opp. 16.  Even if

these statistics are accurate and representative of all drivers, they would not change the fact that

the vast majority of these plaintiffs' rides, and rides nationwide, are intrastate.  Ex. 3, ¶¶ 4, 8.  As

for Plaintiffs' statistics establishing that the absolute number of interstate trips is high (Opp. 16-

17): that shows that Uber is popular, not that drivers "engag[e] in interstate commerce."

Plaintiffs theorize that they are "engag[ing] in interstate commerce" because "a sizable

portion of their trips … include connecting passengers to other forms of interstate transportation."

Opp. 18.  That argument conflicts with *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947),

which held that "when local taxicabs merely convey interstate train passengers between their

homes and the railroad station in the normal course of their independent local service, that service

is not an integral part of interstate transportation" for Sherman Act purposes.  *Id.* at 233; *see* MTC

13-15 (citing authority rejecting this argument).  Plaintiffs point to *Yellow Cab*'s statement that a

conspiracy *targeting* railroad stations might have a sufficient connection to interstate commerce

to trigger Sherman Act coverage, Opp. 19, but Plaintiffs allege no such conspiracy here.

Contrary to Plaintiffs' suggestion (Opp. 21), the Court should not apply the multi-factor

test in *Lenz v. Yellow Transp. Inc.*, 431 F.3d 348 (8th Cir. 2005).  "[T]he *Lenz* factors were

formulated in a specific context—determining whether a worker one step removed from the actual

physical delivery of goods fell under the residuary exemption—not at issue in the instant case."

*Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 483 n.3 (S.D.N.Y. 2008); *see, e.g.*, *Papetti v. Compagnie Nationale Air France*, No. 97 Civ. 2921, 1998 WL 667932 (E.D.N.Y. Aug. 14, 1998), addressing the classification of a cargo agent physically moving freight). "[T]here is no need for recourse to an indeterminate balancing test in light of the Supreme Court's analysis in *Yellow Cab*." *Rogers*, 2020 WL 1684151, at *7 n.3.[6]

Plaintiffs resort to a serious mischaracterization of Uber's argument: that "all members of a particular class must cross state lines in their work in order for any of these workers can be considered as engaging in interstate commerce." Opp. 25. Uber's motion said the precise opposite: "This does not mean that the residual clause requires that *all* workers within a class *always* 'engage in interstate commerce.' As long as a class *generally* engages in interstate commerce, it is natural to say that the 'class' does so, even if some individual class members do not." MTC 12. Seamen and railway employees generally engage in interstate commerce; personal transportation providers do not, so they do not fall within Section 1.

Finally, the most striking feature of Plaintiffs' brief is their total failure to offer any rational reason why personal transportation providers should be exempted from the FAA. As Uber's motion explained, Congress enacted Section 1 because it "had already prescribed alternative employment dispute resolution regimes for many transportation workers." *New Prime*, 139 S. Ct. at 537; *see* MTC 19-20. In other words, federal law already covered those workers, so the FAA

---

[6] *Waithaka v. Amazon.com*, No. 19-1848, 2020 WL 4034997 (1st Cir. July 17, 2020), cited in Plaintiffs' supplemental brief, is not on point. In *Waithaka*, the First Circuit held that Amazon's last-mile delivery drivers fell within Section 1 of the FAA. No one doubted that last-mile delivery drivers typically transport goods that cross state lines; the disputed issue was whether drivers "who haul goods on the final legs of interstate journeys" are "engaged in … interstate commerce," "regardless of whether the workers themselves physically cross state lines." *Id.* at *11. This case presents the reverse scenario: Plaintiffs claim the drivers sporadically *do* cross state lines, but they typically provide local transportation *without* a connection to interstate commerce. Nothing in *Waithaka* suggests that such drivers are "engaged in interstate commerce."

did not need to cover them.  At the time of the FAA, however—and still today—federal law does not cover personal transportation providers.  Thus, as several courts have held, the purpose of Section 1—deferring to remedial schemes in other federal statutes—would not be served by holding that personal transportation providers fall within Section 1.  *See* MTC 20 (collecting cases).  Indeed, it is implausible that Congress would have decided to exclude *only* contracts involving personal transportation providers from an otherwise seamless web of federal coverage of arbitration agreements.  MTC 20-21.  In view of the Supreme Court's instruction that Section 1 of the FAA "be afforded a narrow construction," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001) (citation omitted), the Court should not introduce an inexplicable gap into the FAA.[7]

## III.     If the FAA Does Not Apply, the Agreement Is Enforceable under New York Law.

If the Agreement falls within Section 1 of the FAA, its arbitration provision is not stricken. Rather, state law applies—and under state law, the parties must arbitrate.  MTC 21-25.

A.   The Agreement does not bar a court from applying state law.

The Agreement recites that it is "governed by" the FAA.  According to Plaintiffs, this provision means that the Agreement is enforceable *only if* the FAA applies—so if the Agreement is exempted from the FAA, it is invalid.  This argument conflicts with the Agreement's plain terms.

The Agreement recites: "[I]n the event any provision of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable."  Ex. A, § 14.3(ix); Ex. D, § 15.3(ix).  Thus, even if the "governed by" provision is unenforceable, the

---

[7] Contrary to Plaintiffs' repeated assertions, nothing in *Singh v. Uber Techs., Inc.*, 939 F.3d 210 (3d Cir. 2019) casts doubt on Uber's argument.  *Singh* held that Section 1 does not categorically exclude all workers who transport passengers, as opposed to goods.  As Uber explained (MTC 18), although Uber disagrees with *Singh*, the Court need not decide that question here.  Even if Section 1 covers workers who primarily engage in *interstate* transportation of passengers (such as airplane pilots), it does not cover workers primarily engaging in *intrastate* transportation.

remainder of the Arbitration Provision is enforceable—including the provisions explicitly reciting that the parties will arbitrate their claims.

This analysis would vindicate the parties' intent. It is apparent from the Agreement that the parties intended to arbitrate; nothing in the Agreement suggests that the parties would have wanted to arbitrate only if the source of law used to compel arbitration was federal rather than state law. Other courts have reached the same conclusion on identical facts. For instance, in *Diaz v. Michigan Logistics Inc.*, 167 F. Supp. 3d 375 (E.D.N.Y. 2016), the contract recited that the "Arbitration Provision is governed by the Federal Arbitration Act," but the court found that it fell within Section 1. *Id.* at 379. Like Plaintiffs here, the plaintiff argued that "given the parties' explicit choice to apply the FAA, the FAA is the *only* law the Court should consider in determining whether to compel arbitration, effectively rendering the arbitration provision unenforceable." *Id.* at 381. The court disagreed: "The detailed arbitration provision clearly demonstrates the parties' intent to arbitrate disputes." *Id.* "Thus, assuming that the FAA does not apply, state arbitration law governs." *Id.*; *accord Espinosa v. SNAP Logistics Corp.*, 17 Civ. 6383, 2018 WL 9563311, at *1, *2, *4-*5 & n.3 (S.D.N.Y. Apr. 3, 2018) (enforcing arbitration agreement with provision requiring settlement of disputes "in accordance with the [FAA]," even if Section 1's exemption applied, because the arbitration provision "manifest[ed] an intent to arbitrate, not contingent on whether Plaintiff's employment arrangement falls within the coverage of the FAA.").[8]

Plaintiffs' contrary argument rests on *Rittmann v. Amazon.com, Inc.*, 383 F. Supp. 3d 1196 (W.D. Wash. 2019), and *Hamrick v. Partsfleet*, 411 F. Supp. 3d 1298 (M.D. Fla. 2019). Opp. 32-33. Those cases are unpersuasive, and in any event, distinguishable from this case because the

---

[8] Plaintiffs deem it significant that the contract states that state law will *not* apply. Opp. 33. But those provisions merely reiterate that federal law displaces state law. If federal law is unenforceable, all provisions reflecting that federal law displace state law are severed.

contracts at issue lacked severability clauses, so it was "not clear … whether the parties intended the Arbitration Provision to remain enforceable in the event that the FAA was found to be inapplicable." *Rittmann*, 383 F. Supp. 3d 1203.  Here, the parties plainly intended to arbitrate and included a severability provision specific to the arbitration provision to memorialize that intention.

      B.  <u>New York law requires enforcement of the Agreement.</u>

      Plaintiffs' remaining arguments are makeweights.  Plaintiffs cite N.Y. CPLR § 7515, but that provision only prohibits contract provisions that require parties to arbitrate "to resolve any allegation or claim *of discrimination*." N.Y. CPLR § 7515(a)(2) (emphasis added).  The statute expressly states that it cannot "be construed to impair or prohibit" incorporation of a "non-prohibited clause or other mandatory arbitration provision" within a contract, and that the inclusion of a prohibited clause in a contract "shall not serve to impair the enforceability of any other provision of such contract." *Id.* § 7515(b)(ii), (b)(iii).  Thus, that statute does not impair the Court from enforcing the Agreement as applied to Plaintiffs' breach-of-contract claims.

      Plaintiffs also argue that requiring them to arbitrate is against New York public policy because the New York Legislature has exempted certain claims involving "significantly unequal bargaining power" from arbitration.  Opp. 38-39.  Of course, here Plaintiffs had *complete* bargaining power because they had the opportunity to unilaterally opt out.  Moreover, New York courts have held that class-action waivers in arbitration agreements are categorically not against public policy, "given the strong public policy favoring arbitration . . . and the absence of a commensurate policy favoring class actions." *Ranieri v. Bell Atl. Mobile*, 304 A.D.2d 353, 354 (1st Dep't 2003); *see also* MTC at 23-24.  Although the State Legislature has exempted consumers who enter certain contracts and workplace discrimination claims from mandatory arbitration, it tellingly has not extended this exemption to ordinary breach of contract claims like Plaintiffs'.

Dated:  July 31, 2020                     Respectfully submitted,

s/ Jeremy Creelan
Jeremy M. Creeelan
Elizabeth A. Edmondson
919 Third Avenue
New York, NY 10022-3908
(212) 891-1600
JCreelan@jenner.com
EEdmondson@jenner.com

Adam G. Unikowsky (*pro hac vice*)
Tassity S. Johnson (*pro hac vice forthcoming*)
1099 New York Avenue, NW Suite 900
Washington, DC 20001-4412
(202) 639-6000
AUnikowsky@jenner.com
TJohnson@jenner.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2020, the foregoing Memorandum of Law in Support of Motion to Compel Arbitration was filed electronically through the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

s/ Jeremy Creelan
Jeremy M. Creeelan