UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

LEVON ALEKSANIAN, SONAM
LAMA, HARJIT KHATRA, and,
Individually, on Behalf of All Others
Similarly Situated, and as Class
Representatives,

             Plaintiffs,

    -against-

UBER TECHNOLOGIES, INC., UBER
LOGISTIK, LLC, UBER USA LLC,
jointly and severally,

          Defendants.

------------------------------------------------------ X

       1:19-CV-10308 (ALC) (RWL)

    **ORAL ARGUMENT REQUESTED**

**DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.1
STATEMENT OF MATERIAL OF FACTS**

Pursuant to Local Rule 56.1, Defendants Uber Technologies, Inc. and Uber USA LLC ("Uber") hereby respond to Plaintiffs' Counterstatement of Facts in Opposition to Defendants' Motion to Compel Arbitration, as it relates to the time period between 2013 and 2019.

**UBER'S INTERSTATE TRIPS[1] AND DRIVER INFO[2]**

94. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Response**: Undisputed to the extent that (a) "interstate trips" refers to trips that were (i) dispatched and picked up in different states or (ii) picked up and dropped off in different states, and (b) "on-trip time" refers to the total minutes that drivers spent completing trips, as articulated in the Declaration of Philip Linfoot, dated August 29, 2025 (Dkt. 131) ("Linfoot Declaration") ¶11.

95. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Response**: Undisputed to the extent that "on-trip time" refers to the total minutes that drivers spent completing trips, as articulated in Linfoot Declaration-¶11 (cited in Soleimany Declaration-¶12).

96. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Response**: Undisputed to the extent that (a) Plaintiffs meant to cite Soleimany Declaration-¶15, (b) "airport trips" refers to trips taken using the Uber Rides application with a pick-up location

---

[1] Uber understands Plaintiffs' representations concerning "trips" in their Counterstatement of Facts to concern only trips completed through Uber's Rides platform, as articulated in Uber's Rule 56.1 Statement of Undisputed Material Facts ("SUF")-¶2.

[2] All subheadings appearing are taken from Plaintiffs' Statement of Material Facts.

and/or a drop-off location at an airport, and (c) "gross amount charged to riders" refers to the gross amount charged to the rider (i.e., fares, booking fees, tolls, and taxes collected in local currency) excluding any upfront adjustments made (e.g., a rider discount) and tips.

97.    The average trip length, in miles, for all trips nationwide is as follows: 2013: 4.8; 2014: 5.2; 2015: 5.8; 2016: 6.2; 2017: 6.3; 2018: 6.2; 2019: 6.4. Linfoot Decl. Para.13.

**Response**:  Undisputed.

98.    The average trip length, in miles, for all trips in New York City is as follows: 2013: 5.4; 2014: 5.3; 2015: 5.3; 2016: 5.3; 2017: 5.0; 2018; 4.8; 2019; 4.7. Linfoot Decl. Para. 17.

**Response**:  Undisputed to the extent that "all trips in New York City" refers to "all NYC drivers' trips,"[3] as articulated in Linfoot Declaration-¶17.

99.    The average trip length, in miles for all interstate trips nationwide, is as follows: 2013: 9.9; 2014: 10.6; 2015: 11.5; 2016: 12.1; 2017: 12.7; 2018: 13.1; 2019: 14.1. Linfoot Decl. at Para. 13.

**Response**:  Undisputed.

100.    The average trip length, in miles for all interstate trips in New York City is as follows: 2013: 15.7; 2014: 15.2; 2015: 16.3; 2016: 16.9; 2017: 17.4; 2018: 17.6; 2019: 17.8. Linfoot Decl. Para. 18.

**Response**:  Undisputed to the extent that "all interstate trips in New York City" refers to "all NYC drivers' interstate trips," as articulated in Linfoot Declaration-¶18.

---

[3] As the parties agreed in discovery, Uber produced data for drivers who completed at least one trip in New York City during the relevant year(s) and were licensed to do so by the New York City Taxi & Limousine Commission ("NYC drivers").  It is possible that there are drivers that are licensed elsewhere that may have completed a trip with a drop-off location in New York City that would not be accounted for in that data. The data Plaintiffs cite therefore does not correspond to *all* trips in New York City but rather all New York City drivers' trips.

101.    The average on-trip minutes for all trips nationwide is as follows: 2013: 15.8; 2014; 17.3; 2015: 16.0; 2016: 16.2; 2017: 16.1; 2018: 15.7; 2019: 15.7. Linfoot Decl. Para. 14

**Response**:  Undisputed to the extent that "average on-trip minutes" refers to "average trip time" as articulated in Linfoot Declaration-¶14.

102.    The average on-trip minutes for all trips in New York City is as follows: 2013: 22.4; 2014: 30.2; 2015: 20.7; 2016: 20.2; 2017: 19.3; 2018: 18.6; 2019: 18.0. Linfoot Decl. Para. 17.

**Response**:  Undisputed to the extent that (a) "average on-trip minutes" refers to "average trip minutes," and (b) "all trips in New York City" refers to "all NYC drivers' trips," as articulated in Linfoot Declaration-¶17.

103.    The average on-trip minutes for all interstate trips nationwide is as follows: 2013: 24.6; 2014; 29.1; 2015: 27.1; 2016: 27.6; 2017: 28.1; 2018: 28.4; 2019: 29.4. Linfoot Decl. Para.14.

**Response**:  Undisputed to the extent that "average on-trip minutes" is meant to refer to "average trip time" as articulated in Linfoot Declaration-¶14.

104.    The average on-trip minutes for all interstate trips in New York City is as follows: 2013: 38.7; 2014: 50.7; 2015: 38.5; 2016: 39.3; 2017: 40.8; 2018: 41.7; 2019: 42.2. Linfoot Decl. Para.18.

**Response**:  Undisputed to the extent that (a) "average on-trip minutes" refers to "average trip minutes," and (b) "all interstate trips in New York City" refers to "all NYC drivers' interstate trips," as articulated in Linfoot Declaration-¶18.

105.    Nationwide, the percentage of drivers who performed at least one trip in each year from 2013-2019 who performed an interstate trip is as follows:

- 2013: 24.4%

4

- 2014: 20.9%

- 2015: 19.6%

- 2016: 21.1%

- 2017: 24.7%

- 2018: 26.7%

- 2019: 27.9%

Soleimany Decl. Ex. C (Defs' Supp. Responses to Lama's First Interrogatories), at 38.

**Response**: Undisputed to the extent that "[n]ationwide, the percentage of drivers who performed at least one trip in each year from 2013-2019 who performed an interstate trip" is meant to refer to the drivers nationwide with at least one interstate trip annually, expressed as a percentage of all drivers nationwide, as articulated in Soleimany Declaration Ex. C at 38.

106.    The vast majority of NYC drivers perform interstate trips. Soleimany Decl., Para. 14; Ex. C, at 38, showing the percentage of drivers in NYC who performed interstate trips between 2013 and 2019 as follows:

- 2013: 66.5%

- 2014: 74.3%

- 2015:82.9%

- 2016: 90.0%

- 2017:92.1%

- 2018: 92.0%

- 2019: 93.6%

**Response**: Disputed.  The cited evidence does not support Plaintiffs' statement, including without limitation the phrase "vast majority."  The cited evidence supports that drivers who

completed at least one trip in New York City during the relevant year(s) and were licensed to do so by the New York City Taxi & Limousine Commission ("NYC drivers") and who performed at least one interstate trip annually, expressed as a percentage of all NYC drivers, is as follows:

- 2013: 66.5%

- 2014: 74.3%

- 2015: 82.9%

- 2016: 90.0%

- 2017: 92.1%

- 2018: 92.0%

- 2019: 93.6%

Soleimany Ex. C at 38.

107.    Between 2013 and 2019, for drivers nationwide who completed 50 or more trips annually, the percentage of drivers who performed interstate trips is as follows:

- 2013: 28.9%

- 2014: 26.6%

- 2015: 26.7%

- 2016: 29.0%

- 2017: 32.5%

- 2018: 34.1%

- 2019: 34.9%

Soleimany Decl., Ex. C, at 44.

**Response**:    Undisputed to the extent that "the percentage of drivers who performed interstate trips" refers to all drivers nationwide who completed 50 or more trips and one or more

interstate trips annually, expressed as a percentage of all drivers nationwide with 50 or more trips annually, as articulated in Soleimany Declaration Ex. C at 44.

108.    Between 2013 and 2019, for drivers nationwide who completed 1500 or more trips annually, the percentage of drivers who performed an interstate trip is as follows:

- 2013: 41.6%

- 2014: 40.2%

- 2015: 44.0%

- 2016: 46.8%

- 2017: 50.5%

- 2018: 51.8%

- 2019: 52.5%

Soleimany Decl. Ex. C, at 50.

**Response**:  Undisputed to the extent that "the percentage of drivers who performed an interstate trip" refers to all drivers nationwide who completed 1,500 or more trips and one or more interstate trips annually expressed as a percentage of all drivers nationwide with 1,500 or more trips annually, as articulated in Soleimany Declaration Ex. C at 50.

109.    Between 2013 and 2019, the average number of interstate trips completed per driver nationwide per year, month and week  is as follows:

2013:
- Per Year: 983,659 interstate trips/61,181 drivers =16.1

- Per month: 16.1/12 = 1.3

- Per week: 16.1/52 = 0.3

 2014:

- Per Year: 4,045,693/314,890 =12.8

- Per Month: 12.8/12 = 1.1

- Per Week: 12.8/52 = 0.2

2015:

- Per Year: 10,782,583/1,038,096 = 10.4

- Per Month: 10.4/12 = 0.9

- Per Week: 10.4/52 = 0.2

2016:

- Per Year: 20,291,265/1,773,212 = 11.4

- Per Month: 11.4/12 = 1.0

- Per Week: 11.4/52 = 0.2

2017:

- Per Year: 28,733,990/2,087,973 =13.8

- Per Month: 13.8/12 = 1.1

- Per Week: 13.8/52 = 0.3

2018:

- Per Year: 33,543,822/2,151,552 = 15.6

- Per Month: 15.6/12 = 1.3

- Per Week: 15.6/52 = 0.3

2019:

- Per Year: 33,925,757/2,094,630 = 16.2

- Per Month: 16.2/12 = 1.3

- Per Week: 16.2/52 = 0.3

Soleimany Decl. Ex. D, at 2.

**Response**:  Undisputed.

110.    Between 2013 and 2019, for drivers nationwide who completed 50 or more trips annually, the average number of interstate trips completed per year is as follows:

- 2013: 22.8
- 2014: 19.5
- 2015: 17.3
- 2016: 18.7
- 2017: 20.6
- 2018: 22.2
- 2019: 22.3.

Soleimany Decl. Ex. D, at 3-4.

**Response**:  Undisputed.

111.    Between 2013 and 2019, for drivers nationwide who completed 50 or more trips annually, the average number of interstate trips completed per week is as follows:

- 2013: 0.4
- 2014: 0.4
- 2015: 0.3
- 2016: 0.4
- 2017: 0.3
- 2018: 0.3
- 2019: 0.3.

Soleimany Decl. Ex. D, at 3-4.

**Response**:  Undisputed except to the extent that Soleimany Declaration Ex. D reflects an August 1, 2025, stipulation between the parties stating that drivers nationwide who completed 50 or more trips per year provided, on average, 0.4, 0.4, and 0.4 interstate trips per week in 2017, 2018, and 2019, respectively.

112.    In each year, the percentage of trips nationwide performed by drivers with 50 or more trips in that year is as follows:

- 2013: 98.5%

- 2014: 98.3%

- 2015: 97.9%

- 2016: 98.4%

- 2017: 98.9%

- 2018: 99.1%

- 2019: 99.3%

Soleimany Decl., Para 22.

**Response**:  Undisputed to the extent that (a) Plaintiffs meant to cite Soleimany Declaration-¶27 and (b) "performed by drivers with 50 or more trips" refers to drivers who completed 50 or more trips in at least one year between 2013 and 2019.

113.    From 2013 to 2019, drivers with 50 or more trips per year were represented between 59.1% and 72.4% of all drivers nationwide in each year. *See* Soleimany Decl., Para. 30.

**Response**:  Undisputed to the extent that "were represented between 59.1% and 72.4% of all drivers nationwide in each year" refers to the fact that from 2013 to 2019, drivers nationwide with 50 or more trips annually comprised between 59.1% and 72.4% of the total number of drivers nationwide, calculated using data contained in Soleimany Declaration Ex. B at 16 and Ex. C at 13.

114.    From 2013-2019, despite accounting for between 59.1% and 72.4% of all driver nationwide, in each year, drivers with 50 or more trips per year performed 98.9% of all trips during the total period from 2013-2019. Soleimany Decl., Para. 29.

**Response**:    Disputed.    The cited declaration testimony (from Plaintiffs' counsel) is inaccurate and does not support Plaintiffs' statement.    The total trips nationwide completed by drivers with 50 or more trips annually from 2013 to 2019 is 4,885,531,757, *see* Soleimany Declaration Ex. A at 58, not 4,885,532,257, as averred in Soleimany Declaration-¶29.    Further disputed to the extent the word "despite" suggests any correlation between the percentage of all drivers who completed 50 or more trips annually from 2013 to 2019 and the percentage of all trips completed by those drivers.

115.    In each year, the percentage of trips performed by drivers with 1500 or more trips in that year is as follows:

- 2013: 31.3%
- 2014: 39.3%
- 2015: 43.3%
- 2016: 48.1%
- 2017: 52.2%
- 2018: 57.6%
- 2019: 61.0%

Soleimany Decl., Para. 33.

**Response**: Undisputed to the extent that (a) Plaintiffs meant to cite Soleimany Declaration-¶35 and (b) "performed by drivers with 1500 or more trips" refers to drivers who completed 1,500 or more trips in at least one year between 2013 and 2019.

11

116.    From 2013-2019, drivers with 1500+ trips performed 54.5% of all trips. Soleimany Decl., at Para. 35.

**Response**:  Undisputed to the extent that (a) Plaintiffs meant to cite Soleimany Declaration-¶37, (b) "performed 54.5% of all trips" means completed 54.5% of all trips, and (c) "drivers with 1500+ trips" means drivers who completed at least 1,500 trips in at least one year between 2013 and 2019.

117.    Between 2013 and 2019, for drivers nationwide who completed 1500 or more trips annually, the average number of interstate trips completed per year is as follows:

- 2013: 130.9
- 2014: 99.1
- 2015: 87.7
- 2016: 86.6
- 2017: 83.8
- 2018: 79.1
- 2019: 70.8

Soleimany Decl. Ex. D, at 5-6.

**Response**:  Undisputed.

118.    Between 2013 and 2019, for drivers nationwide who completed 1500 or more trips annually, the average number of interstate trips completed per week is as follows:

- 2013: 2.5
- 2014: 1.9
- 2015: 1.7
- 2016: 1.7

- 2017: 1.6

- 2018: 1.5

- 2019: 1.4

Soleimany Decl. Ex. D, at 5-6.

**Response**: Undisputed.

119. Yet, the incidence of interstate trips as a percentage of all trips does not vary significantly between all drivers nationwide, all drivers nationwide with 50+ trips in a year, and all drivers nationwide with 1500+ trips per year; the incidence of interstate trips for all drivers nationwide, drivers with 50+ trips nationwide, and drivers with 1500+ trips nationwide, is 2.7%, 2.7%, and 3.0%, respectively. Linfoot Decl. at Paras. 7, 19, 21.

**Response**: Undisputed to the extent "does not vary significantly" refers to "generally consistent." *See* Linfoot Declaration-¶15.

120. Rather, the only factor that would affect the average number of interstate trips such drivers perform over a given time period is the amount of work overall these drivers choose to perform in a given time period; more trips means more interstate trips. *See id*. Indeed, Uber touts the flexibility of working as an Uber driver, and the ability to go online at any time. *See* Soleimany Decl., at Para. 35; Ex. K. Accordingly, any driver nationwide could have become a driver performing more trips per year, and thus, on average, one performing interstate trips on a weekly basis.

**Response**: Disputed. The cited evidence does not support Plaintiffs' vague statement that the "only factor that would affect the average number of interstate trips such drivers perform over a given time period is the amount of work overall these drivers choose to perform in a given time period." Multiple factors may affect the average number of interstate trips a driver completes

during a given period, including but not limited to the City_ID where the driver is registered and the regulations applicable to that City_ID. *See* Uber SUF-¶¶26-29, 63-64. The cited evidence also does not support Plaintiffs' inaccurate statement that "Uber touts the flexibility of working as an Uber driver, and the ability to go online at any time," except to the extent that Uber's "Partner Guide," dated August 4, 2015, states that drivers "may tap the 'Go Online' button and become active on the Uber network anytime." Soleimany Declaration Ex. K at UBER-ALEKSANIAN_00005664. The cited evidence also does not support Plaintiffs' vague and incomprehensible statement that "any driver nationwide could have become a driver performing more trips per year, and thus, on average, one performing interstate trips on a weekly basis."

121.



**Response**: Disputed.

15



122.

---

[4] Uber defines "airport trip" as a trip taken using the Uber Rides application with a pick-up location and/or a drop-off location at an airport, as set forth in Soleimany Decl. Ex. C at 41 n.3.

**Response**: Disputed. █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

123.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

██

**Response**: Undisputed to the extent that (a) "total trip minutes nationwide" refers to the total minutes that drivers spent completing trips, as articulated in Linfoot Declaration-¶11, and (b) "minutes devoted to airport trips" refers to the minutes spent completing trips with a pick-up location and/or a drop-off location at an airport, as articulated in Soleimany Declaration Ex. A at 17 n.2; 20 n.3; 26-27.

124.    ████████████████████████████████████████████

████████████████████████████████████████████

**Response**: Undisputed to the extent that "gross amount charged to riders nationwide" refers to total gross bookings for all drivers' trips nationwide, as articulated in Soleimany Declaration Ex. A at 29.

125.    ████████████████████████████████████████████

█████████

████████████████

████████████████

████████████████

████████████████

██████████████████

16

• ██████████████

**Response**: Undisputed to the extent (a) Plaintiffs meant to cite Soleimany Declaration-¶16 and (b) "gross amounts charged to riders for interstate trips nationwide" refers to the gross amount charged to the rider (i.e., fares, booking fees, tolls, and taxes collected in local currency) excluding any upfront adjustments made (e.g., a rider discount) and tips for interstate trips nationwide.

126. ████████████████████████████████████████████████████

████████████████████████████████████████████

**Response**: Undisputed to the extent that "gross amount Uber charged to riders for interstate trips nationwide" refers to total gross bookings for all drivers' interstate trips nationwide, as articulated in Soleimany Declaration Ex. A at 33.

**Versions of the Agreement**

127. Material terms of the TSA Uber provided to drivers outside of New York City, and that provided to drivers in New York City are essentially similar. Compare, *e.g.*, 2015 TSA, Dkt. 132-2 and Soleimany Decl., Ex. V.

**Response**: Disputed. Plaintiffs offer no support for the vague characterization of certain terms in the TSA as "material" or "essentially similar."

128. In 2020, Uber offered a new version of its contract to drivers, the Platform Access Agreement ("PAA"). Soleimany Decl., Ex W.

**Response**: Undisputed. Soleimany Declaration Ex. W reflects a document dated in 2020, which is outside the "time period between 2013 and 2019" set forth in Plaintiffs' Opposition to Uber's SUF-Intro.

17

129.    Unlike the SLA and TSA, the PAA contracts for an alternate choice of law if the FAA is found not to apply to Uber drivers. Section 14.1(a) of the PAA states:

> This Arbitration Provision is a contract governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce, and you agree that this is not a contract of employment involving any class of workers engaged in foreign or interstate commerce within the meaning of Section 1 of the Federal Arbitration Act. If notwithstanding the foregoing, the Federal Arbitration Act does not apply to this Arbitration Provision, the law pertaining to arbitration agreements of the state where you reside when you entered into this Agreement shall apply.

**Response**:    Undisputed that Soleimany Declaration Ex. W Section 14.1(a) contains the quoted text.

### UBER'S BUSINESS MODEL AND ADVERTISING AND NATIONWIDE AVAILABILITY OF INTERSTATE TRIPS

130.    In the New York City market, Uber advertises that trips may last as long as four hours. Soleimany Decl. Ex. L, at UBER-ALEKSANIAN_02660. For example, Plaintiffs, who signed up to work based out of New York City received trips beyond New York City and New York State and once outside and, having taken trips to other states, received trips from Uber that began in New Jersey and Connecticut. See Aleksanian Decl. at Paras. 5-9; Lama Decl. at Paras. 5-8; 12; 14.

**Response**:    Disputed.  The cited evidence does not support Plaintiffs' statement that "[i]n the New York City market, Uber advertises that trips may last as long as four hours."  Soleimany Declaration Ex. L, at UBER-ALEKSANIAN_02661, reflects a historical version of Uber's informational city webpage for New York City, which specifies a regulatory requirement that "[a]ll trips beginning in NYC are limited to 4 hours."  Uber disputes Plaintiffs' mischaracterization of this document as an advertisement for trips that last as long as four hours.  Also disputed to the extent that Soleimany Declaration Ex. L reflects a document dated in 2021, which is outside the "time period between 2013 and 2019" set forth in Plaintiffs' Opposition to Uber's SUF-Intro.  The

cited evidence (Plaintiffs Aleksanian's and Lama's declarations) also does not support Plaintiffs' vague and incomprehensible statement that all three Plaintiffs "signed up to work based out of New York City" and "received trips beyond New York City and New York State and once outside and, having taken trips to other states, received trips from Uber that began in New Jersey and Connecticut."

131.    In other markets, Uber's advertising contains no such limitations on the length of trips. *See*, *e.g.*, Soleimany Decl. Ex. M. Uber states that customers can make trip requests to go to any destination in the contiguous. *United States. Singh v. Uber Technologie*s, 16-cv-03044-FLW-DEA (D. N.J.), at Dkt 70-2, Transcript of Deposition of Brad Rosenthal, at 126:2-127:2.

**Response**: Disputed.  The cited evidence does not support Plaintiffs' vague statement that "[i]n other markets, Uber's advertising contains no such limitations on the length of trips."  It is unclear what "other markets" and "such limitations" Plaintiffs intend to reference.  Plaintiffs' vague statement also mischaracterizes Soleimany Declaration Ex. M, which reflects a historical version of Uber's informational city webpage for New Jersey.  Plaintiffs' statement also mischaracterizes Mr. Rosenthal's testimony that riders can select "[a]ny destination within the U.S. contiguous."  *Singh*, 16-cv-03044 (D. N.J.), Dkt 70-2 at 126:23–127:2.  Mr. Rosenthal testified that Uber's Rides platform is generally available throughout the contiguous United States but did not testify that riders can request a destination to anywhere in the United States from anywhere in the United States.  Plaintiffs' own evidence confirms that a rider using Uber's platform with a pick-up location in New York City cannot choose a drop-off location anywhere in the United States.  *See, e.g.*, Soleimany Declaration Ex. L at UBER-ALEKSANIAN_00002661 (specifying a regulatory requirement that "[a]ll trips beginning in NYC are limited to 4 hours").  Also disputed to the extent that Soleimany Declaration Ex. M reflects a document dated in 2021,

19

which is outside the "time period between 2013 and 2019" set forth in Plaintiffs' Opposition to Uber's SUF-Intro.

132.    Uber's public-facing advertising specifically advertises trips to other states, noting a $20 surcharge on all trips to New Jersey from New York City. Soleimany Decl. Ex. L, at UBER-ALEKSANIAN_02660.

**Response**: Disputed.  The cited evidence does not support Plaintiffs' statement that "Uber's public-facing advertising specifically advertises trips to other states."  Soleimany Declaration Ex. L, at UBER-ALEKSANIAN_02661, reflects a historical version of Uber's informational city webpage for New York City which specifies "a $20 surcharge on all trips" between New York City and only one other state, New Jersey, that is charged to riders and makes their trips more expensive.  Uber disputes Plaintiffs' mischaracterization of this document as an advertisement for "trips to other states."  Also disputed to the extent that Soleimany Declaration Ex. L reflects a document dated in 2021, which is outside the "time period between 2013 and 2019" set forth in Plaintiffs' Opposition to Uber's SUF-Intro.

133.    Uber is a transportation company, which describes its goal as "transportation as reliable as running water for everyone, everywhere." Aleksanian Decl. Ex. A, at Aleksanian Plaintiffs001736; Aleksanian Decl. Ex. B, at 9.

**Response**: Disputed.  Uber is a technology (not transportation) company that develops proprietary software to create digital marketplaces that are operated through app-based platforms. SUF-¶1.  It is undisputed that Aleksanian Declaration Exs. A and B reflect a New York Unemployment Insurance Appeal Board ("UIAB") decision stating that Uber's "policy reads that 'our goal at Uber is transportation as reliable as running water everywhere, and for everyone.'" That dicta in a UIAB decision is entitled to "little or no weight" in this case because the question

before the Administrative Law Judge is different from the limited Section 1 inquiry before this Court. *See Arroyo v. WestLB Admin., Inc.*, 54 F. Supp. 2d 224, 230 (S.D.N.Y. 1999).

134.    Uber describes the values of the company as "we want people to be able to get where they wanna go." Soleimany Decl. Ex. G, at Aleksanian Plaintiffs000848.

**Response**:  Disputed.  Soleimany Declaration Ex. G reflects an excerpt of April 24, 2018 testimony from then-Uber Senior Operations Manager Chad Dobbs before the New York State Insurance Appeal Board, but Plaintiffs cite no evidence that Mr. Dobbs was speaking on behalf of Uber.  Plaintiffs' statement also mischaracterizes Mr. Dobbs' testimony.  Mr. Dobbs testified that the Uber driver app does not show drivers the destination at the time of the ride request because "it would give the driver the ability to destination discriminate, which again is against local rules and laws, and has gone against kind of our values of the company that we want people to be able to get where they wanna go."  Soleimany Declaration Ex. G at ALEKSANIAN PLAINTIFFS000848.

135.    Nationwide, Uber advertises its services as the "best way" to get from specific locations in one state to another, in regions throughout the country. Uber maintains specific websites at permanent URLs for trips such as Boston's Logan Airport to Portland, Maine (Soleimany Decl., Ex. N); Cheyenne, Wyoming to Denver International Airport, (Soleimany Decl. Ex. O); Chicago to Milwaukee (Soleimany Decl. Ex. X); Philadelphia to Trenton, NJ (Soleimany Decl. Ex. Y) Portland, Oregon International Airport (PDX) to Vancouver, Washington (Soleimany Decl. Ex. Z); MCI Airport (St. Louis, Missouri) to Topeka, Kansas (Soleimany Decl. Ex. AA); New Haven, CT to JFK Airport (Soleimany Decl. Ex. BB).

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' statements that "[n]ationwide, Uber advertises its services as the 'best way' to get from specific locations in one

21

state to another" through "specific websites . . . for trips." Soleimany Declaration Exs. N, O, X, Y, Z, and AA reflect Uber's informational webpages reflecting routes from a limited number of cities to nearby airports. Uber disputes Plaintiffs' mischaracterization of these documents as advertisements of "Uber's services"—which is developing proprietary software to create digital marketplaces that are operated through app-based platforms. Uber SUF-¶1. Also disputed to the extent that Soleimany Declaration Exs. N, O, X, Y, Z, and AA all reflect documents dated within the last two years, which is outside the "time period between 2013 and 2019" set forth in Plaintiffs' Opposition to Uber's SUF-Intro.

136.   Uber's policy is that drivers who refuse a passenger based on where they are going can be subject to termination or "deactivation." Soleimany Decl. Ex. R, at Aleksanian Plaintiffs00567-00568.

**Response**: Disputed. The cited evidence does not support Plaintiffs' vague statement that drivers may be "subject to termination or 'deactivation'" pursuant to "Uber's policy" for merely "refus[ing] a passenger based on where they are going." Soleimany Declaration Ex. R reflects an excerpt of the April 6, 2017 testimony from then-Uber Operations and Logistics Manager Chad Dobbs before the New York State Insurance Appeal Board. Mr. Dobbs testified that Uber may suspend drivers' access to the Uber platform if the driver *discriminates* against a passenger based on their requested destination. Soleimany Declaration Ex. R at ALEKSANIAN PLAINTIFFS000567-568. The cited evidence does not reflect testimony concerning a "policy" to suspend drivers from the platform for rejecting or cancelling a trip for any reason associated with the passenger's destination. The record evidence confirms that drivers are not required to accept every trip offered to them, nor are they required to accept every (let alone any) trip across state lines. Perl Second Declaration-¶5.

22

137.   Uber's Senior Operations and Logistics Manager Chad Dobbs testified that discriminating against a passenger based on their destination is a "fairly egregious error" that would likely lead Uber to suspend a driver's access to the application (stating "getting in a physical altercation with a rider or discriminating someone [sic] based on their destination, in those types of situations, which I would consider fairly egregious errors on the driver[']s part, you know Uber would likely, uh, suspend access to the application.") Accordingly, no driver could choose to exclude interstate trips without risking "permanent deactivation" pursuant to Uber's "zero-tolerance" policy.   That is deemed "destination discrimination." Soleimany Decl., Ex. R, at Aleksanian Plaintiffs00567-00568.

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' statement concerning "destination discrimination," which is not referenced or described in Mr. Dobb's cited testimony. Uber has a "zero tolerance policy towards discrimination" and prohibits drivers from "refus[ing] to provide services based on where someone is going."  Soleimany Declaration Ex. Q at UBER-ALEKSANIAN_00005139–40.  Mr. Dobbs testified that "there -- there many things that a driver could do that are unlawful, whether it's . . . getting in a physical altercation with a rider or discriminating someone based on their destination; in those types of situations, which I would consider fairly egregious errors on the drivers part . . . Uber would likely, uh, suspend access to the application." Soleimany Declaration Ex. R at ALEKSANIAN PLAINTIFF000568.  Plaintiffs' vague statement that "no driver could choose to exclude interstate trips" for any reason "without risking 'permanent deactivation' pursuant to Uber's 'zero-tolerance' policy" mischaracterizes Mr. Dobbs' testimony and the term "destination discrimination."  The record evidence confirms that drivers are not required to accept every trip offered to them, nor are they required to accept every (let alone any) trip across state lines.  Perl Second Declaration-¶5.

23

138.    Uber's "Community Guidelines" document, under the header, "Why Drivers Can Lose Access to Uber (U.S. Only)", under the sub-header  Discrimination" states, "*What leads to you losing access to your account?* It is unacceptable to refuse to provide services based on where someone is going, or characteristics like a person's race, religion, national origin, disability, sexual orientation, sex, marital status, gender identity, age or any other characteristic protected under relevant federal, state or local law. Actions like these will result in permanent deactivation of your account." That is deemed "destination discrimination." Soleimany Decl., Ex. Q, UBER-ALEKSANIAN_00005134-00005140, at 5139-40. This policy contains no exception for trips that cross state lines. This policy contains no exception for trips that go to airports. Indeed Uber treats interstate trips the same as any other trips; there are no policies uniquely applicable to interstate trips that separate them from the regular flow of work to Uber drivers.

**Response**:  Disputed except to the extent that Soleimany Declaration Ex. Q reflects Uber's Community Guidelines, dated December 8, 2016, and under the header "Why Drivers Can Lose Access to Uber (U.S. Only)," under the sub-header "Discrimination" states, "*What leads to you losing access to your account?* It is unacceptable to refuse to provide services based on where someone is going, or characteristics like a person's race, religion, national origin, disability, sexual orientation, sex, marital status, gender identity, age or any other characteristic protected under relevant federal, state or local law. Actions like these will result in permanent deactivation of your account." UBER-ALEKSANIAN_00005139-40.  The cited evidence, however, does not include the term "destination discrimination."  Uber disputes Plaintiffs' characterization of the cited evidence as a "policy," but does not dispute that the cited evidence does not specifically reference trips that cross state lines or trips that being or end at an airport.  The cited evidence also does not specifically support Plaintiffs' statement that  "Uber treats interstate trips the same as any other

24

trips; there are no policies uniquely applicable to interstate trips that separate them from the regular flow of work to Uber drivers." The record evidence confirms that drivers are not required to accept every trip offered to them, nor are they required to accept every (let alone any) trip across state lines. Perl Second Declaration-¶5.

139. An Uber website entitled "Understanding why drivers and delivery people lose account access" states that "a driver or delivery person can lose account access for … [r]efusing or cancelling a trip or delivery on the basis of a rider's destination or a customer's delivery location." Soleimany Decl., Ex S, Aleksanian Plaintiff001839-001857, at 1850. This policy contains no exception for trips that cross state lines. This policy contains no exception for trips that go to airports.

**Response**: Disputed. Plaintiffs' statements mischaracterize Soleimany Declaration Ex. S, which reflects an Uber document titled "Understanding why drivers and delivery people lose account access," accessed on June 19, 2023. The quoted portion of the cited document (which is undisputed) specifically appears under a subheading titled "*Discrimination* and service denial." Soleimany Declaration Ex. S, at ALEKSANIAN PLAINTIFFS001850 (emphasis added). The cited evidence does not reflect that a driver could lose account access for rejecting or cancelling a trip for any reason associated with the passenger's destination. Uber disputes Plaintiffs' characterization of the cited evidence as a "policy," but does not dispute that the cited evidence does not reference trips that cross state lines or trips that being or end at an airport. The record evidence confirms that drivers are not required to accept every trip offered to them, nor are they required to accept every (let alone any) trip across state lines. Perl Second Declaration-¶5. Also disputed to the extent that Soleimany Declaration Ex. S reflects a document dated in 2023, which

is outside the "time period between 2013 and 2019" set forth in Plaintiffs' Opposition to Uber's SUF-Intro.

**UBER APP FUNCTION AND DISPATCH OF TRIPS, INCLUDING INTERSTATE TRIPS**

140.    The parties stipulated that Uber's onboarding videos depicting the functions of the Uber driver app (Soleimany Decl. Exs. H, I) (UBER-ALEKSANIAN00005075; UBER-ALEKSANIAN00005583) reflect how drivers would use the Uber app "anywhere in the United States." Soleimany Decl., Ex. J.

**Response**:  Undisputed to the extent that the Plaintiffs' statement is limited to Soleimany Declaration Exs. H, I (UBER-ALEKSANIAN_00005075; UBER-ALEKSANIAN_00005583).

141.    Interstate trips appeared to drivers in the app the same as other trips; nothing in the app indicated that drivers were receiving an interstate trip before they accepted it or arrived at the destination. Aleksanian Decl. Para. 11; Lama Decl. Para. 11.

**Response**:  Disputed.  Uber's app-based Rides platform indicates when drivers receive a trip offer (including an interstate trip) before they "accept[] it" or "arrive[] at the destination." Soleimany Declaration. Ex. I, UBER-ALEKSANIAN_00005583 at 0:49–1:08.  The cited evidence (Plaintiffs' declarations) concerning two Plaintiffs' own experiences does not support Plaintiffs' statement concerning "drivers" generally.

142.    Trips headed to airports appeared to drivers the same as any other trips. Aleksanian Decl. Para. 14; Lama Decl. Para. 11.

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' vague statement, including without limitation the terms "headed" and "appeared."  The cited evidence (Plaintiffs' declarations) concerning two Plaintiffs' own experiences does not support Plaintiffs' statement concerning "drivers" generally.

26

143.   Uber's training materials show no way by which drivers can isolate, toggle off, or filter out interstate or airport trips. *See* Soleimany Decl. Exs. H, I, K (showing driver app function).

**Response**:  Disputed.  Plaintiffs do not cite any evidence in support of their suggestion that *none* of Uber's training materials show a "way by which drivers can isolate, toggle off, or filter out interstate or airport trips."   The record evidence confirms that drivers may accept, reject, or cancel a trip for any reason.  *See* Uber SUF-¶¶38, 62.  It is undisputed that Soleimany Declaration Exs. H, I, and K, which reflect specific videos and a "Partner Guide" dated August 4, 2015, do not expressly describe a "way by which drivers can isolate, toggle off, or filter out interstate or airport trips."

144.   There is no way for drivers to not receive trip requests for trips that go to other states. Aleksanian Decl. Para. 15; Lama Decl. Para. 10.

**Response**:  Disputed.  Drivers can choose to not receive trip requests (including "trips that go to other states") by not logging in to Uber's platform.  Perl Second Declaration-¶6; Soleimany Declaration. Ex. I (video entitled "How to Use the Uber Partner App," which explains that "once you are online, you will start to receive trip requests, so don't go online if you're not ready to drive").  The cited evidence (Plaintiffs' declarations) concerning Plaintiffs' own experience does not support Plaintiffs' statement concerning "drivers" generally.

145.   There is no way for drivers to not receive trips that go to airports. Aleksanian Decl. Para. 16; Lama Decl. Para. 10.

**Response**:  Disputed.  Drivers can choose to not receive trip requests (including "trips that go to airports") by not logging in to Uber's platform.  Perl Second Declaration-¶6; Soleimany Declaration. Ex. I (video entitled "How to Use the Uber Partner App," which explains that "once you are online, you will start to receive trip requests, so don't go online if you're not ready to

drive"). The cited evidence (Plaintiffs' declarations) concerning Plaintiffs' own experience does not support Plaintiffs' statement concerning "drivers" generally.

146. The TSA notes that drivers would not be provided the passenger's destination until pick-up, either in the app or provided by the passenger. TSA §2.3.

**Response**: Undisputed to the extent that Plaintiffs meant to reference TSA § 2.2 instead of TSA §2.3.

147. Uber did not require passengers to enter a destination into the app until October 2016. Soleimany Decl., Ex. G, ALEKSANIAN-PLAINTIFFS_00000842-00000851 (UI Transcript, Apr. 24, 2018).

**Response**: Disputed. The cited evidence does not support Plaintiffs' vague statement, including without limitation because there is no context for the reference to "enter[ing] a destination." It is undisputed that Soleimany Declaration Ex. G reflects an excerpt of April 24, 2018 testimony from Uber Senior Operations Manager Chad Dobbs before the New York State Insurance Appeal Board, in which Mr. Dobbs testified that "in probably October or November of 2016, the app completely changed and at that point, the rider was forced to enter the destination prior to requesting the trip." ALEKSANIAN PLAINTIFFS000844.

148. Uber drivers do not know the destination before they accept a trip request. Soleimany Decl. Exs. H, I, K.; TSA § 2.3.

**Response**: Disputed. The cited evidence does not support Plaintiffs' statement concerning what drivers "know."

149. Uber drivers do not learn the destination of a trip after they accept a trip request.

**Response**: Disputed. Plaintiffs offer no support for their statement, including what drivers "learn." Uber drivers have access to the drop-off location when they click "begin trip," which

occurs after the trip is accepted. *See* Soleimany Declaration Ex. K at UBER-ALEKSANIAN_00005666.

150.    Earlier in Uber's operations, until around 2015, Uber drivers only learned the destination once the passenger entered the car and informed the driver of their destination. TSA, Dkt. 132-2 at § 2.2, UBER-ALEKSANIAN_00006032 (describing destination as received in app or in person from the passenger); Soleimany Decl. Ex. G, Transcript of the Unemployment Insurance Appeal Board (Apr. 24, 2018), at Aleksanian Plaintiffs000842-000849, (Testimony of Uber Senior Operations & Logistics Manager Chad Dobbs describes times when passengers could not enter destination information; such information not required to be entered until 2016). *See also* Onboarding Video, attached as Ex. I to the Soleimany Decl.; UberPOOL Onboarding Video, attached as Ex. H to the Soleimany Decl; Soleimany Decl., Ex. J, Aug. 1. Parties' Stipulation regarding videos (noting that such the videos in Exs. H and I reflect how drivers would use the Uber app "anywhere in the United States"). *See also* Soleimany Decl. Ex. K, "Partner Guide," at UBER-ALEKSANIAN00005666. *See* Aleksanian Decl. Para. 24.

**Response**: Disputed.  The cited evidence does not support Plaintiffs' statement.  Perl Declaration Ex. B at UBER-ALEKSANIAN_00006032 and Soleimany Declaration Ex. G at ALEKSANIAN PLAINTIFFS000847 provide that a driver does receive a pick-up location from Uber's platform.

151.    Uber decided not to provide passengers' destination information earlier because Uber was concerned that doing so would give drivers the ability to destination discriminate. Soleimany Decl. Ex. G, at Aleksanian Plaintiffs000848.

**Response**: Disputed.  The cited evidence does not support Plaintiffs' vague statement, including without limitation because there is no context for their reference to "earlier."  It is

undisputed that Soleimany Declaration Ex. G reflects an excerpt of the April 24, 2018 testimony from Uber Senior Operations Manager Chad Dobbs before the New York State Insurance Appeal Board, in which Mr. Dobbs testified that "there was a concern that if we were to service the destination information at the point of time that a driver is accepting or rejecting a trip request, that it would give the driver the ability to destination discriminate." ALEKSANIAN PLAINTIFFS000848.

152.    Once the Uber app was updated to allow passengers to enter their destination in advance, Uber drivers would only learn of a trip's destination when the trip began. During the first few years of the relevant time period, the app variously  did not permit and later did not require passengers to input their destination into the Uber app when requesting a trip. TSA, Dkt. 132-2 at § 2.2, UBER-ALEKSANIAN_00006032 (describing destination as received in app or in person from the passenger); Soleimany Decl. Ex. G, Transcript of the Unemployment Insurance Appeal Board (Apr. 24, 2018), at Aleksanian Plaintiffs000842-000849,  (Testimony of Uber Senior Operations & Logistics Manager Chad Dobbs describes times when passengers could not enter destination information; such information not required to be entered until 2016).  *See also* Onboarding Video, attached as Ex. I to the Soleimany Decl.; UberPOOL Onboarding Video, attached as Ex. H to the Soleimany Decl; Soleimany Decl., Ex. J,  Aug. 1. Parties' Stipulation regarding videos (noting that such the videos in Exs. H and I reflect how drivers would use the Uber app "anywhere in the United States"). *See also* Soleimany Decl. Ex. K, "Partner Guide," at UBER-ALEKSANIAN00005666.

**Response**: Disputed.  Plaintiffs cite no evidence to support the statement that "[o]nce the Uber app was updated to allow passengers to enter their destination in advance, Uber drivers would only learn of a trip's destination when the trip began."  That statement is also vague and

30

incomprehensible, particularly to the extent there is no context for their reference to "in advance." The cited evidence does not support Plaintiffs' vague statement that "[d]uring the first few years of the relevant time period, the app variously did not permit and later did not require passengers to input their destination into the Uber app when requesting a trip," including without limitation the time period.  It is undisputed that Soleimany Declaration Ex. G reflects an excerpt of April 24, 2018 testimony from Uber Senior Operations Manager Chad Dobbs before the New York State Insurance Appeal Board, in which Mr. Dobbs testified that "in probably October or November of 2016, the app completely changed and at that point, the rider was forced to enter the destination prior to requesting the trip."    Soleimany Declaration Ex. G at ALEKSANIAN PLAINTIFFS000844.

153.    As drivers did not see the passenger's destination until the passenger had arrived, the only way to have refused any trip on the basis of its destination would have been to cancel a trip upon the passenger's arrival and remove the passenger from the vehicle. *See* Aleksanian Decl. Para. 24.

**Response**: Disputed.  The cited evidence does not support Plaintiffs' vague statement that "[a]s drivers did not see the passenger's destination until the passenger had arrived, the only way to have refused any trip on the basis of its destination would have been to cancel a trip upon the passenger's arrival and remove the passenger from the vehicle," including, but not limited to, the term "arrival."  The record evidence confirms that, as of the date the video was created, drivers had access to a rider's destination once the rider entered the vehicle and the driver "slid[] the button to begin the trip."  Soleimany Declaration. Ex. I, UBER-ALEKSANIAN_00005583 at 2:18.  The cited evidence (Plaintiff Aleksanian's declaration) concerning one Plaintiff's own experience does not support Plaintiffs' statement concerning "drivers" generally.

31

**UBER'S AIRPORT OPERATIONS**

154.    Uber's public-facing advertising consistently emphasizes the availability of airport service. Soleimany Decl. Ex. L, at UBER-ALEKSANIAN_02660; Ex. M, UBER-ALEKSANIAN_00002663-00002670.

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' statement. Soleimany Declaration Exs. L and M reflect historical versions of Uber's city webpages for New York City and New Jersey, respectively.  The cited evidence does not support Plaintiffs' statement that Soleimany Declaration Exs. L and M are "public-facing advertising."  Soleimany Declaration Exs. L and M reflect historical versions of Uber's informational city webpages for New York City and New Jersey, respectively.  The cited evidence also does not support Plaintiffs' statement that Uber "consistently emphasizes the availability of airport service."  The cited evidence simply contains directions regarding pickup logistics at nearby airports and does not "emphasize[] the availability of airport service."  The cited evidence also does not support Plaintiffs' statement that Uber "consistently" highlights the availability of airport service, when the cited evidence reflects merely two instances in which Uber discusses the availability of airport service.  Also disputed to the extent that Soleimany Declaration Exs. L and M reflect documents dated in 2021, which is outside the relevant "time period between 2013 and 2019."  SUF-Intro.

155.    At a nationwide level, Uber e-mails its  customers that Uber is "available 24/7 from 600+ airports." Soleimany Decl. Ex. DD, at ALEKSANIAN-UBER00005814.

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' vague and incomprehensible statement, including but not limited to the time period and phrase "[a]t a nationwide level."  It is undisputed that Soleimany Declaration Ex. DD reflects a single email communication stating that Uber is "[a]vailable 24/7 from 600+ airports."

32

156.    Airport operations are crucial to Uber's business generally; Uber's 2019 SEC Form S-1 states " *We generate a significant percentage of our Gross Bookings from trips in large metropolitan areas and trips to and from airports. If our operations in large metropolitan areas or ability to provide trips to and from airports are negatively affected, our financial results and future prospects would be adversely impacted.*" (Emphasis original). Soleimany Decl., Ex. T, at Aleksanian Plaintiffs001363. ██████████████████████████████

██████  Soleimany Decl., Ex. A, at 17.

**Response**: Disputed. The cited evidence does not support Plaintiffs' vague statement that "[a]irport operations are crucial to Uber's business generally," including but not limited to the term "crucial." It is undisputed that Soleimany Declaration. Ex. T reflects Uber's Form S-1, filed with the Securities and Exchange Commission on April 11, 2019, which contains the language reproduced in Plaintiffs' statement. ██████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

157.    Uber maintains agreements "with most major airports" in order to operate within airport boundaries, stating "[w]e have entered into agreements with most major U.S. airports … to allow the use of our platform within airport boundaries" and that Uber established a customer rewards program "aimed at increasing usage" of Uber that created "priority pickups at airports." Soleimany Decl. Ex T, at Aleksanian Plaintiffs001364.

**Response**: Disputed. The cited evidence does not support Plaintiffs' statement that "Uber established a customer rewards program 'aimed at increasing usage' of Uber that created 'priority pickups at airports.'" The cited document states that the referenced rewards program can be "spent on" several customer perks, including but not limited to priority pickup at airports. Soleimany

Declaration Ex. T at ALEKSANIAN PLAINTIFFS001483. It is undisputed that the cited document states that Uber "entered into agreements with most major U.S. airports as well as certain airports outside the United States to allow the use of our platform within airport boundaries." *Id.* at ALEKSANIAN PLAINTIFFS001364.

158. ███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

**Response**: Undisputed ████████████████████████

████████████████████████████ and (b) "for the purpose of its dispatched vehicles dropping off and picking up passengers" refers to "dictate… guidelines for picking up and dropping off riders (*e.g.*, designated pick-up areas)," as articulated in the Declaration of Rachel Perl, dated August 29, 2025 (Dkt. 132) ("Perl Declaration") ¶20. These operating agreements do not require drivers to accept trips to or from select airports. *Id.*-¶21. These agreements do not require riders to use Uber's Rides platform to travel to or from select airports. *Id.*

159. ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████

**Response**: Disputed. ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

35

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

160.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

**Response**: Disputed. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

161.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██

**Response**: Undisputed █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

35

162. ██████████████████████████████████

**Response**: Disputed. █████████████████████████

36

163. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**Response**: Undisputed ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

164.    Airlines can contract directly with Uber to provide transportation services for their passengers and crew. Soleimany Decl. Ex. JJ, Aleksanian Plaintiffs000316-000317; Aleksanian Plaintiffs; Soleimany Decl. Ex. KK, Aleksanian Plaintiffs.

**Response**: Disputed to the extent that Soleimany Declaration Ex. KK reflects a document dated within the last two years, ALEKSANIAN-PLAINTIFFS000001, which is outside the relevant "time period between 2013 and 2019."  SUF-Intro.

165. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

**Response**: Disputed. ██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

[REDACTED]

166.    Uber markets its ability for passengers to reserve trips from airports, integrating their flight information into the Uber app, and adjusting riders' reservations for Uber rides by tracking flight data. Soleimany Decl., Ex. MM, at ALEKSANIAN PLAINTIFFS000318.

**Response**:  Disputed.  The cited evidence does not support Plaintiff's vague statement that "Uber markets its ability for passengers" to perform a variety of functions, including "integrating their flight information into the Uber app."  It is undisputed that Soleimany Declaration Ex. MM reflects an Uber newsroom article about airport travel, which states that passengers may reserve trips from airports and provide Uber with flight information, which Uber can use to adjust a passenger's reservation so that a driver is waiting at the airport when he or she lands.  *Id.* at ALEKSANIAN_PLAINTIFFS000319.   Disputed as to Plaintiffs' characterization that this document allows riders to "integrat[e] their flight information into the Uber app."

167.    In the New York area, Uber often requires drivers to wait in specified lots at airports before they can receive trips from airports. Soleimany Decl. Ex. NN, at UBER-ALEKSANIAN_00006067,    UBER-ALEKSANIAN_00006072,    UBER-ALEKSANIAN_00006079.

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' vague statement, including without limitation the phrase "in the New York area" and the term "often."  Soleimany Declaration Ex. NN reflects a compilation of informational webpages about picking up riders at John F. Kennedy, LaGuardia, and Newark International Airports, and none of those webpages

address the frequency with which drivers must "wait in specified lots."  The cited evidence also does not support Plaintiffs' statement that it is *Uber* who "requires" drivers to wait in specified lots. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████

168.    Uber's guidelines for waiting in New York area lots, as reflected in Soleimany Decl. Ex. NN are representative of Uber's guidelines for airport hold lots in airports throughout the U.S. *See* Soleimany Decl. Ex. D, at 7.

**Response**:  Undisputed to the extent that (a) "Uber's guidelines for waiting in New York area lots" refers only to Soleimany Declaration Ex. NN, and (b) "Uber's guidelines for airport hold lots in airports throughout the U.S." is meant to refer to "Uber's guidelines between 2013-2019 (if any) regarding Drivers' use of holding lots and/or virtual queues to pick up riders at airports nationwide that used holding lots and/or virtual queues," as articulated in Soleimany Declaration. Ex. D at 7.

169.    Drivers cannot typically complete trips from airports without first waiting in these lots, as directed by Uber. Soleimany Decl. Ex. NN; Lama Decl. Ex. 18.

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' vague statement, including without limitation the terms "typically" and "these lots."  The cited evidence does not support Plaintiffs' statement that drivers "cannot typically complete trips from airports without first waiting" in a lot.  Soleimany Declaration Ex. NN reflects a compilation of informational webpages about driving at John F. Kennedy, LaGuardia, and Newark International Airports, and does not discuss the frequency with which drivers must wait in specified lots before completing a

trip from the airport. The cited evidence also does not support Plaintiffs' statement that drivers must wait in lots "as directed by Uber."



The cited evidence (Plaintiff Lama's Declaration) concerning one Plaintiff's own experiences does not support Plaintiffs' statement concerning "[d]rivers" generally.

**Standard Treatment of Outlier Drivers and Workers in Assessing Industry-Wide Data**

170. A National Bureau of Economic Research study on the habits of Uber drivers, co-authored by an Uber employee and shareholder, using data that Uber contracted for, looked only at those drivers who performed at least four trips per month. Soleimany Decl. Ex. OO, Hall and Krueger (Nov. 2016), at Aleksanian Plaintiff004586-004588.

**Response**: Disputed. Plaintiffs' statement is misleading to the extent that Plaintiffs suggest that Uber reviewed or endorsed the referenced working paper. The cited document explicitly disclaims that "[t]he views expressed herein are those of the authors." Soleimany Declaration Ex. OO at ALEKSANIAN PLAINTIFF004586. Plaintiffs' statement is also misleading to the extent that Plaintiffs' use of the phrase "Uber drivers" suggests any employment relationship between Uber and the individuals who contract to use its platform. Plaintiffs' statement is also misleading to the extent that Plaintiffs suggest that the referenced working paper is based entirely or exclusively on "data that Uber contracted for." It is undisputed that Soleimany Declaration Ex. OO reflects a working paper by the National Bureau of Economic Research that (a) incorporated data from a web survey that Uber contracted with the Benson Survey Group to conduct in December 2014; (b) defined "active" drivers using Uber's platform as those who

40

"provided at least four trips to passengers in the month"; and (c) co-author Jonathan Hall "was an employee and shareholder of Uber Technologies before, during, and after the writing of th[e] paper."  Soleimany Decl. Ex. OO at ALEKSANIAN PLAINTIFF004586, 004588.

171.    In another NBER study concerning Uber drivers, in which Uber had the right to review the paper "to confirm that confidential information is being represented in a non-misleading fashion," the data set was limited to only drivers who were active for an hour in at least 16 weeks out of a 36-week period, or the equivalent of at least 23.1 hours in a 52-week period. Soleimany Decl. Ex. PP, Aleksanian Plaintiff00462-00469, at 004622;  004630.

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' statement that 16 weeks out of a 36-week period equates to 23.1 hours in a 52-week period.  Plaintiffs' statement is also misleading to the extent that Plaintiffs' use of the phrase "Uber drivers" suggests any employment relationship between Uber and the individuals who contract to use its platform.  It is undisputed that Soleimany Declaration Ex. PP reflects a working paper by NBER, which (a) states that "Uber has the right to review the paper 'solely to confirm that confidential information is being represented in a non-misleading fashion' but not to dispute or influence the findings or conclusions of the paper," and (b) used a "base sample of drivers who are active at least 16 weeks during our 36 week study, but eliminate[d] drivers before their first week of activity."  *Id.* at ALEKSANIAN PLAINTIFF004622, 004630.

172.    Similarly, the U.S. Census Bureau, when analyzing rideshare drivers, under a rubric of nonemployer businesses, limits its analysis to only those workers with $1,000 or more in gross annual receipts. Soleimany Decl. Ex. QQ, at Aleksanian Plaintiff004685-004687.

**Response**:  Disputed.   The cited evidence does not support Plaintiffs' statement.  Soleimany Declaration Ex. QQ at ALEKSANIAN PLAINTIFF004686 reflects an article on

census.gov discussing the "gig economy" and states that "[n]onemployers are defined as businesses that have no paid employees, are subject to federal income tax, and have receipts of $1,000 or more."

173.     The averages described in Para. 68, *supra*, for all drivers nationwide would include drivers who do as little as one trip per year.

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' vague statement, including without limitation the term "do."  It is undisputed that the average number of interstate trips completed nationwide, as articulated in SUF-¶68, includes trips by drivers who completed at least one trip in at least one year between 2013 and 2019.

174.     The average described at Para. 77, *supra*, for all drivers nationwide would include drivers who do as little as one trip per year.

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' vague statement, including without limitation the term "do."  It is undisputed that the percentage of drivers who did not complete a single interstate trip in each year between 2013 and 2019, as articulated in SUF-¶77, includes drivers who completed at least one trip per year.  It is undisputed that "[o]n average, 76.4% of drivers who completed trips did not complete a single interstate trip in each year between 2013 and 2019."  *See* SUF-¶77.

175.     Trip data indicates that drivers who perform more trips in a year do not perform interstate and airport trips at a significantly different rate than drivers as a whole. Linfoot Decl. at Paras. 7, 19, 21.

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' vague and incomprehensible statement, including without limitation because the phrase "more trips in a year" lacks context and the phrases "significantly different" and "as a whole" are vague.  The cited

42

evidence also does not address trips to or from an airport. It is undisputed that "[b]etween 2013 and 2019, the [trip] data as applied to (i) NYC drivers, (ii) NYC drivers who completed 50+ or 1500+ trips annually, and (iii) drivers who completed 50+ or 1500+ trips annually was generally consistent with what the [trip] data reflects for drivers nationwide." Linfoot Declaration-¶15; *see also* Linfoot Declaration-¶¶7, 16, 19-28.

176. Drivers who perform 1500 trips per week would, on average, perform 28.8 trips per week.

**Response**: Disputed. Plaintiffs offer no support for this statement.

177. Between 2013 and 2019, the average length of all trips nationwide, in minutes, ranged from 15.8 to 17.3 minutes. Linfoot Decl. at Para. 14.

**Response**: Undisputed to the extent Plaintiffs meant to write 15.7 instead of 15.8. *See* Linfoot Declaration-¶14.

178. A driver who performed 28.8 trips per week, would spend, at most, 498.2 minutes a week, or 8.3 hours per week at work in on-trip time. (28.8 trips per week multiplied by the 17.3 minutes maximum average length of trip per year (Linfoot Decl. Para. 14) equals 498.2 minutes).

**Response**: Disputed. The cited evidence does not support Plaintiffs statement concerning the "on-trip time" that a hypothetical driver would spend "at most." Plaintiffs' statement mischaracterizes the evidence by multiplying a set number of trips by the average trip time nationwide in a single year (2017), *see* Linfoot Declaration-¶14, and concluding without support that a driver performing that number of trips would "spend, at most . . . 8.3 hours at work."

179. ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

**Response**: Disputed. The cited evidence does not support Plaintiffs' vague statement, including without limitation as to time period and the phrase "significant divergence." It is undisputed that the cited evidence reflects different figures.

**Enumerated Classes of Workers' Activities**

180. In 1923, 14.3% of the Southern Pacific Railroad's daily trains were interstate. Soleimany Decl., Para. 85; Soleimany Decl. Ex. RR, Part IX, Part X, and Part XI at 794-828.

**Response**: Disputed. Plaintiffs cite no comprehensible support for this statement. Additionally, Plaintiffs did not file or serve Soleimany Declaration Ex. RR, Part X as an exhibit, which is a violation of Local ECF Rule Section 5. Uber also objects to the use of this document, which Plaintiffs did not produce in discovery despite it being responsive to Uber's request for production seeking all documents Plaintiffs intend to rely on in opposing Uber's motion to compel arbitration.[5]

181. In 1923, 44.6% of the Southern Railway System's daily trains were interstate. Soleimany Decl., Para. 86; Soleimany Decl. Ex. RR, Part VI, Part VII, and Part VIII at 462-491.

**Response**: Disputed. Plaintiffs offer no comprehensible support for this statement. Uber also objects to the use of this document at pages 482-491, which Plaintiffs did not produce in discovery despite it being responsive to Uber's request for production seeking all documents Plaintiffs intend to rely on in opposing Uber's motion to compel arbitration.

---

[5] Uber also objects to Plaintiffs' use of Soleimany Declaration Exs. E and F, which Plaintiffs did not produce in discovery even though those documents were responsive to Uber's request for production seeking all documents Plaintiffs intend to rely on in opposing Uber's motion to compel arbitration. *See* SUF-¶¶1-2-Responses, 22-Response, 32-36-Responses, 41-42-Responses.

182.     In 1923, 38.2% of the New York Central Railroad's daily trains were interstate. Soleimany Decl., Para. 87; Soleimany Decl. Ex. RR, at Part I, Part II, Part III, Part IV, Part V, and Part VI at 156-231.

**Response**:  Disputed.  Plaintiffs offer no comprehensible support for this statement.

183.     In 1923, none of the Long Island Railroad's daily trains were interstate. Soleimany Decl., Para 88; Soleimany Decl. Ex. RR, Part XII at

**Response**:  Disputed.  Plaintiffs offer no comprehensible support for this statement.  Uber also objects to the use of this document, which Plaintiffs did not produce in discovery despite it being responsive to Uber's request for production seeking all documents Plaintiffs intend to rely on in opposing Uber's motion to compel arbitration.

184.     In 2019, Amtrak provided 32.5 million trips. Soleimany Decl. Ex SS, Aleksanian Plaintiff004504-004512. Millions of these trips were intrastate. *Id* (showing millions of trips remaining with California or Pennsylvania).

**Response**:  Disputed.  The cited evidence does not support Plaintiffs' vague statement, including without limitation the phrases "Amtrak provided" and "these trips."  Additionally, Plaintiffs did not file or serve Soleimany Declaration Ex. SS as an exhibit, which is a violation of Local ECF Rule Section 5.  It is undisputed that the cited evidence (a) states that during fiscal year 2019, Amtrak customers took 32.5 million trips, (b) lists various routes within California or Pennsylvania, and (c) states that over one million riders took trips between various cities within California or Pennsylvania during fiscal year 2019.  ALEKSANIAN PLAINTIFF004507; ALEKSANIAN PLAINTIFF004510-11.

185.    At more than 33.9 million interstate trips in 2019, Uber provided millions more trips across state lines than all Amtrak trips, whether interstate or intrastate. *See* Soleimany Decl. Ex. A, at 14 (showing 33, 925, 757 interstate trips performed by Uber nationwide in 2019).

**Response**: Disputed. The cited evidence does not support Plaintiffs' vague statement. It is undisputed that drivers using Uber's platform nationwide completed 33,925,757 interstate trips in 2019, as articulated in Soleimany Declaration Ex. A at 14.

186.    In 2019, Greyhound stated that it transported 16 million passengers a year. Soleimany Decl. Ex TT, at Aleksanian Plaintiff004503.

**Response**: Disputed. The cited evidence does not support Plaintiffs' vague statement, including without limitation the phrase "transported." Plaintiffs did not file or serve Soleimany Declaration Ex. TT as an exhibit, which is a violation of Local ECF Rule Section 5. It is undisputed that the cited evidence lists "16 million passengers a year" as a "Key Corporate Fact[]." ALEKSANIAN PLAINTIFF004503.

187.    At more than 33.9 million interstate trips in 2019, Uber provided more trips across state lines than all Greyhound bus trips. *See* Soleimany Decl. Ex. A, at 14; Soleimany Decl., Ex. TT, at Aleksanain Plaintiff004503.

**Response**: Disputed. The cited evidence does not support Plaintiffs' vague statement, including without limitation the phrases "Uber provided" and "all Greyhound bus trips." Plaintiffs did not file or serve Soleimany Declaration Ex. TT as an exhibit, which is a violation of Local ECF Rule Section 5. It is undisputed that drivers using Uber's platform nationwide completed 33,925,757 interstate trips in 2019, as articulated in Soleimany Declaration Ex. A at 14.

188.    In 1925, government reports indicated that 49% percent of trips on Class I railroads (those with the highest level of revenue), occurred on commuter railroads, an inherently local form

of travel. Soleimany Decl. Ex. UU, William J. Cunningham, Committee on Recent Economic Changes of the President's Conference on Unemployment, RECENT ECONOMIC CHANGES IN THE UNITED STATES (1929), at 278, available at https://www.nber.org/system/files/chapters/c4957/c4957.pdf, attached hereto as Exhibit UU to the Soleimany Decl.

**Response**: Disputed. The cited evidence does not support Plaintiffs' vague statement. Plaintiffs did not file or serve Soleimany Declaration Ex. UU as an exhibit, which is a violation of Local ECF Rule Section 5. It is undisputed that the cited evidence contains a table stating that in 1925, 49% *of passengers* on Class I railways were commuter passengers, and 18% *of passenger-miles* were commuter passenger-miles. Crain Declaration Ex. I at ALEKSANIAN PLAINTIFF04713 (referenced by Plaintiffs available at https://www.nber.org/system/files/chapters/c4957/c4957.pdf). The cited evidence does not describe commuter railroads as "an inherently local form of travel." In any event, statistics regarding the percentage of passengers that were commuter passengers are misleading because passenger service made up only a small fraction of railway service. Soleimany Decl. Ex. UU reflects that in 1925, 74.2% of revenue came from freight service, and only 17.3% came from passenger service (the rest was "other"). *Id.* at ALEKSANIAN PLAINTIFF004728.

189. In 1926, almost all passenger trips on boats– 93.1%-- were taken on ferries. Department of Commerce, U.S. Bureau of the Census, WATER TRANSPORTATION 1926 (1929), at 124, available at https://books.google.com/books?id=JUgnAQAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false (Date accessed: Oct. 6, 2025). *See also, id* (showing, in, 1916, 88.1% of all passenger boat trips taking place on ferries).

**Response**: Disputed. The cited evidence does not support plaintiffs' vague statement, including without limitation the term "almost all." It is undisputed that the cited evidence states that in 1926, 93.1% of passengers who traveled using American vessels were "carried in ferryboats." Crain Declaration Ex. J at 124 (referenced by Plaintiffs, available at https://books.google.com/books?id=JUgnAQAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false). In any event, Plaintiffs' cited report demonstrates that only 456 out of 12,878 recorded "seamen" were "short-haul" ferryboat workers, whereas the majority (12,422) were freight- and passenger-vessel workers. *Id.* at 40, 101. Additionally, Plaintiffs did not file or serve this document as an exhibit, which is a violation of Local ECF Rule Section 5. Uber also objects to the use of this document, which Plaintiffs did not produce in discovery despite it being responsive to Uber's request for production seeking all documents Plaintiffs intend to rely on in opposing Uber's motion to compel arbitration.

190. In 1925, when the FAA was passed, no road crossings connected New York City and New Jersey. Soleimany Decl. Ex. VV, *Bridges and Tunnel History*, Port Authority of New York and New Jersey, available at https://www.panynj.gov/port-authority/en/about/History/bridges-and-tunnels-history-about.html (Last Accessed: Oct. 6, 2025) (Describing the Holland Tunnel, Built in 1927, as the first Hudson River crossing in New York City).

**Response**: Disputed. The cited evidence does not support Plaintiffs' vague statement, including without limitation the term "road crossing." Additionally, Plaintiffs did not file or serve this document as an exhibit, which is a violation of Local ECF Rule Section 5. Uber also objects to the use of this document, which Plaintiffs did not produce in discovery despite it being responsive to Uber's request for production seeking all documents Plaintiffs intend to rely on in

opposing Uber's motion to compel arbitration.  It is undisputed that the cited evidence describes the Holland Tunnel as "the first Hudson River crossing in New York City."

Dated: December 18, 2025
       New York, New York

Respectfully submitted,

*/s/ Theane Evangelis*
Theane Evangelis

Theane Evangelis
Heather Lynn Richardson
Samuel Eckman
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071
Telephone:  (213) 229-7000
tevangelis@gibsondunn.com
hrichardson@gibsondunn.com
seckman@gibsondunn.com

Lee R. Crain
Hayley H. Fritchie
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
 New York, NY 10166-0193
Telephone:  (212) 351-4000
lcrain@gibsondunn.com
hfritchie@gibsondunn.com

Blaine Evanson
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone:  (949) 451-3805
bevanson@gibsondunn.com

*Attorneys for Defendants*