UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- ------------------------------------------------------------------------------- x

LEVON ALEKSANIAN, SONAM LAMA, HARJIT KHATRA,
and, Individually, On Behalf of All Others Similarly Situated, and
as Class Representatives,

                                                 Case No.
                                                 1:19-cv-10308-ALC

                             Plaintiffs,

     -Against-

UBER TECHNOLOGIES, INC., UBER LOGISTIK, LLC, UBER
USA LLC, jointly and severally,

                             Defendants.

- ------------------------------------------------------------------------------- x

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION (CORRECTED)

---

ZUBIN SOLEIMANY, Esq
New York Taxi Workers Alliance
31-10 37th Ave. Ste. 300
Long Island City, NY 11101
(718) 706-9892
Attorney for Plaintiffs

JEANNE E. MIRER, Esq.
RIA JULIEN, Esq.
 Julien Mirer & Associates, PLLC
300 Cadman Plaza W, 12th Floor
Brooklyn, NY 11201
(212) 231-2235
Attorneys for Plaintiffs

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

PRELIMINARY STATEMENT............................................................................................2

STATEMENT OF FACTS ....................................................................................................3

ARGUMENT ....................................................................................................................... 8

I. RIDESHARE DRIVERS ARE EXEMPT FROM THE FAA......................................................8

    A.  Rideshare Drivers As Nationwide and New York City Class Are "Directly Involved" in Interstate Commerce As They Regularly Cross State Lines............................................... 8

        a.  The Residual Exemption Applies to Transportation Workers Engaged In Interstate Commerce, Without Further Qualification ............................................................ 10

        b.  The Percentage of Uber Drivers Who Actually Perform Interstate Trips Is Significant And Similar to That of Other Workers Enumerated in Section 1 ....... 14

        c.  Rideshare Drivers Regularly Perform Interstate Trips Such That They Can Reasonably Expect To Perform Interstate Work ...................................................... 15

        d.  Drivers Must Perform Interstate Trips The Same As Other Trips, or Face Discipline For Refusal Based On Destination Discrimination ................................................ 17

    B.  Uber's "Fundamentally Local" Standard Disregards The Plain Meaning of §1 ............... 19

        a.  Uber's "Fundamentally Local" Standard Does Not Comport With the Text of Section 1...................................................................................................................... 19

        b.  Uber's Proposal that Interstate Commerce Must Be Long-Distance Imposes an Ahistorical Gloss on §1 .............................................................................................. 24

    C.  Uber Drivers Engage In Interstate Commerce Through Transportation To Airports ....... 24

        a.  *Saxon*'s Treatment of Wharfage Makes Clear that, under the FAA, Uber's Airport Trips Are In Interstate Commerce........................................................................... 25

        b.  Uber Drivers' Airport Trips Are A Significant Portion Of Their Job ................... 27

II. THE AGREEMENT IS A CONTRACT OF EMPLOYMENT ............................................... 29

III. ABSENT THE FAA'S APPLICABILITY, THE CONTRACT'S CHOICE-OF-FAA PROVISION CONTROLS AND CANNOT BE CONTRAVENED BY STATE LAW............ 30

A. The Parties' Choice-Of-Law Controls; The Parties Agreed to Arbitration Governed by the FAA, or Not At All ................................................................................31

    a. Uber's Contract Selects The FAA As The Exclusive Law Governing The Arbitration Provision ............................................................................31

    b. No Other Law Can Be Applied To Contravene An Extant Choice-Of-FAA Provision ....................................................................................34

    c. Severing The Choice-Of-FAA Provision Is A Prerequisite To Applying Another Law......................................................................................35

    d. The Contract Does Not Allow for Severance Simply Because the FAA Does Not Apply....................................................................................... 36

B. Plaintiffs' Claims Cannot Be Arbitrated Even If New York Law Applied.................37

    a. NYLL Claims Cannot Be Compelled To Arbitration Under NY Law ................. 37

    b. The Arbitration Provision Is Null And Void Under CPLR §7515........................38

    c. New York Public Policy Weighs Against Enforcing The Class Waiver ............... 39

CONCLUSION ....................................................................................................... 40

# TABLE OF AUTHORITIES

Cases                                                                                                    Page(s)

*67 Wall St. Co. v. Franklin Nat'l Bank*,
37 N.Y.2d 245 (1975) ...............................................................................................35

*Aimcee Wholesale Corp. v. Tomar Prods., Inc.*, 21 N.Y.2d 621 (1968).....................................37

*Aleksanian v. Uber Techs. Inc.*,
No. 22-98-cv, 2023 U.S. App. LEXIS 30196 (2d Cir. Nov. 14, 2023) ......................................1, 3

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995)................................................................................................ 32

*AT&T Mobility LLC v. Concepcion*,
 563 U.S. 333 (2011)................................................................................................ 32

*Bailey v. Fish & Neave*,
2007 NY Slip Op 3958, 8 N.Y.3d 523 (2007) .............................................................. 34

*Bensadoun v. Jobe-Riat,*
316 F.3d 171 (2d Cir. 2003)....................................................................................... 1

*Bissonnette v. LePage Bakeries Park St., LLC*,
123 F.4th 103 (2d Cir. 2024), *vacated and remanded,* 601 U.S. 246 (2024)................................9

*Baltimore & O.R. Co. v. U.S.*,
201 F.2d 795, 796 (3d Cir. 1953)................................................................................ 27

*BP p.l.c. v. Mayor of Baltimore*,
593 US (2021)........................................................................................................ 24

*Brady v. Williams Capital Group, L.P.,*
14 N.Y.3d 459  (2010) .............................................................................................39

*Brod v. Omya, Inc.*,
653 F.3d 156 (2d Cir. 2011)........................................................................................ 2

*Brown & Brown v. Johnson*,
25 N.Y. 3d 364 (2015) ..............................................................................................37

i

*Burgos v. Northeast Logistics*,
2017 WL 10187756 (E.D.NY. Mar. 30, 2017) .............................................................. 12

*Burke v. PricewaterhouseCoopers LLP Long Term Disability Plan*,
572 F.3d 76 (2d Cir. 2009)........................................................................................34

*Capriole v. Uber Techs., Inc.*,
7 F.4th 854 (9th Cir. 2021) ...........................................................................20, 21, 23

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) ................................................................................ 8, 16, 23, 24

*Coleman v. Oakland*,
110 Cal. App. 715 (Ct. App. 1st Dist. 1930)..................................................................26

*Cooper v. Bruckner,*
21 A.D.3d 758  (1st Dep't 2005) ...............................................................................31

*Cunningham v. Lyft, Inc.*,
17 F.4th 244 (1st Cir. 2021)..................................................................................... 14

*Diaz v. Mich. Logistics Inc.,*
167 F. Supp. 3d 375 (E.D.N.Y. 2016)..........................................................................36

*Dysart v. St. Louis*,
321 Mo. 514 (1928) ................................................................................................27

*Employers Liability Cases*,
207 U.S. 463 (1908).............................................................................................. 22

*Ex Parte Easton*,
95 U.S. 68 (1887)................................................................................................. 27

*Fletcher v. Kidder, Peabody, & Co.,*
81 N.Y.2d 263 (1993) .............................................................................................38

*Gilmer v Interstate/Johnson Lane Corp.*
500 U.S. 20.........................................................................................................38

*Gonzalez v. Lyft*

2020 WL 7183573 (D. N.J. Oct. 13, 2020), *adopted*, 2021 WL 303024 (D. N.J. Jan. 29, 2021) ................................................................................................................................13

*Griswold v. Webb*,
16 R.I. 649 (1889) .....................................................................................................................27

*Haider v. Lyft, Inc.*,
2021 WL 1226442 (S.D.N.Y. Mar. 31, 2021) .....................................................................passim

*Harris v. Shearson Hayden Stone, Inc.*,
82 A.D.2d 87 (1st Dep't 1981), aff'd, 56 N.Y.2d 627 (1982) ........................................................39

*Hill v. Rent-a-Center*,
398 F.3d 1286 (11th Cir. 2005)......................................................................................................21

*Howard v. Ill. C. R. Co*
148 F. 997 (C.C. W.D. Tenn. 1907)...............................................................................................22

*International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*,
702 F.3d 954  (7th Cir. 2012)..........................................................................9, 11 14, 20, 21

*Islam v. Lyft, Inc.*,
524 F. Supp. 3d at 338 (S.D.N.Y. 2021)..................................................................... 10, 11, 13, 14

*Katel Ltd. Liab. Co. v. AT&T Corp.*,
607 F.3d 60  (2d Cir. 2010)........................................................................................... 34

*Kennedy v. Equity Transp. Co.*,
2015 U.S. Dist. LEXIS 143565 (N.D.N.Y. Oct. 22, 2015).......................................................9, 15

*Marshall v. Victoria Transp. Co.*,
 603 F.2d 1122 (5th Cir. 1979).....................................................................................................28

*Matter of Lowry*,
189 A.D.3d 1863 (3d Dep't 2020), lv. denied Matter of Lowry, 37 N.Y.3d 1045 (2021) .........30

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Benjamin*,
1 A.D.3d 39 ................................................................................................................... 31

*Morris v. McComb*,
332 U.S. 422 (1947)................................................................................................ 9, 14, 16, 18

*Motorola Credit Corp. v. Uzan,*
388 F.3d 39 (2d Cir. 2004)..................................................................................................33, 36

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019) ............................................................................... 2, 9, 30, 31, 32

*Newton v. LVMH Moët Hennessy,*
192 A.D.3d 540 (1st Dep't 2021)...................................................................................38

*Osvatics v. Lyft, Inc.,*
535 F. Supp. 3d 1 (D.D.C. 2021) ............................................................................. 21

*Rittmann v. Amazon.com, Inc.*
971 F.3d 904 (9th Cir. 2020)....................................................................33, 35, 36, 37

*Rodgers-Rouzier v. Am. Queen Steamboat Operating Co., LLC*,
104 F.4th 978 (7th Cir. 2024) .........................................................................................37

*Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
85 N.Y.2d 173 (1995) ................................................................................................... 33

*Sw. Airlines Co. v. Saxon*,
596 U.S. 450 (2022) ................................................................................... 2, 9, 11

*SCR Joint Venture L.P. v. Warshawsky*,
559 F.3d 133 (2d Cir. 2009)..............................................................................................1

*Senno v. Elmsford Union Free Sch. Dist.,*
812 F. Supp. 2d 454 (S.D.N.Y. 2011)..............................................................................1

*Smith v. Allstate Power Vac Inc.*,
482 F. Supp. 3d 40(E.D.N.Y. 2020)........................................................................... 13

*Stegemann v. Price,*
2023 WL 218577 (2d Cir. 2023)....................................................................................30

*Terwiliger v. Terwiliger,*
206 F.3d 240 (2d Cir. 2000)...........................................................................................32

*The Brooklyn*

46 F.132 (S.D.N.Y. 1891) ................................................................................................. 27

*U.S. v. Hubbard,*
266 U.S. 474 (1925) ........................................................................................................ 22

*U.S. v. Quintieri,*
 306 F.3d 1217, 1225 (2d Cir. 2002) ............................................................................... 30

*United States v. Yellow Cab Co.,*
332 U.S. 218 (1947) ................................................................................................. *passim*

*Valdes v. Swift,*
292 F. Supp. 2d 524 (S.D.N.Y. 2003) ............................................................................ 36

*Waithaka v. Amazon.com, Inc.,*
966 F.3d 10 .................................................................................................................... 25

*Wallace v. Grubhub Holdings, Inc.,*
970 F.3d 798 (7th Cir. 2020) .................................................................................... 12, 21

*Weinstein v. McKenzie,*
177 Misc. 451 (Sup. Ct. N.Y. Co. 1941) ....................................................................... 27

*Wertheim & Co. v. Halpert,*
48 N.Y.2d 681 (1979) ............................................................................................... 38, 39

*Woods v. Empire Health Choice, Inc.,*
574 F.3d 92  (2d Cir. 2009) ............................................................................................ 20

## Statutes

49 Stat. 543, Motor Carrier Act ..................................................................................... 23
9 U.S.C. § 1 ...................................................................................................................... 8
9 U.S.C. § 4 ............................................................................................................... 32, 35

## Rules

C.P.L.R. 7515 .................................................................................................................. 39

**INTRODUCTION**

This matter is before the Court on remand from the Second Circuit. The Court determined that discovery was required to rule on the applicability of the Section 1 exemption of the FAA to Plaintiffs. Courts have applied different "tests" to determine engagement in interstate commerce. Regardless of the test applied, the Circuit Court found discovery was necessary. While the Circuit noted that Uber had provided some data to the district court regarding the average time and length of Uber trips and the percentage of trips that crossed state lines, the Circuit stated that such information "would be insufficient to resolve the inquiry in this case." App. Dkt. 88, at 9. Contrary to Defendants' suggestion, no part of the district court's decision, or reasoning was affirmed by the Circuit. It was entirely vacated. *Aleksanian v. Uber Techs. Inc.*, No. 22-98-cv, 2023 U.S. App. LEXIS 30196, at *9 (2d Cir. Nov. 14, 2023).

As set forth herein, and in the accompanying counterstatement of facts and responses to Defendants' statement of purportedly undisputed facts, the evidence adduced through discovery supports Plaintiffs' claims that they are part of a class of workers engaged in interstate commerce and exempt from the FAA.

**LEGAL STANDARD**

Courts deciding motions to compel "apply a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). Summary judgment is only appropriate where "the movant shows that there is no genuine dispute as to any material fact." FRCP 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) ). A fact is "material" if it might affect the outcome

1

of the litigation under the governing law. *Id*. In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

## PRELIMINARY STATEMENT

In support of their motion, Defendants make three arguments: 1. That Plaintiffs are not members of a class of workers who engage in interstate commerce; 2. That the contracts at issue are not employment contracts; and 3; that Uber is entitled to arbitrate under state law even if this court finds Plaintiffs are exempt from arbitration under the FAA section 1.

As to the first issue, Plaintiffs, and drivers nationwide and in New York, as a class of workers, perform interstate trips and work in the flow of interstate commerce with such frequency that they are "directly involved in transpor[tation]…across state or international borders falls within §1's exemption." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457, (2022). This brings rideshare drivers, as a class, within the FAA's residual exemption.

Second, Uber's agreement is plainly a contract of employment, and no court has found otherwise. The Supreme Court decided this question head-on in *New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019). Third, absent the applicability of the FAA, there is no basis to compel arbitration under state law where, as here, the contract explicitly and repeatedly calls to be governed by the FAA, and forswears the potential application of alternate state law, a position taken by every other circuit court to consider arbitration agreements with similar choice-of-law provisions. Even if New York law did apply, public policy prevents Plaintiffs' claims from being compelled to arbitration.

As set forth herein, the facts and law in this case support none of Defendants' purported grounds.

2

**STATEMENT OF FACTS**

In deciding the appeal, the Second Circuit was aware that nationwide 2.72% of all trips— or every

37th Uber trip—crosses state lines. This means when drivers nationwide, on average, show up to

work for 37 trips a week (a mere 10.7 hours of on- trip time weekly), they can expect to cross state

lines on a weekly basis. In requesting the additional categories of data, the Circuit stated that the

percentage of overall trips was not dispositive stating:

> The decisions of other courts suggest that information relevant to the Section 1 inquiry
> might include: Uber's policies regarding interstate trips; the potential penalties and costs
> of declining interstate trips; Uber's revenue from interstate trips; the average number of
> interstate trips Uber drivers take over various time periods (such as a week, a month, or a
> year); the median number of interstate trips for Uber drivers over various time periods;
> what percentage of Uber drivers take interstate trips over various time periods; how often
> Uber drivers decline interstate trips; and any other relevant information. [App. Dkt. 88, at
> 8-9.]

Set forth below is the information Plaintiffs were able to obtain from Defendants as to the

suggested categories. Plaintiffs also provide the Court with other relevant information derived

from this information and other undisputed facts.

1. Uber's Policies Make Interstate Trips and Airport Trips Fully Integrated, Non-Segregable And Integral To Uber Drivers' Job.

- Uber is a transportation company, which describes its goal as "transportation as reliable as running water for everyone, everywhere." SUF ¶ 133.
- Uber describes the values of the company as "we want people to be able to get where they wanna go." SUF ¶ 134.
- Interstate trips appear to drivers in the app the same as other trips; nothing in the app indicated that drivers were receiving an interstate trip before they accepted it or arrived at the destination. SUF ¶ 141.
- Uber's training materials show no way by which drivers can isolate, toggle off, or filter out interstate or airport trips. SUF ¶ 143.
- There is no way for drivers to not receive trip requests for trips that go to other states. SUF ¶ 144.
- There is no way for drivers to not receive trips that go to airports. SUF ¶145.
- Drivers would not be provided the passenger's destination until pick-up, either in the app or provided by the passenger. SUF ¶¶146, 147.

3

- At all times Uber drivers do not know the destination before they accept a trip request and do not learn the destination of a trip until the trip itself begins until the passenger is in the car. SUF ¶¶ 148-149.
- Uber treats interstate trips as part of the normal and inseparable flow of work to be performed the same as other trips. (SUF ¶¶ 141, 143, 144).
- There are no policies uniquely applicable to Uber's interstate trips that separate them from the regular flow of work to Uber drivers. (SUF ¶138).
- Uber allows anyone standing anywhere in the contiguous United States to request a ride on Uber's platform to be transported to anywhere else in the contiguous United States. (SUF ¶¶131, 140).

2. Uber's Business Model and Advertising Touts Its Interstate Trip Capability To Riders

- In the New York City market, Uber advertises that trips may last as long as four hours. SUF ¶ 130.
- In other markets, Uber's advertising contains no such limitations on the length of trips. SUF ¶ 131.
- Uber's public-facing advertising specifically advertises trips to other states, noting a $20 surcharge on all trips to New Jersey from New York City. SUF ¶ 132.
- Nationwide, Uber advertises its services as the "best way" to get from specific locations in one state to another, in regions throughout the country. SUF ¶ 135.

3. Costs And Penalties To The Driver For Declining Interstate Trips/ Rate Of Declination Of Interstate Trips Or Airport Trips

- Uber's policy is that drivers who refuse a passenger based on where they are going can be subject to termination or "deactivation." SUF ¶ 136. This is deemed "destination discrimination" SUF ¶ 136-138.
- Uber's "Community Guidelines" document states "It is unacceptable to refuse to provide services based on where someone is going [....] Actions like these will result in permanent deactivation of your account." This policy contains no exception for trips that cross state lines. This policy contains no exception for trips that go to airports. SUF ¶ 138.

Defendants did not have or provide data which would show a declination of a trip due to being interstate.

4. Uber's Revenue from Interstate Trips

4



SUF ¶¶ 125- 126.

SUF ¶ 124.

5. The Average Number of Interstate Trips Per Driver, Average Time On Interstate Trips

-

SUF ¶ 94.

Between 2013 and 2019, the average number of interstate trips completed per driver nationwide

per year is:

- 2013: 983,659 interstate trips/61,181 drivers =16.1
- 2014: 4,045,693/314,890 =12.8
- 2015: 10,782,583/1,038,096 = 10.4
- 2016: 20,291,265/1,773,212 = 11.4
- 2017: 28,733,990/2,087,973 =13.8
- 2018: 33,543,822/2,151,552 = 15.6
- 2019: 33,925,757/2,094,630 = 16.2 SUF ¶ 109.

Between 2013 and 2019, for drivers nationwide who completed 50 or more trips annually i.e. on

average one trip a week (see SUF 114, 170, explaining that this group performs 98.9% of the work

and excludes outliers etc.), the average number of interstate trips completed per year per driver is:

- 2013: 22.8
- 2014: 19.5
- 2015: 17.3
- 2016: 18.7
- 2017: 20.6
- 2018: 22.2
- 2019: 22.3. SUF ¶ 110.

Between 2013 and 2019, for drivers nationwide who completed 1500 or more trips annually (see

SUF ¶178 explaining that such category of workers are those who work at least approximately 8.3

5

hours on trip time per week), the average number of interstate trips completed per year per driver

is:

- 2013: 130.9
- 2014: 99.1
- 2015: 87.7
- 2016: 86.6
- 2017: 83.8
- 2018: 79.1
- 2019: 70.8 SUF ¶117.

The total number of interstate trips per year performed by all drivers nationwide is:

- 2013: 983,659
- 2014: 4,045,693
- 2015: 10,782,583
- 2016: 20,291,265
- 2017: 28,733,990
- 2018: 33,543,822
- 2019: 33,925,757. SUF ¶109.

6. The Percentage of Drivers Engaging in Interstate Trips Over Time, Directly Crossing State Lines

Nationwide, a significant percentage of drivers performed an interstate trip. The percentages of

drivers nationwide who perform interstate trips for the following years is:

- 2013: 24.4%
- 2014: 20.9%
- 2015: 19.6%
- 2016: 21.1%
- 2017: 24.7%
- 2018: 26.7%
- 2019: 27.9% SUF ¶ 105.

Between 2013 and 2019, for drivers nationwide who completed 50 or more trips annually, the

percentage of drivers who performed interstate trips is:

- 2013: 28.9%
- 2014: 26.6%
- 2015: 26.7%
- 2016: 29.0%

6

- 2017: 32.5%
- 2018: 34.1%
- 2019: 34.9% SUF ¶ 107.

Between 2013 and 2019, for drivers nationwide who completed 1500 or more trips annually, the percentage of drivers who performed an interstate trip is:

- 2013: 41.6%
- 2014: 40.2%
- 2015: 44.0%
- 2016: 46.8%
- 2017: 50.5%
- 2018: 51.8%
- 2019: 52.5% SUF ¶ 108.

The vast majority of NYC drivers perform interstate trips. The percentages of NYC drivers who perform interstate trips are as follows for the following years:

- 2013: 66.5%
- 2014: 74.3%
- 2015: 82.9%
- 2016: 90.0%
- 2017: 92.1%
- 2018: 92.0%
- 2019: 93.6% SUF ¶ 106.

7. Uber Drivers In The Flow Of Interstate Commerce

Other relevant data, not specifically enumerated in the Second Circuit's nonexhaustive list includes Uber driver's direct participation in the flow of interstate commerce by providing transportation of passengers to and from airports:



- SUF ¶¶158-163.

7



- Trips headed to airports appear in the drivers' app the same as any other trips. SUF ¶ 142.

- There is no way for drivers to not receive trips that go to airports. SUF ¶ 145.

## ARGUMENT

## I. RIDESHARE DRIVERS ARE EXEMPT FROM THE FAA

### A. Rideshare Drivers As a Nationwide and New York City Class Are "Directly Involved" in Interstate Commerce As They Regularly Cross State Lines

Section 1 exempts from arbitration under the FAA, "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In *Circuit City*, the Court limited the scope of the exemption, to encompass only "class[es]" of *transportation* workers engaged in interstate commerce. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001). Subsequent decisions have clarified the transportation worker exemption's scope; the Supreme Court has provided a "workable principle" in its holding that "any class of workers directly involved in transporting goods across state or international borders falls

8

within §1's exemption." *Bissonnette v. Le Page Bakeries*, 59 F. 4th 594, 597 (2d Cir. 2023) (Nathan, J. dissenting) (*quoting Saxon*, at 457) *vacated and remanded*, 601 U.S. 246 (2024).

Under §1, the term engaged in interstate commerce applies to transportation workers who cross state lines. *See, e.g., New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019) (uncontested that driver for an interstate trucking company was engaged in interstate commerce). In *Saxon*, the Court further articulated that any class of workers that is "directly involved" in transportation across state lines is engaged in commerce and falls within the §1 exemption. To start with, Uber drivers transport passengers across state lines and in the flow of interstate commerce—this is the essence of interstate commerce.

To the extent that this case presents line-drawing questions based on the amount of interstate work done, §1's text and precedent addressing engagement in interstate commerce resolve these questions. Drivers perform interstate work in manners found to constitute engagement in interstate commerce, "as a natural, integral and apparently inseparable part of their jobs." *Morris v. McComb,* 332 U.S. 422, 433 (1947). Thus, as drivers can "reasonably expect" to perform interstate trips if they work with any regularity, they are engaged in interstate commerce. *Kennedy v. Equity Transp. Co.*, 2015 U.S. Dist. LEXIS 143565, at *15, 2015 WL 6392755 (N.D.N.Y. Oct. 22, 2015), *aff'd* 663 Fed. Appx 38 (2d Cir. 2016), *cert denied* 137 S. Ct. 2117 (2017). *See also, infra, International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954 (7th Cir. 2012).

On the question of the scope of the FAA class, as the court in *Saxon* stated, "Latrice Saxon frequently loads and unloads cargo on and off airplanes that travel in interstate commerce. She therefore belongs to a class of workers engaged in foreign or interstate commerce." 596 U.S. 450, 463 (2022). Plaintiffs have set forth facts and evidence to establish that Uber drivers cross state

lines and engage in the flow of commerce, as set forth herein. This occurs generally nationwide and in New York City, as New York Uber drivers perform interstate trips at a rate roughly in line with that of drivers nationwide, and both groups of drivers engage in interstate commerce in a manner sufficient to fall within the exemption. We ask the court to consider and make a determination as to both, finding both within the exemption.

a. <u>The Residual Exemption Applies to Transportation Workers Engaged In Interstate Commerce, Without Further Qualification</u>

Plaintiffs and rideshare drivers in New York and nationally are part of a class of rideshare drivers who 1) engage in interstate commerce by actually crossing state lines in a manner that courts have recognized as sufficient to bring them within the ambit of engagement in interstate commerce; and 2) engage in non-state line crossing activity within the flow of interstate commerce by trips to airports. Each of these activities alone is sufficient to bring the class within the FAA exemption. *See*, *Islam v. Lyft*, 524 F. Supp. 3d 338 (S.D.N.Y. 2021) and *Haider v. Lyft*, 2021 U.S. Dist. LEXIS 62690, 2021 WL 1226442 (S.D.N.Y. Mar. 31, 2021).

Uber's data shows that nationwide Uber drivers performed 33.9 million interstate trips in 2019 alone. SUF ¶187. While interstate trips represented around 2.7% of total trips nationwide, ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ **This would be considered an integral or central part of any worker's job**; a McDonald's employee who spends 25 minutes/day taking trash to the dumpsters five days/week spends 2 hours out of 40 taking out the trash. If they refuse to do so, they'll be fired; thus it's an integral part of their job. The same is true if they must spend four hours every two weeks cleaning out the grease-trap.

10

Because ██████████████████████████████████████ ██████ they are engaged in commerce as they can reasonably expect to perform interstate work. **Moreover the data show that on average nationwide from 2013-2019, every driver performed an interstate trip more than monthly.** SUF ¶109. **When looking to those drivers who perform a minimum of a mere 8.3 hours on trips a week, they performed an interstate trip on average more than once a week.** SUF ¶117. *See Islam, supra at 351* (discussing a federal judge's duties, and finding the overseeing of criminal trials central "even if it is not something that she does every day or even every month.") Moreover, Uber's view that looking to data from drivers who performed at least 50 or 1500 trips/year is a form of "gerrymandering" the class of workers misunderstands the need to avoid outliers and is belied by standard statistical methods, including that used by Uber's economists. SUF ¶170. Plaintiffs don't propose restricting the class. Rather, Plaintiffs note that analyzing drivers with a *de minimis* amount of work leads to misleading conclusions about the class. This view is consistent with common practice by both government and Uber's economists. *See* SUF ¶¶170-172. Looking at the activities of drivers who typically perform the work, as opposed to those who dabble in it for less than 1 trip per week, is consistent with *Saxon*'s emphasis on the work that class members typically carry out; here, what the class typically does is most meaningfully understood by who typically does the work.)

While Uber attempts to argue that ████████████████████████████████████ is insufficient for drivers to fall within the exemption, nothing in §1 supports such a reading. Engagement in commerce is found without regard to the incidence of interstate trips. In *International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, the Seventh Circuit held that truck drivers who hauled concrete locally within the St. Louis area, from Illinois to Missouri a "few dozen" times out of "1500 to 1750 deliveries each year" were engaged in

11

interstate commerce under the FAA. 702 F.3d 954, 958 (7th Cir. 2012). ███████████

████████████ ████████████████████████████████████████████████████

████

In *Kienstra*, the Court held explicitly that "**there is no basis in the text of §1 for drawing a line between workers who do a lot of interstate transportation work and those who cross state lines only rarely; both sorts of worker are engaged in foreign or interstate commerce.**" 702 F.3d, at 958 (citation omitted). *See also Islam*, at 351, *quoting Kienstra*; *Haider*, at *10, *quoting Kienstra*. Citing to the Seventh Circuit's decision in *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798 (7th Cir. 2020), Uber argues that this incidence of interstate trips means that interstate commerce cannot be a "central part" of Uber drivers' work. Yet, in *Wallace*, which involved app-based delivery workers who *never cross state lines,* the Court cited *Kienstra* approvingly immediately before and after holding that engagement in interstate commerce must be a "central part." By grounding its §1 standard in *Kienstra*, the *Wallace* Court made plain that being "actually engaged in interstate commerce," as the truck drivers were in *Kienstra*, accords with *Wallace*'s "central part" standard. *Wallace* does not present a conflict with *Kienstra*'s standard. Rather *Wallace*'s holding distills *Kienstra* and is consistent with the Supreme Court's subsequent, controlling formulation that to fall within the exemption, workers must merely be "directly involved" in interstate commerce. *Saxon*, at 457.

Several courts within this Circuit have followed the Seventh Circuit's approach in *Kienstra* recognizing that no bright-line incidence of interstate work is necessary to find these transportation workers engaged in interstate commerce. *See Burgos v. Northeast Logistics*, 2017 WL 10187756

---

[1] Deriving percentage based on a "few" dozen, taken to mean three to five dozen.

(E.D.NY. Mar. 30, 2017); *Smith v. Allstate Power Vac Inc.*, 482 F. Supp. 3d 40, at 46-47 (E.D.N.Y. 2020), *Islam v. Lyft*, *supra*, *Haider v. Lyft*, *supra*, all finding drivers to fall within the exemption where they performed some work across state lines. In *Islam*, Judge Abrams held that rideshare drivers nationwide are engaged in interstate commerce by virtue of performing "sufficient numbers of interstate rides, with sufficient regularity." *Islam*, *supra*, at 353. Judge Nathan followed *Islam*, writing:

> Interstate travel is a central component of Lyft's business in the tri-state area. The Court has little trouble concluding that its drivers here are members of a class of workers engaged in interstate commerce…
>
> The Court reaches the same conclusion when considering rideshare drivers as a class without regard to geography. … From the perspective of an individual driver, these interstate trips are a regular component of his or her day-to-day work

*Haider*, at *8-10 (internal citations omitted).

Consistent with §1's text, these courts refused to amend the FAA by interpretation. There is no "basis to read into Section One the words '*predominantly* engaged in' or '*primarily* engaged in' interstate commerce." *Islam*, at 351 (emphasis original). Similarly, in *Gonzalez v. Lyft*, the court held

> "The [FAA] does not say 'engaged exclusively", "engaged primarily", "engaged routinely", or even 'engaged in a lot of' interstate commerce. Congress could have inserted any number of modifiers intended to express a baseline amount of activity. It did not."

2020 WL 7183573 (D. N.J. Oct. 13, 2020), *adopted*, 2021 WL 303024, (D. N.J. Jan. 29, 2021). *See also Haider*, at 351.

13

Because Uber drivers are transportation workers, and they perform interstate work at a rate at least equal to that of the drivers in *Kienstra*,[2] they are transportation workers engaged in interstate commerce. Drivers perform these trips as a routine part of their work, such that they can reasonably expect to work in interstate commerce. See also *Morris v. McComb*, 332 U.S. 422 (1947)("engaged in interstate commerce" when 3.65% of trips performed were interstate trips.) 332 U.S. 422, 433 (1947).

b. The Percentage of Uber Drivers Who Actually Perform Interstate Trips Is Significant And Similar to That of Other Workers Enumerated in Section 1

This case is in line with *Kienstra*, and the *Morris-Islam-Haider* standard that drivers can reasonably expect to work in interstate commerce. Looking next to the percentage of Uber drivers who actually perform interstate trips, such percentage is significant and similar to that of other workers enumerated in section 1.

As held in *Haider*, "not every rideshare driver takes passengers across state lines. But that's true too for workers expressly covered by the exemption like railroad employees." *Haider*, *supra*, at *9. The First Circuit noted that "we also expect that some workers on passenger railroads may handle only within-state trips," so the Court refused to "rely on this fact alone" to determine whether rideshare drivers fall within the exemption. *Cunningham v. Lyft*, 17 F.4th 244, 253 (1st Cir. 2021). A review of railroad timetables from the time the FAA was passed confirms this. Even the most archetypically long-distance interstate passenger railroads in 1923 shows that a majority of train runs did not cross state lines. Accordingly, the engineers and other workers on these trains would not cross state lines in the ordinary course of their routes. Looking at paragons of long-distance train travel, the number of trains run per day that cross state lines is as follows:

---

[2] Plaintiffs will discuss drivers' engagement in interstate commerce through their airport trips *infra*.

14

- Southern Pacific: 14.3% (102/713 trains) SUF ¶ 180.

- New York Central: 38.2% (794/2078 trains) SUF ¶ 182.

- Southern Railway System 44.6% (288/646 trains) SUF ¶ 181.

It is impossible, though, to say that engineers for the New York Central or Southern Pacific were not engaged in interstate commerce. By comparison, 34.9% of Uber drivers with 50+ trips/year in 2019, *e.g.*, crossed state lines; 52.5 % of drivers with 1500+ trips/year in 2019 did. SUF ¶¶107-108. Indeed including all drivers nationwide from 2013 to 2019 the percentage of drivers who perform an interstate trip ranges from a low of 19.6% in 2015 to 26.7% of drivers in 2019. That is, as many or more Uber drivers, as a percentage, cross state lines than did engineers on routes for Southern Pacific or New York Central; drivers engage in interstate commerce in a manner similar to railroad workers.

**c**. Rideshare Drivers Regularly Perform Interstate Trips Such That They Can Reasonably Expect To Perform Interstate Work

*Haider* and *Islam* provide a standard, grounded in this Circuit's approach to determining whether workers are engaged in interstate commerce under the FLSA's motor carrier exemption. In this Circuit's approach, a worker is considered engaged in interstate commerce when "the employee could reasonably have expected to drive in interstate commerce." *Kennedy v. Equity Transp. Co.*, 2015 U.S. Dist. LEXIS 143565, at *15, 2015 WL 6392755 (N.D.N.Y. Oct. 22, 2015), *aff'd* 663 Fed. Appx. 38 (2d Cir. 2016), *cert denied* 137 S. Ct. 2117 (2017). "One way in which interstate travel can be a natural, integral, and inseparable part of an employee's position [for purposes of the FLSA's motor carrier exemption] is when any employee may be required to perform interstate travel, regardless of the actual time spent by employees individually on interstate travel[.]" *Islam*, at 352, *quoting Kennedy*, at *14-15.

15

This approach follows directly relevant Supreme Court precedent. Construing the requirement that motor carrier workers must, *inter alia*, engage in interstate commerce to be exempt from the FLSA, courts have found businesses engaged in interstate commerce when 1 or 2% of their trips involve interstate commerce. In *Morris v. McComb*, the Court found truckers to be within this exemption and "engaged in interstate commerce" when 3.65% of trips performed were interstate trips. 332 U.S. 422, 433 (1947). The Court noted that these trips occurred in "the normal operation of the business," were distributed indiscriminately among drivers, mingled among its predominantly intrastate work, and occurred throughout the year; accordingly, the Court found that such interstate trips "were thus a natural, integral and apparently inseparable part of the common carrier service" at issue. *Circuit City* held that "engaged in commerce" must be interpreted in an "objective and consistent" manner across statutes. 532 U.S. at 117. Accordingly, *Morris* and its progeny, are on point in interpreting §1.

Uber drivers are engaged in interstate commerce because Uber drivers can "reasonably expect" to perform interstate trips as a "natural, integral and inseparable part" of their work. Plaintiffs explain in the fact section how this is the case, setting forth how Uber's policies and practices render it impossible to segregate or exclude interstate and airport trips. See facts *supra*. First, drivers perform interstate trips not by "happenstance," but because Uber puts itself out as being able to "provide transportation as reliable as running water," meaning that customers are able to go anywhere they want, including across state lines. SUF ¶133. Second, interstate trips are inseparable; drivers cannot filter them out through the app and cannot refuse trips by destination if they wish not to cross state lines, without facing termination. SUF ¶¶ 136, 141, 143, 144. If a New York passenger can reliably travel to LaGuardia, or JFK, but not Newark

16

Airport, then they are not getting transportation as reliable as running water. Such limitations would clearly disrupt Uber's main goal, of getting passengers where they want to go, which in many cities includes destinations in other states. That Uber maintains no guidelines or policies specific to interstate trips bears this out; Uber treats such interstate trips as part of the normal flow of driver dispatches to be performed the same as any other trip.

Further, Uber specifically markets its ability to perform interstate trips. SUF ¶¶ 130, 131, 132, 135. As noted by Judge Nathan in *Islam*, what emerges from a review of rideshare industry practices across the nation is that companies like Uber explicitly put themselves out to customers as providing interstate service, not merely by happenstance, but by explicitly setting parameters for service to advertise and attract customers for these specific interstate trips. In New York this is clear through its advertisement of trips between New York City and Newark Airport. SUF ¶61 (Counter Statement) and SUF ¶¶ 130, 132. New York City-based drivers are required to transport passengers between New Jersey or Connecticut given that Uber states that trips originating in New York City may last as long as four hours. SUF¶ 130-131. Uber's general policy requiring drivers to perform trips means such trips would be an integral part of its work in many markets across the U.S. This is reflected in the fact that, nationwide, Uber hosts dozens of permanent URLs for specific trips, advertising Uber as the "best way to get from" locations in one state to another, including, *e.g.*, trips from Portland, Maine to Boston's Logan Airport, the Kansas City, Missouri Airport (MCI) to Topeka, Kansas, Cheyenne, Wyoming to Denver International Airport, Chicago to Milwaukee. See *supra* page 5. Similarly, looking at the industry as a whole, "Lyft's fare schedules, advertisements, and guidelines for drivers reflect that interstate travel is a regular part of its business." *Haider*, 2021 U.S. Dist. LEXIS 62690, at *4.

> **d.** Drivers Must Perform Interstate Trips The Same As Other Trips, or Face Discipline For Refusal Based On Destination Discrimination

17

Rideshare drivers' interstate trips occur pursuant to Uber policy, disregard of which can lead to termination; there is nothing "happenstance" about this. There is no way to avoid the performance of interstate trips without discipline.

Excluding trips based on their destination is what Uber calls "destination discrimination," which Uber deems a terminable offense. SUF¶ 138. Uber's "Community Guidelines" states unequivocally:

> *What leads to you losing access to your account?* It is unacceptable to refuse to provide services **based on where someone is going** … **Actions like these will result in permanent deactivation of your account.** SUF¶ 138.

Uber's sworn testimony confirms this:

> "getting in a physical altercation with a rider or discriminating someone [sic] based on their destination, in those types of situations, which I would consider fairly egregious errors on the driver[']s part, you know Uber would likely, uh, suspend access to the application." SUF ¶ 137.

Accordingly, no driver could choose to exclude interstate trips without risking "permanent deactivation" pursuant to Uber's "zero-tolerance" policy. See SUF ¶ 137.

Notably, the Uber app doesn't allow drivers to filter out interstate trips. SUF ¶143. Uber asserts that it maintains no guidelines regarding interstate trips specifically; this means, not only is there no policy reflected in the app design to separate interstate trips, but also that there is no interstate exception from Uber's generally applicable policies on destination discrimination. Drivers cannot toggle off interstate trips from the rest of their work; even a single instance of destination discrimination merits termination under Uber's "zero-tolerance" policy. SUF ¶¶137, 143. Thus, interstate and airport trips are an inseparable part of the flow of work to drivers. See *supra,* page 4. *Cf. Morris*, *supra*.

More simply, Uber's contracts require drivers to complete all trips to the passengers' destination. If drivers fail to do so, they are in breach and subject to termination. Completion of interstate trips was a term and condition of drivers' access to Uber dispatches. SUF ¶ ¶ 38, 60, 62 (counterstatement).

Contrary to Uber's argument, drivers may not refuse interstate trips based on their destination without discipline. Drivers don't learn drop-off locations until passengers enter the vehicle (SUF ¶¶ 148-149) and accordingly cannot knowingly refuse interstate trips before then. SUF¶153. Accordingly, no driver could make a choice to exclude interstate or airport trips without first learning of their destination, and then cancelling such trips, once the passenger had already sat down in the vehicle. SUF¶153.

Nonetheless, Uber claims that drivers were free to cancel trips based on their destination without penalty. This is not credible given Uber's clear-as-day deactivation policy and sworn statements. Because drivers don't learn passengers' destinations until they press "begin trip" with passengers inside the vehicle, there is no way to isolate trips by destination until that stage. SUF ¶¶ 148-149.

**B.   Uber's "Fundamentally Local" Standard Disregards The Plain Meaning of §1.**

      a.   Uber's "Fundamentally Local" Standard Does Not Comport With the Text of Section 1

Despite this clear evidence in favor of direct engagement in interstate commerce, Uber argues primarily that what it subjectively deems "fundamentally local" work—despite being interstate— does not count for §1 purposes. This argument is plainly atextual and runs against a century-plus of precedent that "interstate" simply means interstate. Uber, and some courts, can make this

argument only by implying modifiers such as "long-distance" or "non-local" before the phrase "interstate commerce" that do not exist in §1.

In interpreting a statute, a court's analysis must begin with the text. *See Woods v. Empire Health*, 574 F.3d 92, 98 (2d Cir. 2009). *supra*. Arguments that drivers' interstate trips occur only by "happenstance of geography" and that Uber is not specifically promoting interstate rides, import tacit modifiers of undefined notions of "non-local" or "long-distance" interstate commerce into §1 as an additional element of the residual exemption. Such arguments "substitute a vague notion of [Uber's] business model for the evidence before it[,]" *Haider*, at \*11. *Cf. Kienstra* (finding drivers engaged in interstate commerce where performing fundamentally local concrete deliveries in one metro area).

Uber's view was expressed most fully in *Capriole v. Uber Techs.*, where the Ninth Circuit wrote that Uber drivers, even when crossing state lines are "merely convey[ing] interstate . . . passengers between their homes and [their destination] in the normal course of their independent local service." 7 F.4th 854, 865 (9th Cir. 2021), *quoting United States v. Yellow Cab*, 332 U.S. 218, 233 (1947). There, the Court held that interstate commerce, for the purpose of the residual exemption, means only long-distance interstate commerce, to the exclusion of more local interstate commerce, explicitly discounting the significance of drivers' interstate trips and the statute's plain language: "even Uber trips that 'started and ended in different states' are inherently local in nature." *Id.* at 864. In essence, the *Capriole* court further limited the residual exemption only to ***long-distance*** interstate transportation workers, based on its unfounded and unexplained assumption that railroads and maritime transportation were primarily and essentially long-distance enterprises, and that travel across long distances is 'central part of the job description.'" *Id.* at 865, *citing Wallace*, 970 F.3d, at 803 (emphasis added). This decision plainly misstates *Wallace*, and

20

does not remotely touch on the question of any distinction between long or short-distance interstate travel. Rather, *Wallace* cited *Kienstra* with approval, which found drivers engaged in interstate commerce where they made short interstate trips in the East St. Louis area. Such citations aim to invent a new element of the exemption from whole cloth.

*Capriole*'s denials of the significance of rideshare drivers' interstate trips being grounded in *Yellow Cab* is puzzling, considering that "[t]he *Yellow Cab* decision was premised on the fact that the local taxicab service was 'confined to transportation between any two points within the corporate limits of the City [of Chicago]'" *Islam*, at 355, *quoting Yellow Cab*, at 230-31. That is not the case here. SUF ¶¶130-131. Nothing in *Yellow Cab* begins to imply that transportation ***that actually crosses state lines*** would not be considered interstate commerce because of its length.

Other courts repeat this error by importing discussions regarding whether non-transportation workers incidentally do transportation work into discussions of whether local interstate transport is at issue in §1. In *Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 21 (D.D.C. 2021), the Court wrote that "Lyft drivers' interstate rides, no matter how numerous, are merely 'incidental' to their local transportation function" *Id*, at 21, citing *Hill v. Rent-a-Center*, 398 F.3d 1286, at 1289 (11th Cir. 2005). But *Hill* concerned whether an account manager for a furniture rental store, who made occasional deliveries across state lines, that "were incidental to [his] employment as an account manager," should be considered a "transportation worker."

Fundamentally, there is no basis in the text of §1 for such attempts to imply modifiers before the phrase "engaged in commerce." Here, the appropriateness of a plain language reading is confirmed by the fact that, just 17 years before Congress enacted the FAA, the Supreme Court had addressed the scope of another federal law involving railroads "engaged in interstate commerce," and key to its ruling, held that the phrase "engaged in interstate commerce" would

21

necessarily apply to railroads which in the course of their business, cross state lines, without limiting its understanding of this term to long-haul or "non-local" interstate commerce, nor to railroads "primarily" or "predominately" engaged in interstate commerce. *See Employers Liability Cases*, 207 U.S. 463 (1908). This decision affirmed *Howard v. Ill. C. R. Co.*, which held that engagement in interstate commerce, "whether it is intra or inter state–is to be determined by the point of reception and the point of destination, and not by the number or length of railroads over which it is routed." 148 F. 997, 1003 (C.C. W.D. Tenn. 1907). This rejection of length as irrelevant to understanding interstate commerce is evident in the Court's inclusion of "ferries," "bridges" or "trolley lines" among the modes of interstate commerce. *Employer Liability Cases*, *supra*, at 497.

*Howard* and its affirmance are crucial to understanding what Congress meant when it framed the §1 exemption as applying to classes of workers simply "engaged in interstate commerce." Given the text and the canon of *ejusdem generis*, there is no basis to read in a limitation of the exemption to only long-haul interstate commerce, especially where the Supreme Court had, not long before the FAA's passage, explicitly addressed the unlimited scope of "interstate commerce" in the context of railroads, and found that the term could support no such limitations.

The Court confirmed its commitment to this interpretation in *U.S. v. Hubbard*, 266 U.S. 474 (1925) (Brandeis, J.), decided a month before the FAA's enactment. There, faced with the "question whether interurban electric railroads *engaged in interstate commerce* are subject generally to regulation by the Interstate Commerce Commission," and looking at interurban electric railroads that operated "lines within and between Ohio municipalities, and also between these and a city in an adjoining State," the Court held that such essentially local railroads were subject to ICC regulation. *Id.* at 476. *Hubbard* sets a definitive understanding of what "railroad,"

22

without any modifiers or exceptions, was understood to encompass in 1925. The Court explicitly rejected the dissent's view that "interstate commerce" should only encompass long-distance railroads.

The import of these cases is clear: interstate means interstate. State lines impart clear and unambiguous meanings; undefined notions of "locality" do not.

When Congress wanted to exclude local commerce from the definition of interstate commerce, it knew how to; it did not do this with the FAA. Instructive is the 1935 Motor Carrier Act, 49 Stat. 543, whose structure makes plain that the phrase "engaged in interstate commerce," when not modified by preceding phrases, cannot be read to exclude subjectively "local" interstate commerce. Written to "apply to the transportation of passengers or property by motor carriers engaged in foreign or interstate commerce," *id*, § 202(b), the Act specifically notes that it, **in part**, does not apply to "taxicabs, or other motor vehicles performing a bona fide taxicab service" or to "the transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality." *Id* at § 203(b)(2); (b)(8). The Act's structure sheds light on the contemporary understanding that taxicab service across state lines, or interstate travel of shorter distances, would otherwise be considered interstate commerce, and remain subject to regulation.

Finally, as *Circuit City* limited engagement in interstate commerce to "transportation workers," *Capriole* and cases following it all err in further reading the residual exemption narrowly, as, at the time these decisions were rendered, the Supreme Court had already held that statutory exemptions should, as a rule, be afforded a "fair" reading. *BP p.l.c. v. Mayor of Baltimore*, *supra*. Uber's request that the Court engage in a "double narrowing" of the exemption is not warranted by *Circuit City*.

23

b. Uber's Proposal that Interstate Commerce Must Be Long-Distance Imposes an Ahistorical Gloss on §1.

Attempts to further limit *Circuit City*'s scope of the residual exemption to long-distance transportation in interstate commerce conflict not only with the statutory text but also the understanding of "interstate commerce" at the time the FAA was written. The assumption that railroad and maritime work is inherently long distance, or non-local, as previously stated, is simply incorrect.

In 1925, government reports indicated that 49% percent of trips on Class I railroads (those with the highest level of revenue), occurred on commuter railroads, an inherently local form of travel. SUF ¶188. Such trips would include commuter railroad trips from Manhattan to Long Island, Westchester County, and Connecticut and New Jersey– exactly the type of interstate trips that Plaintiffs took.

Further, in 1926, almost all passenger trips on boats– 93.1%-- were taken on ferries, an inherently local form of transportation. SUF ¶189. These types of ferry trips, for example, across the Hudson River, which had no road crossings between New York and New Jersey in 1925 (SUF ¶190), are among the trips that Uber drivers perform, and are shorter than Uber trips from New York to New Jersey. See SUF ¶80. Such ferry trips are shorter than even the average nationwide Uber trip since most ferry trips typically cross rivers or harbors. Thus, seamen and railroad workers were largely engaged in local or short-distance activities at the time of the FAA's passage, similar to the engagement by drivers today. Local interstate transportation is consistent with Uber drivers' engagement in interstate commerce. That is, contrary to Defendants' arguments, local and interstate are not mutually exclusive.

C. **Uber Drivers Engage In Interstate Commerce Through Transportation To Airports**

24

While rideshare drivers' state-line crossings independently establish their engagement in interstate commerce, drivers' engagement in the channels of interstate commerce via transporting passengers to airports further supports such a finding. Recently, several courts have found in-state driving to support a finding of engagement in the flow of interstate commerce. *See Waithaka v. Amazon.com, Inc.*, 966 F.3d 10; *Cunningham v. Lyft, Inc.*, 17 F.4th 244 (1st Cir. 2021), *Rittmann v. Amazon.com Inc.*, 971 F.3d 904 (9th Cir. 2020). *See also Islam, supra*, at 353-355; *Haider, supra*, at *11-13; *Saxon*, 596 U.S. 450, (2022).

a. *Saxon*'s Treatment of Wharfage Makes Clear that, under the FAA, Uber's Airport Trips Are In Interstate Commerce

As set forth *supra*, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ This is even more so in the specific context of the FAA's text. In *Saxon*, the Court looked to §1 for guidance on what activities constitute commerce under the exemption. *Saxon*'s treatment of wharfage indicates that rideshare drivers' airport trips constitute interstate commerce under §1. There, the Court wrote,

> the FAA defines exempted "maritime transactions" to include, among other things, "agreements relating to wharfage…or any *other* matters in foreign commerce." (Emphasis added.) The use of "other" in the catchall provision indicates that Congress considered the preceding items to be "matters in foreign commerce." And agreements related to the enumerated "matte[r] in foreign commerce" of "wharfage," to take one example, included agreements for mere access to a wharf— which is simply a cargo-loading facility…. It stands to reason, then, that if payments to access a cargo-loading facility relate to a "matte[r] in foreign commerce," then an individual who actually loads cargo on foreign-bound ships docked along a wharf is himself engaged in such commerce.

*Saxon*, 596 US at 459. ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████



SUF ¶163.

SUF ¶160    SUF

¶158. *Compare, e.g., Russell v. The Empire State*, 21 F. Cas. 23 (D. Mich. 1857) (Declaring wharfage agreement on the Detroit River void as city lacked authority "to exact toll for egress or regress.")

The analogy between airports and wharves, and its legal significance, was well understood in the early-twentieth century. "An air port falls naturally into the same classification as such public utilities as … transportation systems … Its nearest analogy is perhaps found in docks and wharves." *Coleman v. Oakland*, 110 Cal. App. 715 (Ct. App. 1st Dist. 1930) (considering

26

precedent regarding ports and wharves relevant to determination of similar issues involving an airport), *citing Dysart v. St. Louis*, 321 Mo. 514, 526 (1928); *Weinstein v. McKenzie*, 177 Misc. 451 (Sup. Ct. N.Y. Co. 1941) (LaGuardia Airport classified as "wharf property," and, accordingly, had authority to charge taxis and for-hire vehicles access fees for passenger pick-ups). ███████

████████████████████████████████████████████████████████████████████

██████ *See Griswold v. Webb*, 16 R.I. 649 (1889) (describing hackney carriage drivers picking up disembarking ship passengers on the wharf).

Wharfage applies to passengers as well as cargo. *See Ex Parte Easton*, 95 U.S. 68, 74 (1887) (vessels would be "liab[le] for wharfage" if docking "for the purpose of loading or unloading cargo, or receiving or for landing passengers.") Wharfage is understood to apply not only to transfer of goods or passengers from ship to wharf, but also the transportation therefrom. In *The Brooklyn*, it was uncontested that wharfage or "dock privileges" includes "use of the dock in receiving [freight] from the lighters and in reloading it on trucks and carting it away." 46 F. 132, 133 (S.D.N.Y. 1891). *See also Baltimore & O.R. Co. v. U.S.*, 201 F.2d 795, 796 (3d Cir. 1953). (Railroads owned piers and charged wharfage to trucks to access piers and take "freight unloaded from the ships").

████████████████████████████████████████████████ thus drivers' airport trips are as much in commerce as the handling of baggage in *Saxon*.

b.  Uber Drivers' Airport Trips Are A Significant Portion Of Their Job

In addition to ████████████████████████████████ rideshare drivers spend a significant portion of their work time traveling to and from airports.

████████████████████████████████████████████████████████████████████

27



███████ SUF ¶95. Between █████████████████████████████████

███ Moreover more than ████████████████████ from these trips. SUF ¶ 96.

While Uber argues that *Yellow Cab* forecloses finding Uber's airport trips to be in commerce, their argument does not take wharfage into account, or that *Yellow Cab* was explicitly limited to its facts. *Yellow Cab Co., supra,* at 232. *Yellow Cab* does not foreclose finding ████

████████████████████████████████████████████████

██████████████████████████████████████████SUF ¶156.

Following *Yellow Cab*, in *Marshall v. Victoria Transp. Co.*, the Fifth Circuit held that a bus company operating entirely within Brownsville, Texas, on the U.S.-Mexico border, was engaged in foreign commerce under the FLSA's motor carrier exemption, where 14.2% of Victoria Transp. Co. passengers began or ended their journeys in different countries, even where there was no through-ticketing arrangement and where Victoria Transp. Co. never left Texas. 603 F.2d 1122, at 1124 (5th Cir. 1979). In *Marshall*, the Court explicitly held that *Yellow Cab* did not foreclose its decision, noting that unlike the "casual and incidental" trips to railroad stations, the bus company, "carries a substantial percentage of international travelers every day."

In allowing for "other arrangement[s]," *Yellow Cab* did not require through-ticketing as an essential element for finding engagement in the flow of interstate commerce. *Id.* at 231. Further, in contrast to *Yellow Cab* where "'the taxi companies had no contractual or other arrangement with the interstate railroads,' [...] here there is at least some evidence in the record of ridesharing companies' arrangements with airports and even airlines." *Islam, supra,* at 355, *quoting Yellow Cab*, at 230-31. Specifically discovery in this matter confirmed: Uber holds itself out as specifically offering airport service at tailored rates of fare, (SUF ¶ 61 Counterstatement), and Uber's SEC filings make clear that such business is the result of Uber's contractual arrangements

with airports, and Uber's structuring of its business focuses on delivering airport service. Uber's SEC filings note that "[w]e have entered into agreements with most major U.S. airports … to allow the use of our platform within airport boundaries" and that Uber established a customer rewards program "aimed at increasing usage" of Uber that created "priority pickups at airports." SUF ¶157. These same corporate disclosures state that "*We generate a significant percentage of our Gross Bookings from trips in large metropolitan areas and trips to and from airports. If our operations in large metropolitan areas or ability to provide trips to and from airports are negatively affected, our financial results and future prospects would be adversely impacted.*" SUF ¶156. Beyond the mere happenstance, <u>Uber also seeks to contract directly with airlines to provide service to crew, and to an airline's passengers in the event of delays.</u> SUF ¶164. Indeed, ██████████████

███████████████████████████████████████████████

████████████████████████████████████████████ SUF ¶165.

For all the reasons set forth above by actual state line crossing and by work in the flow of interstate commerce, Uber drivers whether as a nationwide or NYC class of transportation workers, are clearly engaged in interstate commerce within the meaning of the FAA section 1.

## II.    THE AGREEMENT IS A CONTRACT OF EMPLOYMENT

Uber next argues that as an independent basis to grant their motion, Uber drivers' contract is not a contract of employment within the meaning of the FAA section 1 because Uber does not pay drivers. This argument simply strains credulity. To be clear, the Supreme Court already decided the question of what is a contract of employment head-on in *New Prime*. Notably the contracts in *New Prime* contain no promise to ever perform a job, and style the contract as an agreement for an independent contractor to lease trucking equipment to New Prime, the trucking company. *New Prime*, 1:15-cv-10603-PBS (D. Mass.), Dkt. 36-1, at 1. Moreover New York courts

have held that Uber's payments to drivers are "wages" earned  sufficient to establish eligibility for unemployment benefits. The New York Unemployment Insurance Appeal Board ruled that Uber paid Plaintiff Aleksanian wages. SUF ¶32 (counterstatement). *See also Matter of Lowry*, 189 A.D.3d 1863 (3d Dep't 2020) (same), *lv. denied Matter of Lowry*, 37 N.Y.3d 1045 (2021). This argument provides no basis to grant Defendants' motion.

### III. ABSENT THE FAA'S APPLICABILITY, THE CONTRACT'S CHOICE-OF-FAA PROVISION CONTROLS AND CANNOT BE CONTRAVENED BY STATE LAW

Third, Uber argues, for the first time on remand, that arbitrability questions should be decided by an arbitrator. While *New Prime* makes clear that questions regarding the FAA's applicability must be heard by a court, Uber's argument that if the FAA does not apply, questions regarding arbitrability must be arbitrated is meritless.

First, Uber waived the issue of delegating arbitrability, and may not raise it for the first time on remand. Parties may not raise new arguments on remand under the mandate rule, which ordinarily forecloses relitigation of issues previously waived by the defendant or decided by the appellate court. *Stegemann v. Price*, 2023 WL 218577 (2d Cir. 2023) *quoting U.S. v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002). The Circuit impliedly decided that it is for the Court to decide state law issues when it wrote that the Court may choose to take up state law issues first. *See Statek Corp. v. Dev. Specialists, Inc.*, 809 F.3d 94, at 99 (2d Cir. 2015). Since remand, Uber asked the Court to decide state law issues, not delegate them: "In Uber's view discovery should not occur until the Court rules on Uber's argument that the arbitration agreement is enforceable under state law." Dkt. 79, at 3.

Even if permitted to argue delegation, there is no basis to arbitrate arbitrability questions. Just as in *New* Prime, where the parties disputed whether the FAA applied, the parties dispute whether

30

or not the parties contracted to arbitrate under New York law if the FAA does not apply. As in *New Prime*, such a threshold question must first be decided. That is, the parties dispute whether an agreement was formed to arbitrate under New York law. When the FAA applies, such questions of contract formation must be decided by a court. Parties "cannot agree to arbitrate 'threshold questions concerning contract formation.'" *Vitol, Inc. v. Copape Produtos de Petroleo LTDA*, 2024 U.S. Dist. LEXIS 51585, at \*22 (S.D.N.Y. Mar. 21, 2024), *quoting Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019).

However, while FAA case law may be relevant, absent the FAA's application, under what state law would the court even begin to determine whether delegation is appropriate? The Court would first have to decide what law, if any, applies to the arbitration agreement, rendering delegation of this question impossible. Even if the Court could reach the question at this stage New York law would foreclose delegation; Plaintiffs raise questions of public policy *infra* that render delegation of arbitrability inappropriate even if New York law would apply. *Cooper v. Bruckner*, 21 A.D.3d 758, 759 (1st Dep't 2005) (under New York arbitration law, "whether public policy precludes arbitration is…a threshold question for the court."); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Benjamin*, 1 A.D.3d 39 (1st Dep't 2003).

### A. The Parties' Choice-Of-Law Controls; The Parties Agreed to Arbitration Governed by the FAA, or Not At All

#### a. Uber's Contract Selects The FAA As The Exclusive Law Governing The Arbitration Provision

Plaintiffs cannot be compelled to arbitration under state law because Uber's contract selects the FAA as the exclusive law governing the arbitration provision. The Ninth and Seventh Circuits have both held that where an express choice-of-law becomes inapplicable to a party, arbitration may not be compelled under alternate law not contracted for. No choice-of-law analysis can begin

31

when an agreement provides for an express choice-of-law, and, as here, there is no basis to sever the choice-of-law provision. Fundamental to the Supreme Court's arbitrability decisions is that courts may only compel arbitration "accord[ing to] the terms of the parties' agreement" *New Prime*, 139 S. Ct. at 534. If the FAA does not apply, courts must enforce the agreement as written, even if this means they cannot compel arbitration, pursuant to 9 U.S.C. § 4.

Arbitration agreements must be placed "on an equal footing with other contracts" and should be enforced "according to their terms." *AT&T Mobility v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted). Here, the contract contemplates only an agreement to arbitrate governed by the FAA. Drafted by Uber, the express terms provide emphatically for arbitration pursuant to the FAA, to the exclusion of other law. SUF ¶58; 59 (counterstatement) The general governing law provision does not apply to the arbitration clause, which is "governed by the Federal Arbitration Act," while California law applies to the remainder. *See id*. Uber reiterates this choice ***three more times*** in §§15.1 and 15.3, never raising the possibility of other law applying, and explicitly foreclosing the application of its general choice-of-law: "The Choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause." SUF ¶59.

Uber's choice-of-FAA provision is an affirmative choice-of-law, subject to the same treatment as other choice-of-law provisions. Parties are free to contract for the applicable choice-of-law, and generally, "choice of law provisions are valid and enforceable." *Terwiliger v. Terwiliger*, 206 F.3d 240, 245 (2d Cir. 2000). Indeed, because arbitration agreements involving interstate commerce, such as this one, are governed by the FAA, whether or not Uber specifically invoked the FAA (*see Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, at 273-75 (1995)), Uber's repeated invocation of the FAA is not superfluous, but represents a meaningful decision to choose one law to the exclusion of others. *Compare* Uber's January 2020 Agreement providing

32

for an alternate state choice-of-law, "if…the Federal Arbitration Act does not apply to this agreement." SUF ¶129. Had Uber intended to provide for state law to apply if the FAA did not, it could have done so in the TSA. Uber chose not to.

Courts must defer to choice-of-law provisions in arbitration agreements. Regarding arbitration agreements, "[t]he court's role is limited to interpretation and enforcement of the terms agreed to by the parties; it does not include the rewriting of their contract and the imposition of additional terms." *Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 85 N.Y.2d 173, 182 (1995). "[W]here the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement." "In short, if defendants wish to invoke the arbitration clauses in the agreements at issue, they must also accept the … choice-of-law clauses in the agreements." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004).

Absent application of the FAA, Plaintiffs cannot be compelled to arbitrate under New York law, a choice-of-law that runs counter to the articulated choice-of-law, absent an impermissible re-writing. As the arbitration agreement calls unequivocally to be governed by the FAA alone, and as rideshare drivers "are engaged in interstate commerce and are thus exempt from the FAA's enforcement provisions pursuant to §1" accordingly "the parties did not enter into a valid agreement to arbitrate and … there is no other ground upon which [a court] may enforce the arbitration provision. *Rittmann*, 971 F. 3d at 921. Faced with functionally identical contracts, the Seventh and Ninth Circuits have agreed with Plaintiffs' position. Considering whether to apply state law after finding the plaintiff exempt from the FAA, the Seventh Circuit held that when the parties agreed to arbitrate, "they did not agree to arbitrate in the abstract but agreed to arbitrate

33

subject to the FAA" and refused to compel arbitration under state law where the contract, as here, was governed by the FAA. *Rodgers-Rouzier v. Am. Queen Steamboat Operating Co., LLC*, 104 F.4th 978, 992 (7th Cir. 2024). No other circuit-level law holds to the contrary regarding such language.

### b.   No Other Law Can Be Applied To Contravene An Extant Choice-Of-FAA Provision

Where an express choice-of-law clause selects the FAA, and applies to workers exempt under §1, it is not the case that a choice of law was not made, nor that such choice-of-law clause would automatically be severed, leaving a court to consider arbitrability on a blank slate. The result is merely that Uber, as the drafter, chose the FAA as the governing law, the FAA governs and, a court lacks the power to compel Plaintiffs to arbitration under 9 U.S.C. 4. Given this, a court may not rewrite the contract by assuming the contract has no choice-of-law provision.

To superimpose New York law onto an arbitration provision which contemplates only the FAA would be a textbook prohibited re-writing of a contract. Under New York law, a "court must not rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous." *Burke v. PricewaterhouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 81 (2d Cir. 2009) (internal citations omitted). *See also Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007) ("courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") Rather, determining the parties' intent requires examining "the plain meaning of the language employed" and giving "full meaning and effect to all of its provisions." *See Katel Ltd. Liab. Co.*

34

*v. AT&T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (internal citations omitted). In this case this means honoring the parties' choice of the FAA.

While Uber's exclusive choice-of-FAA clause is clear, even if there were ambiguity, it would be construed against Uber, as the drafter, and no law other than the FAA could be applied. *See*, *67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 249 (1985) ("a contract must be construed most strongly against the party who prepared it"). *See also Rittmann*, *supra*, at 920 (9th Cir. 2020) (Refusing to compel arbitration under any state law "[b]ecause it is not clear that the parties intended to apply Washington law to the arbitration provision in the event the FAA did not apply, we construe ambiguity in the contract against Amazon to avoid that result.").

The choice-of-FAA provision remains in the contract; it cannot be disregarded or papered over in the guise of interpretation.

### c. Severing The Choice-Of-FAA Provision Is A Prerequisite To Applying Another Law

The contract's extant choice-of-law clause cannot merely be papered over if the FAA does not apply. Before any analysis of whether state law could apply to the arbitration provision, the choice-of-FAA clause would necessarily need to be severed.

In *Rodgers-Rouzier*, facing the same question of how to proceed on a similar contract with a similar severability clause, in light of the FAA's inapplicability, the Seventh Circuit held that "we cannot sever the choice-of-law clause… because we have no reason to say that the choice-of-law clause is 'invalid or unenforceable.'" 104 F.4th, at 993. In *Rittmann*, in the same posture, the Ninth Circuit discussed Amazon's arguments regarding the possible application of state law to the arbitration clause **only because** it decided to entertain, "*arguendo*," Amazon's argument that the

35

choice-of-FAA provision should be severed. 971 F.3d at 920. Where it was not severed, the Court held that no state law arguments could even be entertained. *Id*.

The Second Circuit has yet to consider how to treat an arbitration agreement explicitly and exclusively governed by the FAA, when the FAA does not apply; no well-reasoned decision has sought to compel arbitration under state law without first disposing of contractual language applying the FAA. District Court decisions that compelled arbitration under state law where the FAA did not apply are inapposite. In *Valdes v. Swift*, the Court analyzed a contract that, unlike the Uber contract, contained no choice-of-law provision and the Court explicitly limited its holding to situations "where the arbitration agreement contains no choice of law provision." 292 F. Supp. 2d 524, 528. (S.D.N.Y. 2003). In that case, as the FAA did not apply, the Court conducted a choice-of-law analysis, because no language selecting the FAA barred such an analysis, and the contract contained no other applicable choice-of-law provision. *Id*. *See also Rittmann*, 383 F. Supp. 3d, at 1203 (Distinguishing *Valdes*). Where one court compelled arbitration of a transportation worker's claims despite a choice-of-FAA provision, it did so only by misconstruing the facts. *Diaz v. Mich. Logistics Inc.*, 167 F. Supp. 3d 375 (E.D.N.Y. 2016) (compelling arbitration under state law where the court believed "the agreements contain no general or otherwise applicable choice of law provision," but the contract ***did include*** a choice-of-FAA provision that the court did not acknowledge or sever. *See* 2:15-cv-01415-LDW-ARL (E.D.N.Y.), Dkt. 43-1, §17.)

d. <u>The Contract Does Not Allow for Severance Simply Because the FAA Does Not Apply</u>

The fact that the contracts' choice-of-FAA provision does not provide Uber with the power to compel drivers to arbitration, does not mean that the clause must be severed, either under the contract's terms or any principles of contract law. Choice-of-law provisions are to be honored. *See Motorola*, *supra*. Generally, choice-of-law provisions may only be severed or disregarded if

36

application would violate "some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal." *Brown & Brown v. Johnson*, 25 N.Y. 3d 364, 368 (2015) (citations omitted). In no case could the choice of the FAA, a preemptive federal statute, as governing law be considered so repugnant that it would require severance. In *Rittmann*, the Ninth Circuit noted that it did not see how the choice-of-FAA provision in Amazon's contract was susceptible to a severability analysis "merely because the provision does not work as Amazon had intended." 971 F.3d at 920, n. 10.

The TSA's severance clause is similar to those in *Rittmann* and *Rodgers-Rouzier*, and does not allow for severance of the valid choice-of-FAA provision; it merely allows for the severance of invalid clauses. The Seventh Circuit explicitly refused to sever the choice-of-FAA clause in *Rodgers-Rouzier* on invalidity grounds (which could have then allowed for alternate state law to apply), holding that the choice-of-FAA clause remained valid and enforceable, but that "[t]he result of enforcing that valid [choice-of-FAA] clause is just that American Queen's request to compel arbitration must be denied." *Id*. at 993.

### B. Plaintiffs' Claims Cannot Be Arbitrated Even If New York Law Applied

#### a. NYLL Claims Cannot Be Compelled To Arbitration Under NY Law

New York law does not permit certain statutory claims encompassing the state's public policy to be compelled to arbitration. Plaintiffs' claims, arising under the NYLL, are exactly such claims, and absent application of the FAA, could not be compelled to arbitration. In *Aimcee Wholesale Corp. v. Tomar Products, Inc.*, 21 N.Y.2d 621 (1969), the Court of Appeals held that antitrust claims, representing public policy of the highest order, could not be subject to arbitration. More explicitly, a unanimous Court of Appeals held that although arbitration is a favored method

37

of dispute resolution, arbitration agreements are unenforceable where substantive rights, embodied by statute, express a strong public policy which must be judicially enforced." *Wertheim & Co. v. Halpert*, 48 N.Y.2d 681, 683 (1979). The NYLL and its anti-wage theft provisions in particular express a strong public policy. *See* 2021 N.Y. Laws 397, at §1 ("Article 6 of the labor law, and sections 193 and 198(3) in particular, reflects New York's longstanding policy against the forfeiture of earned but undistributed wages.")

Uber will likely argue that lower courts have recently expressed skepticism of *Aimcee*. Nonetheless, *Aimcee* and *Wertheim* remain controlling; to the extent they have been abrogated, this is only if the FAA applies. In *Fletcher v. Kidder, Peabody, & Co.*, the Court held that, "in light of recent Supreme Court decisions, most notably the Court's decision in *Gilmer v Interstate/Johnson Lane Corp.* (500 U.S. 20, 111 S. Ct. 1647), our 1979 decision in *Wertheim* should no longer be followed in cases governed by the FAA." 81 N.Y.2d 263, 629 (1993).

### b. The Arbitration Provision Is Null And Void Under CPLR §7515

CPLR 7515 invalidates in whole, prospectively and retrospectively,[3] any arbitration provision that would compel arbitration of sexual harassment or discrimination claims, as the arbitration provisions here do.

Although *Islam* held that 7515 only bars the arbitration of certain claims, *Islam, supra*, at 357, n.7, the statute, by its plain language, functions not by prohibiting the compelling of arbitration of discrimination claims, but by prohibiting new, and voiding existing arbitration

---

[3] The Appellate Division reversed a holding that 7515 applies retroactively. *Newton v. LVMH Moët Hennessy*, 192 A.D.3d 540 (1st Dep't 2021). The Court of Appeals has not yet addressed this question.

provisions that require such claims to be arbitrated. 7515 functions by, first, defining a "prohibited clause" as "*any* clause or provision in any contract which requires as a condition of the enforcement of the contract or obtaining remedies under the contract that the parties submit to mandatory arbitration to resolve any allegation or claim of discrimination, in violation of laws prohibiting discrimination, including but not limited to, article fifteen of the executive law." CPLR §7515(a)(2).

Uber's arbitration provision, in whole, is a "prohibited clause" under 7515(a)(2) because it requires arbitration of discrimination claims, pursuant to a universal requirement to arbitrate all types of disputes under the contract, necessarily including discrimination claims. Accordingly, the arbitration clause requires that a party would have to submit any discrimination claim to mandatory arbitration. Accordingly, it is a "prohibited clause" under 7515(a)(2). As a "prohibited clause" it is "null and void."

<u>c. New York Public Policy Weighs Against Enforcing The Class Waiver</u>

New York's public policy in favor of arbitration is not unlimited and yields to other policy concerns on a case-by-case basis. As the Court of Appeals has acknowledged, the "strong state policy favoring arbitration" is not unlimited, and must be balanced against other policy interests. *Brady v. Williams Capital Group, L.P.*, 14 N.Y.3d 459, 467 (2010). Where public policy has favored arbitration, it did so on the basis that arbitration was a more efficient means of dispute resolution; that rationale evaporates under the facts of this case, where requiring individualized arbitration of systematic identical contract violations for 90,000+ drivers would take hundreds of years to resolve. Per *Brady*, these facts present starkly different policy considerations than any present in, *e.g.*, *Harris v. Shearson Hayden Stone*, 82 A.D.2d 87 (1st Dep't 1981) which involved

39

a sophisticated party seeking to bring a class action concerning the handling of his commodities account on behalf of a class of unknown size.

In this case, due to the scale of the potential class, enforcement of the arbitration clause would make it impossible for the putative class of over 90,000 largely immigrant low-wage workers to have their claims heard at all should the arbitration agreement and class waiver be enforced. Those policy interests – namely, effective vindication of the putative class' rights – would preclude the enforcement of the arbitration agreement in this case as a matter of New York policy.

## CONCLUSION

For all the reasons set forth above, as Uber drivers are as a whole nationwide and in New York City, are transportation workers engaged in interstate commerce, as they are not subject to arbitration under state law or on any other basis, Plaintiffs respectfully request that this Court deny Uber's motion in whole and allow this matter to proceed in court.

Dated:  November 3, 2025
      (Corrected: February 24, 2026)

        Respectfully Submitted,

           ZUBIN SOLEIMANY,
           ESQ.
           /s/ Zubin Soleimany

           31-10 37th Avenue, Suite
           300 Long Island City,
           New York 11101
           (718) 706-9892
           zsoleimany@nytwa.org

           *Attorneys for Plaintiffs*

and

JULIEN MIRER &
ASSOCIATES,
PLLC

/s/ Jeanne Mirer

_____

By: Jeanne Mirer
Ria Julien
300 Cadman Plaza W
12th Floor
Brooklyn, NY 11201
(212) 231-2235
jmirer@julienmirer.com

41

## CERTIFICATE OF COMPLIANCE

I, Ria Julien, certify that Plaintiffs' Memorandum of Law In Opposition To Defendants' Motion To Compel Arbitration (corrected) complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and Rule III(E) of Your Honor's Individual Practices.

I further certify that, in preparation of this memorandum, I used Microsoft Word and that this word processing program has been applied specifically to include all text (including footnotes) but excluding the caption, table of contents, table of authorities, signature block, and any certificates.

I further certify that the above-referenced memorandum contains 12,177 words.

/s/ Ria Julien

_____

Ria Julien