UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

LEVON ALEKSANIAN, SONAM LAMA, and : 
HARJIT KHATRA, individually, on behalf of :
all others similarly situated, and as Class :     19-CV-10308 (ALC) (RWL)
Representatives, :
     :
                  Plaintiffs, :     **DECISION AND ORDER:**
     :     **MOTION TO COMPEL**
        - against - :     **ARBITRATION (DKT. 128)**
     :
UBER TECHNOLOGIES INC., UBER :
LOGISTIK, LLC, and UBER USA LLC, :
     :
                Defendants. :

-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Levon Aleksanian, Sonam Lama, and Harjit Khatra (the "Named Plaintiffs"), individually and as class representatives of all others similarly situated (collectively, "Plaintiffs"), brought this action against Uber Technologies Inc., Uber Logistik, LLC, and Uber USA LLC (collectively, "Uber"), asserting claims for the period 2013-2017 under New York Labor Law ("NYLL") and for breach of contract.  On March 8, 2021, the Court granted Uber's first motion to compel arbitration under the Federal Arbitration Act ("FAA" or the "Act"), ruling that the parties' arbitration agreement did not fall within the FAA's exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  (Dkt. 60, *reconsideration denied* Dkt. 75.)  *See Aleksanian v. Uber Technologies Inc.*, 524 F. Supp.3d 251 (S.D.N.Y. 2021) (Carter, J.) [hereinafter *Aleksanian I*] (subsequent history omitted). Plaintiffs appealed.  (Dkt. 76.)

On November 14, 2023, the Second Circuit vacated the Court's decision and remanded the case for limited discovery on the application of the FAA exemption to

Plaintiffs' claims.  (Dkt. 80.)  *See Aleksanian v. Uber Technologies Inc.*, No. 22-98, 2023 WL 7537627 (2d Cir. Nov. 14, 2023) [hereinafter *Aleksanian II*] (summary order).  With discovery now complete, Uber has again moved to compel arbitration under the FAA or, alternatively, New York law.  (Dkts. 128-129.)  The motion is fully briefed, and the Court heard oral argument on March 11, 2026.  (*See* Dkt. 175 ("Tr.").)  For the reasons set forth below, Uber's motion is GRANTED.

**BACKGROUND**[1]

**A.      The Instant Action**

Uber operates a digital app-based platform connecting riders seeking personal transportation services with nearby drivers.  (*See* SUMF ¶¶ 1-3.)  Between 2013 and 2019, drivers who wanted to access Uber's platform and provide rides were required to first execute the then-applicable licensing agreement (the "Agreement") and a market-specific addendum.  (SUMF ¶¶ 4, 5, 34-35.)  Uber employed various versions of the Agreement between 2013 and 2017.  (*See* First Amended Complaint ("FAC"), Dkt. 83 ¶ 237.)  Two versions are relevant for present purposes:  the June 21, 2014, Software License and Online Services Agreement (the "SLA") and the December 11, 2015, Technology Services Agreement (the "TSA").  (*See* Perl Decl. Exs. A ("SLA"), B ("TSA").) For purposes of the instant dispute, the agreements are materially similar.  (*See* SUMF

---

[1] The facts are primarily drawn from the statements of undisputed material facts and responses thereto submitted pursuant to Local Rule 56.1 ("SUMF").  (*See* Dkts. 150 ¶¶ 1-93, 156 ¶¶ 94-190.)  Facts also are drawn from the parties' supporting declarations and exhibits thereto.  The declarations include, inter alia:  the Declaration of Philip Linfoot at Dkt. 131 ("Linfoot Decl."); the Declaration of Rachel Perl at Dkt. 132 ("Perl Decl."); the Supplemental Declaration of Rachel Perl at Dkt. 157 ("Supp. Perl Decl."); the Declaration of Zubin Soleimany at Dkt. 147 ("Soleimany Decl."); the Declaration of Levon Aleksanian at Dkt. 148 ("Aleksanian Decl."); and the Declaration of Sonam Lama at Dkt. 149 ("Lama Decl.").

¶ 10.)  *See also Aleksanian I*, 524 F. Supp.3d at 255 n.5 ("The TSA is substantially the same as the SLA in regard to the provisions related to arbitration"); *Aleksanian II*, 2023 WL 7537627, at *1 n.2.

The Agreement permitted drivers to access Uber's platform and described certain terms and conditions of use, including how customer fares would be apportioned between Uber and the drivers.  (*See* SUMF ¶¶ 34-35; SLA; TSA.)  The Agreement also contained a broad arbitration provision and class action waiver:

> This Arbitration Provision is governed by the Federal Arbitration Act ….  This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates ….
>
> **Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration ... [and] requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative [] action ...**

(SUMF ¶ 47.)   The Agreement permitted drivers to opt out of the arbitration provision by providing written notice to Uber within thirty days of their signing.  (*Id.* ¶¶ 54-55.)

The Named Plaintiffs are "present and former drivers who contracted with Uber to drive … as part of [its] New York City fleet."  (FAC ¶ 2.)  Each accepted the Agreement and did not opt out of its arbitration clause.[2]  (*Id.*; SUMF ¶ 56.)  On November 6, 2019, Plaintiffs initiated this action by filing a class action complaint in federal court.  (Dkt. 1.)

---

[2] Aleksanian accepted the SLA, and Lama and Khatra accepted the TSA.  (SUMF ¶¶ 9, 11.)

In their operative pleading, Plaintiffs allege that they were misclassified as independent contractors instead of employees and seek to recover unpaid wages and amounts that were deducted from drivers' earnings in violation of NYLL and the Agreement. (FAC ¶¶ 1-10, 233-271.) Plaintiffs also assert that Uber engaged in an unlawful scheme which deprived drivers of their due earnings by "charg[ing] different fares to customers than it reported on drivers' pay statements." (FAC ¶¶ 15, 272-281.) The Named Plaintiffs seek to represent two putative classes, encompassing "more than 96,000 New York City Uber drivers." (FAC ¶ 4; *see also id.* ¶¶ 18 (describing the classes), 19, 39, 53, 65, 286-304.)

On May 1, 2020, Uber moved to compel arbitration pursuant to the Agreement. (Dkts. 19-20.) Plaintiffs opposed, arguing they belonged to a "class of workers engaged in … interstate commerce" and thus were exempt from the FAA. (Dkt. 35.) Plaintiffs also filed a motion for discovery on the issue. (Dkts. 43, 45.) Ruling on March 8, 2021, the Court found no need for discovery and granted Uber's motion to compel, reasoning that neither Uber's policies nor Named Plaintiffs' trip data establish that Uber drivers, as a class, are engaged in interstate commerce for purposes of the FAA. *Aleksanian I*, 524 F. Supp.3d at 258-62. After their motion for reconsideration was denied, Plaintiffs appealed. (Dkt. 76.)

On November 14, 2023, the Second Circuit vacated the district court decision. *See generally Aleksanian II*, 2023 WL 7537627. The panel determined that the district court erred in failing to allow discovery on the motion to compel and instead ruling solely based on allegations in the complaint. *Id.* at *2. The panel provided a nonexclusive list of information which "might" be relevant to the Section 1 inquiry and thus appropriate fodder for discovery on remand:

> Uber's policies regarding interstate trips; the potential penalties and costs of declining interstate trips; Uber's revenue from interstate trips; the average number of interstate trips Uber drivers take over various time periods (such as a week, a month, or a year); the median number of interstate trips for Uber drivers over various time periods; what percentage of Uber drivers take interstate trips over various time periods; how often Uber drivers decline interstate trips[.]

*Id.* at *3. While recognizing disagreement among courts, the panel declined to opine on the proper "test to determine whether the 'class of workers' are 'engaged in ... interstate commerce' within the meaning of the [FAA]." *Id.* at *2-3 & n.3.

Following remand, the parties engaged in over nineteen months of discovery concerning facts relevant to the applicability of the FAA exemption. (Dkts. 84, 126.) Uber produced thousands of pages of documents and data for more than a hundred discrete metrics for its operations between 2013 and 2019 as they relate to interstate transportation. (*See* Dkt. 121 at 1.) On August 29, 2025, discovery closed (Dkt. 126), and Uber filed the instant motion to compel supported by declarations and a memorandum of law ("Mem."). (Dkts. 128-129.) Plaintiffs filed declarations and a memorandum in opposition ("Opp."). (Dkt. 154, *corrected* Dkt. 170.) Uber filed a reply ("Reply"). (Dkt. 155.) Uber also filed a notice of supplemental authority, to which Plaintiffs responded. (*See* Dkts. 168, 172.)

On January 13, 2026, Uber filed a letter motion seeking to maintain under seal portions of 18 documents filed in connection with the motion to compel. (Dkt. 162; *see also* Dkt. 165 (reply in support of letter motion to seal).) Plaintiffs filed a letter in opposition. (Dkt. 162.) The sealing dispute will be resolved by separate order.

5

**B.    Uber's Interstate Activities**

When signing up with Uber, drivers must identify a city they want to associate with their account.  (SUMF ¶¶ 20-21; *see also id.* ¶ 44.)  This "home city" is referred to in the TSA as the "Territory" and in the SLA as the "City."[3]  (*See* TSA § 1.12; SLA § 1.4.)  Drivers are permitted to pick up passengers in their respective territory and, in some cases, prevented from picking up passengers in areas outside of their territory depending on local regulations.  (SUMF ¶¶ 24, 44; *see also* TSA § 1.12; SLA § 1.4; Perl Decl. ¶ 10.)  Territories occasionally span multiple states.  (SUMF ¶ 63; *see also* Soleimany Decl. Ex. A, Appendix A (listing Uber territories between 2013 and 2020).)  However, even where a territory covers only a single state, drivers may perform rides which conclude outside of their territory, including in other states.  (*See* Lama Decl. ¶¶ 6-7; Aleksanian Decl. ¶¶ 6-7; *see also* TSA § 1.12 (defining Territory as where drivers can **receive** requests) (emphasis added).)

Depending on the rider's pick-up location, Uber may restrict the length of rides.  For instance, trips beginning in New York City are limited to four hours.[4]  (SUMF ¶¶ 130-131; *compare* Soleimany Decl. Ex. L at ECF 7 (Uber webpage noting all "trips beginning in NYC are limited to 4 hours") *with id.*, Ex. M (informational webpage for Uber services in New Jersey mentioning no similar restriction).)

---

[3] Internally, Uber refers to these areas by a unique "City_ID."  (Perl Decl. ¶ 10.)  Plaintiffs observe that the term "home city" is not used in the Agreement and was not known to either Lama or Aleksanian.  (SUMF ¶ 20 (response).)

[4] Plaintiffs refashion this limitation as an "advertise[ment] that trips may last as long as four hours."  (SUMF ¶ 130; *see also* Opp. at 17.)  That characterization is far-fetched, particularly given that the limitation appears at the bottom of a webpage along with other conditions, disclosures, and fees associated with using Uber's platform.  (*See* Soleimany Decl. Ex. L at ECF 6-7.)

If a driver decides to sign on to the Uber platform and is offered a trip, they are generally free to "accept or decline or ignore" the request. (SUMF ¶ 38 (quoting TSA § 2.4); *see also id.* ¶ 39 (quoting similar language in SLA § 4.2.2).) Uber has warned drivers, however, that they may lose access to its platform for declining too many rides or discriminating against riders on the basis of their destination. (SUMF ¶¶ 137-138; *see also* Soleimany Decl. Ex. I at 1:13-1:17 (Uber introductory video to drivers explaining "if you are online, you are expected to accept most trip requests"), Ex. R at 231 (Uber employee describing destination discrimination as a "fairly egregious error[] on the drivers part" which may result in suspension from the platform); Supp. Perl Decl. ¶¶ 5-7 (describing Uber "guidelines" prohibiting "destination discrimination," and how Uber may deactivate a driver's account for cancelling too many trips).) Notwithstanding these general policies, Uber does not "impose [specific] penalties … for declining or cancelling a trip because it does or does not cross state lines," nor do the parties identify a way drivers can isolate or filter out those trips.[5] (Perl Decl. ¶ 18; *see also* SUMF ¶¶ 61, 143.) Uber only informs drivers of the rider's destination after the driver has accepted the ride. (Soleimany Decl. Ex. I at 0:59-1:33; *see also* SUMF ¶¶ 146-153.)

Discovery in this matter has provided a detailed statistical picture of Uber's interstate business during the relevant period.[6] At its most basic, the record shows that Uber's engagement in cross-border transportation between states was quite limited

---

[5] Uber imposes a $20 surcharge on all trips between New York City and New Jersey. (SUMF ¶ 132.)

[6] For purpose of Plaintiffs' class action claims, the relevant period spans November 6, 2013, to May 22, 2017. (*See* FAC ¶¶ 91-92.) Per the parties' agreement, discovery covered the period from 2013 through 2019. (SUMF at 1.)

relative to its provision of intrastate services within any given state.  Between 2013 and 2019, only 2.7% of Uber's completed trips were "dispatched and picked up in different states or … picked up and dropped off in different states" (the "Interstate Trips").  (SUMF ¶ 66.)  The remaining 97.3% of Uber trips were dispatched, picked up, and dropped off within the same state (the "Intrastate Trips").[7]  (SUMF ¶ 65.)  Unsurprisingly, the Interstate Trips tended to be longer (in both distance and duration) than the Intrastate Trips and resulted in higher fares on average.  (SUMF ¶¶ 69-75.)  Specifically, Interstate Trips accounted for 4.8% of all on-trip time and, between 2014 and 2019, 5.7% of the gross amount charged to riders (amounting to over four billion dollars in Uber fares from interstate trips).[8]  (SUMF ¶¶ 94, 124, 126.)  Whether intrastate or interstate, the length of Uber rides tended to be modest:  the average ride during the discovery period was less than 17.4 minutes and covered less than 6.5 miles.  (SUMF ¶¶ 71, 73; *see also id.* ¶¶ 72 & 74 (the average interstate trip was less than 14.2 miles and lasted less than 29.5 minutes).)

"Nationwide, the percentage of drivers who performed at least one trip in each year from 2013-2019 [and] who performed an interstate trip" ranged from a low of 19.6% to a high of 27.9%, depending on the year.  (SUMF ¶¶ 77, 105.)  For drivers who completed at least 50 trips annually, the percentages were naturally higher:  between 26.6% and

---

[7] In absolute terms, drivers "completed 4,939,759,400 trips nationwide between 2013 and 2019, … and 4,807,452,631 … of those trips were" intrastate.  (SUMF ¶ 65.)

[8] "On-trip time" refers to the total minutes that drivers spent completing trips.  (SUMF ¶ 94.)

34.9%.[9]  (SUMF ¶ 107.)  And, on average, those drivers completed between 17.3 and 22.8 interstate trips per year, depending on the year.  (SUMF ¶ 110.)  "[T]he median number of interstate trips nationwide per driver per" week, month, and year "was zero."[10] (SUMF ¶ 76; Linfoot Decl. ¶ 9.)

Some Uber riders used Uber to travel to and from airports.  Between 2013 and 2019, 9.7% of Uber trips were to or from an airport (i.e., an "airport trip"); these trips accounted for 16.9% of nationwide on-trip time.  (SUMF ¶¶ 89, 95.)  In those years, between 71.9% and 82.4% of drivers nationwide performed an airport trip.  (SUMF ¶ 121.) For the period between 2014 and 2019, 20.6% of the gross amount charged to Uber riders nationwide came from airport trips.  (SUMF ¶ 96.)

To facilitate airport trips, Uber signed non-exclusive agreements with "most major U.S. airports" to operate within airport boundaries.  (Soleimany Decl. Ex. T at ECF 64; SUMF ¶¶ 85, 157.)  Generally, these agreements dictate, among other things, where drivers can pick up passengers on airport property and set forth the fees Uber would pay for those rights.  (*See* SUMF ¶¶ 86, 158-163; Soleimany Decl. Exs. EE-II.)  Uber signed at least one agreement directly with an airline; under the terms of that agreement, Uber paid the airline for new users it referred to Uber's platform through the airline's app.  (*See*

---

[9] The vast majority of rides are performed by the subset of drivers who complete 50 or more trips in a given year.  (*See* SUMF ¶ 112.)

[10] Plaintiffs understandably take issue with the median as a metric and argue it does not "meaningfully reflect the frequency with which the class as a whole performs interstate work."  (SUMF ¶ 76; *see also* Opp. at 11 ("analyzing drivers with a *de minimis* amount of work leads to misleading conclusions").)  The Court appreciates that, given the uneven distribution of how many rides Uber drivers complete per year, focusing on the median driver may not be particularly enlightening.  With that said, the Second Circuit explicitly envisioned discovery on that metric, *see Aleksanian II*, 2023 WL 7537627, at *3.

*generally* Soleimany Decl. Ex. LL.)  Uber has also offered tools to help airlines provide ground transportation via the Uber platform to their employees and "distressed passengers" when their flight is delayed or cancelled.[11]  (Soleimany Decl. Ex. JJ at ECF 2; *see also* SUMF ¶ 164.)

To passengers, Uber has touted its platform as the "best way" to get to select airports from nearby cities, including cities in other states.  (*See, e.g.,* Soleimany Decl. Ex. BB (Uber webpage describing the "[b]est way to get from New Haven CT to JFK" and providing prices for Uber rides).)  In October 2021, Uber posted an article on its website announcing various "new updates geared toward making [riders'] airport travel experience smoother and simpler than ever before."  (Soleimany Decl. Ex. MM at ECF 3; *see also* SUMF ¶ 156.)

The parties also submitted evidence specific to New York City drivers.  New York City drivers are those who completed at least one trip in New York City during any of the relevant years and were licensed to do so by the New York Taxi & Limousine Commission.  (SUMF at 3 n.3.)  Those drivers performed interstate trips at a slightly higher rate than drivers nationwide (3.6% of all completed trips).  (SUMF ¶ 78; *see also id.* ¶ 106.)  New York City drivers also performed airport trips at a rate higher than the national average.  (*Compare* SUMF ¶ 121 *with* Soleimany Decl. Ex. C at 41 (depending on the year, between 83.5% and 96.8% of New York City drivers performed at least one airport trip).)

---

[11] There is no evidence in the record concerning the extent to which this service was actually available during the relevant time period, and to the extent it was, how many airlines, if any, contracted with Uber for this service, or the number of trips, if any, provided under these arrangements.  (*See* Opp. at 29; Tr. 6:16-6:23.)

## LEGAL STANDARDS

### A.    Motion To Compel Arbitration

When deciding a motion to compel arbitration, courts apply a standard similar to that applicable at summary judgment.  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).  Under that standard, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986).  The Court's task is not to resolve contested issues of fact but rather to determine whether there exists any disputed issue of material fact. *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987); *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir. 1986).  "A fact is material when it might affect the outcome … under governing law."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citation omitted).  A dispute "is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

"The moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'"  *Federal Deposit Insurance Corp. v. Great American Insurance Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Celotex*, 477 U.S. at 323).  Once that burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Id.* (citing *Anderson*, 477 U.S. at 249).

"All evidence submitted on the motion is to be construed in the manner most favorable to the nonmoving party."  *Horvath v. Westport Library Association*, 362 F.3d

11

147, 151 (2d Cir. 2004).  However, "[t]o defeat a summary judgment motion, the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Federal Deposit Insurance Corp.*, 607 F.3d at 292 (first quoting *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986), then quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

## B.    The Federal Arbitration Act

The FAA provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable," and establishes procedures for enforcing such agreements in federal court.  9 U.S.C. § 2.  The Act reflects an "emphatic federal policy in favor of arbitral dispute resolution."  *KPMG LLP v. Cocchi*, 565 U.S. 18, 21, 132 S. Ct. 23 (2011) (per curiam) (internal quotation marks and citation omitted); *see also Arciniaga v. General Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) ("it is difficult to overstate the strong federal policy in favor of arbitration").

Under the Act, the Court's inquiry into arbitration agreements is narrow.  Unless otherwise provided for in the agreement, courts consider threshold questions of arbitrability.  *Doctor's Associates, Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019).  Arbitrability is determined by a two-part test:  "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement."  *In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113, 128 (2d Cir. 2011).  In applying this test, courts must "construe arbitration clauses as broadly as possible."  *Id.* (internal quotations marks omitted); *see also Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460

U.S. 1, 24-25, 103 S. Ct. 927 (1983) ("doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").

Notwithstanding the strong federal policy in favor of arbitration, the FAA "bears its qualifications." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 108, 139 S. Ct. 532 (2019). Relevant here, Section 1 of the FAA states "nothing" contained in the Act "shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. This carveout was intended to shield from the FAA pre-existing or developing "alternative employment dispute resolution regimes for some groups of transportation workers." *Silva v. Schmidt Baking Distribution, LLC*, 162 F.4th 354, 359 (2d Cir. 2025); *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121, 121 S. Ct. 1302 (2001) ("It is reasonable to assume that Congress excluded 'seamen' and 'railroad employees' from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers"). In *Circuit City*, the Supreme Court interpreted the residual category of this provision – "any other class of workers" – as referring solely to **transportation** workers, not workers generally. 532 U.S. at 114-15 (applying the *ejusdem generis* canon of construction and reasoning that the residual clause derives its meaning from the preceding list, i.e., "seamen" and "railroad employees"); *see also Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 458, 142 S. Ct. 1783 (2022). The Supreme Court has since clarified that transportation workers are defined "by what they do [in their jobs], not for whom they do it" and, thus, a "transportation worker need not work in the transportation industry to fall within the exemption." *Bissonnette v. LePage*

*Bakeries Park St., LLC*, 601 U.S. 246, 255-56, 144 S. Ct. 905 (2024); *see also Saxon*, 596 U.S. at 460.

Determining whether the Section 1 exclusion applies is a question the Court must decide before compelling arbitration. *New Prime*, 586 U.S. at 111. "Plaintiffs have the burden of proving that the [transportation-worker] exemption applies." *Capriole v. Uber Technologies, Inc.*, 460 F. Supp.3d 919, 928 (N.D. Cal. 2020), *aff'd*, 7 F.4th 854 (9th Cir. 2021).

## DISCUSSION

Plaintiffs do not dispute that the Agreement reflects a valid agreement to arbitrate and that Plaintiffs' claims in this litigation fall within the broad scope of the arbitration provision.[12]  (*See generally* Opp.)  Instead, Plaintiffs assert that the instant dispute is exempted from the FAA altogether because the Agreement is a "contract[] of employment of seamen, railroad employees, or any other class of workers engaged in … interstate commerce."  9 U.S.C. § 1.  Uber argues that (1) plaintiffs are not members of a "class of workers engaged in … interstate commerce" and (2) the Agreement is not a "contract[] of employment."  (Mem. at 8-22.)  In the event the FAA does not apply, Uber also seeks to compel arbitration under New York law.  (*See* Mem. at 22-26 (citing N.Y. C.P.L.R. § 7503).)  Uber's first argument is correct and sufficient to compel arbitration.[13]

---

[12] The arbitration provision explicitly "applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law … and common law claims."  (SLA § 14.3(i); TSA § 15.3(i).)

[13] Because Plaintiffs are compelled to arbitrate under the FAA, the Court declines to consider whether New York law provides an alternative means to compel arbitration or address Uber's argument that the Agreement is not a "contract of employment."

To determine whether the FAA's Section 1 exemption applies, the Court must define "the relevant 'class of workers' to which [plaintiff] belongs," and then address "whether that class of workers is 'engaged in foreign or interstate commerce.'" *Saxon*, 596 U.S. at 455.

## A.   The Relevant Class Of Workers Is Uber Drivers Nationwide

The relevant class of workers consists of Uber drivers nationwide during the relevant period.  As alluded to above, the job of driving for Uber may vary as it relates to interstate travel depending on the specific driver and their geography.  For instance, a driver in Honolulu will never cross a state boundary while a driver in Kansas City may do so with some frequency.  And, because drivers are not required to complete any minimum number of rides, *see* SUMF ¶¶ 38-39, the volume of interstate crossings (in absolute terms) varies across the class as a function of the number of trips that individual drivers provide.   (*Compare* SUMF ¶ 110 (interstate trip data for drivers who completed 50 or more trips annually) *with id.* ¶ 117 (interstate trip data for drivers who completed 1500 or more trips annually).)

But the FAA generally does not require courts to splice the class of workers into subcategories or rely on the circumstances of individual plaintiffs for purposes of the Section 1 analysis. *See Bacashihua v. United States Postal Service*, 859 F.2d 402, 405 (6th Cir. 1988) (the question is not "whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce").  Instead, when assessing whether a "class of workers" is engaged in interstate commerce, the relevant class generally "must be defined at a *nationwide* level," *Osvatics v. Lyft, Inc.*, 535 F. Supp.3d 1, 14-15 (D.D.C.

15

2021), and considered "as a whole," *Saxon*, 596 U.S. at 456.[14]  *See also Singh v. Uber Technologies, Inc*., 67 F.4th 550, 556 (3d Cir. 2023) [hereinafter *Singh II*] ("We give the residual clause … [a] national scope"); *Golightly v. Uber Technologies, Inc*., No. 21-CV-3005, 2022 WL 22964674, at *7 (S.D.N.Y. Dec. 21, 2022) ("for purposes of the Section 1 exemption, … Courts are largely in agreement that the proper geographic scope of the class of workers … is nationwide") (internal quotation marks omitted); *Capriole v. Uber Technologies, Inc*., 7 F.4th 854, 866 (9th Cir. 2021) (rejecting an exclusive focus on "full-time" drivers).   That conclusion, as then-Judge Jackson explained, flows from the text, structure, and purpose of the FAA in establishing a "***national*** policy favoring arbitration." *Osvatics*, 535 F. Supp.3d at 15 (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443, 126 S. Ct. 1204 (2006)); *see also Capriole*, 7 F.4th at 862 (endorsing the *Osvatics* approach and observing "[a]ny alternative approach would potentially produce absurd results whereby the FAA would apply differently to neighboring states, or even neighboring cities in the same state").  As to the text and structure of the Act, the residual clause derives its meaning from the preceding list of "seamen" and "railroad employees," and those terms contain no geographic limitation; accordingly, the residual clause too operates without such limit.  *Osvatics*, 535 F. Supp.3d at 15 (citing *Circuit City*, 532 U.S. at 115).

---

[14] Courts have left open the possibility that, in certain circumstances, a court may need to consider "a more local class [of workers]" where an employer seeks to group an employee in with "other persons who bear the same job title but whose work otherwise bears no resemblance to the work the employee does." *Golightly*, 2022 WL 22964674, at *8.  No such circumstances are present here.

Notwithstanding the established case law to the contrary, Plaintiffs "ask the court to consider and make a [separate] determination as to both" New York City drivers and drivers nationwide. (Opp. at 10; *see also* Tr. 11:19-11:22.) The Court sees no reason to do so.[15] Accordingly, the Court next considers whether Uber drivers nationwide for the relevant period are engaged in interstate commerce under the FAA.[16]

## B.    Uber Drivers Are Not Engaged In Interstate Commerce Under The FAA

Based on the record before it and the decisions of a growing majority of federal courts, the Court is persuaded that Uber drivers for the relevant period are not "engaged in … interstate commerce" as that term is used in Section 1 of the FAA. *See, e.g., Singh*

---

[15] Regardless, in this case, the issue is somewhat academic. As Plaintiffs concede and as described above, "New York Uber drivers perform interstate trips at a rate roughly in line with that of drivers nationwide." (Opp. at 10; *but see* SUMF ¶ 106 (describing the percentage of New York City Drivers who performed at least one interstate trip annually, which is higher than the nationwide percentages at SUMF ¶ 105).) *See also Golightly*, 2022 WL 22964674, at *8 (noting, based on the evidence before the court, there is no reason to think "the nature of the job description or the nature of the work of an Uber driver nationally differs materially from that of New York State or New York City Uber drivers"). The Court does, however, consider the New York-specific facts and Named Plaintiffs' experiences to the extent they illuminate the activities of Uber drivers nationwide. *See Rogers v. Lyft, Inc.*, 452 F. Supp.3d 904, 915 (N.D. Cal. 2020) ("plaintiffs' personal exploits are relevant only to the extent they indicate the activities performed by the overall class"), *aff'd,* No. 20-15689, 2022 WL 474166 (9th Cir. Feb. 16, 2022). *But see Davarci v. Uber Technologies, Inc.*, No. 20-CV-9224, 2021 WL 3721374, at *9 (S.D.N.Y. Aug. 20, 2021) (noting the "idiosyncratic patterns of two Uber drivers in New York State are largely irrelevant to the Court's analysis").

[16] Given the factual record on this motion, which is specific to Uber, the Court focuses on *Uber* drivers nationwide, as opposed to rideshare drivers generally. For the same reason, and though the Court speaks of Uber drivers generally, the Court's holding is necessarily limited to Uber drivers during the relevant period. With that said, the Court discusses cases involving another rideshare company, Lyft, and cases involving Uber that were resolved on different factual records. The Court relies on those cases to the extent they involved analogous evidence and provide helpful elucidations of law. *See Davarci*, 2021 WL 3721374, at *8 n.18 (defining the class as Uber drivers nationwide while noting the "result would not be different [if the class were] defined as all rideshare drivers").

17

*II*, 67 F.4th at 561; *Capriole*, 7 F.4th at 861; *Cunningham v. Lyft, Inc.*, 17 F.4th 244, 253 (1st Cir. 2021); *Golightly*, 2022 WL 22964674, at *6 (observing the "majority of courts hold that Uber … drivers are not exempt from the FAA's coverage under Section 1") (citing cases); *Davarci*, 2021 WL 3721374, at *1 (noting a "consensus has seemingly begun to develop that rideshare drivers are not exempt from the FAA"); *Osvatics*, 535 F. Supp.3d at 12 ("A majority of courts faced with this question have concluded that rideshare drivers do not fall within the section 1 residual clause").

Courts "have articulated a variety of tests and relied on a variety of factors in examining Section 1 of the FAA," and the Second Circuit has not yet weighed in on the appropriate standard.  *Aleksanian II*, 2023 WL 7537627, at *2 n.3; *see also Aleksanian I*, 524 F. Supp.3d at 260 (there is "no clear definition or consensus of what constitutes a transportation worker who is engaged in interstate commerce") (internal quotation marks and brackets omitted)[17]; *Chambers v. Maplebear, Inc*., 746 F. Supp.3d 206, 217 (S.D.N.Y. 2024) ("The Second Circuit has not directly opined on how to determine whether a class of workers is engaged in interstate commerce," and certifying related issue for appeal), *appeal dismissed on procedural grounds* (May 7, 2025).

But all three courts of appeals to have considered the issue in the context of rideshare drivers have reached the same conclusion and endorsed the Seventh Circuit's approach articulated in *Wallace v. Grubhub Holdings, Inc.,* which focuses the inquiry on

---

[17] Because *Aleksanian I* was vacated, it lacks precedential value.  *Brown v. Kelly*, 609 F.3d 467, 477 (2d Cir. 2010) ("a decision that has been vacated has no precedential authority whatsoever") (internal quotation marks omitted).  However, the Second Circuit vacated on grounds no longer at issue, and the Court cites the decision here as merely persuasive authority.  *Id.* (treating vacated decision as persuasive authority).

whether interstate transportation is "'a central part' of the job description of the class."
*Singh II*, 67 F.4th at 557 (quoting *Wallace*, 970 F.3d 798, 803 (7th Cir. 2020) (Barrett, J.)
and citing, as in accord, *Capriole*, 7 F.4th at 864; *Cunningham*, 17 F.4th at 253); *see also*
*Aleksanian I*, 524 F. Supp.3d at 260 (endorsing the *Wallace* approach); *Osvatics*, 535 F.
Supp.3d at 17 (same); *Davarci*, 2021 WL 3721374, at *9 (same); *Singh v. Uber*
*Technologies, Inc.*, 571 F. Supp.3d 345, 361 (D.N.J. 2021) [hereinafter *Singh I*]
("Though somewhat different in form, the centrality test in *Wallace*" has been endorsed
by every circuit and "virtually every district court to consider the issue") (internal citation
omitted), *aff'd*, 67 F.4th 550, *as amended* (May 4, 2023).

In *Wallace*, the Seventh Circuit considered whether delivery drivers on Grubhub,
a digital food ordering and delivery platform, qualified as transportation workers under
Section 1 of the FAA.  970 F.3d at 799.  The Grubhub drivers argued that they transported
goods which had previously "moved across state and even national lines" and, thus, fell
within the exemption.  *Id.* at 802.  The panel disagreed and explained that the Section 1
inquiry turns on "whether the interstate movement of goods is a central part of the class
members' job description," not where the goods had been.  *Id.* at 801.

In formulating the "central part" standard, then-Judge Barrett relied heavily on the
Supreme Court's textual interpretation of Section 1 in *Circuit City*.  There, the Supreme
Court observed that the term "engaged in commerce" is distinct from – and narrower than
– both (i) the "affecting commerce" language Congress uses to regulate commerce to the
outer limit of its constitutional authority, and (ii) the phrase "involving commerce" as
employed elsewhere in the FAA.  *Circuit City*, 532 U.S. at 115-16.  Further, as noted
above, *Circuit City* instructed that the residual clause must be understood in relation to

19

the company it keeps:  "seamen" and "railroad workers."  *Id.* at 115.  And, the Supreme Court advised that the FAA's purpose in stemming judicial hostility towards arbitration "compel[s] … the [Section] 1 exclusion provision be afforded a narrow construction."  *Id*. at 118; *but see Saxon*, 596 U.S. at 463 (warning against "pav[ing] over bumpy statutory text[] [in Section 1] in the name of more expeditiously advancing a policy goal") (quoting *New* Prime, 586 U.S. at 120).  The *Wallace* court thus concluded, "to fall within the scope of the residual clause, the class of workers must 'perform work analogous to that of seamen and railroad employees, whose occupations are centered on the transport of goods or persons in interstate or foreign commerce.'"  *Osvatics*, 535 F. Supp.3d at 17 (quoting *Wallace*, 970 F.3d at 802) (brackets omitted).

Here, the extensive record before the Court, which is summarized above, confirms that interstate travel is not a "central part" of the job description of Uber drivers nationwide for the relevant period, and therefore Uber drivers are not engaged in interstate commerce as the term is used in the Section 1 exemption.  Uber drivers' engagement with interstate travel is, on most any measure, a small percentage of the work they did and incidental to their provision of an intrastate service.  Uber drivers cross state lines during trips with limited frequency (*see* SUMF ¶¶ 66-68); most Uber drivers do not perform any interstate trips in a given year (*id.* ¶¶ 76, 105); Uber does not impose specific penalties for declining or cancelling an interstate trip, as opposed to any other trip (*id.* ¶ 61); and, generally, Uber's local services bear little resemblance to that of both railroads and seamen.  *See Singh II*, 67 F.4th at 561 ("take away interstate trips, and the fundamental character of Uber drivers' work remains the same"); *Davarci*, 2021 WL 3721374, at *9 ("Uber drivers' business does not inherently implicate interstate

commerce; the business is more accurately described as a primarily local, intrastate function"); *Golightly*, 2022 WL 22964674, at \*11 (observing interstate trips are "not a central or inherent part of [Uber drivers'] job.  The vast majority of Uber trips are local and the average Uber trip is very short"); *cf. Capriole*, 7 F.4th at 865 (recognizing for "seamen and railroad workers, the interstate movement of goods and passengers over long distances and across national or state lines is an indelible and central part of the job description") (internal quotation marks omitted); *Osvatics*, 535 F. Supp.3d at 18 (similar). And, despite discovery, Plaintiffs have offered scant evidence that interstate travel is a central component of Uber drivers' work, regardless of whether "Uber is set up to handle the occasional interstate trip"; generally aims to provide passengers with a comprehensive transportation option; and does not permit drivers to avoid any particular type of trip without risking discipline.  *Aleksanian I*, 524 F. Supp.3d at 262.  (*See also* Opp. at 3-4, 16-19.)

## C.     Plaintiffs' Other Arguments Are Unavailing

Plaintiffs' arguments in favor of a broader construction of the Section 1 exemption are not persuasive.  Those arguments rely on inapt standards; Uber's contracts with airports and provision of trips thereto; historical material from the time the FAA was enacted; and two decisions from this District that predate the swell of appellate and other decisions finding that Uber (or Lyft) drivers are not exempt workers.

First, Plaintiffs assert that *Wallace*'s Section 1 central-part standard is unduly narrow and, instead, latch onto *Saxon*'s statement that "any class of workers ***directly involved*** in transporting goods across state … borders falls within [Section] 1's exemption."  (Opp. at 2, 8-9 (quoting *Saxon*, 596 U.S. at 457 (emphasis added)).)  But *Saxon* does not compel a different result in this case, nor does it upset the *Wallace*

approach.  As the Third Circuit explained in finding that Uber drivers did not come within the Section 1 exemption, this "single sentence" in *Saxon* must be read in context.  *Singh II*, 67 F.4th at 559.

In *Saxon*, the Supreme Court ruled that an airline ramp supervisor who "frequently … load[s] and unload[s] baggage, airmail, and commercial cargo on and off airplanes that travel across the country" is exempt from the FAA because she was "intimately involved with the … transportation[] of that cargo" regardless of whether the supervisor actually moves the cargo across state borders.  *Saxon*, 596 U.S. at 453.  In resolving a circuit split over whether Section 1 only applies to workers who engage in actual transportation, *id.* at 454-55, the Supreme Court in *Saxon* did **not** hold "that rare border crossings are enough to make interstate transportation central to a class of workers' job description." *Singh II*, 67 F.4th at 559.   That question was not at issue because it was undisputed that Ms. Saxon loaded and unloaded interstate cargo "on a frequent basis."  *Saxon*, 596 U.S. at 456.  Indeed, *Saxon* is of a piece with *Wallace*:  the Supreme Court interpreted Section 1's use of the term "engaged" as "emphasiz[ing] the actual work that the members of the class, as a whole, **typically** carry out."[18]  *Id.* at 456 (emphasis added); *see also Singh II*,

---

[18] *Saxon* also declined to address whether a "class of workers [which] carries out duties further removed from the channels of interstate commerce or the actual crossing of borders," such as "'last leg' delivery drivers" or "food delivery drivers," fell within the exemption.  *Saxon*, 596 U.S. at 457 n.2 (first citing *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 915 (9th Cir. 2020); then citing *Wallace*, 970 F.3d at 803).

Guidance on that question may be forthcoming.  On October 20, 2025, the Supreme Court granted a writ of certiorari in *Flower Foods, Inc. v. Brock*.  *See* 146 S. Ct. 327, 223 L. Ed. 2d 161 (2025).  That case concerns whether the transportation-worker exemption covers "workers who deliver locally goods that travel in interstate commerce … but who do not transport the goods across borders nor interact with vehicles that cross borders."  Petition For A Writ Of Certiorari, *Flower Foods* (No. 24-935).

22

67 F.4th at 559.

Relying on the text of the statute, Plaintiffs argue that the Section 1 exemption applies to transportation workers engaged in interstate commerce "without further qualification." (Opp. at 10.)  The minority of courts which have found Uber and Lyft drivers exempt from the FAA have adopted a similar view.  *See, e.g., Islam v. Lyft, Inc.*, 524 F. Supp.3d 338, 351 (S.D.N.Y. 2021) (seeing no "basis to read into Section One the words 'predominantly engaged in' or 'primarily engaged in' interstate commerce"); *Gonzalez v. Lyft, Inc.*, No. 2:19-CV-20569, 2021 WL 303024, at *3 (D.N.J. Jan. 29, 2021) (noting *Circuit City* did not construe Section 1 as requiring an "exclusive, primary, or routine engagement in interstate commerce"); *see also International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 958 (7th Cir. 2012) ("there is no basis in the text of [Section] 1 for drawing a line between workers who do a lot of interstate transportation work and those who cross state lines only rarely" and holding that certain truck drivers who rarely cross state lines are exempt from the FAA).  Of course, Plaintiffs rely on qualifying language by embracing the "directly involved" standard from *Saxon*.

Indeed, Plaintiffs' understanding of Section 1's text "is at odds with *Saxon*, … and the majority approach of [the courts of appeals].  The duties of seamen and railroad employees are defined by interstate commerce – remove interstate commerce from the equation, and the fundamental character of their work changes.  So too must the work of any class of workers covered by [Section] 1."  *Singh II*, 67 F.4th at 559 n.8; *see also Davarci*, 2021 WL 3721374, at *11 (the "minority view impermissibly reads all nuance out of Section 1's residual clause and contravenes binding Supreme Court precedent

23

dictating the proper interpretation of Section 1 and Congress's intent in creating a limited exception to the normal reach of the FAA").  Put another way, "Congress' use of the enumerated categories of 'seamen' and 'railroad employees,' when coupled with the narrow construction due the exception, convinces [the Court] that the residual clause includes only those workers whose jobs are centered on interstate commerce."  *Singh II*, 67 F.4th at 559; *see also Golightly*, 2022 WL 22964674, at *12 (distinguishing *Kienstra Precast* on the grounds that it involved "a trucking company …, a business that is more often associated with interstate than intrastate commerce" and, to the extent it is not distinguishable, noting the court's reasoning is "contrary to the Supreme Court's guidance" concerning Section 1); *Wallace*, 970 F.3d at 800 (explaining, after *Kienstra* and notwithstanding citations thereto, that "someone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind of work").

In endorsing a broader standard, Plaintiffs also reach for interpretations of "engaged in interstate commerce" from unrelated statutory schemes.  (Opp. at 15-16, 22-23.)  For instance, courts have found that "a driver is engaged in interstate commerce for purposes of the [Fair Labor Standards Act's ("FLSA")] motor carrier exemption when the employee could reasonably have expected to drive in interstate commerce" and "regardless of the actual time spent by employees individually on interstate travel."  *Islam*, 524 F. Supp.3d at 352 (internal quotation marks and citations omitted).  And, in *Morris v. McComb*, the Supreme Court found, based on an interpretation of the Motor Carrier Act of 1935, 49 Stat. 543 ("1935 MCA"), that the FLSA exemption applies to certain truckers who spend only "about 4% of their time and effort … devoted to services in interstate

commerce" because the work was a "natural, integral and apparently inseparable part of the common carrier service."  332 U.S. 422, 431-33, 68 S. Ct. 131 (1947).

But while courts may seek to "afford[] … consistent significance to the meaning of the words Congress uses," they must also construe the "FAA with reference to the statutory context in which it is found and in a manner consistent with the FAA's purpose." *Circuit City*, 532 U.S. at 117-18 ("we do not mean to suggest that statutory jurisdictional formulations necessarily have a uniform meaning whenever used by Congress" (internal quotation marks omitted)).  Section 1 of the FAA differs in text, structure, purpose, and doctrinal development from the FLSA and MCA; most notably, the transportation worker exemption is afforded a narrow construction and derives its meaning, in part, from the terms "railroad employees" and "seamen."  *Id.* at 115; *see also Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1347-49 (11th Cir. 2021) (declining to rely on cases involving the FLSA and the MCA in interpreting Section 1 of the FAA).  And, absent any indication that "Congress borrowed language from one statute to graft onto a second statute,  … [courts] can't take a piece from one structure and put it on top of another and automatically expect it to fit." *Id*. at 1347 (internal quotation marks and citations omitted); *see also Freeman v. Easy Mobile Labs, Inc.*, No. 1:16-CV-18, 2016 WL 4479545, at *2 n.2 (W.D. Ky. Aug. 24, 2016) (finding MCA "irrelevant" in applying Section 1 of the FAA).

The Court does agree with Plaintiffs that the Section 1 inquiry should focus on whether the transportation is interstate, not merely whether it is "local" or of short duration. (*See* Opp. at 19-24.)  A class of workers whose job, for example, centers on shuttling passengers between neighboring states will fall within the exemption, regardless of whether the passengers' journeys tend to be short.  (*See, e.g.*, Opp. at 24 (describing

short – but interstate – ferry trips transporting passengers across the Hudson River between New York and New Jersey).)  Nonetheless, the fact that Uber rides tend to be short and local, at the very least, reinforces and contextualizes the data establishing that they are also, with only limited exception, intrastate.

Plaintiffs further argue that when "Congress wanted to exclude local commerce from the definition of interstate commerce, it knew how to" do so, and point to a provision of the 1935 MCA which explicitly excluded "taxicabs" and the "transportation of passengers … wholly within a municipality or between contiguous municipalities" from the act's reach.  (Opp. at 23 (quoting § 203(b) of the MCA); *see also* Tr. 28:18-29:04.)  But the fact that Section 1 of the FAA does not include similar carveouts is not as revealing as Plaintiffs would have us believe.  The operative provisions of the 1935 MCA – from which taxicabs and certain local transport were excluded – apply to "the transportation of passengers or property **by motor carriers** engaged in foreign or interstate commerce." (Opp. at 23 (quoting 1935 MCA § 202(b)) (emphasis added).)  Congress defined motor carriers as "both a common carrier by motor vehicle and a contract carrier by motor vehicle."  1935 MCA § 203(a)(16); *see also id.* § 203(a)(13) (defining motor vehicle as a "vehicle [or] machine … drawn by mechanical power and used upon the highways" but not to include any "vehicle … operated exclusively on … rails"), (14) (defining common carrier by motor vehicle, in relevant part, as any person "transport[ing] passengers … in interstate … commerce by motor vehicle for compensation").

This statutory language is meaningfully different from Section 1 of the FAA, notwithstanding its invocation of the engaged in interstate commerce standard.  Most notably, Section 203(b) of the MCA explicitly contemplates the statute's application to

26

motor vehicles transporting passengers for compensation, a category likely to encompass local taxicabs. There is no surprise then that Congress would have felt compelled to explicitly exclude taxicabs and local transportation from the MCA. Plaintiffs' reliance on the 1935 MCA would be more persuasive if, for instance, the FAA specifically excluded "contracts of employment of any class of workers who transported passengers by motor vehicle engaged in foreign or interstate commerce." But that is not what the FAA says. Section 1 speaks of railroad employees and seamen – and a residual class "controlled and defined" by the same. *Circuit City*, 532 U.S. at 115.

Second, Plaintiffs argue that Uber's transportation of passengers to and from airports is sufficient to draw the drivers into the transportation-worker exemption. (*See* Opp. at 10.) Most courts that have considered this argument have rejected it. *See, e.g.*, *Singh II*, 67 F.4th at 562 (rejecting arguments that Uber's "airport trips are so closely related to interstate commerce as to bring rideshare drivers within the ambit of [the Section 1 exemption]"); *Cunningham*, 17 F.4th at 251 ("we do not think that plaintiffs are engaged in interstate travel merely because they bring passengers to and from an airport"); *Capriole*, 7 F.4th at 864 (similar); *Osvatics*, 535 F. Supp.3d at 21 ("the mere transport of passengers to and from hubs of interstate travel, however frequently that may occur, is not enough" to qualify rideshare drivers for the transportation-worker exemption); *Davarci*, 2021 WL 3721374, at *13 (same); *Aleksanian I*, 524 F. Supp.3d at 262 ("Plaintiffs' alleged role in connecting passengers to international and interstate transportation hubs, does not support a finding that Uber drivers as a class engaged in interstate commerce") (internal quotation marks and citation omitted).

In so doing, courts have found instructive the Supreme Court's decision in *United States v. Yellow Cab Co*., 332 U.S. 218, 67 S. Ct. 1560 (1947) (subsequent history omitted). That case addressed whether two alleged conspiracies involving certain taxicab companies sufficiently "affected" interstate commerce to fall within the Sherman Act. *Id.* at 225. The first conspiracy involved exclusive contracts between cab companies and railroads to transfer "passengers and their luggage between railroad stations" as part of their multi-leg train journeys. *Id.* at 228. The Supreme Court determined that those trips formed an "***integral step*** in … interstate movement" and affected interstate commerce for purposes of the Sherman Act. *Id*. at 229 (emphasis added). In contrast, the second conspiracy involved a broader effort to monopolize local taxicab services in Chicago, which sometimes included transporting passengers to and from hubs of interstate transportation. The Supreme Court held that the second conspiracy did not affect interstate commerce as contemplated by the Sherman Act. *Id*. at 230.

In addressing the second conspiracy, the Supreme Court held that "when local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation," *id.* at 233, and explained:

> [A] traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and … his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. … [Taxicab service] is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires. From the standpoints of time and continuity, the taxicab trip may be quite distinct and

> separate from the interstate journey.  To the taxicab driver, it is just another local fare.

*Id.* at 231-32.

The Court has little trouble concluding that Uber drivers' airport trips are akin to those provided by local taxicab companies in the second conspiracy described in *Yellow Cab* and do not form a basis for exempting plaintiffs from the FAA, regardless of the fact that airport trips make up a portion of Uber's revenue and drivers' on-trip time.  Air travelers have a myriad of options for transportation to and from the airport.  If a passenger chooses Uber, their airport trip is "distinct and separate" from their flight and "just another local fare" for Uber.  *Yellow Cab Co.*, 332 U.S. at 232.

Conversely, Uber's nonexclusive agreements to enter airport property, referral arrangement with an airline, and marketing of Uber's services to air travelers and airlines are materially dissimilar to the arrangements that were at issue in the first *Yellow Cab* conspiracy which integrated the cab companies with the railroad's interstate transportation.  *See Mahwikizi v. Uber Technologies, Inc.*, No. 22-CV-3680, 2023 WL 2375070, at *5 (N.D. Ill. Mar. 6, 2023) (stating that "the fact that Uber contracts with airports for access to nearby staging lots and requires drivers to pick up riders at designated areas at the airport does not alter the essentially local nature of Uber drivers' work"); *Capriole*, 7 F.4th at 865 (finding Uber's agreements with airports do not amount to participation "in a single, unbroken stream of interstate commerce"); *Davarci*, 2021 WL 3721374, at *14 (explaining that "marketing partnerships with airlines" and agreements to "allow passengers to hail an Uber from within airport boundaries do[] not transform Uber drivers from local transportation providers to part of the continuous flow of interstate commerce") (internal quotation marks omitted); *Golightly*, 2022 WL 22964674, at *9

(finding Uber's access agreements with airports are "wholly different from the type of special arrangement which *Yellow Cab* held may result in a cab service being part of the stream of interstate commerce").

Uber's agreements, for instance, do not permit airline passengers to purchase an Uber ride and an airline ticket in the same transaction; nor do they require Uber drivers to transport air travelers, much less solely between legs of their journey. (SUMF ¶¶ 87-88.) And, regardless of whether the agreements are between Uber and airports, *see* Tr. 48:15-48:25, the actual airport trips are "contracted for independently of the [air] journey and may be utilized whenever the traveler so desires." *Yellow Cab*, 332 U.S. at 232. In the first *Yellow Cab* conspiracy, by contrast, the "railroads often contract[ed] with the passengers to supply between-station transportation" and then subcontracted that work to a third-party cab company; the third-party employed "special cabs carrying seven to ten passengers" to provide the service. *Id.* at 228.

Plaintiffs' attempts to distinguish *Yellow Cab* are unavailing. Plaintiffs point to *Marshall v. Victoria Transportation Co, Inc.*, a Fifth Circuit decision addressing whether workers on bus lines in the Texas border region were engaged in interstate commerce so as to come within the protections of the FLSA, not the FAA. (Opp. at 28 (citing 603 F.2d 1122, 1124 (5th Cir. 1979).) In *Marshall*, the panel distinguished *Yellow Cab* on the grounds that "every bus route of each defendants' company carries a substantial percentage of international travelers every day" and *Yellow Cab* "is an anti-trust suit in which the broader [FLSA] coverage precedents are not applicable." *Marshall*, 603 F.2d at 1124.

*Marshall* does not help Plaintiffs.  Unlike in *Marshall*, the evidence here does not establish that "every [Uber ride] carries a substantial percentage of international travelers every day."  *Id.*  And, whereas the FAA transportation-worker exemption requires a narrow construction, the FLSA's coverage provision at issue in *Marshall* is interpreted broadly.  *Compare Marshall*, 603 F.2d at 1123-24 (the "court is committed to giving the [FLSA] a broad, liberal construction" and "any regular contact with commerce, no matter how small, will result in coverage") *with Circuit City*, 532 U.S. at 118 (Section 1's "exclusion provision [should] be afforded a narrow construction").  And, again, "affecting" interstate commerce under the Sherman Act is a broader concept than engaging in commerce.  *See Circuit City*, 532 U.S. at 115.  As such, "conduct that does not affect interstate commerce under the Sherman Act (e.g., local cab rides to the station) would seem *a fortiori* not to be conduct 'engaged in interstate commerce' under the FAA's section 1 exception."  *Cunningham*, 17 F.4th at 251; *see also Golightly*, 2022 WL 22964674, at *10; *Singh I*, 571 F. Supp.3d at 364 n.7.

Plaintiffs also seek to distinguish *Yellow Cab* on the ground that the cab drivers there only provided transportation within Chicago's city limits and thus never completed interstate trips.  (*See* Tr. 28:02-28:08; Opp. at 21 (criticizing *Capriole*'s reliance on *Yellow Cab* in the context of interstate trips).)  The Court agrees that Uber drivers are not so limited and that some percentage of trips, as set forth above, do cross state lines.  But the fundamental point of *Yellow Cab*'s analysis applies no less to Plaintiffs' reliance on Uber's airport trips and agreements:  provision of trips to hubs of interstate transportation – rail stations in *Yellow Cab*, and airports here – do not transform what is essentially a local service into a service affecting interstate commerce, let alone the narrower definition

of engaging in interstate commerce as used in FAA Section 1. *Cunningham*, 17 F.4th at 251.

*Yellow Cab*'s focus on whether the transportation is provided as part of a single, unbroken interstate chain – and the Court's ultimate conclusion – is also consistent with *Rittmann v. Amazon.com* where the Ninth Circuit held that, regardless of whether they ever crossed state lines, "last mile" Amazon delivery workers *were* engaged in interstate commerce for purposes of the FAA. 971 F.3d at 919; *see also Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 26 (1st Cir. 2020) (similar). (*See* Opp. at 25 (relying on these cases).) The Ninth Circuit explained that these "workers pick up packages that have been distributed to Amazon warehouses, certainly across state lines, and transport them for the last leg of the shipment to their destination. Although Amazon contends that [its] delivery providers are 'engaged in local, intrastate activities,' the Amazon packages they carry are goods that remain in the stream of interstate commerce until they are delivered." *Rittmann*, 971 F.3d at 915. Uber's transportation of air travelers is different; Uber's airport trips are not "a part of a *continuous* interstate transportation" service provided by Uber. *Id.* at 916 (emphasis added); *see also Rogers*, 452 F. Supp.3d at 917 (Lyft "drivers thus lack the requisite practical, economic continuity with interstate air … transportation") (internal quotation marks omitted).

Plaintiffs also argue that Uber's agreements to access airports are akin to "wharfage agreements" and, accordingly, sufficient to trigger the Section 1 exemption. (Opp. at 25.) In making this argument, Plaintiffs rely on the following reasoning from *Saxon*:

> A final piece of statutory context further confirms that [Ms. Saxon's] cargo loading is part of cross-border "commerce."

32

> The first sentence of § 1 of the FAA defines exempted "maritime transactions" to include, among other things, "agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce."  The use of "other" in the catchall provision indicates that Congress considered the preceding items to be "matters in foreign commerce."  And agreements related to the enumerated "matte[r] in foreign commerce" of "wharfage," to take one example, included agreements for mere access to a wharf — which is simply a cargo-loading facility.  See Black's 1226 (wharfage: "[m]oney paid for landing wares at a wharf, or for shipping or taking goods into a boat or barge from thence"); Webster's 2323 (similar); see also, *e.g.*, Black's 1226 (wharf: "A perpendicular bank or mound ... extending some distance into the water, for the convenience of lading and unlading ships and other vessels").  It stands to reason, then, that if payments to access a cargo-loading facility relate to a "matte[r] in foreign commerce," then an individual who actually loads cargo on foreign-bound ships docked along a wharf is himself engaged in such commerce.  Likewise, any class of workers that loads or unloads cargo on or off airplanes bound for a different State or country is "engaged in foreign or interstate commerce."

*Saxon*, 596 U.S. at 459.

Uber responds, in part, that its agreements with airports are not akin to wharfage agreements.  (Reply at 9 (citing *Mahwikizi*, 2023 WL 2375070, at *5 n.8 (stating in a footnote that Uber's "agreements to access staging lots near the airports are not 'wharfage' agreements")).)   Even assuming that Uber's agreements with airports were analogous to wharfage agreements, *Saxon's* reasoning can only be taken so far and does not change the result in this case.  As noted above, *Saxon* centered on whether an airline employee who never actually traveled could still fall within the exemption.  The Supreme Court did not hold that any person who performs any amount of work under a wharfage agreement is per se engaged in interstate commerce.  Moreover, unlike Ms. Saxon who worked for the airline completing the interstate trips and loaded goods directly on the

flights, Uber drivers' provision of airport trips is far more removed from – and not "directly involved in" – the passenger's interstate transportation. *Saxon*, 596 U.S. at 457. Indeed, regardless of the question of whether Uber drivers are employees or independent contractors, there is no evidence that any Uber drivers enjoyed either status with the airlines using the airport.

Finally on this point, the Supreme Court's comparison between Ms. Saxon's work and that contemplated in a wharfage agreement was only the "final piece of statutory context" for its holding. *Id.* at 459. The Court does not read this ancillary portion of *Saxon* as upending *Yellow Cab*, nor its more recent Section 1 progeny finding Uber's access agreements with airports insufficient to invoke the exemption. *See Cunningham*, 17 F.4th at 250 (holding "argument … [that] transportation of some passengers to and from [an airport supports the application of the Section 1 exemption] runs headlong into the instruction supplied by [*Yellow Cab*]"); *Singh II*, 67 F.4th at 562 (finding, after *Saxon*, "*Yellow Cab* … seriously undermines Plaintiffs' argument" that Uber's airport trips and "agreements with major airports" are part of an "integrated interstate transport effort").

Third, Plaintiffs attempt to liken Uber drivers to railroad employees and seamen by pointing to historical data to show that, at the time Congress enacted the FAA, a significant percentage of passengers on Class I railroads were commuters, and a vast majority of passenger boat trips were taken on ferries, suggesting these trips covered relatively short distances. (*See* Opp. at 14-15, 24; SUMF ¶¶ 180-190.) Uber responds that passenger service on railroads "made up only a small fraction of railway service" and, likewise, most seamen were "freight- and passenger-vessel workers," not short-haul ferrymen. (SUMF ¶¶ 188-189 (responses).)

Plaintiffs rely on a "review of [historical] railroad timetables" to show that the relative percentage of interstate as opposed to intrastate trips for railroads at the time the FAA was enacted is similar to that of Uber trips during the relevant period.  (Opp. at 14-15.)  Even accepting Plaintiffs' historical data at face value,[19] it is not persuasive.  Plaintiffs point to data showing that between 14.3% and 44.6% of scheduled train routes performed by certain large railroad companies in 1923 crossed state lines.  (Opp. at 15 (citing SUMF ¶¶ 180-182).)  Plaintiffs compare that historical data to the fact that "34.9% of Uber drivers with 50+ trips/year in 2019, … crossed state lines [and] 52.5 % of drivers with 1500+ trips/year in 2019 did."  (Opp. at 15.)  But those values are not comparable.  The historical railroad data cited by Plaintiffs provides the percentage of the railroads' trips that were interstate, not the percentage of railroad engineers who crossed state lines in a given year.[20]  The Uber data cited by Plaintiffs, however, identifies the rate of a subset of Uber drivers who performed at least one interstate trip (among many trips) in a given year.  The more apt comparator is Uber's rate of interstate trips – 2.7% – which is far lower than the cited historical data and therefore does not support Plaintiffs' argument.

---

[19] Plaintiffs rely on excerpts from *The Official Guide of the Railways of the United States, Porto Rico, Canada, Mexico, and Cuba (July 1923)*.  (*See* Soleimany Decl. ¶ 84 & Ex. RR.)  Uber suggests that publication is not admissible evidence, arguing, inter alia, that it is not "comprehensible support" for Plaintiffs' assertions, and was not produced during discovery notwithstanding its responsiveness to one of Uber's requests.  (*See* SUMF ¶¶ 180-83 (responses).)  The Court does not make a ruling in that respect.  As explained above, even if it is admissible evidence, the railway guide does not materially change the analysis or outcome.

[20] Plaintiffs provide no evidence suggesting that railroad engineers in 1923 only worked on a single route.  If that unlikely scenario were the case, the comparison would likely be more apt.

Plaintiffs also cite to *United States v. Village of Hubbard, Ohio*, a case decided a month before the FAA's enactment, for the proposition that "railroad" does not solely encompass long-distance railroads.  266 U.S. 474, 45 S. Ct. 160 (1925) [hereinafter *Hubbard*].  (*See* Opp. at 22-23; Tr. 46:10-46:24.)  *Hubbard* held that interurban electric railroads were subject to the Interstate Commerce Commission's jurisdiction, rejecting the view that the Commission's jurisdiction was limited to railroads "which are operated as part of a general steam railroad system, or which, if operated independently, are engaged in the general transportation of freight."  266 U.S. at 476-77.  Justice Brandeis reasoned that the act establishing the Commission's jurisdiction used general language and "made no distinction between railroads operated by steam and those operated by electricity."  *Id.* at 478.  Brandeis' opinion does not turn on the meaning of interstate commerce or notions of locality, and sheds little light on Section 1 of the FAA, much less its application to Plaintiffs' claims.  *Cf. id.* at 480-81 (separate opinion of Justice McReynolds highlighting the Supreme Court had previously recognized a distinction between "street railroads and common carriers" due, in part, to the fact that the former is "local in nature" and thus should be controlled by the States absent "clear language" from Congress).

Again, the question is not whether any Uber drivers make any interstate trips.  They do.  The question is whether, as a nationwide class, they are engaged in interstate commerce as the phrase is used in Section 1 of the FAA.  According to the record and the groundswell of case law, they do not.

Lastly, Plaintiffs put considerable stock in two cases from this District that concluded Lyft drivers fell within the Section 1 exemption:  *Islam v. Lyft, Inc.*, 524 F.

36

Supp.3d 338 (S.D.N.Y. 2021) and *Haider v. Lyft, Inc.*, No. 20-CV-2997, 2021 WL 1226442 (S.D.N.Y. Mar. 31, 2021). As an initial observation, those cases involved a different rideshare company, not Uber, and, more importantly, factual records "different from the factual record … offered in this case." *Golightly*, 2022 WL 22964674, at *13. The distinctions are material. For instance, *Haider* focused its analysis specifically on **full-time** Lyft drivers rather than a nationwide class of all drivers. *Compare Haider*, 2021 WL 1226442, at *3 (relying on data showing that full-time Lyft "drivers take passengers across state lines about twice each week on average") *with* SUMF ¶ 109 (showing the "average number of interstate trips completed per [Uber] driver nationwide per … week" ranges from 0.2 to 0.3, depending on the year); *see also Capriole*, 7 F.4th at 866 (declining to follow *Haider* due, in part, to its focus on full-time drivers); *Singh I*, 571 F. Supp.3d at 361 (declining to follow *Haider* and explaining "the crux of the inquiry is not whether a certain proportion of a specific kind of driver's work is out-of-state"). And, in *Islam*, plaintiffs provided evidence that Lyft permitted "passengers to book … rides through [an airline] app and to pay for the rides using [airline loyalty points]," establishing far greater integration between the rideshare company and an airline than present here. *Islam*, 524 F. Supp.3d at 348; *see also Golightly*, 2022 WL 22964674, at *13 (declining to follow *Islam* and *Haider* based on different factual record concerning Lyft's "special commercial arrangement[s]" with hotels and airlines).

Islam and *Haider*, issued in March of 2021, also predate the uniform Circuit-level authority on the issue and rely on arguments that, as found by those Circuits, contravene Section 1's text and Supreme Court precedent. *Compare Haider*, 2021 WL 1226442, at *2 (noting that, at the time, "[n]o circuit court has decided whether rideshare drivers fall

within the exemption for transportation workers") *with Cunningham*, 17 F.4th 244; *Singh II*, 67 F.4th 550; *Capriole*, 7 F.4th 856.

For example, both *Islam* and *Haider* grounded their decisions, at least in part, on drivers' airport trips (perhaps due to the distinct factual record before them). *Islam*, 524 F. Supp.3d at 353 (finding the court's "conclusion is bolstered, if not independently justified, by the fact that the nationwide class of rideshare drivers frequently transports passengers to airports, train stations, and other hubs of interstate travel"); *Haider*, 2021 WL 1226442, at *4 (the "quantity and nature of Lyft's connections to hubs of interstate travel lead the Court to conclude that its drivers engage in interstate commerce even when they do not personally cross state lines"); *see also Davarci*, 2021 WL 3721374, at *13 (observing the "second pillar of support for the minority view is the frequency with which rideshare drivers conduct trips to and from hubs of interstate travel, such as airports"). As addressed at length above, "the Supreme Court rejected [this argument] in *Yellow Cab*." *Davarci*, 2021 WL 3721374, at *11 (declining to follow *Haider* and *Islam* on this point); *see also Osvatics*, 535 F. Supp.3d at 21 (same); *Capriole*, 7 F.4th at 866 (the minority view "assign[s] too much weight to the fact that rideshare drivers occasionally perform interstate trips or trips to transportation hubs").

*Islam* and *Haider* (and Plaintiffs) also lean heavily on *Rittmann* and its First Circuit twin, *Waithaka*; but, as noted, those cases concern instances where, unlike here, drivers participated in an "unbroken chain of interstate commerce, all directed by" a single company, "whose business is indisputably interstate in nature." *Davarci*, 2021 WL 3721374, at *13 (finding *Rittmann* and *Waithaka* "entirely distinguishable" to Uber's airport trips); *see also Capriole*, 7 F.4th at 866 (observing *Islam* and *Haider* "do **not** consider

38

whether the trips form part of a single, unbroken stream of interstate commerce that renders interstate travel a 'central part' of a rideshare driver's job description").

Finally, *Islam* and *Haider* put considerable weight on the aggregate number of interstate trips Lyft performed. *See Islam*, 524 F. Supp.3d at 352 (noting Lyft's "tens of millions of interstate rides in the United States each year"); *Haider*, 2021 WL 1226442, at *3 (describing the "sheer number of interstate trips rideshare drivers make"). As other courts have since held, however, the raw number of interstate trips is not determinative. *See Davarci*, 2021 WL 3721374, at *11 ("Once the Court concludes that interstate trips are merely incidental to Uber drivers' local transportation function, there is no raw number of interstate trips that can transform them into workers who are engaged in interstate commerce"); *Osvatics*, 535 F. Supp.3d at 21 ("disagree[ing] with *Islam*'s and *Haider*'s analyses" for this reason).

In short, to support their contention that Uber drivers during the relevant period fall within the transportation-worker exemption, Plaintiffs urge a result contrary to the three Circuits and majority of district courts that have weighed in on the issue; rely on unduly broad standards from other contexts; make apples-to-oranges comparison of data; and lean on cases with materially different records. Discovery in this case, however, confirmed that interstate transportation was not a central part of Uber drivers' work for the relevant time period, that interstate commerce was not integral to the work they did, and that the drivers were not engaged in interstate commerce for purposes of Section 1. Accordingly, Plaintiffs' claims are subject to arbitration under the FAA.

**CONCLUSION**

For the foregoing reasons, Uber's second motion to compel arbitration is GRANTED and the case is STAYED pending arbitration between the parties.  The parties shall file a joint status letter with the Court within five days after arbitration is concluded.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 128.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: March 26, 2026
       New York, New York

Copies transmitted this date to all counsel of record.